## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KURT B. OLSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No._____ |
| | ) | |
| NANCY PELOSI, in her official capacity as Speaker of the United States House of Representatives; | ) ) ) ) | |
| | ) | |
| BENNIE G. THOMPSON, in his official capacity as Chair of the Select Committee to Investigate the January 6th Attack on the United States Capitol; | ) ) ) ) ) | |
| | ) | |
| ELIZABETH L. CHENEY, in her official capacity as a member of the United States House of Representatives; | ) ) ) | |
| | ) | |
| ADAM B. SCHIFF, in his official capacity as a member of the United States House of Representatives; | ) ) ) | |
| | ) | |
| JAMES B. RASKIN, in his official capacity as a member of the United States House of Representatives; | ) ) ) | |
| | ) | |
| SUSAN E. LOFGREN, in her official capacity as a member of the United States House of Representatives; | ) ) ) | |
| | ) | |
| ELAINE G. LURIA, in her official capacity as a member of the United States House of Representatives; | ) ) ) | |
| | ) | |
| PETER R. AGUILAR, in his official capacity as a member of the United States House of Representatives; | ) ) ) | |
| | ) | |
| STEPHANIE MURPHY, in her official capacity as a member of the United States House of Representatives; | ) ) ) | |
| | ) | |
| ADAM D. KINZINGER, in his official | ) | |

| | |
|---|---|
| capacity as a member of the United States | ) |
| House of Representatives; and | ) |
| | ) |
| SELECT COMMITTEE TO INVESTIGATE | ) |
| THE JANUARY 6th ATTACK ON THE | ) |
| CAPITOL OF THE UNITED STATES, a | ) |
| body established by the United States | ) |
| House of Representatives, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## COMPLAINT FOR DECLARATORY AND INJUCTIVE RELEIF

### INTRODUCTION

Abuses of the investigative process may imperceptibly lead to abridgement of protected freedoms. The mere summoning of a witness and compelling him to testify, against his will, about his beliefs, expressions or associations is a measure of governmental interference. . . . Those who are identified by witnesses and thereby placed in the same glare of publicity are equally subject to public stigma, scorn and obloquy. Beyond that, there is the more subtle and immeasurable effect upon those who tend to adhere to the most orthodox and uncontroversial views and associations in order to avoid a similar fate at some future time.

*Watkins v. United States,* 354 U.S. 178, 197-98 (1957)

1.      Plaintiff, Kurt B. Olsen, is an active attorney licensed to practice in Maryland and Washington D.C.  He was appointed Special Counsel to the Office of the Attorney General for the State of Texas ("OAG") to assist the OAG in representing the State of Texas in a suit before the United States Supreme Court. The purpose of this suit was to prevent dilution of the electoral-college votes of Texas in the 2020 Presidential election and uphold and enforce state and federal election law. *Texas v. Pennsylvania, et al*, 141 S. Ct. 1230 (2020). Eighteen other States and 126 Members of Congress joined or filed amicus briefs supporting Texas in that action.

2.      Among his other clients, Plaintiff also has an attorney-client relationship with former President Trump; Mike Lindell, who is currently engaged in litigation with Dominion Voting Systems, Inc. ("Dominion"); and proposed class representatives in a putative class action

2

pending against Dominion. That class action alleges Dominion engaged in an illegal campaign of intimidation and harassment against volunteer poll watchers and other Americans by threatening to wage Lawsuit Warfare ("Lawfare") against anyone who exposes or even speaks about fraud and illegal voting activity in the November 2020 election.[1]

3.     On March 1, 2022, Plaintiff received an email from the Senior Investigative Counsel for the U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol (the "Select Committee") asking whether he would accept service via email of a subpoena issued by Defendant Bennie G. Thompson, Chairman of the Select Committee.  In the alternative, the email stated that "If you are represented by counsel, please let me know his or her name and contact information and we will reach out as soon as possible." No subpoena was attached to that email. The email is attached hereto as Exhibit 1.

4.     Plaintiff's counsel received the subpoena (the "Subpoena") from the Select Committee's counsel on March 1, 2022. The Subpoena is attached hereto as Exhibit 2.

5.     The Subpoena compels Plaintiff to appear for a deposition and to produce a considerable number of documents that, among other things, unquestionably cover his provision of legal assistance to clients, as well as documents pertaining to his personal and political affairs.

6.     The Committee's investigation was fundamentally flawed from the outset. The resolution that established the Select Committee, House Resolution 503 ("H. Res. 503"), demonstrates that the Select Committee had already reached a predetermined conclusion without examination of the facts that those who attacked the Capitol on January 6, 2921, were "fueled by false narratives." H. Res. 503, Second Whereas Clause. That conclusion shows that the Select Committee had reached a predetermined conclusion that claims of election fraud in the

---

[1] https://en.wikipedia.org/wiki/Lawfare.

2020 election were false and that "false narratives" of election fraud contributed to the violence at the Capitol. The Select Committee prejudged what logically should be the central inquiry of its purported "investigation" – whether the claims of election fraud are accurate. H. Res. 503 §4 (B)

7.     The Select Committee has sought from the outset to report that President Trump (and others) committed crimes.

8.     As a consequence of this prejudgment, the Select Committee's reports will lack legitimacy and credibility because the central issue was predetermined before the Committee began its investigation. That the investigation is a partisan exercise is also shown by the fact that highly partisan Members appointed by Defendant Pelosi subscribed to that predetermined conclusion and are in complete control of this investigation. All of the appointees had previously voted to impeach President Donald Trump. Defendant Thompson has sued Mr. Trump for the avowed purpose of punishing him for purported unlawful actions. *Thompson v. Trump,* No. 1:21-cv-00400 (D.D.C. 2/16/21). Defendant Raskin had served as the lead manager for the House of Representatives in the second impeachment trial of Mr. Trump. Defendant Cheney had submitted a memorandum to her Republican colleagues in the House three days before the January 6, 2021, attack arguing that claims of election fraud had been debunked without acknowledging strong evidence to the contrary. The Cheney memorandum is attached as Exhibit 3.

9.     The Select Committee never intended for its investigation to be a balanced inquiry to determine the truth. An investigation with public hearings, subpoenas, and depositions devoted to confirming a predetermined conclusion is reminiscent of Soviet "show trials" intended to intimidate and silence political opponents.

4

10.     The Select Committee's investigation is not an exercise to develop "legislative facts."

11.     The Select Committee's true -- and improper -- partisan purpose is also to discourage, penalize, and criminalize speaking out about election fraud and/or illegal voting in the November 2020 election. Indeed, just three weeks ago, the Select Committee argued in a court filing that claiming that election fraud altered the result of the 2020 election could make one part of a "criminal conspiracy to defraud the United States in violation of 18 U.S.C. § 371." Congressional Defendants' Opposition to Plaintiff's Privilege Assertions, *Eastman v. Thompson,* No. 8:22-cv-00099, ECF No. 164-1 at 57 (C.D. Cal. 3/3/22) ("*Eastman,* 8:22-cv-00099, ECF No. 164-1 (C.D.Cal.)) They made that argument while ignoring clear evidence of outcome-determinative election fraud and illegal voting in the November 2020 election available to them at the time. Even since then additional evidence of election fraud continues to become public.

12.     For example, the potential for fraud with mail-in voting is well-known.  Indeed, the 2005 bipartisan Commission on Federal Election Reform concluded that "[a]bsentee ballots remain the largest source of potential voter fraud."[2] In the 2020 Presidential election, according to the Pew Research Center, a record number of votes—about 65 million—were cast via mail compared to 33.5 million mail-in ballots cast in the 2016 general election—an increase of more than 94 percent.  Indiscriminate mail-in balloting was particularly prevalent in battleground states such as Georgia, Michigan, Wisconsin, and Pennsylvania where non-legislative actors also usurped their legislatures' authority and unconstitutionally revised their state's election statutes, by disregarding the two strongest security measures designed to lessen fraud in mail-in voting—

---

[2] Commission on Federal Election Reform, *Building Confidence in U.S. Elections* §5.2 at 46 (2005) *available at* https://www.legislationonline.org-/download/id/1472/file/3b50795b2d0374cbef5c22976656.pdf.

signature verification and witness requirements—and mandating the profligate use of unmanned drop boxes.

13.     Courts in Wisconsin and Michigan subsequently ruled that such acts were illegal. *See Jefferson v. Dane County*, 394 Wis. 2d 602, 951 N.W.2d 556 (Wis. 2020) (Wisconsin officials, including Governor Evers, unlawfully told Wisconsin voters to declare themselves "indefinitely confined" -- thereby allowing over two hundred thousand voters to avoid signature and photo ID requirements). In On February 11, 2022, the Wisconsin Supreme Court upheld a stay on the employment of unmanned ballot drop boxes illegally used in the 2020 general election in violation of Wisconsin law. [3]  On March 9, 2021, the Michigan Court of Claims ruled that the Michigan Secretary of State unlawfully required election clerks to presume that voters' signatures were genuine, which violated Michigan law. *Genetski v. Benson*, Case No. 20-000216-MM, slip op. at 14 (Mich. Ct. Claims, March 9, 2021).

14.     On March 1, 2022, the Office of the Special Counsel ("OSC"), charged by Wisconsin Speaker of the Assembly to investigate the allegations of fraud and illegality in the Wisconsin 2020 general election, issued a damning 136-page Report after an eight-month investigation.  That Report detailed numerous instances of outcome-determinative voter fraud and felony crimes. The OSC called on Wisconsin's legislature to decertify its 2020 Presidential electors.[4]

---

[3] https://www.wpr.org/sites/default/files/2022ap91_02-11-22.pdf

[4] The Report of the Office of the Special Counsel can be found at
https://legis.wisconsin.gov/assembly/22/brandtjen/media/1552/osc-second-interim-report.pdf.

15.     Following the OSC's Report, on March 16, 2022, Wisconsin Speaker Vos publicly stated, "*I think there was widespread fraud [in Wisconsin] and I think we are going to see more and more data that comes out as [the OSC] continues his investigation*."[5] (Emphasis added).

16.     On February 7, 2022, Arizona Representative Mark Finchem introduced Arizona HCR 2033 to decertify Arizona's 2020 Presidential electors, signed by 13 other State Representatives and Senators, detailing a myriad of investigatory findings of outcome changing fraud and illegal votes in Arizona's 2020 and calling for the decertification of its 2020 Presidential electors.[6]

17.     Notably, Arizona HCR 2033 is based in part on seven-month long forensic audit of the Maricopa County, Arizona 2020 election which, despite Maricopa County officials having improperly withheld and deleted 2020 election records, found numerous anomalies and outcome-determinative illegal votes in the County[7] -- contrary to the misleading headline in the media reports that the audit confirmed Mr. Biden's win there.

18.     The Select Committee's investigation also ignores the conclusion of the National Academy of Sciences, Engineering & Medicine that "all digital information -- such as ballot definitions, voter choice records, vote tallies, or voter registration lists -- is subject to malicious alteration."[8] *See also Curling v. Raffensperger,* 493 F.Supp.3d 1264, 1280 (N.D. Ga. 10/11/2020) (finding that "a broad consensus now exists among the nation's cybersecurity experts recognizing

---

[5] https://wisconsinexaminer.com/brief/after-meeting-with-election-conspiracists-vos-says-decertification-impossible-but-reaffirms-belief-in-widespread-fraud/
[6] The Resolution can be found at https://www.azleg.gov/legtext/55leg/2R/bills/HCR2033P.pdf

[7] Cyber Ninjas, *Maricopa County Forensic Election Audit*, vol. III, at 6, 51, 10, 12-14, 20-21, 25-26, 29-30, 34-36 (Sept. 24, 2021) available at https://www.azsenaterepublicans.com/_files/ugd/2f3470_d36cb5eaca56435d84171b4fe7ee6919.pdf.

[8] National Academy of Sciences, Engineering & Medicine 2018, *Securing the Vote: Protecting American Democracy* 90 (Nat'l Acad. Press 2018) *available at* https://doi.org/10.17226/25120.

the capacity for the unobserved injection of malware into computer systems to circumvent and access key codes and hash values to generate fraudulent codes and data.")

19. In addition, the Select Committee ignored the findings in a public report unanimously approved by the Georgia Election Law Study Subcommittee of the Georgia Standing Senate Judiciary Committee. That report discussed a myriad of voting irregularities and potential fraud in the Georgia 2020 general election. The Subcommittee unanimously approved the report on December 30, 2020. The Executive Summary states that "[t]he November 3, 2020 General Election (the 'Election') was chaotic and any reported results must be viewed as untrustworthy". Exhibit 4.

20. On January 7, 2021, the DNI concluded in an unclassified memorandum that "CIA Management took actions 'pressuring [analysts] to withdraw their support' for findings regarding China's actions to "interfere" in the election. John Ratcliffe, Director of National Intelligence, *Views on Intelligence Community Election Security Analysis*, at 2 (Jan. 7, 2021). Exhibit  The DNI concluded that the CIA's actions violated Intelligence Community Tradecraft Standards. *Id.* The Committee's lack of curiosity on such issues involving national security and our elections speaks volumes.

21. These are but a few examples of clear evidence of outcome-determinative fraudulent or illegal voting in swing states in the November 2020 election that was public both before and after January 6, 2021. The Select Committee not only deliberately ignores the evidence but seeks to criminalize the discussion of it.

22. As Justice Clarence Thomas observed in *Republican Party of Pennsylvania v. DeGraffenreid,* 141 S. Ct. 732, 737 (2021) "the judicial system is not well-suited to address these kinds of [election fraud] questions in the short time period available immediately after an election

. . . ." Although the Select Committee has had ample time to investigate such questions, it has asserted that no evidence of election fraud and illegal voting in the 2020 Presidential election exists -- illustrating the fact that the Select Committee's true purpose is to intimidate individuals who might speak out on this topic, violating their First Amendment rights in the process.

23.     Ignoring the prospect that the 2020 Presidential election was altered by election fraud in light of the mounting evidence in support of that claim constitutes a dereliction of legislative responsibility. Indeed, in stark contrast, some Members of Congress, with virtually no justification, claimed that the 2016 Presidential election result was altered by collusion between Russia and the campaign of Mr. Trump. A special counsel was appointed by the Deputy Attorney General to investigate whether such collusion occurred. After three years and expenditure of more than $32 million, Special Counsel Robert Mueller reported that no evidence of collusion had been found. Unlike the Committee's investigation, the Mueller investigation into possible criminal activity was conducted by law enforcement officials, not a congressional committee and its staff, as the Constitution's separation-of--powers provisions require.

24.     The governmental efforts to stifle free speech and intimidate anyone who speaks out on election fraud is not limited to the Select Committee.  The U.S. Department of Homeland Security has taken similar action to intimidate anyone who would expose 2020 election fraud by issuing thinly veiled threatening "guidance" on "domestic extremism," which includes "sociopolitical developments such as narratives of fraud in the recent general election" as a marker.[9]

---

[9] Report *available at* https://www.dhs.gov/sites/default/files/2022-03/Report%20to%20the%20Secretary%20of%20Homeland%20Security%20Domestic%20Violent%20Extremism%20Internal%20Review%20Observations%2C%20Findings%2C%20and%20Recommendations.pdf.

25.     On July 28, 2021, the U.S. Department of Justice published "guidance" threatening states that conduct a forensic audit with criminal prosecution and civil action under federal statutes.[10]

26.     The Office of the Director of National Security issued a report on March 1, 2021, entitled *Domestic Violent Extremism Poses Heightened Threat in 2021.* It stated:

> Newer sociopolitical development – such as narratives of fraud in the recent general election, the emboldening impact of the violent breach of the US Capitol, conditions related to the COVID-19 pandemic, and conspiracy theories promoting violence – will almost certainly spur some [domestic violent extremists] to try to engage in violence this year.[11]

27.     The Subpoena was issued by Defendant Thompson as Chairman of the Committee. He is not a neutral and detached party as required by the warrant provision of the Fourth Amendment.

28.     In association with others who share Plaintiff's beliefs about the need for election integrity, including certain of his clients, and others who share a common interest in pending or anticipated litigation, Plaintiff has been and continues to be involved in efforts to investigate and raise awareness of fraud and illegal voting that occurred in the November 2020 election and to protect the constitutional rights of those who are concerned about such issues. They have been working together to alert the public and to petition their government for a redress of their grievances. Plaintiff insists on the right, protected by freedom of the press, to control his own message and the manner, timing and circumstances of the disclosure of the evidence which he and others have and continue to assemble about the 2020 election.  The Subpoena demands that Plaintiff place his attorney work product which assembles that evidence into the hands of partisan

---

[10] https://www.justice.gov/opa/press-release/file/1417796/download.

[11] Report *available at*
https://www.dhs.gov/sites/default/files/publications/21_0301_odni_unclass-summary-of-dve-assessment-17_march-final_508.pdf.

members of Congress who have demonstrated no interest in election fraud, but rather could use that information strategically by way of selective release, distortion, or other tactics of information warfare to minimize or defeat the effect its publication by Plaintiff.

29.     Some who have associated with Plaintiff to assist and inform his exercise of free speech and political expression have intentionally kept their association with him confidential out of fear that they will suffer retaliation, harassment, and loss of business or professional opportunities if their association with Plaintiff is made public.

30.     Enforcement of the Subpoena would violate Plaintiff's rights of freedom to associate with others to advance their shared beliefs, freedom of speech, and freedom of political expression, which are guaranteed by the First Amendment.

31.     In conducting its investigation, the Select Committee acted without authority because it is not validly organized as a House committee under the Rules of the United States House of Representatives, notably Rule X.5(a)(1) ("The standing committees shall be elected by the House . . . from nominations submitted by the respective party caucus or conference.").

32.     The Select Committee is also acting without authority because it does not satisfy the requirements of H. Res. 503 that established the Committee and is asserting authority to investigate matters unrelated to the causes of, and influencing factors contributing to, the events of January 6, 2021, when it has not been granted that authority.

33.     The Committee's investigation constitutes a thinly veiled effort to conduct an unauthorized criminal investigation by a handful of Members of Congress in violation of the separation-of-powers provisions of the Constitution and is otherwise not in furtherance of a valid legislative purpose.

34.     Indeed, on March 2, 2022, Defendants Thompson and Cheney issued a statement concluding that "[t}he facts we've gathered strongly suggest that Dr. [John] Eastman's emails may show that he helped Donald Trump advance a corrupt scheme to impede the transfer of power."[12] Once the Select Committee reaches such a conclusion, it has a duty to refer the matter, accompanied by the evidence it has gathered, to the Department of Justice for its investigation, if warranted. Continued investigation by the Select Committee of the alleged "corrupt scheme" and "conspiracy to impede the transfer of power" by the Select Committee would violate the separation-of-powers provisions of the Constitution, which assign the law enforcement function to the executive branch.

35.     The Subpoena makes no provision for Plaintiff's assertion of the attorney-client on behalf of his clients, which is required by law.

36.     Accordingly, Plaintiff brings this action seeking declaratory and injunctive relief to invalidate the Subpoena on constitutional and other grounds and to prohibit the enforcement of the Subpoena.

**PARTIES**

37.     Plaintiff, Kurt B. Olsen, is a resident of the State of Maryland a member of the Bar of that State, and the District of Columbia.

38.     Defendant Nancy Pelosi is a Member of the United States House of Representatives who is currently serving as Speaker of the House and, as Speaker, appointed the members of the Select Committee.

---

[12] https://january6th.house.gov/news/press-releases/Thompson-cheney-statement-filing-eastmen-lawsuit.

39.     Bennie G. Thompson is a Member of the United States House of Representatives who was appointed by Speaker Pelosi to chair the Select Committee. He issued the Subpoena.

40.     Defendants Elizabeth L. Cheney, Adam B. Schiff, James B. Raskin, Susan E. Lofgren, Elaine G. Luria, Peter R. Aguilar, Stephanie Murphy, and Adam D. Kinzinger are members of the United States House of Representatives who were appointed by the Speaker of the House to serve on the Select Committee.

## JURISDICTION AND VENUE

41.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 based upon Defendants' violations of Plaintiff's constitutional rights, as well as 28 U.S.C. §§2201 and 2202, which provides for declaratory judgments.

42.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the Subpoena was issued in the District of Columbia and the Committee's investigation is occurring there.

## FACTUAL BACKGROUND

43.     Following the events at the Capitol on January 6, 2021, Defendant Thompson on May 14, 2021, introduced H.R. 3233 to establish a National Commission to Investigate the January 6 Attack on the United States Capitol Complex. His bill would have established a bipartisan body of ten members with an equal number of Democrats and Republicans. The legislative proposal was approved by the House of Representatives but rejected by the Senate on May 28, 2021.

44.     After the Senate failed to pass H.R. 3233, Defendant Pelosi, as Speaker of the House of Representatives, introduced H. Res. 503 to establish the Select Committee. The resolution was approved by the House of Representatives on June 28, 2021. Unlike the failed H.R. 3233 that assured equal bipartisanship in the membership of a National Commission, H. Res. 503

directs the Speaker to appoint 13 members to the Select Committee of which only five "shall be appointed after consultation with the minority leader."

45.     The Minority Leader of the House nominated five members of his party to serve on the Select Committee, but Defendant Pelosi refused to appoint two of the five nominees of the Minority Leader. Instead, she appointed only nine members to the Select Committee. Two of the nine were Republican representatives who had voted to approve H. Res. 503 and whose appointments to the Committee were opposed by the Minority Leader.

46.     Following Defendant Pelosi's unprecedented rejection of nominees of the Minority Leader for membership on the Committee, the Minority Leader declined to participate in the investigation by the Committee, citing its excessive partisanship, its unprecedented composition, and the proclaimed preconceptions of the Committee members who had been appointed by Defendant Pelosi, including members who had voted to impeach President Donald J. Trump and had publicly accused him of unlawful conduct.

47.     As a result of Defendant Pelosi's actions, the Committee, which was to include eight Democrats chosen by the leadership of their party and five Republicans chosen by the leadership of their party as H. Res. 503 provided, instead consisted of four vacancies and a strikingly unbalanced partisan membership of seven Democrats chosen by their party leadership and two nominal Republicans not chosen by their party leadership but rather by Defendant Pelosi to produce further imbalance of the membership than H. Res. 503 had provided.

48.     H. Res. 503 assigns to the Select Committee the responsibility of investigating the facts, circumstances, and causes relating to the January 6, 2021, breach of the Capitol; identifying, reviewing, and evaluating the causes of, and the lessons learned from, the events at the Capitol on that day; investigating influencing factors that contributed to the January 6th events; and issuing a

final report to the House containing such findings, conclusions, and recommendations for corrective measures as it deems necessary. The Select Committee is not authorized to conduct any investigation that is not specified in H. Res. 503.

49.     Plaintiff was not present during the events that occurred at the Capitol on January 6, 2021.

50.     As early as the beginning of the Select Committee's investigation in June 2021, the Chairman and other members were aware of Plaintiff's meeting with then-Acting Attorney General Jeffrey Rosen.  Nonetheless, the Committee did not issue the Subpoena until nine months later on March 1, 2022, with an unreasonable return date for document production of March 15, 2022.

## COUNT I
## Violation of the Fourth Amendment

51.     Each of the foregoing paragraphs is incorporated as if fully set forth within this Count.

52.     The Subpoena cannot be enforced because it violates Plaintiff's right to the security of his property and privacy, to be protected against unreasonable searches and seizures, and to the issuance of a subpoena directed to him by a neutral and detached party, which rights are guaranteed by the Fourth Amendment.

53.     The Subpoena was issued by Defendant Thompson as Chairman of the Committee.

54.     On February 16, 2021, Defendant Thompson filed an action against former President Trump in the United States District Court for the District of Columbia in which he asserted that President Trump had committed unlawful acts for which he should be punished. *Thompson v. Trump,* No. 1:21-cv-00400 (2/16/2021), ECF No. 1, ¶¶ 8, 132, 141.

55.    On January 13, 2021, Defendant Thompson voted to impeach President Trump based on a House Resolution that stated, among other things, "President Trump repeatedly issued false statements asserting that the Presidential election results were the product of widespread fraud and should not be accepted by the American people or certified by State or Federal officials."[13]

56.    The statement in the Resolution that it is false to assert that "the Presidential election results were the product of widespread fraud" is contradicted by numerous publicly available findings made by, *inter alia*, state legislative representatives, or those acting at legislative bodies' direction.

57.    Defendant Thompson has publicly stated in a televised January 6, 2022, interview with the Washington Post:

> The Big Lie brought a lot of people to Washington under the guise of stopping the steal and they were weaponized at that rally to come to the Capitol and do just what they did. And Donald Trump has to be the principal author of what occurred because he invited people to Washington on January 6. And he said it was going to be wild and indeed it was wild.
>
> ***
>
> If you're seeing the United States Capitol under attack by people who you sent there and it takes you 187 minutes for you to say this is wrong, you need to go home, and as my vice chair has said, this borders on dereliction of duty and it might just necessitate a referral to the Department of Justice to take a look at. So we will not just with that but any other instance of we think illegal activity, we will refer – or criminal activity – we'll make a referral. So you can't just watch TV for 187 minutes and not expect people to think that you are complicit in what is going on by not trying to stop it.[14]

58.    The second provision of the Fourth Amendment, the warrant provision, requires that the decision to issue a warrant or subpoena be made by "a neutral and detached" party.

---

[13] https://www.congress.gov/bill/117th-congress/house-resolution/24/text.
[14] https://www.youtube.com/watch?y=BCxbcWAOVGQ.

59.     The warrant provision is applicable to all searches and seizures except those that have been permitted as exceptions to the warrant requirement by decisions of the United States Supreme Court, which exceptions do not include congressional subpoenas.

60.     Defendant Thompson is not a "neutral and detached" party for purposes of the warrant provision of the Fourth Amendment.

61.     The Subpoena violates Plaintiff's Fourth Amendment rights because it was issued by a party who was not "neutral and detached."

62.     The conjunction of Plaintiff's right to free association presents a hybrid situation in which his right protected by the Fourth Amendment and his rights protected by the First Amendment, as asserted in Count II of this Complaint, reinforce each other, making the Subpoena's intrusive demands qualitatively more offensive to the fundamental constitutional rights and laws that bind the House and its committees.

63.     The scope of the Subpoena is overbroad and intrusive. It would force disclosure of private communications between Plaintiff and persons with whom he has associated in pursuit of shared political objectives without regard for whether those communications relate to the authorized subject and purposes of the Committee's investigation. The Subpoena seeks access to information that Plaintiff has worked with others to assemble detailing fraud in the 2020 election so that Committee members and opponents of Plaintiff and those with whom he associates. Such forced disclosure would expose Plaintiff and his associates to harassment and retaliation for the exercise of their rights to exercise free speech, political expression, free association, freedom of the press, and to petition their government for the redress of grievances.

64.     The Fourth Amendment requires that items to be seized must be identified with particularity. The Subpoena's language demands the production of not simply documents

17

concerning the events of January 6, 2021, but also the production of documents and communications through the present date categorized only as: Election Fraud Claims, Meetings with State Officials, and Fee Arrangements. The breadth and generality of such a demand constitute a plain violation of the Fourth Amendment's particularity requirement.

65.     The Subpoena compels the production of records which are the property of Plaintiff and his clients and for which there has been no showing that they constitute instrumentalities of crime, the fruits of crime, or contraband.  The Subpoena carries a sweeping demand for records the disclosure of which would cause a substantial and illegal intrusion into the property and privacy rights of those communicating with Plaintiff and others with whom they have associated to advance shared beliefs.

66.     The broad reach of the disclosure requirements of the Subpoena would not pass constitutional muster in a criminal proceeding and should not be permitted in a congressional investigation. The Fourth Amendment provides a general right of property and privacy where any governmental compulsion is involved.

67.     The Subpoena, therefore, is unenforceable and invalid.

## COUNT II
## Violation of the First Amendment

68.     Each of the foregoing paragraphs is incorporated as if fully set forth within this Count.

69.     Plaintiff's rights to freedom of speech, press, freedom of association, and freedom of political expression are guaranteed by the First Amendment.

70.     The conjunction of Plaintiff's First Amendment rights and Fourth Amendment rights presents a hybrid situation in which those rights reinforce each other, making the Subpoena's

intrusive demands qualitatively more offensive to the fundamental law that binds the House and its committees.

71.     The Subpoena cannot be enforced because it violates Plaintiff's freedom of speech, press, freedom of association, and freedom of political expression guaranteed by the First Amendment.

72.     The Subpoena violates Plaintiff's First Amendment right to free association because its purpose and effect are to identify persons with whom Plaintiff has associated to advance their shared political beliefs as they relate to the conduct of the 2020 presidential election. Many of Plaintiff's associates wish to remain anonymous. The forced disclosure of their identity and participation in the association would chill and potentially end their willingness to continue their association with Plaintiff for the advancement of their shared political beliefs.

73.     The Subpoena violates Plaintiff's rights of freedom of speech, of political expression, of association, and of the press because it has the effect of chilling the exercise of those rights.

74.     Congress has no general or inherent authority to issue subpoenas for any purpose. Rather, its subpoena authority is strictly limited to inquiries in furtherance of its legislative function. Congress's authority does not extend to inquiries intended to develop information in support of criminal investigations or prosecutions, to merely bring facts to light, or to harass and intimidate private citizens or political opponents.

## COUNT III
## Violation of the Constitution's Separation of Powers

75.     Each of the foregoing paragraphs is incorporated as if fully set forth within this Count.

76.     From the inception of the Select Committee's investigation, the Select Committee and its members have pursued a law enforcement objective of the prosecution of former President Trump to prevent him from holding political office and to secure the prosecution of his associates, including Plaintiff, for violations of federal law.

77.     Every member of the Select Committee voted to impeach former President Trump on January 25, 2021, for allegedly, *inter alia*, "repeatedly issu[ing] false statements asserting that the Presidential election results were the product of widespread fraud and should not be accepted by the American people or certified by State or Federal officials."[15]

78.     Defendant Raskin served as lead manager of the House prosecution team in the second Senate impeachment proceeding of former President Trump.

79.     On March 2, 2022, the Committee filed its Congressional Defendants' Brief in Opposition to Plaintiff's Privilege Assertions in the case of *Eastman v. Thompson* in the United States District Court for the Central District of California in which it represented to the court that the Select Committee had concluded that John Eastman and former President Trump had violated 18 U.S.C. § 371, a criminal conspiracy statute. No. 8:22-CV-00099, ECF No. 164-1 at 57 (C.D.Cal.).

80.     On information and belief, the Select Committee and its staff have been cooperating with the U.S. Department of Justice and other law enforcement agencies in the investigation and prosecution of individuals suspected or accused of criminal offenses in connection with the events of January 6, 2021, at the Capitol.

81.     Even if the Committee had the authority to initiate an investigation that led to the discovery of what the Select Committee considered sufficient evidence to accuse Mr. Eastman and

---

[15] https://www.congress.gov/bill/117th-congress/house-resolution/24/text.

President Trump of conspiracy to commit a felony, the Select Committee was not authorized to continue its investigation of the alleged crime beyond that point but was obligated to refer the matter to the United States Department of Justice for further investigation, if appropriate. The Select Committee has no authority to continue its investigation of such alleged criminal activity.

82.     The Select Committee's investigation has become, if it had not been from the beginning, an unconstitutional law enforcement investigation.

83.     Congress and its committees may not conduct law enforcement investigations because such investigations violate the separation-of-powers provisions of the Constitution, which assign the law enforcement and prosecution functions to the executive and judicial branches.

84.     The investigation of Plaintiff by the Committee is, therefore, a violation of the First Amendment and must be enjoined.

**COUNT IV**
**Violation of H. Res. 503**

85.     Each of the foregoing paragraphs is incorporated as if fully set forth within this Count.

86.     Only a congressional committee that is duly organized by the respective chamber has the authority to issue subpoenas. The Select Committee fails to qualify as an authorized congressional committee because it is in substantial violation of the requirements of H. Res. 503, the purported source of its authority. H. Res. 503 does not grant any authority except to a committee that meets the conditions established by that resolution. The Select Committee fails to meet those conditions.

87.     Defendant Pelosi made the unprecedented decision of refusing to appoint two members of the House nominated by the Minority Leader to serve on the Select Committee to represent the Minority.

21

88.     The Committee has also conducted its investigation on the presupposition of its members that the claims of widespread election fraud in the 2020 Presidential election were not only false but fraudulent.

89.     The Select Committee's insistence that claims of election fraud create mistrust about the election itself and "undermine our democracy" reveals a bias that caused the Select Committee to ignore mounting evidence that the 2020 election in fact was affected by widespread fraud creates mistrust of our electoral process and undermines our democracy.

90.     The Select Committee's failure to this date to conduct any serious investigation of whether the claims of election fraud were accurate, coupled with the statements of Committee members that those claims are baseless and fraudulent, demonstrate a profound bias.

91.     The public was led to believe by statements of Select Committee members that it was established to develop the complete story of the events of January 6, 2021, and the causes of those events. The Select Committee, however, has chosen not to reveal extensive surveillance videotapes of those events that would contribute to the development of a complete story. Statements in the Select Committee's court filings that there is no evidence of outcome-determinative fraud or illegal voting in the 2020 Presidential election also demonstrates that it has no intention of developing a complete story. *Eastman,* No. 8:22-cv-00099, ECF No. 164-1 at 20-22.

92.     The possibility that election fraud may have altered the outcome of the 2020 Presidential election was so inconsistent with the preconceived assumptions of Select Committee members that its investigation from the outset was unbalanced and not in compliance with the directives in H. Res. 503.

93.     The Select Committee's refusal to conduct its investigation in accordance with the directives in H. Res. 503 makes the investigation an unauthorized and *ultra vires* undertaking.

94.     The Subpoena demands information related to events that occurred after January 6, 2021, and, therefore, unrelated to the events of that day. Such a demand is beyond the scope of the investigation that H. Res. 503 authorizes.

95.     Accordingly, the Select Committee's investigation of Plaintiff must be declared outside of its authority and the Subpoena unenforceable.

**COUNT V**
**Violation of the Rules of the House**

96.     Each of the foregoing paragraphs is incorporated as if fully set forth within this Count.

97.     The Subpoena is invalid because it was issued in violation of the Rules of the United States House of Representatives, particularly Rule X.5(a)(1), which requires bipartisanship in the appointment of House committees. This requirement is designed to prevent abuses by committees, particularly when an excess of partisanship would violate the fundamental rights of citizens with whom the committees engage.

98.     The Select Committee is not a committee authorized pursuant to the Rules of the House of Representatives to issue subpoenas because it was not established in compliance with those Rules.

99.     None of the members of the Select Committee was nominated by the Minority Leader of the House of Representatives.

100.    Each member of the Select Committee has publicly revealed a personal view that the outcome of the Committee's investigation is predetermined.

101.    The violations of the Rules of the House of Representatives go to the very legitimacy of the Select Committee and render its investigation and the issuance of the Subpoena *ultra vires.*

## COUNT VI
## Absence of Legitimate Legislative Purpose

102.    Each of the foregoing paragraphs is incorporated as if fully set forth within this Count.

103.    Issuance of the Subpoena by Chairman Thompson was *ultra vires* because it was not in furtherance of a legitimate legislative purpose.

104.    The Subpoena purports to be a legislative subpoena. Congress has no inherent or general power to issue subpoenas but may do so only in furtherance of a legitimate legislative purpose. A legislative subpoena must be issued in furtherance of a legitimate legislative purpose.

105.    A legislative subpoena cannot qualify as a legitimate exercise of legislative power merely by virtue of the appropriateness of the investigation that being pursued. A legislative subpoena may be improper even when issued in the course of an otherwise proper congressional investigation. Each legislative subpoena must be assessed individually, to determine whether the information it demands is sought in furtherance of a legitimate legislative purpose.

106.     The Select Committee has no authority to require the production and disclosure of the identities and the private communications of individuals who did not have any involvement in the January 6, 2021, events at the Capitol or who have no reasonable nexus to the authorized scope of the Committee's investigation.

107.    Exposing private communications for the mere sake of exposure, which is the purpose and effect of the Subpoena, does not justify the issuance of a legislative subpoena.

24

108.    Enforcement of criminal laws, which is a peculiar function of the Executive Branch, does not justify the issuance of a legislative subpoena. The U.S. Department of Justice has special rules governing the issuance of subpoenas directed to attorneys given the inherent dangers posed to the judicial system and fundamental constitutional rights by such subpoenas. *See* U.S. Department of Justice Manual 9-13.410.

109.    The Subpoena is unauthorized, invalid, and unenforceable because it has no legitimate legislative purpose. The information it seeks is calculated to expose information for the mere sake of exposure, to discover the identity, tactics, and organization of citizens outraged by the 2020 election fraud, to harm the Committee's political opponents, to assist ongoing criminal investigations and prosecutions by the U.S. Department of Justice, to inflict harm upon Plaintiff and those he has associated with to exercise constitutional rights, and most of all to obtain partisan political advantage. None of these are legitimate purposes for a legislative subpoena.

### COUNT VII
### Assertion of Attorney-Client Privilege and Attorney
### Work Product Protection Must Be Assured

110.    Each of the foregoing paragraphs is incorporated as if fully set forth within this Count.

111.    In the alternative, even if the Subpoena were properly issued, it improperly requires the production of records of private communications without providing an opportunity for Plaintiff to review those records to determine whether they involve privileged attorney-client communications or are subject to protection under the attorney work product doctrine.

112.    Recipients of congressional subpoenas retain their right to assert al common law, statutory, and constitutional privileges. Plaintiff is entitled on behalf of his clients to assert any

applicable privileges and constitutional rights regarding communications covered by the Subpoena's requirements.

113.    To the extent the Subpoena requires production of documents and testimony regarding communications covered by the Subpoena without allowing review by Plaintiff and his clients for attorney-client privilege and attorney work product protection and an opportunity to assert objections, the Subpoena is invalid and unenforceable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Defendants, and order the following relief:

a.   Entry of a declaratory judgment that the Subpoena violates Plaintiff's right to property and privacy guaranteed by the Fourth Amendment because defendant Thompson, who issued the Subpoena, was not a neutral and detached party and the Subpoena is overbroad;

b.   Entry of a declaratory judgment that the Subpoena violates the right to free speech, political expression, free association, and petition for redress of grievances guaranteed to Plaintiff by the First Amendment;

c.   Entry of a declaratory judgment that the actions of Defendant Thompson in issuing the Subpoena and of the Select Committee in conducting its investigation were unlawful, invalid, and *ultra vires* because the Select Committee is organized and is functioning in violation of the Rules of the United States House of Representatives;

d.    Entry of a declaratory judgment that the Select Committee fails to meet the requirements of House Resolution 503, by which it was established and, therefore, lacks authority to enforce the Subpoena and to conduct its investigation;

e.      Entry of a declaratory judgment that the Subpoena is invalid and unenforceable because it does not serve a legitimate legislative purpose;

f.      Entry of an order quashing the Subpoena as unlawful and invalid and prohibiting its enforcement;

g.      Entry of an order granting Plaintiff the opportunity to assert appropriate attorney-client privilege and attorney work production claims in response to the Subpoena;

h.      An award of costs and attorneys' fees incurred in this proceeding; and

i.      Such other relief as the Court deems just and proper.

## **VERIFICATION**

I swear and verify under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing statements of fact are true and correct to the best of my knowledge, information, and belief.

Dated: March 23, 2022                    _____

                                          Kurt B. Olsen

DATED:  March 23, 2022.

By _____
Patrick M. McSweeney
**MᴄSᴡᴇᴇɴᴇʏ, Cʏɴᴋᴀʀ & Kᴀᴄʜᴏᴜʀᴏғғ, PLLC**
Patrick M. McSweeney*
Christopher I. Kachouroff*
13649 Office Place, suite 101
Woodbridge, VA 22192
Telephone: (804) 937-0895
patrick@mck-lawyers.com
chris@mck-lawyers.com
*Counsel for Plaintiff Kurt B. Olsen*

*** To be admitted Pro Hac Vice***


Charles Burnham, Esq.
DC Bar # 1003464
1424 K St. NW Suite 500
Washington, D.C. 20005
202.386.6920
202.390.7587 F
charles@burnhamgorokhov.com

# Exhibit 1

 Gmail

Patrick McSweeney <patrick@mck-lawyers.com>

## Fwd: U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol

4 messages

**Kurt Olsen** <ko@olsenlawpc.com>
To: Pat McSweeney <patrick@mck-lawyers.com>

Tue, Mar 1, 2022 at 1:25 PM

Get Outlook for iOS

**From:** George, Dan <Dan.George@mail.house.gov>
**Sent:** Tuesday, March 1, 2022 12:24:20 PM
**To:** ko@klafterolsen.com <ko@klafterolsen.com>
**Subject:** U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol

Mr. Olsen --

I am a Senior Investigative Counsel for the U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol. The Select Committee is seeking your deposition testimony and documents relevant to issues it is examining. Please confirm whether you are willing to accept service of a subpoena over email. If you are represented by counsel, please let me know his or her name and contact information and we will reach out as soon as possible.

Thanks,
Dan

Daniel George

Senior Investigative Counsel

Select Committee to Investigate the January 6th Attack

on the United States Capitol

U.S. House of Representatives

The information in this transmittal may be legally privileged, confidential, and/or otherwise protected by law from disclosure, and is intended only for the recipient(s) listed above. If you are neither the intended recipient(s) nor a person responsible for the delivery of this transmittal to the intended recipient(s), you are hereby notified that any distribution or copying of this transmittal is prohibited. If you have received this transmittal in error, please notify Klafter Lesser, LLP immediately at (914) 934-9200 or by return e-mail and take the steps necessary to delete it completely from your computer system. Thank you.

**Patrick McSweeney** <patrick@mck-lawyers.com>
To: Dan.George@mail.house.gov
Cc: Kurt Olsen <ko@klafterolsen.com>, Chris Kachouroff <chris@mck-lawyers.com>

Tue, Mar 1, 2022 at 2:20 PM

Mr. George,

Chris Kachouroff and represent Mr. Olsen. Please direct all communications concerning Mr. Olsen to me, including the subpoena that you refer to. I will accept service on Mr. Olsen's behalf.

Best regards,

Pat McSweeney

[Quoted text hidden]

--
*Patrick M. McSweeney*
*McSweeney, Cynkar & Kachouroff, PLLC*
3358 John Tree Hill Road
Powhatan, VA 23139
(804) 937-0895
FAX (877) 598-4668

NOTICE: If you are not the intended recipient of this message, you are not authorized to use the information contained in this message in any manner. Please delete this email and notify the sender of this inadvertent transmission by return email.

---

**George, Dan** <Dan.George@mail.house.gov>
To: Patrick McSweeney <patrick@mck-lawyers.com>
Cc: Chris Kachouroff <chris@mck-lawyers.com>

Tue, Mar 1, 2022 at 3:13 PM

Thank you, Mr. McSweeney, for agreeing to accept service. The subpoena to Mr. Olsen is attached to this email.

Please let me know if you would like to discuss, I'd be happy to anytime.

Thanks,
Dan

[Quoted text hidden]

📄 **2022-03-01-Subpoena-Signed-Final-Olsen, Kurt B..pdf**

1048K

Tue, Mar 1, 2022 at 3:49 PM

**Patrick McSweeney** <patrick@mck-lawyers.com>
To: "George, Dan" <Dan.George@mail.house.gov>
Cc: Chris Kachouroff <chris@mck-lawyers.com>

I will contact you. I appreciate your offer.

Sent from my iPhone

On Mar 1, 2022, at 3:13 PM, George, Dan <Dan.George@mail.house.gov> wrote:

[Quoted text hidden]
<2022-03-01-Subpoena-Signed-Final-Olsen, Kurt B..pdf>

Exhibit 2

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Kurt B. Olsen

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 1540A Longworth House Office Building, Washington, DC 20515

Date: March 15, 2022          Time: 10:00 AM

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: United States Capitol Building, Washington, DC 20515, or by videoconference

Date: March 24, 2022          Time 10:00 AM

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____          Time _____

*To* any authorized staff member or the United States Marshals Service

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 1st day of March , 2022 .

_____
*Chairman or Authorized Member*

Attest:

_____
*Clerk*

# PROOF OF SERVICE

Subpoena for

Kurt B. Olsen

Address 13317 Drews Ln Potomac MD 20854

before the  Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

Served by (print name)

Title

Manner of service

Date

Signature of Server

Address



BENNIE G. THOMPSON MISSISSIPPI
CHAIRMAN

One Hundred Seventeenth Congress

Select Committee to Investigate the January 6th Attack on the United States Capitol

March 1, 2022

VIA ELECTRONIC AND U.S. MAIL

Kurt Olsen
13317 Drews Ln
Potomac, MD 20854

Dear Mr. Olsen:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce the documents set forth in the accompanying schedule by March 15, 2022, and to appear for a deposition on March 24, 2022.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations.

The Select Committee's investigation has revealed credible evidence that you publicly promoted claims that the 2020 presidential election was fraudulent and participated in attempts to disrupt or delay the certification of the results. For example, just days before the January 6th attack on the U.S. Capitol, you contacted various high-level officials at the Department of Justice at the former President's "direct[ion]" to discuss filing a last-minute challenge to the election based on a similar case that the Supreme Court had already rejected.[1] In addition, you reportedly prepared a draft executive order for former President Trump that would have directed the U.S. Department of Justice "to take voter action,"[2] and, according to materials on file with the Select Committee, you had multiple telephone calls with former President Trump on January 6, 2021.[3]

---

[1] Documents on File with the Select Committee; *see also Trump Asked His AG about Legal Strategy to Overturn Election, Rosen Tells Senators*, Politico (Aug. 10, 2021), available at
https://www.politico.com/news/2021/08/10/trump-asked-ag-overturn-election-503341.
[2] Michael Wolff, LANDSLIDE: THE FINAL DAYS OF THE TRUMP PRESIDENCY (2021) 126.
[3] Documents on File with the Select Committee.

Mr. Kurt Olsen
Page 2

     Accordingly, the Select Committee seeks documents and a deposition regarding these and other matters that are within the scope of the Select Committee's inquiry. A copy of the rules governing Select Committee depositions, and document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

     Sincerely,

Bennie G. Thompson
Chairman

Mr. Kurt Olsen
Page 3

SCHEDULE

In accordance with the attached definitions and instructions, you, Kurt Olsen, are hereby required to produce all documents and communications in your possession, custody, or control—including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal accounts, and/or on personal applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period September 1, 2020, to present.

### Election Fraud Claims

1.  All documents supporting the claim that votes were sent to Spain or Germany to be counted in connection with the November 2020 election.

2.  All documents supporting the claim that Dominion voting machines "flipped" or "switched" votes from one candidate to another in the November 2020 election.

3.  All documents supporting the claim that that any voting system deleted or lost votes, changed votes, or was in any way compromised in the November 2020 election.

4.  All documents supporting the claim that algorithms were used to switch votes or manipulate vote counts during the November 2020 election.

5.  All documents supporting the claim that Smartmatic software was used on any voting machine during the November 2020 election.

6.  All documents supporting the claim that software used during the November 2020 election was developed in Venezuela.

7.  All documents supporting the claim that identical numbers of votes were "injected into the system" at the same time in different states after the polls closed on November 3, 2020.

8.  All documents supporting the claim that "spikes" in ballot processing numbers demonstrate that election results were manipulated in Michigan or any other state in the November 2020 election.

9.  All documents supporting the claim that dead people voted in the November 2020 election.

10. All documents supporting the claim that individuals who were not registered to vote voted in the November 2020 election.

11. All documents supporting the claim that there were more votes than registered voters in any state or precinct in the November 2020 election.

12. All documents supporting the claim that Italian satellites were used to hack voting systems used in the November 2020 election.

13. All documents supporting the claim that voting machines were manipulated using smart thermostats controlled by the Chinese government in the November 2020 election.

Mr. Kurt Olsen
Page 4

14.   All documents supporting the claim that any mail-in ballots were counted more than once in the November 2020 election.

15.   All documents supporting the claim that votes cast for Donald Trump were deleted, discarded, or not counted during the November 2020 election.

16.   All documents reflecting communications with you refuting, rejecting, or challenging any claim of election fraud made by you or other representatives of the Trump campaign with respect to the 2020 election.

**Meetings with State Election Officials**

17.   All documents relating to, referring to, or constituting communications between you or any other representative of former President Trump or the Trump campaign and any elected or appointed state official in any State, including, but not limited to, Texas, Michigan, Georgia, Pennsylvania, and Arizona, between October 1, 2020, and January 6, 2021.

18.   All documents relating or referring to presentations made by you, or any other representative of the Trump campaign, to any state official or legislature regarding the November 2020 election.

**Election Certification**

19.   All documents related to strategies or options for ensuring the certification of President Trump as the victor of the 2020 presidential election, whether by rejecting electoral votes or otherwise; for ensuring the reelection of President Trump in a contingent House election held pursuant to the terms of the Twelfth Amendment to the Constitution of the United States; or for delaying the counting of electoral votes on January 6, 2021.

**Seizure of Voting Machines**

20.   All documents relating or referring to the proposed seizure of voting machines by the federal government, including, but not limited to, communications with any government official regarding the seizure of voting machines, any records of meetings at which the topic was discussed, any authority supporting such a seizure, or any information suggesting that the federal government lacks the lawful authority to seize voting machines.

21.   All documents relating or referring to any other means of acquiring voting machines or data from voting machines, by you or any representative of former President Trump or the Trump campaign, including but not limited to efforts to subpoena voting machines or access voting machines in person.

22.   All documents relating or referring to the invocation of the Insurrection Act or martial law in connection with the results of the 2020 presidential election.

**Contact with Department of Justice Officials**

23.   All documents relating to, referring to, or constituting communications you had with any official of the U.S. Department of Justice regarding litigation seeking to delay or reverse the certification of the 2020 presidential election results in any state.

Mr. Kurt Olsen
Page 5

24.     All documents relating to, referring to, or constituting communications you had with any
        state attorney general or state attorney general staff regarding litigation seeking to delay or
        reverse the certification of the 2020 presidential election results in any state.

25.     All documents relating to, referring to, or constituting communications you had regarding
        any proposed executive orders relating to the U.S. Department of Justice in connection
        with the 2020 presidential election.

**Events of January 6, 2021**

26.     All documents relating to, referring to, or constituting communications you had with
        former President Trump or anyone else on the White House staff on January 6, 2021.

**Fee Arrangements**

27.     All fee agreements provided to you, signed by you, or signed by others but under which
        you provided any legal services related to any of the election fraud claims or election
        certification issues listed above.

28.     All records of fees you charged, and any fees you collected, for any services you provided
        related to any of the election fraud claims or election certification issues listed above,
        including the source of funds, which should include name of sending party, bank name and
        account number from which funds were wired, the date paid, and the amount received.  If
        funds were not wired from a financial institution, provide the name of the sending party,
        and the mechanism for transfer of value to cover the fee.

29.     Any other agreement, record, or other communication reflecting the retention of your legal
        services related to any of the election fraud claims or election certification issues listed
        above.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1. In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2. Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee").

3. In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4. The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5. Electronic document productions should be prepared according to the following standards:

   a. If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   b. All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

   BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6.  Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.  Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.  When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.  The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10. The pendency of or potential for litigation shall not be a basis to withhold any information.

11. In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14. In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16. If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18. All documents shall be Bates-stamped sequentially and produced sequentially.

19. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.    The term "communication" means each manner or means of disclosure or
      exchange of information, regardless of means utilized, whether oral, electronic,
      by document or otherwise, and whether in a meeting, by telephone, facsimile,
      mail, releases, electronic message including email (desktop or mobile device), text
      message, instant message, MMS or SMS message, message application, through a social
      media or online platform, or otherwise.

3.    The terms "and" and "or" shall be construed broadly and either conjunctively or
      disjunctively to bring within the scope of this request any information that might
      otherwise be construed to be outside its scope. The singular includes plural number,
      and vice versa. The masculine includes the feminine and neutral genders.

4.    The term "including" shall be construed broadly to mean "including, but not limited
      to."

5.    The term "Company" means the named legal entity as well as any units, firms,
      partnerships, associations, corporations, limited liability companies, trusts,
      subsidiaries, affiliates, divisions, departments, branches, joint ventures,
      proprietorships, syndicates, or other legal, business or government entities over
      which the named legal entity exercises control or in which the named entity has any
      ownership whatsoever.

6.    The term "identify," when used in a question about individuals, means to
      provide the following information: (a) the individual's complete name and title;
      (b) the individual's business or personal address and phone number; and (c)
      any and all known aliases.

7.    The term "related to" or "referring or relating to," with respect to any given
      subject, means anything that constitutes, contains, embodies, reflects, identifies,
      states, refers to, deals with, or is pertinent to that subject in any manner
      whatsoever.

8.    The term "employee" means any past or present agent, borrowed employee,
      casual employee, consultant, contractor, de facto employee, detailee,
      assignee, fellow, independent contractor, intern, joint adventurer, loaned
      employee, officer, part-time employee, permanent employee, provisional
      employee, special government employee, subcontractor, or any other type of
      service provider.

9.    The term "individual" means all natural persons and all persons or entities
      acting on their behalf.

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 6 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

117TH CONGRESS REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,
Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.

Sincerely,

JAMES P. McGOVERN,
*Chairman, Committee on Rules.*

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,
Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.

Sincerely,

JAMES P. McGOVERN,
*Chairman,
Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.



# H. Res. 8

## *In the House of Representatives, U. S.,*

*January 4, 2021.*

*Resolved,*

### SECTION 1. ADOPTION OF THE RULES OF THE ONE HUNDRED SIXTEENTH CONGRESS.

The Rules of the House of Representatives of the One Hundred Sixteenth Congress, including applicable provisions of law or concurrent resolution that constituted rules of the House at the end of the One Hundred Sixteenth Congress, are adopted as the Rules of the House of Representatives of the One Hundred Seventeenth Congress, with amendments to the standing rules as provided in section 2, and with other orders as provided in this resolution.

### SEC. 2. CHANGES TO THE STANDING RULES.

(a) CONFORMING CHANGE.—In clause 2(i) of rule II—

(1) strike the designation of subparagraph (1); and

(2) strike subparagraph (2).

(b) OFFICE OF DIVERSITY AND INCLUSION AND OFFICE OF THE WHISTLEBLOWER OMBUDS.—

16

**SEC. 3. SEPARATE ORDERS.**

(a) MEMBER DAY HEARING REQUIREMENT.—During
the first session of the One Hundred Seventeenth Congress,
each standing committee (other than the Committee on Eth-
ics) or each subcommittee thereof (other than a subcommittee
on oversight) shall hold a hearing at which it receives testi-
mony from Members, Delegates, and the Resident Commis-
sioner on proposed legislation within its jurisdiction, except
that the Committee on Rules may hold such hearing during
the second session of the One Hundred Seventeenth Con-
gress.

(b) DEPOSITION AUTHORITY.—

(1) During the One Hundred Seventeenth Congress,
the chair of a standing committee (other than the Com-
mittee on Rules), and the chair of the Permanent Select
Committee on Intelligence, upon consultation with the
ranking minority member of such committee, may order
the taking of depositions, including pursuant to sub-
poena, by a member or counsel of such committee.

(2) Depositions taken under the authority pre-
scribed in this subsection shall be subject to regulations
issued by the chair of the Committee on Rules and print-
ed in the Congressional Record.

(c) WAR POWERS RESOLUTION.—During the One Hun-
dred Seventeenth Congress, a motion to discharge a measure
introduced pursuant to section 6 or section 7 of the War

Exhibit 3

FROM: Rep. Liz Cheney (R-WY)
TO: House Republican Colleagues
DATE: January 3, 2021
RE: 2020 Presidential Election Challenges in Arizona, Georgia, Michigan, Nevada, Pennsylvania and
Wisconsin, and Our Constitutional Process

---

# 2020 Presidential Election Challenges in Arizona, Georgia, Michigan, Nevada, Pennsylvania and Wisconsin, and Our Constitutional Process

In connection with our recent Conference meeting, a number of members have requested further information on how precisely Article II and the 12th Amendment to our Constitution address Congress' role and responsibilities in counting electoral votes.  Others have sought additional information on the election challenges in each of the six states at issue, and how the judges hearing these cases have ruled. The following summary begins by addressing the Constitutional issues, then provides excerpts from and a description of the principal judicial decisions in each of the states.  As you will see, there is substantial reason for concern about the precedent Congressional objections will set here.  By objecting to electoral slates, members are unavoidably asserting that Congress has the authority to overturn elections and overrule state and federal courts.  Such objections set an exceptionally dangerous precedent, threatening to steal states' explicit constitutional responsibility for choosing the President and bestowing it instead on Congress.  This is directly at odds with the Constitution's clear text and our core beliefs as Republicans. Democrats have long attempted, unconstitutionally, to federalize every element of our nation—including elections.  Republicans should not embrace Democrats' unconstitutional position on these issues.

The recent proposal for a new "Commission" is even more problematic.  It is not reasonable to anticipate that any commission so formed could wrap up its work in 10 days; indeed, the subsequent debate at both the state and federal level would likely require months.  Did those proposing a new commission realize that they were in essence proposing to delay the inaugural?  Did they mean to set up a new future precedent where the inaugural is delayed and we have an "Acting President?"  For how long?  Who decides when that process is over?  Will that require another Act of Congress?  Could the Acting President veto any such future Congressional action?  If Congress has authority to create such a commission now, are state elections, recounts and state law legal challenges just "make-work" until Congress gets around to investigating and deciding who should be President?  Members who support the new commission proposal may need to answer each of these questions.  And in particular, Members should be prepared to answer how such a commission would be justified by the actual text of our founding documents.

### Article II and the 12th Amendment

Article II and the 12th Amendment to our Constitution govern how our Republic selects the President of the United States.  Although the Framers considered whether to confer the power to select the President upon the Congress of the United States, that proposal was specifically rejected.  Instead, the Framers conferred that specific power upon the States and the People.  Article II creates the Electoral College, and provides that "[e]ach state shall appoint, in such manner as the Legislature thereof may direct, a number of electors, equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress."  "The person having the greatest Number of [Electoral College] votes for President, *shall be the President*."

In accordance with Article II, every State Legislature has enacted a set of rules governing the manner in which the election of the President in that State will be conducted and how electors will be selected. Those laws not only instruct state election officials how to conduct elections (and explicitly delegate authority to those officials for that purpose), but also set forth a state law process for challenging an election when problems arise. The legal processes for challenging the election vary state to state, but generally provide a procedure for recounts and audits, and an opportunity to litigate disputed issues in state court. In certain circumstances, it may be possible to bring an appropriate claim in Federal Court as well (for example, if a State has violated the U.S. Constitution or federal law), but Federal Courts are bound to observe the Constitutional limits on their jurisdiction (under Article III).

Because Article II commits to the States the authority and responsibility to conduct the election for President, and because State Legislatures have (consistent with Article II) provided a specific manner for challenging a Presidential election, allegations of election irregularities, fraud or other illegality must be resolved in accordance with those state laws. This is our Constitutional process and the rule of law. To date, dozens of cases challenging the 2020 Presidential election have been litigated in the six states at issue. Many judges (including multiple federal judges appointed by President Trump himself), have already directly addressed the subject matter of objections members intend to make. For instance, multiple judges have ruled state election officials *were not* acting contrary to state election laws. And multiple judges have found that allegations about Dominion voting machines and other issues *are not* supported by evidence. (See the excerpts and summaries in Sections I and II below.)

In addition to committing the power and responsibility for selecting the President to the People of the States, Article II and the 12th Amendment also explicitly identify the exceptionally limited role of Congress in this process. First, "the President of the Senate shall receive certified copies of the electoral votes from each state" and "in the presence of the Senate and House of Representatives, open all the certificates." The votes "shall then be counted." Nothing in Article II, the 12th Amendment or any other Constitutional text provides for any debate, objection or discretionary judgments by Congress in performing the ministerial task of counting the votes. Nothing in the Constitution remotely says that Congress is the court of last resort, with the authority to second-guess and invalidate state and federal court judicial rulings in election challenges. Indeed, the Constitutional text reads: "The person having the greatest Number of [Electoral College] votes for President, shall be the President." It does not say: "The person having the greatest Number of [Electoral College] votes for President, shall be the President, *unless Congress objects or Congress wants to investigate.*" The Constitution identifies specifically the *only* occasions when Congress can take any non-ministerial action – when no Presidential candidate has a majority of the electoral votes: "[I]f no person have such majority [of the electoral votes counted], then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President….." Thus, the Constitutional text tells us very clearly what Congress' role is and is not.

For most of our nation's history, the Framers' straight-forward instructions regarding selection of the President prevailed. In the aftermath of our nation's Civil War, officials in certain Reconstruction Era state governments submitted competing slates of electors. In 1887, Congress sought to resolve those issues by enacting the Electoral Count Act. A principal provision of that Act instructs that a certificate identifying the Electoral College electors and their votes received from the Governor of a state shall be regarded as "conclusive." 3. U.S.C. § 5. 6. Although the Constitutionality of that Act has been the subject of substantial debate, here there is no dispute that each Governor of the six states at issue submitted an official certification of the election, and those electors' votes have been transmitted to this Congress. Thus, under the Electoral Count Act, those certificates are conclusive and must be counted. There is no discretion to do otherwise under that Act. Accordingly, both the clear text of the Constitution and the Electoral Count Act compel the same conclusion – there is no appropriate basis to object to the electors from any of the six states at issue.

Section I below identifies the conclusions reached by the courts hearing the principal election challenges in the six states at issue. Section II provides more detailed descriptions of the cases, and further excerpts of the judges' reasoning.

### SECTION I: Conclusions Reached by State and Federal Judges in the Six States:

#### Arizona State Trial Court:

"There is no evidence that the manner in which signatures were reviewed was designed to benefit one candidate or another, or that there was any misconduct, impropriety, or violation of Arizona law with respect to the review of mail-in ballots."

#### Arizona Supreme Court:

"[T]he challenge fails to present any evidence of "misconduct," "illegal votes" or that the Biden Electors "did not in fact receive the highest number of votes for office," let alone establish any degree of fraud or a sufficient error rate that would undermine the certainty of the election results ...."

#### Federal Courts in Arizona:

"The allegations they put forth to support their claims of fraud fail in their particularity and plausibility. Plaintiffs append over three hundred pages of attachments, which are only impressive for their volume. The various affidavits and expert reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections."

"The Complaint is equally void of plausible allegations that Dominion voting machines were actually hacked or compromised in Arizona during the 2020 General Election..... Rather, what is present is a lengthy collection of phrases beginning with the words "could have, possibly, might," and "may have.""

"Plaintiffs next argue that they have expert witnesses who can attest to widespread voter fraud in Arizona.... These innuendoes fail to meet Rule 9(b) standards. But perhaps more concerning to the Court is that the 'expert reports' reach implausible conclusions, often because they are derived from wholly unreliable sources."

"Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court. They most certainly cannot be the basis for upending Arizona's 2020 General Election. The Court is left with no alternative but to dismiss this matter in its entirety."

#### State Courts in Georgia:

"[T]he Complaint's factual allegations do not plausibly support his claims. The allegations in the Complaint rest on speculation rather than duly pled facts."

"[Georgia law] provides that a petition for an election contest must set for the grounds for the election context. [Georgia law] further provides that it must set forth such facts as are necessary to 'provide a full particular and explicit statement of the cause of contest.' Georgia's Supreme Court has interpreted this to require a contestant to allege and prove a factual basis showing grounds for an election contest and to prohibit a contestant from basing a contest on a mere speculative belief that an error has occurred. See Ellis v. Johnson, 263 Ga. 514 (1993). Plaintiffs' Complaint does not meet this requirement as it does not recite facts or evidence but relies on speculation as to this belief that an error in the election has occurred. Therefore, his complaint is dismissed for failure to state a claim."

**Federal Courts in Georgia** (Trump-appointed Federal Judge Grimberg, affirmed by panel including Trump-appointed Federal Appellate Judge Lagoa)

"Even assuming Wood possessed standing, and assuming Counts I and II are not barred by laches, the Court nonetheless finds Wood would not be entitled to the relief he seeks."

"[Plaintiffs'] argument is that the procedures in the Settlement Agreement regarding information and signature match so overwhelmed ballot clerks that the rate of rejection plummeted and, *ergo*, invalid ballots were passed over and counted. This argument is belied by the record; the percentage of absentee ballots rejected for missing or mismatched information and signature is the exact same for the 2018 election and the General Election (.15%)."

*Electors Clause*: "Wood argues Defendants violated the Elections and Electors Clauses because the 'procedures set forth in the [Settlement Agreement] for the handling of defective absentee ballots is not consistent with the laws of the State of Georgia, and thus, Defendants' actions . . . exceed their authority.' ... State legislatures—such as the Georgia General Assembly—possess the authority to delegate their authority over elections to state officials in conformity with the Elections and Electors Clauses. Recognizing that Secretary Raffensperger is "the state's chief election official," the General Assembly enacted legislation permitting him (in his official capacity) to "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). The Settlement Agreement is a manifestation of Secretary Raffensperger's statutorily granted authority. It does not override or rewrite state law."

### Federal Court in Michigan:

*Ruling in Case Brought by Sidney Powell*: "With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs'equal protection claim fails. . . . [T]o be perfectly clear, Plaintiffs' equal protection claim is not supported by any allegation that Defendants' alleged schemes caused votes for President Trump to be changed to votes for Vice President Biden. For example, the closest Plaintiffs get to alleging that physical ballots were altered in such a way is the following statement in an election challenger's sworn affidavit: "I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates." (ECF No. 6 at Pg ID 902 ¶ 91 (citing Aff. Articia Bomer, ECF No. 6-3 at Pg ID 1008-1010).) But of course, "[a] belief is not evidence" and falls far short of what is required to obtain any relief, much less the extraordinary relief Plaintiffs request."

**State Courts in Nevada** (Extensive evidentiary analysis following a hearing and multiple depositions). The President's spokesperson, Kayleigh McEnany stated on television (Hannity, Dec. 2, 2020) that this was the "most important case" and would finally vet the Trump legal claims. The Court did indeed vet all the legal claims, including allegations regarding Dominion voting machines, and issued a detailed ruling that the evidence presented did not support the President's claims.

"The Contestants failed to meet their burden to prove credible and relevant evidence to substantiate any of the grounds set forth in NRS 293.410 to contest the November 3, 2020 General Election." The Court assessed evidence submitted regarding the Dominion voting machine allegations specifically and concluded the evidence was not credible.

President Trump's legal team appealed each of the issues up through the Nevada Supreme Court. That Court unanimously affirmed the ruling of the trial court judge, explaining: "Despite our earlier order asking appellants to identify specific findings with which they take issue, appellants have not pointed to any unsupported factual findings, and we have identified none."

**Federal Courts in Pennsylvania** (including decision written by Trump-Appointed Federal Appellate Judge):

"One might expect that when seeking such a startling outcome, a plaintiff would come formidably armed with compelling legal arguments and factual proof of rampant corruption, such that this Court would have no option but to regrettably grant the proposed injunctive relief despite the impact it would have on such a large group of citizens. That has not happened. Instead, this Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence. In the United States of America, this cannot justify the disenfranchisement of a single voter, let alone all the voters of its sixth most populated state."

"Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here. ... 'While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.' Iqbal, 556 U.S. at 679. Yet the Campaign offers no specific facts to back up these claims."

"The Campaign's claims have no merit. The number of ballots it specifically challenges is far smaller than the roughly 81,000-vote margin of victory. And it never claims fraud or that any votes were cast by illegal voters. Plus, tossing out millions of mail-in ballots would be drastic and unprecedented, disenfranchising a huge swath of the electorate and upsetting all down-ballot races too."

### State Supreme Court in Pennsylvania:

"Petitioners' challenge violates the doctrine of laches given their complete failure to act with due diligence in commencing their facial constitutional challenge, which was ascertainable upon Act 77's enactment. It is well-established that "[l]aches is an equitable doctrine that bars relief when a complaining party is guilty of want of due diligence in failing to promptly institute an action to the prejudice of another." Stilp v. Hafer, 718 A.2d 290, 292 (Pa. 1998). ... The want of due diligence demonstrated in this matter is unmistakable. Petitioners filed this facial challenge to the mail-in voting statutory provisions more than one year after the enactment of Act 77. At the time this action was filed on November 21, 2020, millions of Pennsylvania voters had already expressed their will in both the June 2020 Primary Election and the November 2020 General Election and the final ballots in the 2020 General Election were being tallied, with the results becoming seemingly apparent. . . . Thus, it is beyond cavil that Petitioners failed to act with due diligence in presenting the instant claim."

### Federal Courts reviewing Wisconsin election allegations (Decisions written by two Trump-appointed Federal Judges):

"And, on the merits of plaintiff's claims, the Court now further concludes that plaintiff has not proved that defendants violated his rights under the Electors Clause. To the contrary, the record shows Wisconsin's Presidential Electors are being determined in the very manner directed by the Legislature, as required by Article II, Section 1 of the Constitution."

"In sum, far from defying the will of the Wisconsin Legislature in issuing the challenged guidance, the [Wisconsin Election Commission] was in fact acting pursuant to the legislature's express directives. ... Thus, the guidance that plaintiff claims constitutes an unconstitutional deviation from the Wisconsin Legislature's direction, is, to the contrary, the direct consequence of legislature's express command."

"In his concurring opinion in Bush v. Gore, Chief Justice Rehnquist suggested that the proper inquiry under the Electors Clause is to ask whether a state conducted the election in a manner substantially consistent with the "legislative scheme" for appointing electors. 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring). . . . Whatever actions the Commission took here, it took under color of authority expressly granted to it by the Legislature."

### State Supreme Court in Wisconsin

"We conclude the Campaign is not entitled to the relief it seeks. The challenge to the indefinitely confined voter ballots is meritless on its face, and the other three categories of ballots challenged fail under the doctrine of laches."

## SECTION II:  Description and Excerpts of Principal Cases in all Six States

I.    **Arizona**

### A.  Litigation in Arizona State Court

Multiple challenges to the Arizona Presidential election were filed, litigated and resolved with no change to the election outcome.  In the principal case (which ultimately reached the Arizona Supreme Court), the trial judge allowed the challengers to engage in inspection of mail-in and "duplicate" ballots, conduct multiple depositions, and present their evidence at a hearing.   In response to allegations about allegedly forged signatures on mail-in ballots, the court found:

"There is no evidence that the manner in which signatures were reviewed was designed to benefit one candidate or another, or that there was any misconduct, impropriety, or violation of Arizona law with respect to the review of mail-in ballots."

As the Court also explained, neither the plaintiffs nor the defense experts found evidence of "forgery or simulation" as to the examined mail-in ballots.  Addressing the *process* for reviewing mail-in ballots under Arizona law, the trial court explained:

"Under Arizona law, voters who vote by mail submit their ballot inside an envelope that is also an affidavit signed by the voter. Election officials review all mail-in envelope/affidavits to compare the signature on them with the signature in voter registration records. If the official is "satisfied that the signatures correspond," the unopened envelope is held until the time for counting votes. If not, officials attempt to contact the voter to validate the ballot. A.R.S. § 16-550(A).   This legislatively-prescribed process is elaborated on in the Secretary of State's Election Procedures Manual. . . . Maricopa County election officials followed this process faithfully in 2020.*"

The Court also allowed inspection of a sample of "duplicate ballots."  Such duplicates must be made for overseas military voters and in cases when ballots cannot be properly read by a tabulation machine.  As to that evidence, the Court found:

"The duplication process prescribed by the Legislature necessarily requires manual action and human judgment, which entail a risk of human error. Despite that, the duplication process for the presidential election was 99.45% accurate. And there is no evidence that the inaccuracies were intentional or part of a fraudulent scheme. They were mistakes. And given both the small number of duplicate ballots and the low error rate, the evidence does not show any impact on the outcome."

The trial court concluded that "Plaintiff has not proven that the Biden/Harris ticket did not receive the highest number of votes."  The Arizona Supreme Court then unanimously affirmed that ruling, explaining as follows:

"The validity of an election is not voided by honest mistakes or omissions unless they affect the result, or at least render it uncertain. *Findley v. Sorenson*, 35Ariz. 265, 269 (1929). Where an election is contested on the ground of illegal voting, the contestant has the burden of showing that sufficient illegal votes were cast to change the result, *Morgan v.Board of Sup'rs*, 67 Ariz. 133 (1948). The legislature has expressly delegated to the

Secretary the authority to promulgate rules and instructions for early voting. A.R.S. § 16-452(A). After consulting with county boards and election officials, the Secretary is directed to compile the rules "in an official instructions and procedures manual." The Election Procedures Manual or "EPM," has the force of law. The Court recently considered a challenge to an election process and granted relief where the county recorder adopted a practice contrary to the EPM.... *Here, however, there are no allegations of any violation of the EPM or any Arizona law."*

"Because the challenge fails to present any evidence of "misconduct," "illegal votes" or that the Biden Electors "*did not* in fact receive the highest number of votes for office," let alone establish any degree of fraud or a sufficient error rate that would undermine the certainty of the election results, the Court need not decide if the challenge was in fact authorized under A.R.S. § 16-672 or if the federal "safe harbor" deadline applies to this contest. **IT IS ORDERED** affirming the trial court decision and confirming the election of the Biden Electors under A.R.S. § 16-676(B)."

## B. Litigation in Federal Court in Arizona

*Tyler Bowyer, et al., v. Doug Ducey, et al.,* Federal District Court, Arizona, CV-20-     02321-PHX-DJH, 12/09/20. Judge Diana Humetewa.

In addition to litigating in the Arizona state judicial system, plaintiffs supporting President Trump also attempted to bring multiple claims in Federal District Court for the District of Arizona, with factual allegations addressing "destruction of absentee ballots," Dominion voting machines, voting fraud and manipulation, problems with the election observer process, and alleged "dilution of lawful votes." The Court explained why several of the allegations were insufficient to state a federal Constitutional claim, including because the plaintiffs lacked standing under Article III of the Constitution. The Court also addressed plaintiffs' allegations of fraud specifically. Below is a selection of excerpts from the Judge's opinion on those issues:

"The allegations they put forth to support their claims of fraud fail in their particularity and plausibility. Plaintiffs append over three hundred pages of attachments, which are only impressive for their volume. The various affidavits and expert reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections."

"The Complaint is equally void of plausible allegations that Dominion voting machines were actually hacked or compromised in Arizona during the 2020 General Election. Plaintiffs are clearly concerned about the vulnerabilities of voting machines used in some counties across Arizona and in other states. They cite sources that attest to knowledge of 'well-known' vulnerabilities, have included letters from concerned citizens, Arizona elected officials, and United States senators. Plaintiffs even attach an affidavit of an anonymous witness with connections to the late Venezuelan dictator Hugo Chavez claiming to be privy as to how officials in Venezuela rigged their elections with the help of a voting systems company whose software "DNA" is now used in voting machines in the United States. (Doc. 1-1, Ex. 1). These concerns and stated vulnerabilities, however, do not sufficiently allege that any voting machine used in Arizona was in fact hacked or compromised in the 2020 General Election. Rather, what is present is a lengthy collection of phrases beginning with the words "could have, possibly, might," and "may have."

"Plaintiffs next argue that they have expert witnesses who can attest to widespread voter fraud in Arizona. As an initial matter, none of Plaintiffs' witnesses identify Defendants as committing the alleged fraud, or state what their participation in the alleged fraudulent scheme was. Instead, they allege that, absentee ballots "could have been filled out by

anyone and then submitted in the name of another voter," "could be filled in by third parties to shift the election to Joe Biden," or that ballots were destroyed or replaced "with blank ballots filled out by election workers, Dominion or other third parties." (Doc. 1 ¶¶54–58) (emphasis added). These innuendoes fail to meet Rule 9(b) standards. But perhaps more concerning to the Court is that the 'expert reports' reach implausible conclusions, often because they are derived from wholly unreliable sources."

"Not only have Plaintiffs failed to provide the Court with factual support for their extraordinary claims, but they have wholly failed to establish that they have standing for the Court to consider them. *Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court.* They most certainly cannot be the basis for upending Arizona's 2020 General Election. The Court is left with no alternative but to dismiss this matter in its entirety."

## II. Georgia

### A.  Cases litigated in Georgia State Court

Multiple plaintiffs filed cases challenged the Georgia election in Georgia State Courts.  The Georgia legislature has enacted a detailed series of laws governing elections. Those laws provide specific remedies to address election related concerns (including post-election audits). The Georgia code also specifically provides for election challenges to be filed before Georgia state courts.  In certain of the cases filed, the litigants supporting President Trump made fundamental errors by, for example, failing to sue the appropriate Georgia officials as required by Georgia law, failing to serve the defendants in the case with process, and other routine filing errors delaying the cases.  A summary of the issues appears in a brief filed in the U.S. Supreme Court by the Attorney General of the State of Georgia (a Republican appointee).[1]

"Since the November election, there have been at least six Georgia cases alleging that state election officials violated the law by acting in accordance with the State's settlement agreement or by adopting State Rule 183-1-14-0.9-.15. *See, e.g., Wood v. Raffensperger,* No. 1:20-cv-04651-SDG (N.D. Ga.); *Pearson et al. v. Kemp et al.,* No. 1:20-cv-04809-TCB (N.D. Ga.); *Wood v. Raffensperger et al.,* No. 2020-CV-342959 (Fulton Cnty. Sup. Ct.); *Boland v. Raffensperger,* No. 2020-CV-343018 (Fulton Cnty. Sup. Ct.); *Della Polla v. Raffensperger,* No. 20-1-7490 (Cobb Cnty. Sup. Ct); *Trump et al. v. Raffensperger et al.,* No. 2020-CV-343255 (Fulton Cnty. Sup. Ct.).   And none of that litigation has gone anywhere. The Eleventh Circuit, the Northern District of Georgia, and the Superior Courts of Fulton County and Cobb County, Georgia have rejected all the claims except for in one case, which was filed just this week and is thus still winding through Georgia's courts just as the Georgia Legislature envisioned."

The Georgia Attorney General also described how Georgia's legislature enacted measures for election recounts (and state court election challenges) in accordance with Article II of our Constitution, and how those measures were implemented in 2020.

"Georgia's legislature enacted laws governing elections and election disputes, and the State and its officers have implemented and followed those laws. To ensure the accuracy of the results of that process, it has completed three total counts of the vote for its presidential electors, including a historic 100 percent manual recount—all in accordance with state law.  It has, consistent with its authority under 3 U.S.C. § 5 [the Electoral Count

---

[1]  Among the attorneys joining the Attorney General on that brief was Jody Hunt, President Trump's former appointee as Assistant Attorney General for the U.S. Department of Justice's Civil Division.

Act], authorized its courts to resolve election disputes.... The Legislature has given the Election Board express authority to "promulgate rules and regulations" to ensure "uniformity" among election officials and a "fair, legal, and orderly" election. O.C.G.A. § 21-2-31....First, in accordance with O.C.G.A. § 21-2-498, Georgia completed a risk-limiting audit.... The audit resulted in a manual count of nearly 5 million ballots cast—a process that lasted the better part of a week and required the State to deploy immense human and financial resources. Ultimately, the audit confirmed the initial election results, and Secretary Raffensperger certified the results on November 20, 2020. That was not all. Responding to the Trump Campaign's request, Georgia undertook a machine tabulation recount of the nearly 5 million ballots. Again, the recount confirmed the initial election results."

Georgia state courts have specifically addressed allegations of election irregularities. In *Boland v. Raffensperger*, for example, a Georgia State Court evaluated a range of allegations about misconduct by election officials and related matters. The Court described the plaintiffs' case as follows:

"Even if credited, the Complaint's factual allegations do not plausibly support his claims. The allegations in the Complaint rest on speculation rather than duly pled facts. They cannot, as a matter of law, sustain this contest. Count I, which alleges that 20,312 people may have voted illegally in Georgia, relies upon a YouTube video which purportedly is based upon United States Postal Service mail forwarding information. Pet. ¶ 1. Count II alleges that the signature-matching process resulting from a Settlement Agreement entered into by the State nine months ago is inconsistent with Georgia's election code, and allegedly violates the federal Constitution.3 Pet. ¶ 17. The Court finds that Plaintiff's allegations, as pled, do not support an allegation of impropriety or a conclusion that sufficient illegal votes were cast to change or place in doubt the result of the election. These arguments have been offered and rejected in other courts. *See Wood*, 2020 WL 6817513, at *10. Furthermore, the statutory changes put in place by the General Assembly permitting voters to cure signature issues on their ballot as a result of 2019 legislation, as well as regulatory changes adopted by the State Election Board contemporaneous with execution of the Settlement Agreement, would be expected to result in fewer signature rejections. This would not be because illegal votes are somehow evading review, but because subjecting signatures to more thorough verification and permitting voters to cure suspected errors should reduce the number of lawful ballots that are improperly thrown out."

Likewise, in the *Della Polla* case, a Georgia State Court Judge concluded as follows:

"[Georgia law] provides that a petition for an election contest must set forth the grounds for the election context. [Georgia law] further provides that it must set forth such facts as are necessary to 'provide a full particular and explicit statement of the cause of contest.' Georgia's Supreme Court has interpreted this to require a contestant to allege and prove a factual basis showing grounds for an election contest and to prohibit a contestant from basing a contest on a mere speculative belief that an error has occurred. *See Ellis v. Johnson*, 263 Ga. 514 (1993). Plaintiffs' Complaint does not meet this requirement as it does not recite facts or evidence but relies on speculation as to this belief that an error in the election has occurred. Therefore, his complaint is dismissed for failure to state a claim."

In one remaining state court case, *Trump et al. v. Raffensperger et al.*, No. 2020-CV-343255, counsel for President Trump initially sought an emergency hearing to address his claims of fraud and

illegality, but then withdrew that emergency motion on December 8, 2020, canceling the imminent hearing and delaying the case. This has slowed the ultimate resolution of that action.

## B. Principal Cases litigated in Federal Court in Georgia

*Lin Wood v. Raffensperger*, Federal District Court for the Northern District of Georgia, Atlanta Division, Judge Stephen Grimburg (appointed by President Trump.)

The plaintiff in this Federal District Court case argued that Georgia officials took unauthorized actions and treated absentee ballots in a manner that favored candidate Biden. Plaintiff also asked the Court to order a "second recount" of Georgia ballots. The absentee ballot allegations related in part to a settlement in March 2020 by Georgia of a prior lawsuit. Plaintiff also argued that designated Republican monitors did not have proper access to an audit conducted by Georgia state officials in the days after the election.

Judge Grimberg, a Trump appointee, conducted a hearing with live witness testimony before issuing his ruling. His opinion begins by describing the foundational Constitutional problems with Plaintiff Wood's federal suit, including that Wood lacked standing and noting that Wood was relying upon a 1993 11th Circuit precedent that is "no longer good law." Judge Grimberg also explained why courts require the type of challenge Plaintiff brought to be made pre-election, before millions of voters cast their ballots.[2] After addressing those issues, the Court turned to the substance of Wood's legal and factual arguments, explaining as follows:

"Even assuming Wood possessed standing, and assuming Counts I and II are not barred by laches, the Court nonetheless finds Wood would not be entitled to the relief he seeks."

*Allegations about Absentee Ballots*: "Wood's argument is that the procedures in the Settlement Agreement regarding information and signature match so overwhelmed ballot clerks that the rate of rejection plummeted and, ergo, invalid ballots were passed over and counted. This argument is belied by the record; the percentage of absentee ballots rejected for missing or mismatched information and signature is the exact same for the 2018 election and the General Election (.15%). This is despite a substantial increase in the total number of absentee ballots submitted by voters during the General Election as compared to the 2018 election."

*Elections and Electors Clauses*: "In relevant part, the Constitution states: 'The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. This provision—colloquially known as the Elections Clause—vests authority in the states to regulate the mechanics of federal elections. *Foster v. Love*, 522 U.S. 67, 69 (1997). The 'Electors Clause' of the Constitution similarly states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of [Presidential] Electors." U.S. Const. art. II, § 1, cl. 2. Wood argues Defendants violated the Elections and Electors Clauses because the 'procedures set forth in the [Settlement Agreement] for the handling of defective absentee ballots is not consistent with the laws of the State of Georgia, and thus, Defendants' actions . . . exceed their authority.' Put another way, Wood argues Defendants usurped

---

[2] Judge Grimberg cited Justice Kavanaugh's concurrence in a recent election suit filed by the Democratic National Committee. *See Democratic Nat'l Comm. v. Wisc. State Legislature*, No. 20A66,2020 WL 6275871, at *4 (U.S. Oct. 26, 2020) (Kavanaugh, J., concurring in denial of application to vacate stay) ("The principle [of judicial restraint] also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process.")

the role of the Georgia General Assembly—and thereby violated the United States Constitution—by enacting additional safeguards regarding absentee ballots not found in the Georgia Election Code.... State legislatures—such as the Georgia General Assembly— possess the authority to delegate their authority over elections to state officials in conformity with the Elections and Electors Clauses. [*Citing* U.S. Supreme Court precedent.] *Ariz. State Legislature*, 576 U.S. at 816 ("The Elections Clause [ ] is not reasonably read to disarm States from adopting modes of legislation that place the lead rein in the people's hands . . . it is characteristic of our federal system that States retain autonomy to establish their own governmental processes."). *See also Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) ("The Elections Clause, therefore, affirmatively grants rights to state legislatures, and under Supreme Court precedent, to other entities to which a state may, consistent with the Constitution, delegate lawmaking authority.")... Recognizing that Secretary Raffensperger is "the state's chief election official," the General Assembly enacted legislation permitting him (in his official capacity) to "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). *The Settlement Agreement is a manifestation of Secretary Raffensperger's statutorily granted authority. It does not override or rewrite state law*. It simply adds an additional safeguard to ensure election security by having more than one individual review an absentee ballot's information and signature for accuracy before the ballot is rejected. Wood does not articulate how the Settlement Agreement is not "consistent with law" other than it not being a verbatim recitation of the statutory code. Taking Wood's argument at face value renders O.C.G.A. § 21-2-31(2) superfluous. A state official—such as Secretary Raffensperger—could never wield his or her authority to make rules for conducting elections that had not otherwise already been adopted by the Georgia General Assembly. The record in this case demonstrates that, if anything, Defendants' actions in entering into the Settlement Agreement sought to achieve consistency among the county election officials in Georgia, which furthers Wood's stated goals of conducting "[f]ree, fair, and transparent public elections."

*Judge Grimberg's Conclusion*: "Granting injunctive relief here would breed confusion, undermine the public's trust in the election, and potentially disenfranchise over one          million Georgia voters. Viewed in comparison to the lack of any demonstrable harm to     Wood, this Court finds no basis in fact or in law to grant him the relief he seeks."

On appeal, a three judge panel of the Federal Circuit Court of Appeals for the 11th Circuit affirmed Judge Grimberg's ruling unanimously. The panel included Judge Lagoa (a Trump appointee who was considered by the President for the recent Supreme Court vacancy, and Judge William Pryor, a Bush appointee.)

Finally, in the *Pearson* litigation filed by Sidney Powell in Federal District Court in Atlanta, Judge Batten (a Bush appointee) reviewed all the pleadings and held an argument on a motion for an injunction. Judge Batten concluded as follows:

"Finally, in their complaint, the Plaintiffs essentially ask the Court for perhaps the most extraordinary relief ever sought in any Federal Court in connection with an election. They want this Court to substitute its judgment for that of two-and-a-half million Georgia voters who voted for Joe Biden, and this I am unwilling to do."

## III. Michigan

A number of cases were launched in Federal and State Courts in Michigan challenging different elements of the Michigan election. Certain of the cases were summarily dismissed by the courts for a range of pleading or procedural errors – including suing the wrong state official. Certain other cases were voluntarily dismissed by those litigants who brought them after the election was certified under Michigan law. The evidence supporting various arguments was assessed in certain of the cases. For example, Judge Stephens of the Court of Claims for Michigan described one set of evidentiary issues this way:

> "This 'supplemental evidence' is inadmissible as hearsay. The assertion that Connarn was informed by an unknown individual what "other hired poll workers at her table" had been told is inadmissible hearsay within hearsay, and plaintiffs have provided no hearsay exception for either level of hearsay that would warrant consideration of the evidence. See MRE 801(c). The note—which is vague and equivocal—is likewise hearsay. And again, plaintiffs have not presented an argument as to why the Court could consider the same, given the general prohibitions against hearsay evidence. *See Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 105; 776 NW2d 114 (2009). Moreover, even overlooking the evidentiary issues, the Court notes that there are still no allegations implicating the Secretary of State's general supervisory control over the conduct of elections. . . . Not only can the relief requested not issue against the Secretary of State, who is the only named defendant in this action, but the factual record does not support the relief requested."

Another Federal District Court case brought by attorney Sidney Powell in the Eastern District of Michigan alleged many of the same irregularities publicized in the press, such as voting machines allegedly corrupted or hijacked in the same manner used in Venezuela by former President Hugo Chavez. Federal District Court Judge Parker systematically reviewed the evidence Powell submitted explained why the relief sought by Powell could not be granted. For example, Judge Parker wrote:

> "With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs'equal protection claim fails."

> "[T]o be perfectly clear, Plaintiffs' equal protection claim is not supported by any allegation that Defendants' alleged schemes caused votes for President Trump to be changed to votes for Vice President Biden. For example, the closest Plaintiffs get to alleging that physical ballots were altered in such a way is the following statement in an election challenger's sworn affidavit: "I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates." (ECF No. 6 at Pg ID 902 ¶ 91 (citing Aff. Articia Bomer, ECF No. 6-3 at Pg ID 1008-1010).) But of course, "[a] belief is not evidence" and falls far short of what is required to obtain any relief, much less the extraordinary relief Plaintiffs request."

> "The closest Plaintiffs get to alleging that election machines and software changed votes for President Trump to Vice President Biden in Wayne County is an amalgamation of theories, conjecture, and speculation that such alterations were *possible*."

> "As Defendants aptly describe, Plaintiffs' requested injunction would "upend the statutory process for election certification and the selection of Presidential Electors. Moreover, it w[ould] disenfranchise millions of Michigan voters in favor [of] the preferences of a handful of people who [are] disappointed with the official results." (ECF No. 31 at Pg ID 2227.) In short, none of the remaining factors weigh in favor of granting Plaintiffs' request for an injunction."

12

In the wake of Judge Parker's ruling, defense counsel has filed a motion seeking sanctions against Powell and others on her legal team: "Plaintiffs' egregious conduct and frivolous and fraudulent filings clearly warrant sanctions under 28 U.S.C. §1927."

## IV. Nevada

In Nevada, as in other states, several election challenges were filed pursuant to state law. The principal case was filed before .... The Court allowed multiple depositions to be taken, considered all the affidavits presented, and issued a lengthy evidentiary ruling following a hearing. This is the case that President Trump's legal team called, "the most important case" [Kayleigh McEnany Dec 2 Hannity] that would finally fully vet the factual basis for their election fraud claims. The Court did indeed conduct a full hearing vetting the factual basis for each legal claim. He ruled against the plaintiffs, and was affirmed unanimously by the Nevada Supreme Court.

Nevada District Judge Russell allowed each party to conduct 15 depositions, considered all the evidence from those depositions and all submitted affidavits in detail. His 34 page opinion is highly detailed and addresses all the principal allegations. He explained as follows:

> *Dominion Voting Machines*: "Clark County, along with 15 other counties in Nevada uses Dominion Voting Systems to conduct in person voting.... These voting systems are subject to extensive testing and certification before each election and are audited after each election. For example, the electronic voting systems used by Clark County were certified by the federal government when they were first brought on the market, as well as any time a hardware or software component is upgraded. This certification is done by a voting system test laboratory. The electronic voting machines are also tested and certified by the Secretary. ... These voting machines are also audited against a paper trail that is generated ... when voters make their selections. A Clark County voting machine will not operate unless it is connected to a printer ... which creates a paper record that voters can review. ... After each election, Clark County, like Nevada's other counties, conducts a random audit of its voting machines. Specifically, it compares the paper trail created by the printer against the results recorded by the voting machine to ensure they match. ... Clark County conducted this audit following the November election and there were no discrepancies between the paper audit trail created by the printer and the data from the voting machine."

> "Contestants' evidence does not establish by clear and convincing proof, or under any standard of evidence, that 'there was a malfunction of any voting device or electronic tabulator, counting device or computer in a manner sufficient to raise reasonable doubt as to the outcome of the election."

> *Affidavits/Declarations from Non-Testifying Witnesses*: "Much of Contestants' evidence consists of non-deposition evidence in the form of witness declarations. These declarations fall outside the scope of the contest statute, which provides that election contests 'shall be tried and submitted so far as may be possible upon depositions and written or oral argument as the court may order. ... The reason for this is to allow for the cross-examination of the deponent under oath. ... These declarations also constitute hearsay, as they are out-of-court statements offered in evidence to prove the truth of the matters asserted. Most of these declarations were self serving statements of little or no evidentiary value. The Court nonetheless considers the totality of evidence provided by Contestants in reaching and ruling upon the merits of their claims."

> *Plaintiffs' Expert Evidence*: The Court heard expert testimony from three individuals who sought to use telephone surveys and statistical information to infer that the vote tallies must be incorrect, and to opine upon the administration of mail in voting. He found each proffered expert unreliable.

13

"The Court questions Mr. Baselice's methodology because he was unable to identify the source of the data for his survey and conducted no quality control of the data he received."

"The Court questions Mr. Kamzol's methodology because he had little to no information about or supervision over the origins of his data, the manner in which it had been matched and what the rate of false positives would be. Additionally, there was little to no verification of his numbers."

"Mr. Gessler's report lacked citations to facts and evidence that he used to come to his conclusions and did not include a single exhibit to support any of his conclusions. The Court finds that Mr. Gessler's methodology is unsound because he based nearly all of his opinions on a handful of affidavits that he took no steps to corroborate through independent investigation."

"As reflected herein, the Court finds that the expert testimony provided by Contestants was of little or no value. The Court did not exclude consideration of this evidence, which it could have, but gave it very little weight."

*Illegal or Improper Votes*:  "Contestants allege that fraud occurred at multiple points in the voting process in Nevada that exceed the margin of victory in the presidential race. ... The Court finds there is no evidence that voter fraud rates associated with mail in voting are systematically higher than voter fraud rates associated with other forms of voting. .... [T]he illegal vote rate totaled at most only 0.00054 percent."

*Provisional Ballots, Mismatched Signatures, Illegal Votes from In-Person Voting Technology, Ineligible Voters and Double Voting, Deceased Voters, Voter Impersonation, Untimely Ballots*: The court made detailed findings rebutting each of plaintiffs' claims about illegality on each of these topics.

Judge Russell concluded: "The Contestants failed to meet their burden to prove credible and relevant evidence to substantiate any of the grounds set forth in NRS 293.410 to contest the November 3, 2020 General Election." President Trump's legal team appealed each of the issues up through the Nevada Supreme Court.  That Court unanimously affirmed the ruling of the trial court judge, explaining:

"Despite our earlier order asking appellants to identify specific findings with which they take issue, appellants have not pointed to any unsupported factual findings, and we have identified none."

## V.  Pennsylvania

### A.  Cases Filed in State Court

In *Kelly et al. v. Commonwealth of Pennsylvania et al.*, a group of plaintiffs challenged the mail-in ballot measures enacted by the Pennsylvania legislature in Act 77 (Act of October 31, 2019, P.L. 552, No. 77; *see also* 25 Pa. Stat. xx 3146.6(c)). The case began in Pennsylvania state court, reached the Pennsylvania Supreme Court, and then was the subject of a petition for emergency injunctive relief to the U.S. Supreme Court.

The principal allegation in the case was that Pennsylvania's "mail-in ballot" law violated the Pennsylvania state Constitution's provision on absentee voting.  The plaintiffs claimed that the state constitution's provision is a restriction on all forms of remote voting, *i.e.* other than in-person voting.  But Pennsylvania does not interpret its own Constitution that way.  Instead, the Pennsylvania legislature understood the absentee voting provision to require that the Legislature *provide an avenue for absentee*

14

*voting* for anyone who will not vote in person because they will be out of town on business, are prevented from voting in person by illness, are physically disabled, are observing a religious holiday or are serving as poll workers that day.  As Pennsylvania explains in its brief to the U.S. Supreme Court, the absentee voting provision ensures that people in those categories will be able to vote absentee, but does not prevent the legislature from going further and providing a broader provision for mail-in ballots:

> "Petitioners contend that by requiring the General Assembly to allow certain voters to cast absentee ballots, Article VII, § 14 somehow forbids the General Assembly from allowing others to vote by mail. But the inclusion of a particular legislative duty in the Pennsylvania Constitution does not prevent the General Assembly from crafting other legislation on that topic. In fact, the Pennsylvania Constitution originally said "may" and now says "shall" in Article VII, § 14—a change meant to further clarify that this provision provides a floor, not a ceiling, for absentee voting in Pennsylvania. *See, e.g., Mathews v. Paynter,* 752 F. App'x 740, 744 (11th Cir. 2018) (distinguishing "shall" from "may" and noting that former term does not impliedly limit government authority). Thus, the Pennsylvania Constitution provides that the General Assembly must allow voters in the enumerated four categories to cast absentee ballots, but may also go further—by exercising its broad power to "prescribe[]" the permissible "method[s]" of voting, PA. CONST. art. VII, § 4—and allow other categories of voters to vote by mail, including by allowing any voter to opt to cast a mail-in ballot."

When this issue reached the Pennsylvania Supreme Court, the court ruled against plaintiffs based on the state law doctrine of "laches" – explaining that the plaintiffs waited too long to bring their claims, and could have brought their claims before the November election.  Pennsylvania also explained that multiple state elections have already been conducted under the "mail-in" ballot law.  Pennsylvania's brief in the U.S. Supreme Court and characterized the argument this way:

> "Petitioners maintain that the doctrine of laches must yield because they "are not lawyers," and could not have "been reasonably expected to know[] that they had viable legal claims well-before the election occurred." App. at 37. This assertion of ignorance is implausible, given that several Petitioners are current legislators or candidates for legislative office. *See* Compl. ¶¶ 3-4. In any event, '[l]aches is not excused by simply saying, 'I did not know.' If by diligence a fact can be ascertained, the want of knowledge so caused is no excuse for a stale claim. The test is not what the plaintiff knows, 'but what he might have known by the use of the means of information within his reach with the vigilance the law requires of him.'"

As noted, after the Pennsylvania Supreme Court ruled, the plaintiffs in the case filed a request with the U.S. Supreme Court for an emergency injunction.  The Supreme Court denied that request on December 8, 2020.  No U.S. Supreme Court Justice dissented from that denial.

In addition to the *Kelly* case, several other state court cases have been unsuccessfully pursued. One such case, *Metcalf*, was brought 11 days after the state law deadline, and was dismissed on that basis.  In another matter, *IN RE: CANVASS OF ABSENTEE AND MAIL-IN BALLOTS OF NOVEMBER 3, 2020 GENERAL ELECTION,* 8,329 votes were challenged because the voters failed to properly print their names, addresses and the date in full on the ballot envelope. The Pennsylvania Supreme Court applied state law and ruled as follows:

> "Here we conclude that while failures to include a handwritten name, address or date in the voter declaration on the back of the outer envelope, while constituting technical violations of the Election Code, do not warrant the wholesale disenfranchisement of thousands of Pennsylvania voters."

15

## B.  Cases Filed in Federal Court

In *Donald J. Trump for President, Inc., et al v. Boockvar*, the Federal District Court for the Middle District of Pennsylvania addressed plaintiffs' concerns with what is known as a "notice and cure" policy. Under that policy Pennsylvania State election officials allowed Pennsylvania county officials to provide notice to voters who had not properly filled out mail in or absentee ballots, so that the voters could correct them.  Some of the counties in the state exercised this authority and others did not.  Plaintiffs argued that the unequal application of this policy across the state required the Court to throw out the election result state-wide.  The Court responded as follows:

"One might expect that when seeking such a startling outcome, a plaintiff would come formidably armed with compelling legal arguments and factual proof of rampant corruption, such that this Court would have no option but to regrettably grant the proposed injunctive relief despite the impact it would have on such a large group of citizens. That has not happened. Instead, this Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence. In the United States of America, this cannot justify the disenfranchisement of a single voter, let alone all the voters of its sixth most populated state."

"Plaintiffs' claims fail because it is perfectly rational for a state to provide counties discretion to notify voters that they may cure procedurally defective mail-in ballots. Though states may not discriminatorily sanction procedures that are likely to burden some persons' right to vote more than others, they need not expand the right to vote in perfect uniformity. All Plaintiffs have alleged is that Secretary Boockvar allowed counties to choose whether or not they wished to use the notice-and-cure procedure. No county was forced to adopt notice-and-cure; each county made a choice to do so, or not. Because it is not irrational or arbitrary for a state to allow counties to expand the right to vote if they so choose, Individual Plaintiffs fail to state an equal-protection claim."

"Crucially, Plaintiffs fail to understand the relationship between right and remedy. Though every injury must have its proper redress, a court may not prescribe a remedy unhinged from the underlying right being asserted. By seeking injunctive relief preventing certification of the Pennsylvania election results, Plaintiffs ask this Court to do exactly that. Even assuming that they can establish that their right to vote has been denied, which they cannot, Plaintiffs seek to remedy the denial of their votes by invalidating the votes of millions of others. Rather than requesting that their votes be counted, they seek to discredit scores of other votes, but only for one race. This is simply not how the Constitution works."

The Federal Court of Appeals for the Third Circuit affirmed the District Court ruling.  Judge Bibas, *another nominee of President Trump*, wrote the extensive opinion:

"Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here.  The Trump Presidential Campaign asserts that Pennsylvania's 2020 election was unfair. But as lawyer Rudolph Giuliani stressed, the Campaign "doesn't plead fraud. . . . [T]his is not a fraud case." Mot. to Dismiss Hr'g Tr. 118:19–20, 137:18. Instead, it objects that Pennsylvania's Secretary of State and some counties restricted poll watchers and let voters fix technical defects in their mail-in ballots. It offers nothing more."

"So is the claim that, "[u]pon information and belief, a substantial portion of the approximately 1.5 million absentee and mail votes in Defendant Counties should not have

been counted." Id. ¶¶ 168, 194, 223, 253. 'Upon information and belief' is a lawyerly way of saying that the Campaign does not know that something is a fact but just suspects it or has heard it. 'While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.' *Iqbal*, 556 U.S. at 679. Yet the Campaign offers no specific facts to back up these claims."

"The Campaign's claims have no merit. The number of ballots it specifically challenges is far smaller than the roughly 81,000-vote margin of victory. And it never claims fraud or that any votes were cast by illegal voters. Plus, tossing out millions of mail-in ballots would be drastic and unprecedented, disenfranchising a huge swath of the electorate *and upsetting all down-ballot races too*."

Another case filed in Federal District Court addressed the State law deadline for *receipt of mailed ballots*. This case has now been the subject of multiple filings at the U.S. Supreme Court but addresses only a relatively small number of ballots – approximately 9400 votes, far short of the Biden margin of victory in Pennsylvania. The matter relates to a Pennsylvania State Court ruling extending the Pennsylvania statue's deadline for receipt of mailed ballots by a number of days because COVID-19 apparently threatened delays in mail delivery. On November 6, 2020, Justice Alito entered a brief order, requiring that:

"All [Pennsylvania] county boards of election are hereby ordered, pending further order of the Court, to comply with the following guidance provided by the Secretary of the Commonwealth on October 28 and November 1, namely, (1) that all ballots received by mail after 8:00 p.m. on November 3 be segregated and kept "in a secure, safe and sealed container separate from other voted ballots," and (2) that all such ballots, if counted, be counted separately. Pa. Dep't of State, Pennsylvania Guidance for Mail-in and Absentee Ballots Received From the United States Postal Service After 8:00 p.m. on Tuesday, November 3, 2020 (Oct. 28, 2020); Pa. Dep't of State, Canvassing Segregated Mail-in and Civilian Absentee Ballots Received by Mail After 8:00 p.m. on Tuesday, November 3, 2020 and Before 5:00 p.m. on Friday, November 6, 2020 (Nov. 1, 2020)."

The procedural history in this matter is complicated, and multiple courts have ruled in various contexts. But the principal remaining issue pending before the Supreme Court is this: "Do State courts and executive officials have authority to alter legislatively established election rules, despite the U.S. Constitution's vesting of authority to set the rules for federal elections in State legislatures?" Briefing on a petition for certiorari seeking Supreme Court review is complete now, and the Court could issue its decision on the petition at any time. But to be clear, *the parties involved in this case know that the matter being addressed will not impact the outcome of the Presidential Election in Pennsylvania or any other state*. Indeed, the Petitioner, who supports President Trump's position in this case has argued in a recent brief: "In reality, however, this case is an ideal vehicle [for Supreme Court review], in part precisely *because it will not affect the outcome of this election*."

## VI. Wisconsin

### A. Cases litigated in Federal Court

*Donald J. Trump v. Wisconsin Elections Commission, et al.*

In Federal District Court for the Eastern District of Wisconsin, and then on appeal in the Seventh Circuit, *two Trump appointees*, Judges Ludwig and Scudder, ruled against the President. The case addressed a series of issues relating to Wisconsin Election Commission procedures for addressing absentee ballots during the pandemic. The President's counsel argued that those procedures were at

17

odds with Wisconsin Legislative enactments and thus unconstitutional under the Electors Clause of Article II of our federal Constitution.

At the District Court, Judge Ludwig concluded that the President had standing and presented federal claims. He conducted an expedited hearing on the merits of the President's claims before ruling. Judge Ludwig summarized his conclusion as follows:

"And, on the merits of plaintiff's claims, the Court now further concludes that plaintiff has not proved that defendants violated his rights under the Electors Clause. To the contrary, the record shows Wisconsin's Presidential Electors are being determined in the very manner directed by the Legislature, as required by Article II, Section 1 of the Constitution."

Judge Ludwig also explained how the Wisconsin Legislature specifically created the Wisconsin Election Commission (WEC) to carry out the election, and delegated to the Commission specific authority to create procedures for addressing election related issues (including absentee balloting) and created a right to seek relief in state court to remedy any "alleged irregularity, defect or mistake" related to the election:

"The Wisconsin Legislature has also established laws detailing the particulars of election administration; these details are set forth in Chapters 5 to 12 of the Wisconsin Statutes. For the last five years, responsibility for the administration of Wisconsin elections has rested with the WEC. The Wisconsin Legislature created the WEC in 2015 specifically to "have the responsibility for the administration of ... laws relating to elections and election campaigns." 2015 Wis. Act 118 §4; Wis. Stat. §5.05. The Wisconsin Legislature has also assigned powers and duties under the state election laws to municipal and county clerks, municipal and county boards of canvassers, and in Milwaukee, the municipal and county boards of election commissioners. Wis. Stat. §§7.10, 7.15,7.21. The Wisconsin Legislature has directed that these officials, along with the WEC, administer elections in Wisconsin. See Wis. Stat. chs. 5 to 10 and 12. To carry out these duties, the legislature has delegated significant authority to the WEC. ... For the determination of Presidential Electors, the Wisconsin Legislature has directed the WEC to "prepare a certificate showing the determination of the results of the canvass and the names of the persons elected." Wis. Stat. §7.70(5)(b). The legislature has further directed that "the governor shall sign [the certificate], affix the great seal of the state, and transmit the certificate by registered mail to the U.S. administrator of general services." Id. ... In addition to logistically administering the election, the Wisconsin Legislature has directed the WEC to issue advisory opinions. Wis. Stat. §5.05(6a), and "[p]romulgate rules ...applicable to all jurisdictions for the purpose of interpreting or implementing the laws regulating the conduct of elections or election campaigns. Wis. Stat. §5.05(1)(f). The WEC is to"conduct or prescribe requirements for educational programs to inform electors about voting procedures, voting rights, and voting technology." Wis. Stat. §5.05(12). Finally, the Wisconsin Legislature has provided detailed recount procedures. Wis. Stat. §9.01. After requesting a recount, "any candidate ... may appeal to circuit court." Wis. Stat. §9.01(6). The legislature has also directed that "[Wis. Stat. §9.01] constitutes the exclusive judicial remedy for testing the right to hold an elective office as the result of an alleged irregularity, defect or mistake committed during the voting or canvassing process." Wis. Stat. §9.01(11)."

Judge Ludwig then concluded that the WEC did not act inconsistently with the manner provided by the Wisconsin Legislature for conducting the election and selecting a slate for the Electoral College:

"The approach, form, method, or mode the Wisconsin Legislature has set for appointing Presidential electors is by "general ballot at the general election. Wis. Stat. §8.25(1). There

18

is no dispute that this is precisely how Wisconsin election officials, including all the defendants, determined the appointment of Wisconsin's Presidential Electors in the latest election. They used "general ballot[s] at the general election for choosing the president and vice president of the United States" and treated a "vote for the president and vice president nominations of any party is a vote for the electors of the nominees." Absent proof that defendants failed to follow this "Manner" of determining the state's Presidential Electors, plaintiff has not and cannot show a violation of the Electors Clause."

And Judge Ludwig also explained explicitly why the WEC actions regarding absentee ballots were consistent with the enactments of the Wisconsin Legislature:

"These issues are ones the Wisconsin Legislature has expressly entrusted to the WEC. Wis. Stat. §5.05(2w) ("The elections commission has the responsibility for the administration of chs. 5 to 10 and 12."). When the legislature created the WEC, it authorized the commission to issue guidance to help election officials statewide interpret the Wisconsin election statutes and new binding court decisions. Wis. Stat. §5.05(5t). The WEC is also expressly authorized to issue advisory opinions, Wis. Stat. §5.05(6a), and to "[p]romulgate rules ... applicable to all jurisdictions for the purpose of interpreting or implementing the laws regulating the conduct of elections or election campaigns." Wis. Stat. §5.05(1)(f). The Wisconsin Legislature also directed that the WEC would have "responsibility for the administration of ... laws relating to elections and election campaigns." Wis. Stat. §5.05(1). In sum, far from defying the will of the Wisconsin Legislature in issuing the challenged guidance, the WEC was in fact acting pursuant to the legislature's express directives. ... Thus, the guidance that plaintiff claims constitutes an unconstitutional deviation from the Wisconsin Legislature's direction, is, to the contrary, the direct consequence of legislature's express *command*. And, defendants have acted consistent with the "Manner" of election administration prescribed by the legislature."

"Because plaintiff has failed to show a clear departure from the Wisconsin Legislature's directives, his complaint must be dismissed. As Chief Justice Rehnquist stated, "in a Presidential election the clearly expressed intent of the legislature must prevail." Bush v. Gore, 531 U.S. 98, 120 (2000) (Rehnquist, C.J., concurring). That is what occurred here. There has been no violation of the Constitution."

As noted, the United States Court of Appeals for the Seventh Circuit affirmed Judge Ludwig's ruling, and addressed the issues in additional detail.  Judge Scudder, *also a Trump appointee*, wrote for the unanimous three judge panel, explaining:

"We agree that Wisconsin lawfully appointed its electors in the manner directed by its Legislature and add that the President's claim also fails because of the unreasonable delay that accompanied the challenges the President now wishes to advance against Wisconsin's election procedures."

"On the merits, the district court was right to enter judgment for the defendants. We reach this conclusion in no small part because of the President's delay in bringing the challenges to Wisconsin law that provide the foundation for the alleged constitutional violation. Even apart from the delay, the claims fail under the Electors Clause."

"In his concurring opinion in Bush v. Gore, Chief Justice Rehnquist suggested that the proper inquiry under the Electors Clause is to ask whether a state conducted the election in a manner substantially consistent with the "legislative scheme" for appointing electors. 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring). . . . Whatever actions the

Commission took here, it took under color of authority expressly granted to it by the Legislature."

## B. Principal Case in State Court

After a recount conducted in Wisconsin increased candidate Biden's lead, President Trump's campaign filed suit in State Court in Wisconsin arguing that the absentee voting procedures in two specific heavily democratic Wisconsin counties violated Wisconsin law. A Wisconsin state court trial judge conducted a hearing and then on December 11, 2020 entered findings against the President. The matter then reached the Wisconsin Supreme Court on appeal. That court again ruled against the President 4-3, which multiple concurrences and dissents.

The issues litigated related to absentee ballot procedures during the pandemic in the two specific heavily democratic counties selected by the President's counsel. The case did not address similar issues state-wide, or in other counties with vote totals predominantly favoring the President. One issue related to a county determination that, pursuant to the Governor's "Safer at Home" pandemic order, voters could qualify as "indefinitely confined" due to illness, and thus vote by mail or drop box without showing identification in person. The President's counsel sought to disqualify every absentee ballot in the two counties of an "indefinitely confined" person regardless of whether that "confinement" related to the pandemic or not. Another issue related to ballots collected by volunteers at various events in Madison, Wisconsin named "Democracy in the Park."

Judge Hagedorn, appointed by former Republican Governor Scott Walker, wrote the majority opinion. The majority first ruled against the Plaintiff as to the application of the definition of "indefinitely confined" – "The challenge to the indefinitely confined voter ballots is meritless on its face." As a concurrence explained:

"Although the number of individuals claiming indefinitely confined status has increased throughout the state, the Campaign asks us to apply this blanket invalidation of indefinitely confined voters only to ballots cast in Dane and Milwaukee Counties . . . . The Campaign's request to strike indefinitely confined voters in Dane and Milwaukee Counties as a class without regard to whether any individual voter was in fact indefinitely confined has no basis in reason or law; it is wholly without merit."

Next, the Court declined to address the merits of other claims, explaining that the doctrine of "laches" applied:

"Such doctrine is applied because the efficient use of public resources demands that a court not allow persons to gamble on the outcome of an election contest and then challenge it when dissatisfied with the results, especially when the same challenge could have been made before the public is put through the time and expense of the entire election process. Thus if a party seeking extraordinary relief in an election-related matter fails to exercise the requisite diligence, laches will bar the action. ... Although it disagrees the elements were satisfied here,the Campaign does not dispute the proposition that laches may bar an untimely election challenge. This principle appears to be recognized and applied universally. ... The relevant election officials, as well as Vice President Biden and Senator Harris, had no knowledge a claim to these broad categories of challenges would occur. The Campaign's delay in raising these issues was unreasonable in the extreme, and the resulting prejudice to the election officials, other candidates, voters of the affected counties, and to voters statewide, is obvious and immense."

Addressing the "Democracy in the Park" events specifically, the majority explained:

"When the events were announced, an attorney for the Wisconsin Legislature sent a warning letter to the City of Madison suggesting the events were illegal. The City of Madison responded that the events were legally compliant, offering reasons why. Although these events and the legislature's concerns were widely publicized, the Campaign never challenged these events, nor did any other tribunal determine they were unlawful. The Campaign now asks us to determine that all 17,271 absentee ballots collected during the "Democracy in the Park"events were illegally cast. Once again, when the events were announced, the Campaign could have challenged its legality. It did not."

The Majority concluded:

"Our laws allow the challenge flag to be thrown regarding various aspects of election administration. The challenges raised by the Campaign in this case, however, come long after the last play or even the last game; the Campaign is challenging the rulebook adopted before the season began. Election claims of this type must be brought expeditiously. The Campaign waited until after the election to raise selective challenges that could have been raised long before the election. We conclude the challenge to indefinitely confined voter ballots is without merit, and that laches bars relief on the remaining three categories of challenged ballots."

And the concurring justices added:

"As acknowledged by the President's counsel at oral argument, the President would have the people of this country believe that fraud took place in Wisconsin during the November 3, 2020 election. Nothing could be further from the truth. The President failed to point to even one vote cast in this election by an ineligible voter; yet he asks this court to disenfranchise over 220,000 voters.  The circuit court, whose decision we affirm, found no evidence of any fraud."

The three dissenting members of the Wisconsin Supreme Court each opposed application of the doctrine of laches, explaining that the people of Wisconsin deserved clarity on the law applicable for each of the circumstances identified:

"Our constitutional responsibility is to analyze the law and determine if it was followed regardless of whether any remedy might be available. In this way future elections benefit from our analysis."

"Petitioners assert troubling allegations of noncompliance with Wisconsin's election laws by public officials on whom the voters rely to ensure free and fair elections. It is our solemn judicial duty to say what the law is. The majority's failure to discharge its duty perpetuates violations of the law by those entrusted to administer it.  I dissent."

Finally, one dissenter declined to reach a conclusion as to the "indefinite confinement" issue with absentee ballots, noting that the court lacked "sufficient information … to determine whether they lawfully asserted that they were indefinitely confined prior to receiving an absentee ballot."  And multiple dissenters questioned the legality of the "Democracy in the Park" events.  None of the dissenters explained whether or how a contrary ruling on the subject issues could change the outcome of the election.

Exhibit 4

# THE CHAIRMAN'S REPORT OF THE ELECTION LAW STUDY SUBCOMMITTEE OF THE STANDING SENATE JUDICIARY COMMITTEE

## SUMMARY OF TESTIMONY FROM DECEMBER 3, 2020 HEARING

Honorable William T. Ligon, Chairman
Senator, District 3

Honorable John Kennedy
Senator, District 18

Honorable Bill Heath
Senator, District 31

Honorable Blake Tillery
Senator, District 19

Honorable Michael Rhett
Senator, District 33

Honorable Elena Parent
Senator, District 42

I. INTRODUCTION

II. EXECUTIVE SUMMARY

III. ORAL TESTIMONY

IV. FINDINGS

V. RECOMMENDATIONS

Professor Eastman further explained that the failure of State election officials to follow the manner of conducting the election according to the statutes duly passed by the legislative body can annul an election. The U.S. Constitution clearly gives State legislatures under Article I, Section 4 the duty to determine the "manner" of federal elections, and that power rests solely with the State legislatures unless Congress passes its own laws that preempt State election laws. There is no provision which allows any Executive branch member to modify, set aside, enhance, or otherwise create policies or procedures which undermine or contravene those laws.

9

He noted various ways State election officials had failed to follow the statutes in conducting the election. He reiterated failures such as counting the votes of approximately 66,000 underage individuals, the 2,500 felons whose votes were unlawfully counted, the votes of those who had no verifiable residences within the State, and the "biggest" of all he believed was the March 2020 settlement agreement that was entered into with Georgia's Secretary of State and "certain democrat committee challengers that effectively altered the signature verification process" with regard to Absentee Ballots, an agreement that was contrary to State law. He further noted that the "intermingling of legal and illegal ballots" also meant that the election cannot legally be certified. "The State has failed to make a choice on Election Day in accordance with the manner" the legislature prescribed. In light of the failures, the fraud, and the unconstitutional agreement, Dr. Eastman opined that it was the duty of the legislative body to choose the State's Electors for the presidential election.

**Data Analysis in General and Dominion Issues**

- Russell J. Ramsland, Jr., a cybersecurity expert from Texas, testified that his team had compared data from Dominion voting machines in those places where they were used around the nation. They discovered that with Dominion machines, Vice President Biden outperformed what he was statistically expected to receive by an "amazing" 5%. He also outperformed statistical expectations when the analysis was run by county, with Vice President Biden picking up 78% of Dominion counties but only 46% of counties using machines from other manufacturers. Depending on the type of analysis performed, Ramsland estimated that these anomalies translated to between 123,000 and 136,000 extra votes for Vice President Biden in Georgia.

  Ramsland also found that the rejection rate for absentee ballots in Georgia was much lower in 2020 (0.2%) than in 2016 (6.4%). He also identified over 96,000 phantom votes, meaning that they had been counted, but there was no record of the counties recording those ballots as "received."

■ Phil Waldron, a former U.S. Army information officer with expertise in electronic warfare, identified a "pretty significant information warfare campaign" conducted across the country during the Election. He described the history of the Dominion and other voting machines, with the operating software sharing the same "DNA" going back to Smartmatic, which was created to help steal elections in Venezuela.

Waldron analyzed these machines in Michigan and found them extremely insecure. He said a good hacker could get into them within two minutes, while an elementary-school student could probably do it in twelve. There are 12 avenues of attack. Dominion also sends voter data outside the United States.

10

Waldron discussed fractional voting. Waldron testified that the Dominion software used in the Georgia machines assigns a fractional value to each vote; there is no legitimate purpose in assigning an elector's vote as a fractional vote. That feature can allow the manipulation of election results.

Waldron said federal law (USC Title 46) requires that the ballot images within the machine are required to be preserved for 22 months, but only a forensic analysis would show if this was done. Each machine can record 2,000-3,000 ballots per hour. His Michigan analysis showed "huge breaches in chain of custody" with respect to the machines and to absentee ballots. In Georgia, there was an unexplained upload of ballots at 3:36 a.m. on November 4.

Waldron urged a full forensic audit of the machines and of absentee ballots (for example, ink analysis would show if ballots were mass-produced).

■ Scott Hall of Fulton County stated that when he worked at the English Street facility that he had concerns about the contractors hired there. He noted that every vote in Fulton County ends up on thumb drives that eventually find their way to the English Street location. He said, "I have photographs of pallet loads of basically signed checks." "So you've got every single vote, you've got currency, and now you just need someone to do it." He said he hired one of his own guys to determine if a fraudulent vote could be recorded on the Dominion machines at that point in the process. "Now, I've got all these votes that have not been uploaded anywhere. And he actually wrote me a paper, and he said that it was the 'stupidest, simplest thing I've ever seen.' He said, 'Dominion's own documentation shows how you take an entire batch, swipe it off, and then swipe on a new batch, before you put it into the real-time reader that uploads." He summed up the voter fraud by using the analogy that the referee got paid off to call the game and something is very wrong.

Exhibit 5

UNCLASSIFIED

## DIRECTOR OF NATIONAL INTELLIGENCE
WASHINGTON, DC


SUBJECT:       Views on Intelligence Community Election Security Analysis

REFERENCE:    Intelligence Community Assessment: Foreign Threats to the 2020 U.S. Elections


From my unique vantage point as the individual who consumes all of the U.S. government's most sensitive intelligence on the People's Republic of China, I do not believe the majority view expressed by Intelligence Community (IC) analysts fully and accurately reflects the scope of the Chinese government's efforts to influence the 2020 U.S. federal elections.

The IC's Analytic Ombudsman issued a report, which I will reference several times below, that includes concerning revelations about the politicization of China election influence reporting and of undue pressure being brought to bear on analysts who offered an alternative view based on the intelligence. The Ombudsman's report, which is being transmitted to Congress concurrently with this Intelligence Community Assessment (ICA), also delves into a wider range of election security intelligence issues that I will not focus on here. However, the specific issues outlined below with regard to China reporting are illustrative of broader concerns. It is important for all IC leaders to foster a culture within the Community that encourages dissenting views that are supported by the intelligence. Therefore, I believe it is incumbent upon me in my role as the Director of National Intelligence to lead by example and offer my analytic assessment, alongside the majority and minority views. This letter was prepared in consultation with the Ombudsman to ensure that I am accurately articulating his findings and presenting them in their proper context.

The majority view expressed in this ICA with regard to China's actions to influence the election fall short of the mark for several specific reasons.

Analytic Standard B requires the IC to maintain "independence of political considerations." This is particularly important during times when the country is, as the Ombudsman wrote, "in a hyper partisan state." However, the Ombudsman found that:

> "China analysts were hesitant to assess Chinese actions as undue influence or interference. These analysts appeared reluctant to have their analysis on China brought forward because they tend to disagree with the administration's policies, saying in effect, I don't want our intelligence used to support those policies. This behavior would constitute a violation of Analytic Standard B: Independence of Political Considerations (IRTPA Section 1019)."

Furthermore, alternative viewpoints on China's election influence efforts have not been appropriately tolerated, much less encouraged. In fact, the Ombudsman found that:

UNCLASSIFIED

SUBJECT:    Views on Intelligence Community Election Security Analysis

"There were strong efforts to suppress analysis of alternatives (AOA) in the August [National intelligence Council Assessment on foreign election influence], and associated IC products, which is a violation of Tradecraft Standard 4 and IRTPA Section 1017. National Intelligence Council (NIC) officials reported that Central Intelligence Agency (CIA) officials rejected NIC coordination comments and tried to downplay alternative analyses in their own production during the drafting of the NICA."

Additionally, the Ombudsman found that CIA Management took actions "pressuring [analysts] to withdraw their support" from the alternative viewpoint on China "in an attempt to suppress it. This was seen by National Intelligence Officers (NIO) as politicization," and I agree. For example, this ICA gives the false impression that the NIO Cyber is the only analyst who holds the minority view on China. He is not, a fact that the Ombudsman found during his research and interviews with stakeholders. Placing the NIO Cyber on a metaphorical island by attaching his name alone to the minority view is a testament to both his courage and to the effectiveness of the institutional pressures that have been brought to bear on others who agree with him.

Intelligence Reform and Terrorism Prevention Act (IRTPA) Analytic Standard D requires that coordinated analytic products be "based on all available sources of intelligence." However, because of the highly compartmented nature of some of the relevant intelligence, some analysts' judgements reflected in the majority view are not based on the full body of reporting. Therefore the majority view falls short of IRTPA Analytic Standard D.

Tradecraft Standard 1 requires the analytic community to be consistent in the definitions applied to certain terminology, and to ensure that the definitions are properly explained. Having consumed election influence intelligence across various analytic communities, it is clear to me that different groups of analysts who focus on election threats from different countries are using different terminology to communicate the same malign actions. Specifically, definitional use of the terms "influence" and "interference" are different between the China and Russia analytic communities. The Analytic Ombudsman found that:

"Terms were applied inconsistently across the analytic community... Given analytic differences in the way Russia and China analysts examined their targets, China analysts appeared hesitant to assess Chinese actions as undue influence or interference."

As a result, similar actions by Russia and China are assessed and communicated to policymakers differently, potentially leading to the false impression that Russia sought to influence the election but China did not. This is inconsistent with Tradecraft Standard 1.

In the Ombudsman's report, he accurately acknowledged my commitment "to provide an independent avenue for analysts to pursue unbiased analysis." My approach here is not without precedent. In 1962, a National Intelligence Estimate stated that the Soviet Union was unlikely to place missiles in Cuba. Then-CIA Director John McCone forcefully disagreed with the analysts,

2

UNCLASSIFIED

UNCLASSIFIED

SUBJECT:     Views on Intelligence Community Election Security Analysis

and later ordered the U-2 reconnaissance flights that discovered that missiles had in fact been deployed.

    In that same spirit, I am adding my voice in support of the stated minority view -- based on all available sources of intelligence, with definitions consistently applied, and reached independent of political considerations or undue pressure -- that the People's Republic of China sought to influence the 2020 U.S. federal elections, and raising the need for the Intelligence Community to address the underlying issues with China reporting outlined above.

_____
John Ratcliffe

_____January 7, 2021_____
Date

3

UNCLASSIFIED