## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KURT B. OLSEN,                                    )
                                                  )
                        Plaintiff,                )
v.                                                )   Case No. 1:22-cv-00807-CJN
                                                  )
NANCY PELOSI, in her official capacity as         )
Speaker of the United States House of             )
Representatives;                                  )
                                                  )
Official address:                                 )
1236 Longworth H.O.B.                             )
Washington, DC 20515                              )
                                                  )
BENNIE G. THOMPSON, in his official               )
capacity as Chair of the Select Committee         )
to Investigate the January 6th Attack on          )
the United States Capitol;                        )
                                                  )
Official address:                                 )
2466 Rayburn House Office Building                 )
Washington, DC 20515                              )
                                                  )
ELIZABETH L. CHENEY, in her official              )
capacity as a member of the United                )
States House of Representatives;                  )
                                                  )
Official address:                                 )
416 Cannon House Office Building                  )
Washington, DC 20515                              )
                                                  )
ADAM B. SCHIFF, in his official capacity          )
as a member of the United States House            )
of Representatives;                               )
                                                  )
Official address:                                 )
2309 Rayburn House Office Building                 )
Washington, DC 20515                              )
                                                  )
JAMES B. RASKIN, in his official capacity         )
as a member of the United States House            )
of Representatives;                               )
                                                  )
Official address:                                 )

2242 Rayburn House Office Building )
Washington, DC 20515 )
)
SUSAN E. LOFGREN, in her official capacity )
as a member of the United States House )
of Representatives; )
)
Official address: )
1401 Longworth House Office Building )
Washington, DC 20515 )
)
ELAINE G. LURIA, in her official capacity )
as a member of the United States House )
of Representatives; )
)
Official address: )
412 Cannon House Office Building )
Washington, DC 20515 )
)
PETER R. AGUILAR, in his official capacity )
as a member of the United States House )
of Representatives; )
)
Official address: )
109 Cannon House Office Building )
Washington, DC 20515 )
)
STEPHANIE MURPHY, in her official )
capacity as a member of the United States )
House of Representatives; )
)
Official address: )
1710 Longworth House Office Building )
Washington, DC 20515 )
)
ADAM D. KINZINGER, in his official )
capacity as a member of the United States )
House of Representatives; and )
)
Official address: )
2245 Rayburn House Office Building )
Washington, DC 20515 )
)
SELECT COMMITTEE TO INVESTIGATE )
THE JANUARY 6th ATTACK ON THE )
CAPITOL OF THE UNITED STATES, a )

body established by the United States        )
House of Representatives,                     )
                                              )
Official address:                             )
Longworth House Office Building               )
Washington, DC 20515                          )
                                              )
                        Defendants.           )
_____)

## AMENDED COMPLAINT FOR DECLARATORY AND INJUCTIVE RELEIF

### INTRODUCTION

> Abuses of the investigative process may imperceptibly lead to abridgement of protected freedoms. The mere summoning of a witness and compelling him to testify, against his will, about his beliefs, expressions or associations is a measure of governmental interference. . . . Those who are identified by witnesses and thereby placed in the same glare of publicity are equally subject to public stigma, scorn and obloquy. Beyond that, there is the more subtle and immeasurable effect upon those who tend to adhere to the most orthodox and uncontroversial views and associations in order to avoid a similar fate at some future time.

*Watkins v. United States,* 354 U.S. 178, 197-98 (1957)

1.      Plaintiff, Kurt B. Olsen, is an active attorney licensed to practice in Maryland and Washington D.C.  He was appointed Special Counsel to the Office of the Attorney General for the State of Texas ("OAG") to assist the OAG in representing the State of Texas in a suit before the United States Supreme Court. The purpose of this suit was to prevent dilution of the electoral-college votes of Texas in the 2020 Presidential election and uphold and enforce state and federal election law. *Texas v. Pennsylvania, et al*, 141 S. Ct. 1230 (2020). Eighteen other States and 126 Members of Congress joined or filed amicus briefs supporting Texas in that action.

2.      Among his other clients, Plaintiff also has an attorney-client relationship with former President Trump; Mike Lindell, who is currently engaged in litigation with Dominion Voting Systems, Inc. ("Dominion"); and proposed class representatives in a putative class action

pending against Dominion and other related defendants. That class action alleges Dominion engaged in an illegal campaign of intimidation and harassment against volunteer poll watchers and other Americans by threatening to wage Lawsuit Warfare ("Lawfare") against anyone who exposes or even speaks about fraud and illegal voting activity in the 2020 Presidential election.[1]

3.      On March 1, 2022, Plaintiff received an email from the Senior Investigative Counsel for the U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol (the "Select Committee") asking whether he would accept service via email of a subpoena issued by Defendant Bennie G. Thompson, Chairman of the Select Committee.  In the alternative, the email stated that "If you are represented by counsel, please let me know his or her name and contact information and we will reach out as soon as possible." No subpoena was attached to that email. The email is attached hereto as Exhibit 1.

4.      Plaintiff's counsel received the subpoena (the "Subpoena") from the Select Committee's counsel on March 1, 2022. The Subpoena is attached hereto as Exhibit 2.

5.      The Subpoena compels Plaintiff to appear for a deposition and to produce a considerable number of documents that, among other things, unquestionably cover his provision of legal assistance to clients, as well as documents pertaining to his personal and political affairs.

6.      However, the Committee's investigation was fundamentally flawed from its inception. The resolution that established the Select Committee, House Resolution 503 ("H. Res. 503"), demonstrates that the Select Committee had already reached a predetermined conclusion without examination of the facts that those who attacked the Capitol on January 6, 2021, were "fueled by false narratives." H. Res. 503, Second Whereas Clause. That conclusion shows that the Select Committee had reached a predetermined conclusion that claims of election fraud in the

---

[1] https://en.wikipedia.org/wiki/Lawfare.

2020 election were false and that "false narratives" of election fraud contributed to the violence at the Capitol. The Select Committee prejudged what logically should be the central inquiry of its purported "investigation" – whether the claims of election fraud are accurate. H. Res. 503 §4 (B).

7.     Because of its prejudgment of the facts, the Select Committee's reports will lack legitimacy and credibility, and it will be partisan. That the investigation is a partisan exercise is also shown by the fact that highly partisan Members appointed by Defendant Pelosi subscribed to that predetermined conclusion and are in complete control of this investigation. All the appointees had previously voted to impeach President Donald Trump. Defendant Thompson has sued Mr. Trump for the avowed purpose of punishing him for purported unlawful actions. *Thompson v. Trump,* No. 1:21-cv-00400 (D.D.C. Feb. 16, 2021). Defendant Raskin had previously served as the lead manager for the House of Representatives in the second impeachment trial of Mr. Trump. Defendant Cheney had previously submitted a memorandum to her Republican colleagues in the House three days before the January 6, 2021, attack arguing that claims of election fraud had been debunked without acknowledging strong evidence to the contrary. The Cheney memorandum is attached as Exhibit 3.

8.     The Select Committee's goal is an open secret: to prevent former President Trump from running for office again by issuing findings that President Trump committed crimes by purportedly inciting the riots at the Capitol on January 6, 2021 with so-called "false narratives" of election fraud in the 2020 Presidential election.[2]  To accomplish this predetermined goal, the Select Committee has thrown out all legal norms. It has threatened anyone involved with former

---

[2] *See, e.g.,* Democrats quietly consider using the 14th Amendment to prevent Trump from running for office in 2024, Salon, January 7, 2022, https://www.msn.com/en-us/news/politics/democrats-quietly-consider-using-14th-amendment-to-prevent-trump-from-running-for-office-in-2024/ar-AASy7TT

President Trump with subpoenas, public hearings, and criminal charges as the Select Committee and its members repeat the mantra that there is no evidence of widespread illegal voting and election fraud in the 2020 Presidential election.

9.      That mantra, however, is directly contradicted by publicly available evidence—including court rulings and state legislative investigations in states such as Arizona, Wisconsin, Michigan, and Georgia—showing outcome determinative illegal and fraudulent voting.  Indeed, on March 16, 2022, Wisconsin's Speaker of the Assembly, Robin Vos, publicly stated, "*I think there was widespread fraud [in Wisconsin] and I think we are going to see more and more data that comes out. . . .*"[3] (Emphasis added).

10.     Although the Select Committee has had ample time to investigate such issues, it never once changed its false assertions that no evidence of election fraud and illegal voting in the 2020 Presidential election exists. Such indifference shows that the Select Committee's true purpose is to intimidate individuals associated with former President Trump who might speak out on this topic, violating their First Amendment rights in the process.  The Select Committee's so-called "investigation"—with public hearings, subpoenas, and depositions devoted to confirming a predetermined conclusion—is reminiscent of Soviet "show trials" intended to intimidate and silence political opponents.

11.     In stark contrast, some Members of Congress, with virtually no justification, claimed that the 2016 Presidential election result was altered by collusion between Russia and the campaign of Mr. Trump. A special counsel was appointed by the Deputy Attorney General to investigate whether such collusion occurred. After three years and expenditure of more than $32

---

[3] https://wisconsinexaminer.com/brief/after-meeting-with-election-conspiracists-vos-says-decertification-impossible-but-reaffirms-belief-in-widespread-fraud/

million, Special Counsel Robert Mueller reported that no evidence of collusion had been found. Moreover, unlike the Committee's investigation, the Mueller investigation into possible criminal activity was conducted by law enforcement officials, not a congressional committee and its staff, as the Constitution's separation-of-powers provisions require.

12.     The governmental efforts to stifle free speech and intimidate anyone who speaks out on election fraud is not limited to the Select Committee.  The U.S. Department of Homeland Security has taken similar action to intimidate anyone who would expose illegal and fraudulent voting in the 2020 Presidential election by issuing thinly veiled threatening "guidance" on so-called "domestic extremism," which includes "sociopolitical developments such as narratives of fraud in the recent general election" as a marker.[4]

13.     The Office of the Director of National Security issued a report on March 1, 2021, entitled *Domestic Violent Extremism Poses Heightened Threat in 2021.* It stated:

> Newer sociopolitical development – such as narratives of fraud in the recent general election, the emboldening impact of the violent breach of the US Capitol, conditions related to the COVID-19 pandemic, and conspiracy theories promoting violence – will almost certainly spur some [domestic violent extremists] to try to engage in violence this year.[5]

14.     For many Americans, such coordinated acts by government officials to bury the truth is unthinkable.

15.     In association with others who share Plaintiff's beliefs about the need for election integrity, including certain of his clients and others who share a common interest in pending or anticipated litigation, Plaintiff has been and continues to be involved in efforts to investigate and

---

[4] Report *available at* https://www.dhs.gov/sites/default/files/2022-03/Report%20to%20the%20Secretary%20of%20Homeland%20Security%20Domestic%20Violent%20Extremism%20Internal%20Review%20Observations%2C%20Findings%2C%20and%20Recommendations.pdf.
[5] Report *available at* https://www.dhs.gov/sites/default/files/publications/21_0301_odni_unclass-summary-of-dve-assessment-17_march-final_508.pdf.

raise awareness of fraud and illegal voting that occurred in the 2020 Presidential election and to protect the constitutional rights of those who are concerned about such issues. They have been working together to alert the public and to petition their government for a redress of their grievances. Plaintiff insists on the right, protected by freedom of the press, to control his own message and the manner, timing, and circumstances of the disclosure of the evidence which he and others have and continue to assemble about the 2020 election.  The Subpoena demands that Plaintiff place his attorney work product which assembles that evidence, into the hands of partisan members of Congress who have demonstrated no interest in election fraud, but rather could use that information strategically by way of selective release, distortion, or other tactics of information warfare to minimize or defeat the effect its publication by Plaintiff.

16.     Some who have associated with Plaintiff to assist and inform his exercise of free speech and political expression have intentionally kept their association with him confidential out of fear that they will suffer retaliation, harassment, and loss of business or professional opportunities if their association with Plaintiff is made public.

17.     Enforcement of the Subpoena would, among other things, violate Plaintiff's rights of freedom to associate with others to advance their shared beliefs, freedom of speech, and freedom of political expression, which are guaranteed by the First Amendment.

18.     The Subpoena also fails to satisfy the most essential requirements of the Fourth Amendment in that it was issued by Defendant Thompson, who is not a neutral and detached magistrate, and is overbroad and lacking particularity in identifying the documents to be produced.

19.     Accordingly, Plaintiff brings this action seeking declaratory and injunctive relief to invalidate the Subpoena on constitutional and other grounds and to prohibit the enforcement of the Subpoena.

## PARTIES

20.     Plaintiff, Kurt B. Olsen, is a resident of the State of Maryland and a member of the Bar of that State and the District of Columbia.

21.     Defendant Nancy Pelosi is a Member of the United States House of Representatives who is currently serving as Speaker of the House and, as Speaker, appointed the members of the Select Committee.

22.     Bennie G. Thompson is a Member of the United States House of Representatives who was appointed by Speaker Pelosi to chair the Select Committee. He issued the Subpoena.

23.     Defendants Elizabeth L. Cheney, Adam B. Schiff, James B. Raskin, Susan E. Lofgren, Elaine G. Luria, Peter R. Aguilar, Stephanie Murphy, and Adam D. Kinzinger are members of the United States House of Representatives who were appointed by the Speaker of the House to serve on the Select Committee.

## JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 based upon Defendants' violations of Plaintiff's constitutional rights, as well as 28 U.S.C. §§2201 and 2202, which provides for declaratory judgments.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the Subpoena was issued in the District of Columbia and the Committee's investigation is occurring there.

**STATEMENT OF FACTS**

26.     Following the events at the Capitol on January 6, 2021, Defendant Thompson introduced on May 14, 2021, H.R. 3233 to establish a National Commission to Investigate the January 6 Attack on the United States Capitol Complex. His bill would have established a bipartisan body of ten members with an equal number of Democrats and Republicans. The legislative proposal was approved by the House of Representatives but rejected by the Senate on May 28, 2021.

27.     After the Senate failed to pass H.R. 3233, Defendant Pelosi, as Speaker of the House of Representatives, introduced H. Res. 503 to establish the Select Committee. The resolution was approved by the House of Representatives on June 28, 2021. Unlike the failed H.R. 3233 that assured equal bipartisanship in the membership of a National Commission, H. Res. 503 directs the Speaker to appoint 13 members to the Select Committee of which only five "shall be appointed after consultation with the minority leader."

28.     The Minority Leader of the House nominated five members of his party to serve on the Select Committee, but Defendant Pelosi refused to appoint two of the five nominees of the Minority Leader. Instead, she appointed only nine members to the Select Committee. Two of the nine were Republican representatives who had voted to approve H. Res. 503 and whose appointments to the Committee were opposed by the Minority Leader.

29.     Following Defendant Pelosi's unprecedented rejection of nominees of the Minority Leader for membership on the Committee, the Minority Leader declined to participate in the investigation by the Committee and withdrew his slate of Republican nominees. The Minority Leader cited the Committee's excessive partisanship, its unprecedented composition, and the proclaimed preconceptions of the Committee members who had been appointed by

Defendant Pelosi, including members who had voted to impeach President Donald J. Trump and had publicly accused him of unlawful conduct.

30.     As a result of Defendant Pelosi's actions, the Committee, which was to include eight Democrats chosen by the leadership of their party and five Republicans chosen by the leadership of their party as H. Res. 503 provided, instead consisted of four vacancies and a strikingly unbalanced partisan membership of seven Democrats chosen by their party leadership and two nominal Republicans not chosen by their party leadership but rather by Defendant Pelosi to produce further imbalance of the membership than H. Res. 503 had provided.

31.     H. Res. 503 assigns to the Select Committee the responsibility of investigating the facts, circumstances, and causes relating to the January 6, 2021, breach of the Capitol; identifying, reviewing, and evaluating the causes of, and the lessons learned from, the events at the Capitol on that day; investigating influencing factors that contributed to the January 6th events; and issuing a final report to the House containing such findings, conclusions, and recommendations for corrective measures as it deems necessary. The Select Committee is not authorized to conduct any investigation that is not specified in H. Res. 503.

32.     Plaintiff was not present during the events that occurred at the Capitol on January 6, 2021.

33.     As early as the beginning of the Select Committee's investigation in June 2021, the Chairman and other members were aware of Plaintiff's meeting with then-Acting Attorney General Jeffrey Rosen.  Nonetheless, the Committee did not issue the Subpoena until nine months later on March 1, 2022, with an unreasonable return date for document production of March 15, 2022.

34.    The Select Committee's true—and improper—partisan purpose is to discourage, penalize, and criminalize speaking out about election fraud and/or illegal voting in the 2020 Presidential election—particularly as to individuals who were associated with former President Trump. Indeed, last month, the Select Committee argued in a court filing that claiming that election fraud altered the result of the 2020 Presidential election could make one part of a "criminal conspiracy to defraud the United States in violation of 18 U.S.C. § 371." Congressional Defendants' Opposition to Plaintiff's Privilege Assertions, *Eastman v. Thompson,* No. 8:22-cv-00099, ECF No. 164-1 at 57 (C.D. Cal. March 3, 2022).

35.    The Select Committee made that argument while ignoring clear evidence of outcome-determinative election fraud and illegal voting in the 2020 Presidential election available to them at the time. While the courts were not well-suited to address such evidence in the press of time between November 3, 2020 and January 6, 2021, the Select Committee has not been so encumbered.

36.    Indeed, as Justice Clarence Thomas observed in *Republican Party of Pennsylvania v. DeGraffenreid,* 141 S. Ct. 732, 737 (2021): "[T]he judicial system is not well-suited to address these kinds of [election fraud] questions in the short time period available immediately after an election…."

37.    The most effective method—and in many instances, the only method—of determining whether election tampering occurred and, if so, the extent of the tampering is by a forensic audit, which, in the context of elections, examines relevant election records and other information related to voting and ballot tabulation seeking evidence that would be admissible in court to determine whether irregularities, fraud, or criminal activities affected the election process and whether any such interference with the process altered the result of the election.

38.     Numerous actions have been taken, however, to discourage or prohibit forensic audits of the 2020 Presidential election. For example, U.S. Attorney General Merrick Garland on July 28, 2021, threatened any state that proceeded with a forensic audit with criminal and civil actions to prevent such an audit.[6] Dominion and another company that provides computerized election machines and software, Election Systems & Software Company, have refused to comply with subpoenas and to cooperate with investigations by official state legislative bodies in Arizona, Pennsylvania, and Wisconsin.[7]

39.     The Select Committee has had ample time to begin an investigation of the available evidence of election tampering, but it concluded from its inception that there is no evidence of tampering.

40.     The potential for fraud involving mail-in voting is well-known.  Indeed, the 2005 bipartisan Commission on Federal Election Reform concluded that "[a]bsentee ballots remain the largest source of potential voter fraud."[8] In the 2020 Presidential election, according to the Pew Research Center, a record number of votes—about 65 million—were cast via mail compared to 33.5 million mail-in ballots cast in the 2016 general election—an increase of more than 94 percent.  Indiscriminate mail-in balloting was particularly prevalent in battleground states such as Georgia, Michigan, Wisconsin, and Pennsylvania where non-legislative actors also usurped their respective legislature's authority and unconstitutionally revised their State's election laws

---

[6]  https://www.justice.gov/opa/press-release/file/1417796/download.

[7] *See* Cyber Ninjas, *Maricopa County Forensic Election Audit*, vol. III, *supra*, at Section 6.5.3.1.3; Wisconsin OSC Report at 14; and Pennsylvania Supreme Court Prevents Senate Audit of Dominion Voting Machines in the State - Free and Fair Elections Are Finished in PA, legitgov.org, March 25, 2022, at https://www.legitgov.org/pennsylvania-supreme-court-prevents-senate-audit-dominion-voting-machines-state-free-and-fair.

[8] Commission on Federal Election Reform, *Building Confidence in U.S. Elections* §5.2 at 46 (2005) *available at* https://www.legislationonline.org-/download/id/1472/file/3b50795b2d0374cbef5c22976656.pdf.

by disregarding the two strongest security measures designed to lessen fraud in mail-in voting—signature verification and witness requirements—and mandating the profligate use of unmanned drop boxes.

41.     Courts in Wisconsin and Michigan have ruled that the executive or judicial actions that altered the laws for electing Presidential Electors established by a state legislature were illegal. *See, e.g., Jefferson v. Dane County*, 394 Wis. 2d 602, 951 N.W.2d 556 (Wis. 2020) (Wisconsin officials, including Governor Evers, unlawfully told Wisconsin voters to declare themselves "indefinitely confined" —thereby allowing more than two hundred thousand voters to avoid signature and photo ID requirements). On February 11, 2022, the Wisconsin Supreme Court upheld a stay on the employment of unmanned ballot drop boxes illegally used in the 2020 general election in violation of Wisconsin law. [9]  On March 9, 2021, the Michigan Court of Claims ruled that the Michigan Secretary of State unlawfully required election clerks to presume that voters' signatures were genuine, which violated Michigan law. *Genetski v. Benson*, Case No. 20-000216-MM, slip op. at 14 (Mich. Ct. Claims, March 9, 2021). Similar violations of Article II, §1, cl.2 of the Constitution regarding legislative rules governing the 2020 selection of Presidential Electors occurred in Georgia and Pennsylvania. *See, e.g.,* Bill of Complaint at ¶¶ 41-76, *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020) (No. 22O155).

42.     On March 1, 2022, the Office of the Special Counsel ("OSC"), charged by Wisconsin Speaker of the Assembly to investigate the allegations of fraud and illegality in the Wisconsin 2020 general election, issued a damning 136-page Report after an eight-month investigation.  That Report detailed numerous instances of outcome-determinative voter fraud

---

[9] https://www.wpr.org/sites/default/files/2022ap91_02-11-22.pdf

and felony crimes. The OSC called on Wisconsin's legislature to decertify its 2020 Presidential electors.[10]

43.    Following the OSC's Report, on March 16, 2022, Wisconsin Speaker Vos publicly stated, "*I think there was widespread fraud [in Wisconsin] and I think we are going to see more and more data that comes out as [the OSC] continues his investigation*."[11] (Emphasis added).

44.    The public interest organization True the Vote ("TTV") conducted a fifteen-month investigation based on millions of minutes of videotape surveillance of drop boxes and over 10 trillion unique cell phone identity signals in Arizona, Georgia, Michigan, Pennsylvania, Texas, and Wisconsin utilizing a technique known as geospatial mobile device signal analysis. On  March 18, 2022, TTV issued a report showing that large-scale ballot harvesting occurred during the 2020 elections in Wisconsin, Georgia, and Arizona.[12] TTV has announced that it will issue additional reports.

45.    On February 7, 2022, Arizona Representative Mark Finchem introduced Arizona HCR 2033, signed by 13 other State Representatives and Senators, detailing a myriad of investigatory findings of outcome changing fraud and illegal votes in Arizona's 2020 and calling for the decertification of its 2020 Presidential electors.[13]

46.    Notably, Arizona HCR 2033 is based in part on seven-month long forensic audit of the Maricopa County, Arizona 2020 election which, despite Maricopa County officials having

---

[10] The Report can be found at
https://legis.wisconsin.gov/assembly/22/brandtjen/media/1552/osc-second-interim-report.pdf.
[11] https://wisconsinexaminer.com/brief/after-meeting-with-election-conspiracists-vos-says-decertification-impossible-but-reaffirms-belief-in-widespread-fraud/
[12] https://www.truethevote.org/wp-content/uploads/2022/03/FILE_5193_no-meta.pdf.
[13] The Resolution can be found at https://www.azleg.gov/legtext/55leg/2R/bills/HCR2033P.pdf

improperly withheld and deleted 2020 election records, found numerous anomalies and outcome-determinative illegal votes in the County. [14]

47.     In February 2022, two scientific studies analyzing the 1.9+ million signatures on the mail-in ballot envelopes in Maricopa County revealed conclusively that more than 200,000 signatures on those ballot envelopes ***do not match*** the voters' signatures. [15]  In addition, as stated in HCR 2033, "Maricopa County officials violated Arizona statutes and do not have the required chain of custody for at least 740,000 ballots."

48.     In Pennsylvania, an analysis of the official voter history files from the Pennsylvania SURE System reveals that in the November 2020 election, Pennsylvania received and recorded more than 121,000 ballots ***that cannot be attributed to a voter***.  Pennsylvania Law 25 PA.C.S. § 3154 expressly prohibits certification of any votes in any district in which there are more votes than voters until after an investigation of an over-vote is reconciled, which was never done.

49.     In Georgia, a year-long study of ballot images conducted by an expert research team documented clear evidence showing how the November 2020 Fulton County election results were electronically manipulated prior to certification. That study can be verified through public ballot images at GAballots.com or other sites, and among other things, found that in Fulton County: 17,724 final certified Fulton votes have no ballot images; all 374,128 in-person ballot images for the original count are missing; 132,284 mail-in ballot images are missing their

---

[14] Cyber Ninjas, *Maricopa County Forensic Election Audit*, vol. III, at 6, 51, 10, 12-14, 20-21, 25-26, 29-30, 34-36 (Sept. 24, 2021) available at https://www.azsenaterepublicans.com/cyber-ninjas-report.

[15] https://electionsystemsintegrity.org/esii-study-concludes-maricopa-signature-verification-process- deeply-unreliable/

authentication files; and 104,994 image files in 1,096 batches have impossible, duplicate time stamps.  In Dekalb County, more than 43,000 absentee ballots have no required chain of custody.[16]

50.     The Select Committee also ignored the findings in a public report unanimously approved by the Georgia Election Law Study Subcommittee of the Georgia Standing Senate Judiciary Committee.  That report discussed a myriad of voting irregularities and potential fraud in the Georgia 2020 general election. The Subcommittee unanimously approved the report on December 30, 2020.  The Executive Summary states that "[t]he November 3, 2020 General Election (the 'Election') was chaotic and any reported results must be viewed as untrustworthy." *See* Exhibit 4.

51.     The Select Committee's investigation also ignores the conclusion of the National Academy of Sciences, Engineering & Medicine that "all digital information—such as ballot definitions, voter choice records, vote tallies, or voter registration lists—is subject to malicious alteration."[17] *See also Curling v. Raffensperger,* 493 F.Supp.3d 1264, 1280 (N.D. Ga. 2020) (finding that "a broad consensus now exists among the nation's cybersecurity experts recognizing the capacity for the unobserved injection of malware into computer systems to circumvent and access key codes and hash values to generate fraudulent codes and data.").

52.     Indeed, in *Curling*, a leading expert in the field of election security related to electronic voting machines, University of Michigan Professor J. Alex Halderman, issued a 25,000-word expert report on July 1, 2021 describing "critical vulnerabilities" in Dominion's

---

[16] https://georgiastarnews.com/4300-absentee-ballot-votes-counted-in-dekalb-county-2020-election-violated-chain-of-custody-rule.html
[17] National Academy of Sciences, Engineering & Medicine 2018, *Securing the Vote: Protecting American Democracy* 90 (Nat'l Acad. Press 2018) *available at* https://doi.org/10.17226/25120.

electronic voting and tabulating machines that can be used "to steal votes" in at least sixteen

States. *See* Exhibit 5 ((Sept. 21, 2021, Halderman Decl. at ¶¶ 2, 5). Professor Halderman also

stated that the Dominion voting equipment "is very likely to contain other, equally critical flaws

that are yet to be discovered." *Id.* ¶ 4. Professor Halderman's report has been sealed by the

district court. The U.S. Cybersecurity and Infrastructure Security Agency ("CISA") recently

entered an appearance in that case opposing disclosure of Professor Halderman's

report. *See* Exhibit 6.

53.     Professor Halderman also testified that his report "explain[s] in detail how such

malware, once installed, could alter voters' votes while subverting all procedural protections

practiced by the State, including acceptance testing, hash validation, logic and accuracy testing,

external firmware validation, and risk-limiting audits (RLAs)." *See* Exhibit 7 (August 2, 2021

Halderman Decl. at ¶ 4).

54.     In Mesa County, Colorado, cyber experts have issued three reports showing: (i)

that Dominion deleted election records related to the 2020 Presidential election and April 2021

municipal election in connection with a so-called Trusted Build software update; (ii) the voting

machines contain unauthorized software thereby voiding their certification and are wide open to

hacking; and stunningly (iii) unauthorized manipulation of the ballots in both elections.[18]

55.     On January 7, 2021, the Director of National Intelligence ("DNI") concluded in

an unclassified memorandum that "CIA Management took actions 'pressuring [analysts] to

withdraw their support' for findings regarding China's actions to "interfere" in the election. *See*

Exhibit 8, John Ratcliffe, Director of National Intelligence, *Views on Intelligence Community*

*Election Security Analysis*, at 2 (Jan. 7, 2021). The DNI concluded that the CIA's actions

---

[18] The three reports can be found at https://www.tinapetersforcolorado.com/election-reports

violated Intelligence Community Tradecraft Standards. *Id.* The Select Committee has utterly ignored this warning that China may have interfered in the 2020 Presidential election.

These are but a few examples of clear evidence of outcome-determinative fraudulent or illegal voting in swing States in the 2020 Presidential election that were public both before and after January 6, 2021. The Select Committee not only deliberately ignored that evidence but seeks to criminalize the discussion of it.

## COUNT I
## Violation of the Fourth Amendment

56.     Each of the foregoing paragraphs is incorporated as if fully set forth within this Count.

57.     The Subpoena was issued by Defendant Thompson as Chairman of the Committee. He is not a neutral and detached party as required by the warrant provision of the Fourth Amendment.

58.     The Subpoena cannot be enforced because it violates Plaintiff's right to the security of his property and privacy, to be protected against unreasonable searches and seizures, and to the issuance of a subpoena directed to him by a neutral and detached party, which rights are guaranteed by the Fourth Amendment.

59.     On February 16, 2021, Defendant Thompson filed an action against former President Trump in the United States District Court for the District of Columbia in which he asserted that President Trump had committed unlawful acts for which he should be punished. *Thompson v. Trump,* No. 1:21-cv-00400 (2/16/2021), ECF No. 1, ¶¶ 8, 132, 141.

60.     On January 13, 2021, Defendant Thompson voted to impeach President Trump based on a House Resolution that stated, among other things, "President Trump repeatedly issued false statements asserting that the Presidential election results were the product of widespread

fraud and should not be accepted by the American people or certified by State or Federal officials."[19]

61.     The statement in the Resolution that it is false to assert that "the Presidential election results were the product of widespread fraud" is contradicted by numerous publicly available findings made by, *inter alia*, state legislative representatives, or those acting at legislative bodies' direction.

62.     Defendant Thompson has publicly stated in a televised January 6, 2022 interview with the Washington Post:

> The big lie brought a lot of people to Washington under the guise of stopping the steal and they were weaponized at that rally to come to the Capitol and do just what they did. And Donald Trump has to be the principal author of what occurred because he invited people to Washington on January 6. And he said it was going to be wild and indeed it was wild.
>
> ***
>
> If you're seeing the United States Capitol under attack by people who you sent there and it takes you 187 minutes for you to say this is wrong, you need to go home, and as my vice chair has said, this borders on dereliction of duty and it might just necessitate a referral to the Department of Justice to take a look at. So we will not just with that but any other instance of we think illegal activity, we will refer – or criminal activity – we'll make a referral. So you can't just watch TV for 187 minutes and not expect people to think that you are complicit in what is going on by not trying to stop it.[20]

63.     The second provision of the Fourth Amendment, the warrant provision, requires that the decision to issue a warrant or subpoena be made by "a neutral and detached" party.

64.     The warrant provision is applicable to all searches and seizures except those that have been permitted as exceptions to the warrant requirement by decisions of the United States Supreme Court, which exceptions do not include congressional subpoenas.

---

[19] https://www.congress.gov/bill/117th-congress/house-resolution/24/text.
[20] *See* https://www.washingtonpost.com/washington-post-live/2022/01/06/transcript-jan-6-one-year-later-with-rep-bennie-thompson-d-miss/.

65.     Defendant Thompson is not a "neutral and detached" party for purposes of the warrant provision of the Fourth Amendment.

66.     The Subpoena violates Plaintiff's Fourth Amendment rights because it was issued by a party who was not "neutral and detached."

67.     The conjunction of Plaintiff's right to free association presents a hybrid situation in which his right protected by the Fourth Amendment and his rights protected by the First Amendment, as asserted in Count II of this Complaint, reinforce each other, making the Subpoena's intrusive demands qualitatively more offensive to the fundamental constitutional rights and laws that bind the House and its committees.

68.     The scope of the Subpoena is also overbroad and intrusive. It would force disclosure of private communications between Plaintiff and persons with whom he has associated in pursuit of shared political objectives without regard for whether those communications relate to the authorized subject and purposes of the Committee's investigation. The Subpoena seeks access to information that Plaintiff has worked with others to assemble detailing fraud in the 2020 election so that Committee members and opponents of Plaintiff and those with whom he associates. Such forced disclosure would expose Plaintiff and his associates to harassment and retaliation for the exercise of their rights to exercise free speech, political expression, free association, freedom of the press, and to petition their government for the redress of grievances.

69.     The Fourth Amendment requires that items to be seized must be identified with particularity. The Subpoena's language demands the production of not simply documents concerning the events of January 6, 2021, but also the production of documents and communications through the present date categorized only as: Election Fraud Claims, Meetings

with State Officials, and Fee Arrangements. The breadth and generality of such a demand constitute a plain violation of the Fourth Amendment's particularity requirement.

70.     The Subpoena compels the production of records which are the property of Plaintiff and his clients and for which there has been no showing that they constitute instrumentalities of crime, the fruits of crime, or contraband.  The Subpoena carries a sweeping demand for records the disclosure of which would cause a substantial and illegal intrusion into the property and privacy rights of those communicating with Plaintiff and others with whom they have associated to advance shared beliefs.

71.     The broad reach of the disclosure requirements of the Subpoena would not pass constitutional muster in a criminal proceeding and should not be permitted in a congressional investigation. The Fourth Amendment provides a general right of property and privacy where any governmental compulsion is involved.

72.     The Subpoena, therefore, is unenforceable and invalid.

## COUNT II
## Violation of the First Amendment

73.     Each of the foregoing paragraphs is incorporated as if fully set forth within this Count.

74.     Plaintiff's rights to freedom of speech, press, freedom of association, and freedom of political expression are guaranteed by the First Amendment.

75.     The conjunction of Plaintiff's First Amendment rights and Fourth Amendment rights presents a hybrid situation in which those rights reinforce each other, making the Subpoena's intrusive demands qualitatively more offensive to the fundamental law that binds the House and its committees.

76.     The Subpoena cannot be enforced because it violates Plaintiff's freedom of speech, press, freedom of association, and freedom of political expression guaranteed by the First Amendment.

77.     The Subpoena violates Plaintiff's First Amendment right to free association because its purpose and effect are to identify persons with whom Plaintiff has associated to advance their shared political beliefs as they relate to the conduct of the 2020 presidential election. Many of Plaintiff's associates wish to remain anonymous. The forced disclosure of their identity and participation in the association would chill and potentially end their willingness to continue their association with Plaintiff for the advancement of their shared political beliefs.

78.     The Subpoena violates Plaintiff's rights of freedom of speech, of political expression, of association, and of the press because it has the effect of chilling the exercise of those rights.

79.     Congress has no general or inherent authority to issue subpoenas for any purpose. Rather, its subpoena authority is strictly limited to inquiries in furtherance of its legislative function. Congress's authority does not extend to inquiries intended to develop information in support of criminal investigations or prosecutions, to merely bring facts to light, or to harass and intimidate private citizens or political opponents.

### COUNT III
### Violation of the Constitution's Separation of Powers

80.     Each of the foregoing paragraphs is incorporated as if fully set forth within this Count.

81.     From the inception of the Select Committee's investigation, the Select Committee and its members have pursued a law enforcement objective of the prosecution of former

President Trump to prevent him from holding political office and to secure the prosecution of his associates, including Plaintiff, for violations of federal law.

82.    Thus, the Committee's investigation constitutes a thinly veiled effort to conduct an unauthorized criminal investigation by a handful of Members of Congress in violation of the separation-of-powers provisions of the Constitution and is otherwise not in furtherance of a valid legislative purpose.

83.    Indeed, on March 2, 2022, Defendants Thompson and Cheney issued a statement concluding that "[t}he facts we've gathered strongly suggest that Dr. [John] Eastman's emails may show that he helped Donald Trump advance a corrupt scheme to impede the transfer of power."[21] Once the Select Committee reaches such a conclusion, it has a duty to refer the matter, accompanied by the evidence it has gathered, to the Department of Justice for its investigation, if warranted. Continued investigation by the Select Committee of the alleged "corrupt scheme" and "conspiracy to impede the transfer of power" by the Select Committee would violate the separation-of-powers provisions of the Constitution, which assign the law enforcement function to the executive branch.

84.    In addition, every member of the Select Committee voted to impeach former President Trump on January 25, 2021, for allegedly, *inter alia*, "repeatedly issu[ing] false statements asserting that the Presidential election results were the product of widespread fraud and should not be accepted by the American people or certified by State or Federal officials."[22]

85.    Defendant Raskin served as lead manager of the House prosecution team in the second Senate impeachment proceeding of former President Trump.

---

[21] https://january6th.house.gov/news/press-releases/Thompson-cheney-statement-filing-eastmen-lawsuit.
[22] https://www.congress.gov/bill/117th-congress/house-resolution/24/text.

86.     On March 2, 2022, the Committee filed its Congressional Defendants' Brief in Opposition to Plaintiff's Privilege Assertions in the case of *Eastman v. Thompson* in the United States District Court for the Central District of California in which it represented to the court that the Select Committee had concluded that John Eastman and former President Trump had violated 18 U.S.C. § 371, a criminal conspiracy statute. No. 8:22-CV-00099, ECF No. 164-1 at 57 (C.D.Cal.).

87.     On information and belief, the Select Committee and its staff have been cooperating with the U.S. Department of Justice and other law enforcement agencies in the investigation and prosecution of individuals suspected or accused of criminal offenses in connection with the events of January 6, 2021 at the Capitol.

88.     Even if the Committee had the authority to initiate an investigation that led to the discovery of what the Select Committee considered sufficient evidence to accuse Mr. Eastman and President Trump of conspiracy to commit a felony, the Select Committee was not authorized to continue its investigation of the alleged crime beyond that point but was obligated to refer the matter to the United States Department of Justice for further investigation, if appropriate. The Select Committee has no authority to continue its investigation of such alleged criminal activity.

89.     The Select Committee's investigation has become, if it had not been from the beginning, an unconstitutional law enforcement investigation.

90.     Congress and its committees may not conduct law enforcement investigations because such investigations violate the separation-of-powers provisions of the Constitution, which assign the law enforcement and prosecution functions to the executive and judicial branches.

91.     The investigation of Plaintiff by the Committee is, therefore, a violation of the First Amendment and must be enjoined.

## COUNT IV
## Violation of H. Res. 503

92.     Each of the foregoing paragraphs is incorporated as if fully set forth within this Count.

93.     Only a congressional committee that is duly organized by the respective chamber has the authority to issue subpoenas. The Select Committee fails to qualify as an authorized congressional committee because it is in substantial violation of the requirements of H. Res. 503, the purported source of its authority. H. Res. 503 does not grant any authority except to a committee that meets the conditions established by that resolution. The Select Committee fails to meet those conditions.

94.      In conducting its investigation, the Select Committee acted without authority because it is not validly organized as a House committee under the Rules of the United States House of Representatives, notably Rule X.5(a)(1) ("The standing committees shall be elected by the House . . . from nominations submitted by the respective party caucus or conference.").

95.     The Select Committee is also acting without authority because it does not satisfy the requirements of H. Res. 503 that established the Committee and is asserting authority to investigate matters unrelated to the causes of, and influencing factors contributing to, the events of January 6, 2021, when it has not been granted that authority.

96.     In addition, Defendant Pelosi made the unprecedented decision of refusing to appoint two members of the House nominated by the Minority Leader to serve on the Select Committee to represent the Minority.

97.     The Committee has also conducted its investigation on the presupposition of its members that the claims of widespread election fraud in the 2020 Presidential election were not only false but fraudulent.

98.     The Select Committee's insistence that claims of election fraud create mistrust about the election itself and "undermine our democracy" reveals a bias that caused the Select Committee to ignore mounting evidence that the 2020 election in fact was affected by widespread fraud creates mistrust of our electoral process and undermines our democracy.

99.     The Select Committee's failure to this date to conduct any serious investigation of whether the claims of election fraud were accurate, coupled with the statements of Committee members that those claims are baseless and fraudulent, demonstrate a profound bias.

100.     The public was led to believe by statements of Select Committee members that it was established to develop the complete story of the events of January 6, 2021 and the causes of those events. The Select Committee, however, has chosen not to reveal extensive surveillance videotapes of those events that would contribute to the development of a complete story. Statements in the Select Committee's court filings that there is no evidence of outcome-determinative fraud or illegal voting in the 2020 Presidential election also demonstrates that it has no intention of developing a complete story. *Eastman,* No. 8:22-cv-00099, ECF No. 164-1 at 20-22.

101.     The possibility that election fraud may have altered the outcome of the 2020 Presidential election was so inconsistent with the preconceived assumptions of Select Committee members that its investigation from the outset was unbalanced and not in compliance with the directives in H. Res. 503.

102.    The Select Committee's refusal to conduct its investigation in accordance with the directives in H. Res. 503 makes the investigation an unauthorized and *ultra vires* undertaking.

103.    The Subpoena demands information related to events that occurred after January 6, 2021 and therefore unrelated to the events of that day. Such a demand is beyond the scope of the investigation that H. Res. 503 authorizes.

104.    Accordingly, the Select Committee's investigation of Plaintiff must be declared outside of its authority and the Subpoena unenforceable.

**COUNT V**
**Violation of the Rules of the House**

105.    Each of the foregoing paragraphs is incorporated as if fully set forth within this Count.

106.    The Subpoena is invalid because it was issued in violation of the Rules of the United States House of Representatives, particularly Rule X.5(a)(1), which requires bipartisanship in the appointment of House committees. This requirement is designed to prevent abuses by committees, particularly when an excess of partisanship would violate the fundamental rights of citizens with whom the committees engage.

107.    The Select Committee is not a committee authorized pursuant to the Rules of the House of Representatives to issue subpoenas because it was not established in compliance with those Rules.

108.    None of the members of the Select Committee was nominated by the Minority Leader of the House of Representatives.

109.    Each member of the Select Committee has publicly revealed a personal view that the outcome of the Committee's investigation is predetermined.

110.    The violations of the Rules of the House of Representatives go to the very legitimacy of the Select Committee and render its investigation and the issuance of the Subpoena *ultra vires.*

## COUNT VI
## Absence of Legitimate Legislative Purpose

111.    Each of the foregoing paragraphs is incorporated as if fully set forth within this Count.

112.    Issuance of the Subpoena by Chairman Thompson was *ultra vires* because it was not in furtherance of a legitimate legislative purpose.

113.    The Subpoena purports to be a legislative subpoena. Congress has no inherent or general power to issue subpoenas but may do so only in furtherance of a legitimate legislative purpose. A legislative subpoena must be issued in furtherance of a legitimate legislative purpose.

114.    A legislative subpoena cannot qualify as a legitimate exercise of legislative power merely by virtue of the appropriateness of the investigation that being pursued. A legislative subpoena may be improper even when issued in the course of an otherwise proper congressional investigation. Each legislative subpoena must be assessed individually, to determine whether the information it demands is sought in furtherance of a legitimate legislative purpose.

115.    The Select Committee has no authority to require the production and disclosure of the identities and the private communications of individuals who did not have any involvement in the January 6, 2021, events at the Capitol or who have no reasonable nexus to the authorized scope of the Committee's investigation.

116.    Exposing private communications for the mere sake of exposure, which is the purpose and effect of the Subpoena, does not justify the issuance of a legislative subpoena.

117.    Enforcement of criminal laws, which is a peculiar function of the Executive

Branch, does not justify the issuance of a legislative subpoena. The U.S. Department of Justice

has special rules governing the issuance of subpoenas directed to attorneys given the inherent

dangers posed to the judicial system and fundamental constitutional rights by such subpoenas.

*See* U.S. Department of Justice Manual 9-13.410.

118.    The Subpoena is unauthorized, invalid, and unenforceable because it has no

legitimate legislative purpose. The information it seeks is calculated to expose information for

the mere sake of exposure, to discover the identity, tactics, and organization of citizens outraged

by the 2020 election fraud, to harm the Committee's political opponents, to assist ongoing

criminal investigations and prosecutions by the U.S. Department of Justice, to inflict harm upon

Plaintiff and those he has associated with to exercise constitutional rights, and most of all, to

obtain partisan political advantage. None of these are legitimate purposes for a legislative

subpoena.

**COUNT VII**
**The Subpoena's Requirement to Produce**
**Information Covered by the Attorney-Client Privilege**
**and the Work Product Doctrine Is Unenforceable**

69.    Each of the foregoing paragraphs is incorporated as if fully set forth within this

Count.

70.    In the alternative, even if the Subpoena were properly issued, it impermissibly

requires the production of records of private communications protected by the attorney-client

privilege and the attorney work product doctrine, which are established by federal common law.

71.    Recipients of congressional subpoenas retain their right to assert all common law,

statutory, and constitutional privileges. Plaintiff is entitled on behalf of his clients to assert any

applicable privileges, rights and protections regarding communications covered by the Subpoena's requirements.

72.     To the extent the Subpoena requires production of documents and testimony regarding communications covered by the attorney-client privilege and attorney work product protection, it is invalid and unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Defendants, and order the following relief:

a.     A declaratory judgment that the Subpoena violates Plaintiff's right to property and privacy guaranteed by the Fourth Amendment because defendant Thompson, who issued the Subpoena, was not a neutral and detached party and because the Subpoena is overbroad and fails the particularity requirement;

b.     A declaratory judgment that the Subpoena violates the right to free speech, political expression, free association, and petition for redress of grievances guaranteed to Plaintiff by the First Amendment;

c.     A declaratory judgment that the actions of Defendant Thompson in issuing the Subpoena and of the Select Committee in conducting its investigation were unlawful, invalid, and *ultra vires* and served no legitimate legislative purpose because those actions constitute law enforcement functions that a congressional committee may not undertake because they are assigned exclusively to the Executive and Judicial Branches by the Constitution;

d.     A declaratory judgment that the failure of the Select Committee to investigate whether the occurrence of illegal voting or election fraud in the 2020 Presidential election

was an influencing factor that contributed to the January 6, 2021 breach of the Capitol violates the requirement of House Resolution 503;

e.      A declaratory judgment that the alteration by executive or judicial action of rules governing the 2020 election of Presidential Electors in Georgia, Michigan, Pennsylvania, and Wisconsin established by the legislature of each State violated Article II, § 1, cl. 2 of the Constitution;

f.      A declaratory judgment that credible evidence has been produced to the legislatures in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin that election fraud and other illegal activities altered the result of the 2020 Presidential elections in those States;

g.      A declaratory judgment that the issuance of the Subpoena and the conduct of the Select Committee's investigation exceed the authority granted by House Resolution 503;

h.      A declaratory judgment that the issuance of the Subpoena and the conduct of the Select Committee's investigation violate Rule X.5 (a)(1) of the Rules of the United States House of Representatives and, therefore, are invalid and unlawful;

i.      A declaratory judgment that the Subpoena is invalid and unenforceable because it does not serve a legitimate legislative purpose;

j.      An order quashing the Subpoena as unlawful and invalid and prohibiting its enforcement;

k.      A declaratory judgment that the Subpoena and the Select Committee's investigation may not compel the production or disclosure of information protected by the federal common law attorney-client privilege;

l.      An award of costs and attorneys' fees incurred in this proceeding; and

m.      Such other relief as the Court deems just and proper.

**Page 32 of 33**

## <u>VERIFICATION</u>

I verify under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing

statements of fact are true and correct to the best of my knowledge, information, and belief.


Dated: April 4, 2022

_____

Kurt B. Olsen


DATED:  April 4, 2022.                        By: _____/s/_____
Charles Burnham, Esq.
DC Bar # 1003464
1424 K St. NW Suite 500
Washington, D.C. 20005
202.386.6920
202.390.7587 F
charles@burnhamgorokhov.com


By:_____
Patrick M. McSweeney
**MᶜSWEENEY, CYNKAR & KACHOUROFF, PLLC**
Patrick M. McSweeney (Va. Bar # 5669)*
Christopher I. Kachouroff (Va. Bar # 44216)*
13649 Office Place, suite 101
Woodbridge, VA 22192
Telephone: (804) 937-0895
patrick@mck-lawyers.com
chris@mck-lawyers.com
*Counsel for Plaintiff Kurt B. Olsen*

***\* To be admitted Pro Hac Vice***

Exhibit 1

## Chris Kachouroff

**From:** George, Dan ███████████████████████
**Sent:** Tuesday, March 1, 2022 12:24 PM
**To:** ███████████████████
**Subject:** U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol



External (████████████████████)

<u>Report This Email</u>  <u>FAQ</u>  <u>Agio Phishing Protection</u>

Mr. Olsen –

I am a Senior Investigative Counsel for the U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol. The Select Committee is seeking your deposition testimony and documents relevant to issues it is examining. Please confirm whether you are willing to accept service of a subpoena over email. If you are represented by counsel, please let me know his or her name and contact information and we will reach out as soon as possible.

Thanks,
Dan

Daniel George
Senior Investigative Counsel
Select Committee to Investigate the January 6th Attack
on the United States Capitol
U.S. House of Representatives

The information in this transmittal may be legally privileged, confidential, and/or otherwise protected by law from disclosure, and is intended only for the recipient(s) listed above. If you are neither the intended recipient(s) nor a person responsible for the delivery of this transmittal to the intended recipient(s), you are hereby notified that any distribution or copying of this transmittal is prohibited. If you have received this transmittal in error, please notify Klafter Lesser, LLP immediately at (914) 934-9200 or by return e-mail and take the steps necessary to delete it completely from your computer system. Thank you.

Exhibit 2

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Kurt B. Olsen

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 1540A Longworth House Office Building, Washington, DC 20515

Date: March 15, 2022                    Time: 10:00 AM

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: United States Capitol Building, Washington, DC 20515, or by videoconference

Date: March 24, 2022                    Time 10:00 AM

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____                    Time _____

*To* any authorized staff member or the United States Marshals Service

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 1st     day of March                    , 2022 .

_____
*Chairman or Authorized Member*

Attest

_____
*Clerk*

# PROOF OF SERVICE

Subpoena for

Kurt B. Olsen

Address 13317 Drews Ln Potomac MD 20854

before the  Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

Served by (print name)

Title

Manner of service

Date

Signature of Server

Address





BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

One Hundred Seventeenth Congress

Select Committee to Investigate the January 6th Attack on the United States Capitol

March 1, 2022

VIA ELECTRONIC AND U.S. MAIL

Kurt Olsen

Dear Mr. Olsen:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce the documents set forth in the accompanying schedule by March 15, 2022, and to appear for a deposition on March 24, 2022.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations.

The Select Committee's investigation has revealed credible evidence that you publicly promoted claims that the 2020 presidential election was fraudulent and participated in attempts to disrupt or delay the certification of the results. For example, just days before the January 6th attack on the U.S. Capitol, you contacted various high-level officials at the Department of Justice at the former President's "direct[ion]" to discuss filing a last-minute challenge to the election based on a similar case that the Supreme Court had already rejected.[1] In addition, you reportedly prepared a draft executive order for former President Trump that would have directed the U.S. Department of Justice "to take voter action,"[2] and, according to materials on file with the Select Committee, you had multiple telephone calls with former President Trump on January 6, 2021.[3]

---

[1] Documents on File with the Select Committee; *see also Trump Asked His AG about Legal Strategy to Overturn Election, Rosen Tells Senators*, Politico (Aug. 10, 2021), available at https://www.politico.com/news/2021/08/10/trump-asked-ag-overturn-election-503341.

[2] Michael Wolff, LANDSLIDE: THE FINAL DAYS OF THE TRUMP PRESIDENCY (2021) 126.

[3] Documents on File with the Select Committee.

Mr. Kurt Olsen
Page 2

Accordingly, the Select Committee seeks documents and a deposition regarding these and other matters that are within the scope of the Select Committee's inquiry. A copy of the rules governing Select Committee depositions, and document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman

Mr. Kurt Olsen
Page 3

## SCHEDULE

In accordance with the attached definitions and instructions, you, Kurt Olsen, are hereby required to produce all documents and communications in your possession, custody, or control—including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal accounts, and/or on personal applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period September 1, 2020, to present.

### Election Fraud Claims

1. All documents supporting the claim that votes were sent to Spain or Germany to be counted in connection with the November 2020 election.

2. All documents supporting the claim that Dominion voting machines "flipped" or "switched" votes from one candidate to another in the November 2020 election.

3. All documents supporting the claim that that any voting system deleted or lost votes, changed votes, or was in any way compromised in the November 2020 election.

4. All documents supporting the claim that algorithms were used to switch votes or manipulate vote counts during the November 2020 election.

5. All documents supporting the claim that Smartmatic software was used on any voting machine during the November 2020 election.

6. All documents supporting the claim that software used during the November 2020 election was developed in Venezuela.

7. All documents supporting the claim that identical numbers of votes were "injected into the system" at the same time in different states after the polls closed on November 3, 2020.

8. All documents supporting the claim that "spikes" in ballot processing numbers demonstrate that election results were manipulated in Michigan or any other state in the November 2020 election.

9. All documents supporting the claim that dead people voted in the November 2020 election.

10. All documents supporting the claim that individuals who were not registered to vote voted in the November 2020 election.

11. All documents supporting the claim that there were more votes than registered voters in any state or precinct in the November 2020 election.

12. All documents supporting the claim that Italian satellites were used to hack voting systems used in the November 2020 election.

13. All documents supporting the claim that voting machines were manipulated using smart thermostats controlled by the Chinese government in the November 2020 election.

Mr. Kurt Olsen
Page 4

14.  All documents supporting the claim that any mail-in ballots were counted more than once in the November 2020 election.

15.  All documents supporting the claim that votes cast for Donald Trump were deleted, discarded, or not counted during the November 2020 election.

16.  All documents reflecting communications with you refuting, rejecting, or challenging any claim of election fraud made by you or other representatives of the Trump campaign with respect to the 2020 election.

**Meetings with State Election Officials**

17.  All documents relating to, referring to, or constituting communications between you or any other representative of former President Trump or the Trump campaign and any elected or appointed state official in any State, including, but not limited to, Texas, Michigan, Georgia, Pennsylvania, and Arizona, between October 1, 2020, and January 6, 2021.

18.  All documents relating or referring to presentations made by you, or any other representative of the Trump campaign, to any state official or legislature regarding the November 2020 election.

**Election Certification**

19.  All documents related to strategies or options for ensuring the certification of President Trump as the victor of the 2020 presidential election, whether by rejecting electoral votes or otherwise; for ensuring the reelection of President Trump in a contingent House election held pursuant to the terms of the Twelfth Amendment to the Constitution of the United States; or for delaying the counting of electoral votes on January 6, 2021.

**Seizure of Voting Machines**

20.  All documents relating or referring to the proposed seizure of voting machines by the federal government, including, but not limited to, communications with any government official regarding the seizure of voting machines, any records of meetings at which the topic was discussed, any authority supporting such a seizure, or any information suggesting that the federal government lacks the lawful authority to seize voting machines.

21.  All documents relating or referring to any other means of acquiring voting machines or data from voting machines, by you or any representative of former President Trump or the Trump campaign, including but not limited to efforts to subpoena voting machines or access voting machines in person.

22.  All documents relating or referring to the invocation of the Insurrection Act or martial law in connection with the results of the 2020 presidential election.

**Contact with Department of Justice Officials**

23.  All documents relating to, referring to, or constituting communications you had with any official of the U.S. Department of Justice regarding litigation seeking to delay or reverse the certification of the 2020 presidential election results in any state.

Mr. Kurt Olsen
Page 5

24.  All documents relating to, referring to, or constituting communications you had with any state attorney general or state attorney general staff regarding litigation seeking to delay or reverse the certification of the 2020 presidential election results in any state.

25.  All documents relating to, referring to, or constituting communications you had regarding any proposed executive orders relating to the U.S. Department of Justice in connection with the 2020 presidential election.

**Events of January 6, 2021**

26.  All documents relating to, referring to, or constituting communications you had with former President Trump or anyone else on the White House staff on January 6, 2021.

**Fee Arrangements**

27.  All fee agreements provided to you, signed by you, or signed by others but under which you provided any legal services related to any of the election fraud claims or election certification issues listed above.

28.  All records of fees you charged, and any fees you collected, for any services you provided related to any of the election fraud claims or election certification issues listed above, including the source of funds, which should include name of sending party, bank name and account number from which funds were wired, the date paid, and the amount received. If funds were not wired from a financial institution, provide the name of the sending party, and the mechanism for transfer of value to cover the fee.

29.  Any other agreement, record, or other communication reflecting the retention of your legal services related to any of the election fraud claims or election certification issues listed above.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.  In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.  Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee").

3.  In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.  The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.  Electronic document productions should be prepared according to the following standards:

    a.  If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    b.  All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

        BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH,
        PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME,
        SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE,
        ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE,
        FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED,
        DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER,
        NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6.    Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.    Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.    When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.    The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10.   The pendency of or potential for litigation shall not be a basis to withhold any information.

11.   In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12.   Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13.   If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14.   In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15.   If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16.   If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17.   This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18.   All documents shall be Bates-stamped sequentially and produced sequentially.

19.   Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1.   The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.  The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3.  The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4.  The term "including" shall be construed broadly to mean "including, but not limited to."

5.  The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.  The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.  The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.  The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.  The term "individual" means all natural persons and all persons or entities acting on their behalf.

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

## 117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.

Sincerely,

JAMES P. MCGOVERN,
*Chairman, Committee on Rules.*

### REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the Chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested change to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

---

## REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.

Sincerely,

JAMES P. MCGOVERN,
*Chairman,*
*Committee on Rules.*

### REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

#### A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.



# H. Res. 8

## *In the House of Representatives, U. S.,*

*January 4, 2021.*

*Resolved,*

### SECTION 1. ADOPTION OF THE RULES OF THE ONE HUNDRED SIXTEENTH CONGRESS.

The Rules of the House of Representatives of the One Hundred Sixteenth Congress, including applicable provisions of law or concurrent resolution that constituted rules of the House at the end of the One Hundred Sixteenth Congress, are adopted as the Rules of the House of Representatives of the One Hundred Seventeenth Congress, with amendments to the standing rules as provided in section 2, and with other orders as provided in this resolution.

### SEC. 2. CHANGES TO THE STANDING RULES.

(a) CONFORMING CHANGE.—In clause 2(i) of rule II—

    (1) strike the designation of subparagraph (1); and

    (2) strike subparagraph (2).

(b) OFFICE OF DIVERSITY AND INCLUSION AND OFFICE OF THE WHISTLEBLOWER OMBUDS.—

16

### SEC. 3. SEPARATE ORDERS.

(a) MEMBER DAY HEARING REQUIREMENT.—During the first session of the One Hundred Seventeenth Congress, each standing committee (other than the Committee on Ethics) or each subcommittee thereof (other than a subcommittee on oversight) shall hold a hearing at which it receives testimony from Members, Delegates, and the Resident Commissioner on proposed legislation within its jurisdiction, except that the Committee on Rules may hold such hearing during the second session of the One Hundred Seventeenth Congress.

(b) DEPOSITION AUTHORITY.—

(1) During the One Hundred Seventeenth Congress, the chair of a standing committee (other than the Committee on Rules), and the chair of the Permanent Select Committee on Intelligence, upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee.

(2) Depositions taken under the authority prescribed in this subsection shall be subject to regulations issued by the chair of the Committee on Rules and printed in the Congressional Record.

(c) WAR POWERS RESOLUTION.—During the One Hundred Seventeenth Congress, a motion to discharge a measure introduced pursuant to section 6 or section 7 of the War

•HRES 8 EH

# Exhibit 3

FROM: Rep. Liz Cheney (R-WY)
TO: House Republican Colleagues
DATE: January 3, 2021
RE: 2020 Presidential Election Challenges in Arizona, Georgia, Michigan, Nevada, Pennsylvania and
Wisconsin, and Our Constitutional Process

# 2020 Presidential Election Challenges in Arizona, Georgia, Michigan, Nevada, Pennsylvania and Wisconsin, and Our Constitutional Process

In connection with our recent Conference meeting, a number of members have requested further information on how precisely Article II and the 12th Amendment to our Constitution address Congress' role and responsibilities in counting electoral votes. Others have sought additional information on the election challenges in each of the six states at issue, and how the judges hearing these cases have ruled. The following summary begins by addressing the Constitutional issues, then provides excerpts from and a description of the principal judicial decisions in each of the states. As you will see, there is substantial reason for concern about the precedent Congressional objections will set here. By objecting to electoral slates, members are unavoidably asserting that Congress has the authority to overturn elections and overrule state and federal courts. Such objections set an exceptionally dangerous precedent, threatening to steal states' explicit constitutional responsibility for choosing the President and bestowing it instead on Congress. This is directly at odds with the Constitution's clear text and our core beliefs as Republicans. Democrats have long attempted, unconstitutionally, to federalize every element of our nation—including elections. Republicans should not embrace Democrats' unconstitutional position on these issues.

The recent proposal for a new "Commission" is even more problematic. It is not reasonable to anticipate that any commission so formed could wrap up its work in 10 days; indeed, the subsequent debate at both the state and federal level would likely require months. Did those proposing a new commission realize that they were in essence proposing to delay the inaugural? Did they mean to set up a new future precedent where the inaugural is delayed and we have an "Acting President?" For how long? Who decides when that process is over? Will that require another Act of Congress? Could the Acting President veto any such future Congressional action? If Congress has authority to create such a commission now, are state elections, recounts and state law legal challenges just "make-work" until Congress gets around to investigating and deciding who should be President? Members who support the new commission proposal may need to answer each of these questions. And in particular, Members should be prepared to answer how such a commission would be justified by the actual text of our founding documents.

### Article II and the 12th Amendment

Article II and the 12th Amendment to our Constitution govern how our Republic selects the President of the United States. Although the Framers considered whether to confer the power to select the President upon the Congress of the United States, that proposal was specifically rejected. Instead, the Framers conferred that specific power upon the States and the People. Article II creates the Electoral College, and provides that "[e]ach state shall appoint, in such manner as the Legislature thereof may direct, a number of electors, equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress." "The person having the greatest Number of [Electoral College] votes for President, *shall be the President*."

In accordance with Article II, every State Legislature has enacted a set of rules governing the manner in which the election of the President in that State will be conducted and how electors will be selected. Those laws not only instruct state election officials how to conduct elections (and explicitly delegate authority to those officials for that purpose), but also set forth a state law process for challenging an election when problems arise. The legal processes for challenging the election vary state to state, but generally provide a procedure for recounts and audits, and an opportunity to litigate disputed issues in state court. In certain circumstances, it may be possible to bring an appropriate claim in Federal Court as well (for example, if a State has violated the U.S. Constitution or federal law), but Federal Courts are bound to observe the Constitutional limits on their jurisdiction (under Article III).

Because Article II commits to the States the authority and responsibility to conduct the election for President, and because State Legislatures have (consistent with Article II) provided a specific manner for challenging a Presidential election, allegations of election irregularities, fraud or other illegality must be resolved in accordance with those state laws. This is our Constitutional process and the rule of law. To date, dozens of cases challenging the 2020 Presidential election have been litigated in the six states at issue. Many judges (including multiple federal judges appointed by President Trump himself), have already directly addressed the subject matter of objections members intend to make. For instance, multiple judges have ruled state election officials *were not* acting contrary to state election laws. And multiple judges have found that allegations about Dominion voting machines and other issues *are not* supported by evidence. (See the excerpts and summaries in Sections I and II below.)

In addition to committing the power and responsibility for selecting the President to the People of the States, Article II and the 12th Amendment also explicitly identify the exceptionally limited role of Congress in this process. First, "the President of the Senate shall receive certified copies of the electoral votes from each state" and "in the presence of the Senate and House of Representatives, open all the certificates." The votes "shall then be counted." Nothing in Article II, the 12th Amendment or any other Constitutional text provides for any debate, objection or discretionary judgments by Congress in performing the ministerial task of counting the votes. Nothing in the Constitution remotely says that Congress is the court of last resort, with the authority to second-guess and invalidate state and federal court judicial rulings in election challenges. Indeed, the Constitutional text reads: "The person having the greatest Number of [Electoral College] votes for President, shall be the President." It does not say: "The person having the greatest Number of [Electoral College] votes for President, shall be the President, *unless Congress objects or Congress wants to investigate*." The Constitution identifies specifically the *only* occasions when Congress can take any non-ministerial action – when no Presidential candidate has a majority of the electoral votes: "[I]f no person have such majority [of the electoral votes counted], then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President....." Thus, the Constitutional text tells us very clearly what Congress' role is and is not.

For most of our nation's history, the Framers' straight-forward instructions regarding selection of the President prevailed. In the aftermath of our nation's Civil War, officials in certain Reconstruction Era state governments submitted competing slates of electors. In 1887, Congress sought to resolve those issues by enacting the Electoral Count Act. A principal provision of that Act instructs that a certificate identifying the Electoral College electors and their votes received from the Governor of a state shall be regarded as "conclusive." 3. U.S.C. § 5. 6. Although the Constitutionality of that Act has been the subject of substantial debate, here there is no dispute that each Governor of the six states at issue submitted an official certification of the election, and those electors' votes have been transmitted to this Congress. Thus, under the Electoral Count Act, those certificates are conclusive and must be counted. There is no discretion to do otherwise under that Act. Accordingly, both the clear text of the Constitution and the Electoral Count Act compel the same conclusion – there is no appropriate basis to object to the electors from any of the six states at issue.

Section I below identifies the conclusions reached by the courts hearing the principal election challenges in the six states at issue. Section II provides more detailed descriptions of the cases, and further excerpts of the judges' reasoning.

### SECTION I:  Conclusions Reached by State and Federal Judges in the Six States:

#### Arizona State Trial Court:

"There is no evidence that the manner in which signatures were reviewed was designed to benefit one candidate or another, or that there was any misconduct, impropriety, or violation of Arizona law with respect to the review of mail-in ballots."

#### Arizona Supreme Court:

"[T]he challenge fails to present any evidence of "misconduct," "illegal votes" or that the Biden Electors "did not in fact receive the highest number of votes for office," let alone establish any degree of fraud or a sufficient error rate that would undermine the certainty of the election results ...."

#### Federal Courts in Arizona:

"The allegations they put forth to support their claims of fraud fail in their particularity and plausibility. Plaintiffs append over three hundred pages of attachments, which are only impressive for their volume. The various affidavits and expert reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections."

"The Complaint is equally void of plausible allegations that Dominion voting machines were actually hacked or compromised in Arizona during the 2020 General Election..... Rather, what is present is a lengthy collection of phrases beginning with the words "could have, possibly, might," and "may have.""

"Plaintiffs next argue that they have expert witnesses who can attest to widespread voter fraud in Arizona.... These innuendoes fail to meet Rule 9(b) standards.  But perhaps more concerning to the Court is that the 'expert reports' reach implausible conclusions, often because they are derived from wholly unreliable sources."

"Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court. They most certainly cannot be the basis for upending Arizona's 2020 General Election. The Court is left with no alternative but to dismiss this matter in its entirety."

#### State Courts in Georgia:

"[T]he Complaint's factual allegations do not plausibly support his claims. The allegations in the Complaint rest on speculation rather than duly pled facts."

"[Georgia law] provides that a petition for an election contest must set for the grounds for the election contest.  [Georgia law] further provides that it must set forth such facts as are necessary to 'provide a full particular and explicit statement of the cause of contest.'  Georgia's Supreme Court has interpreted this to require a contestant to allege and prove a factual basis showing grounds for an election contest and to prohibit a contestant from basing a contest on a mere speculative belief that an error has occurred.  *See Ellis v. Johnson*, 263 Ga. 514 (1993).  Plaintiffs' Complaint does not meet this requirement as it does not recite facts or evidence but relies on speculation as to this belief that an error in the election has occurred.  Therefore, his complaint is dismissed for failure to state a claim."

**Federal Courts in Georgia** (Trump-appointed Federal Judge Grimberg, affirmed by panel including Trump-appointed Federal Appellate Judge Lagoa)

"Even assuming Wood possessed standing, and assuming Counts I and II are not barred by laches, the Court nonetheless finds Wood would not be entitled to the relief he seeks."

"[Plaintiffs'] argument is that the procedures in the Settlement Agreement regarding information and signature match so overwhelmed ballot clerks that the rate of rejection plummeted and, *ergo*, invalid ballots were passed over and counted. This argument is belied by the record; the percentage of absentee ballots rejected for missing or mismatched information and signature is the exact same for the 2018 election and the General Election (.15%)."

*Electors Clause*: "Wood argues Defendants violated the Elections and Electors Clauses because the 'procedures set forth in the [Settlement Agreement] for the handling of defective absentee ballots is not consistent with the laws of the State of Georgia, and thus, Defendants' actions . . . exceed their authority.' ... State legislatures—such as the Georgia General Assembly—possess the authority to delegate their authority over elections to state officials in conformity with the Elections and Electors Clauses. Recognizing that Secretary Raffensperger is "the state's chief election official," the General Assembly enacted legislation permitting him (in his official capacity) to "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). The Settlement Agreement is a manifestation of Secretary Raffensperger's statutorily granted authority. It does not override or rewrite state law."

### Federal Court in Michigan:

*Ruling in Case Brought by Sidney Powell*: "With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs'equal protection claim fails. . . . [T]o be perfectly clear, Plaintiffs' equal protection claim is not supported by any allegation that Defendants' alleged schemes caused votes for President Trump to be changed to votes for Vice President Biden. For example, the closest Plaintiffs get to alleging that physical ballots were altered in such a way is the following statement in an election challenger's sworn affidavit: "I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates." (ECF No. 6 at Pg ID 902 ¶ 91 (citing Aff. Articia Bomer, ECF No. 6-3 at Pg ID 1008-1010).) But of course, "[a] belief is not evidence" and falls far short of what is required to obtain any relief, much less the extraordinary relief Plaintiffs request."

**State Courts in Nevada** (Extensive evidentiary analysis following a hearing and multiple depositions). The President's spokesperson, Kayleigh McEnany stated on television (Hannity, Dec. 2, 2020) that this was the "most important case" and would finally vet the Trump legal claims. The Court did indeed vet all the legal claims, including allegations regarding Dominion voting machines, and issued a detailed ruling that the evidence presented did not support the President's claims.

"The Contestants failed to meet their burden to prove credible and relevant evidence to substantiate any of the grounds set forth in NRS 293.410 to contest the November 3, 2020 General Election." The Court assessed evidence submitted regarding the Dominion voting machine allegations specifically and concluded the evidence was not credible.

President Trump's legal team appealed each of the issues up through the Nevada Supreme Court. That Court unanimously affirmed the ruling of the trial court judge, explaining: "Despite our earlier order asking appellants to identify specific findings with which they take issue, appellants have not pointed to any unsupported factual findings, and we have identified none."

**Federal Courts in Pennsylvania** (including decision written by Trump-Appointed Federal Appellate Judge):

4

"One might expect that when seeking such a startling outcome, a plaintiff would come formidably armed with compelling legal arguments and factual proof of rampant corruption, such that this Court would have no option but to regrettably grant the proposed injunctive relief despite the impact it would have on such a large group of citizens. That has not happened. Instead, this Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence. In the United States of America, this cannot justify the disenfranchisement of a single voter, let alone all the voters of its sixth most populated state."

"Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here. ... 'While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.' Iqbal, 556 U.S. at 679.  Yet the Campaign offers no specific facts to back up these claims."

"The Campaign's claims have no merit. The number of ballots it specifically challenges is far smaller than the roughly 81,000-vote margin of victory. And it never claims fraud or that any votes were cast by illegal voters. Plus, tossing out millions of mail-in ballots would be drastic and unprecedented, disenfranchising a huge swath of the electorate and upsetting all down-ballot races too."

### State Supreme Court in Pennsylvania:

"Petitioners' challenge violates the doctrine of laches given their complete failure to act with due diligence in commencing their facial constitutional challenge, which was ascertainable upon Act 77's enactment.  It is well-established that "[l]aches is an equitable doctrine that bars relief when a complaining party is guilty of want of due diligence in failing to promptly institute an action to the prejudice of another." Stilp v. Hafer, 718 A.2d 290, 292 (Pa. 1998). ... The want of due diligence demonstrated in this matter is unmistakable. Petitioners filed this facial challenge to the mail-in voting statutory provisions more than one year after the enactment of Act 77.  At the time this action was filed on November 21, 2020, millions of Pennsylvania voters had already expressed their will in both the June 2020 Primary Election and the November 2020 General Election and the final ballots in the 2020 General Election were being tallied, with the results becoming seemingly apparent. . . . Thus, it is beyond cavil that Petitioners failed to act with due diligence in presenting the instant claim."

### Federal Courts reviewing Wisconsin election allegations (Decisions written by two Trump-appointed Federal Judges):

"And, on the merits of plaintiff's claims, the Court now further concludes that plaintiff has not proved that defendants violated his rights under the Electors Clause. To the contrary, the record shows Wisconsin's Presidential Electors are being determined in the very manner directed by the Legislature, as required by Article II, Section 1 of the Constitution."

"In sum, far from defying the will of the Wisconsin Legislature in issuing the challenged guidance, the [Wisconsin Election Commission] was in fact acting pursuant to the legislature's express directives. ... Thus, the guidance that plaintiff claims constitutes an unconstitutional deviation from the Wisconsin Legislature's direction, is, to the contrary, the direct consequence of legislature's express command."

"In his concurring opinion in Bush v. Gore, Chief Justice Rehnquist suggested that the proper inquiry under the Electors Clause is to ask whether a state conducted the election in a manner substantially consistent with the "legislative scheme" for appointing electors. 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring). . . . Whatever actions the Commission took here, it took under color of authority expressly granted to it by the Legislature."

### State Supreme Court in Wisconsin

"We conclude the Campaign is not entitled to the relief it seeks. The challenge to the indefinitely confined voter ballots is meritless on its face, and the other three categories of ballots challenged fail under the doctrine of laches."

## SECTION II:  Description and Excerpts of Principal Cases in all Six States

I.  **Arizona**

### A.  Litigation in Arizona State Court

Multiple challenges to the Arizona Presidential election were filed, litigated and resolved with no change to the election outcome.  In the principal case (which ultimately reached the Arizona Supreme Court), the trial judge allowed the challengers to engage in inspection of mail-in and "duplicate" ballots, conduct multiple depositions, and present their evidence at a hearing.  In response to allegations about allegedly forged signatures on mail-in ballots, the court found:

"There is no evidence that the manner in which signatures were reviewed was designed to benefit one candidate or another, or that there was any misconduct, impropriety, or violation of Arizona law with respect to the review of mail-in ballots."

As the Court also explained, neither the plaintiffs nor the defense experts found evidence of "forgery or simulation" as to the examined mail-in ballots.  Addressing the *process* for reviewing mail-in ballots under Arizona law, the trial court explained:

"Under Arizona law, voters who vote by mail submit their ballot inside an envelope that is also an affidavit signed by the voter. Election officials review all mail-in envelope/affidavits to compare the signature on them with the signature in voter registration records. If the official is "satisfied that the signatures correspond," the unopened envelope is held until the time for counting votes. If not, officials attempt to contact the voter to validate the ballot. A.R.S. § 16-550(A).  This legislatively-prescribed process is elaborated on in the Secretary of State's Election Procedures Manual. . . . Maricopa County election officials followed this process faithfully in 2020."

The Court also allowed inspection of a sample of "duplicate ballots."  Such duplicates must be made for overseas military voters and in cases when ballots cannot be properly read by a tabulation machine.  As to that evidence, the Court found:

"The duplication process prescribed by the Legislature necessarily requires manual action and human judgment, which entail a risk of human error. Despite that, the duplication process for the presidential election was 99.45% accurate. And there is no evidence that the inaccuracies were intentional or part of a fraudulent scheme. They were mistakes. And given both the small number of duplicate ballots and the low error rate, the evidence does not show any impact on the outcome."

The trial court concluded that "Plaintiff has not proven that the Biden/Harris ticket did not receive the highest number of votes."  The Arizona Supreme Court then unanimously affirmed that ruling, explaining as follows:

"The validity of an election is not voided by honest mistakes or omissions unless they affect the result, or at least render it uncertain. *Findley v. Sorenson*, 35Ariz. 265, 269 (1929). Where an election is contested on the ground of illegal voting, the contestant has the burden of showing that sufficient illegal votes were cast to change the result, *Morgan v.Board of Sup'rs*, 67 Ariz. 133 (1948). The legislature has expressly delegated to the

Secretary the authority to promulgate rules and instructions for early voting. A.R.S. § 16-452(A). After consulting with county boards and election officials, the Secretary is directed to compile the rules "in an official instructions and procedures manual." The Election Procedures Manual or "EPM," has the force of law. The Court recently considered a challenge to an election process and granted relief where the county recorder adopted a practice contrary to the EPM.... *Here, however, there are no allegations of any violation of the EPM or any Arizona law.*"

"Because the challenge fails to present any evidence of "misconduct," "illegal votes" or that the Biden Electors "*did not* in fact receive the highest number of votes for office," let alone establish any degree of fraud or a sufficient error rate that would undermine the certainty of the election results, the Court need not decide if the challenge was in fact authorized under A.R.S. § 16-672 or if the federal "safe harbor" deadline applies to this contest. **IT IS ORDERED** affirming the trial court decision and confirming the election of the Biden Electors under A.R.S. § 16-676(B)."

### B. Litigation in Federal Court in Arizona

*Tyler Bowyer, et al., v. Doug Ducey, et al.,* Federal District Court, Arizona, CV-20-    02321-PHX-DJH, 12/09/20. Judge Diana Humetewa.

In addition to litigating in the Arizona state judicial system, plaintiffs supporting President Trump also attempted to bring multiple claims in Federal District Court for the District of Arizona, with factual allegations addressing "destruction of absentee ballots," Dominion voting machines, voting fraud and manipulation, problems with the election observer process, and alleged "dilution of lawful votes." The Court explained why several of the allegations were insufficient to state a federal Constitutional claim, including because the plaintiffs lacked standing under Article III of the Constitution. The Court also addressed plaintiffs' allegations of fraud specifically. Below is a selection of excerpts from the Judge's opinion on those issues:

"The allegations they put forth to support their claims of fraud fail in their particularity and plausibility. Plaintiffs append over three hundred pages of attachments, which are only impressive for their volume. The various affidavits and expert reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections."

"The Complaint is equally void of plausible allegations that Dominion voting machines were actually hacked or compromised in Arizona during the 2020 General Election. Plaintiffs are clearly concerned about the vulnerabilities of voting machines used in some counties across Arizona and in other states. They cite sources that attest to knowledge of 'well-known' vulnerabilities, have included letters from concerned citizens, Arizona elected officials, and United States senators. Plaintiffs even attach an affidavit of an anonymous witness with connections to the late Venezuelan dictator Hugo Chavez claiming to be privy as to how officials in Venezuela rigged their elections with the help of a voting systems company whose software "DNA" is now used in voting machines in the United States. (Doc. 1-1, Ex. 1). These concerns and stated vulnerabilities, however, do not sufficiently allege that any voting machine used in Arizona was in fact hacked or compromised in the 2020 General Election. Rather, what is present is a lengthy collection of phrases beginning with the words "could have, possibly, might," and "may have."

"Plaintiffs next argue that they have expert witnesses who can attest to widespread voter fraud in Arizona. As an initial matter, none of Plaintiffs' witnesses identify Defendants as committing the alleged fraud, or state what their participation in the alleged fraudulent scheme was. Instead, they allege that, absentee ballots "could have been filled out by

anyone and then submitted in the name of another voter," "could be filled in by third parties to shift the election to Joe Biden," or that ballots were destroyed or replaced "with blank ballots filled out by election workers, Dominion or other third parties." (Doc. 1 ¶¶54–58) (emphasis added). These innuendoes fail to meet Rule 9(b) standards. But perhaps more concerning to the Court is that the 'expert reports' reach implausible conclusions, often because they are derived from wholly unreliable sources."

"Not only have Plaintiffs failed to provide the Court with factual support for their extraordinary claims, but they have wholly failed to establish that they have standing for the Court to consider them. *Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court.* They most certainly cannot be the basis for upending Arizona's 2020 General Election. The Court is left with no alternative but to dismiss this matter in its entirety."

## II. Georgia

### A.  Cases litigated in Georgia State Court

Multiple plaintiffs filed cases challenged the Georgia election in Georgia State Courts.  The Georgia legislature has enacted a detailed series of laws governing elections. Those laws provide specific remedies to address election related concerns (including post-election audits). The Georgia code also specifically provides for election challenges to be filed before Georgia state courts.  In certain of the cases filed, the litigants supporting President Trump made fundamental errors by, for example, failing to sue the appropriate Georgia officials as required by Georgia law, failing to serve the defendants in the case with process, and other routine filing errors delaying the cases.  A summary of the issues appears in a brief filed in the U.S. Supreme Court by the Attorney General of the State of Georgia (a Republican appointee).[1]

"Since the November election, there have been at least six Georgia cases alleging that state election officials violated the law by acting in accordance with the State's settlement agreement or by adopting State Rule 183-1-14-0.9-.15. *See, e.g., Wood v. Raffensperger,* No. 1:20-cv-04651-SDG (N.D. Ga.); *Pearson et al. v. Kemp et al.,* No. 1:20-cv-04809-TCB (N.D. Ga.); *Wood v. Raffensperger et al.,* No. 2020-CV-342959 (Fulton Cnty. Sup. Ct.); *Boland v. Raffensperger,* No. 2020-CV-343018 (Fulton Cnty. Sup. Ct.); *Della Polla v. Raffensperger,* No. 20-1-7490 (Cobb Cnty. Sup. Ct); *Trump et al. v. Raffensperger et al.,* No. 2020-CV-343255 (Fulton Cnty. Sup. Ct.).   And none of that litigation has gone anywhere. The Eleventh Circuit, the Northern District of Georgia, and the Superior Courts of Fulton County and Cobb County, Georgia have rejected all the claims except for in one case, which was filed just this week and is thus still winding through Georgia's courts just as the Georgia Legislature envisioned."

The Georgia Attorney General also described how Georgia's legislature enacted measures for election recounts (and state court election challenges) in accordance with Article II of our Constitution, and how those measures were implemented in 2020.

"Georgia's legislature enacted laws governing elections and election disputes, and the State and its officers have implemented and followed those laws. To ensure the accuracy of the results of that process, it has completed three total counts of the vote for its presidential electors, including a historic 100 percent manual recount—all in accordance with state law.  It has, consistent with its authority under 3 U.S.C. § 5 [the Electoral Count

---

[1]  Among the attorneys joining the Attorney General on that brief was Jody Hunt, President Trump's former appointee as Assistant Attorney General for the U.S. Department of Justice's Civil Division.

Act], authorized its courts to resolve election disputes.... The Legislature has given the Election Board express authority to "promulgate rules and regulations" to ensure "uniformity" among election officials and a "fair, legal, and orderly" election. O.C.G.A. § 21-2-31....First, in accordance with O.C.G.A. § 21-2-498, Georgia completed a risk-limiting audit.... The audit resulted in a manual count of nearly 5 million ballots cast—a process that lasted the better part of a week and required the State to deploy immense human and financial resources. Ultimately, the audit confirmed the initial election results, and Secretary Raffensperger certified the results on November 20, 2020. That was not all. Responding to the Trump Campaign's request, Georgia undertook a machine tabulation recount of the nearly 5 million ballots. Again, the recount confirmed the initial election results."

Georgia state courts have specifically addressed allegations of election irregularities. In *Boland v. Raffensperger*, for example, a Georgia State Court evaluated a range of allegations about misconduct by election officials and related matters. The Court described the plaintiffs' case as follows:

"Even if credited, the Complaint's factual allegations do not plausibly support his claims. The allegations in the Complaint rest on speculation rather than duly pled facts. They cannot, as a matter of law, sustain this contest. Count I, which alleges that 20,312 people may have voted illegally in Georgia, relies upon a YouTube video which purportedly is based upon United States Postal Service mail forwarding information. Pet. ¶ 1. Count II alleges that the signature-matching process resulting from a Settlement Agreement entered into by the State nine months ago is inconsistent with Georgia's election code, and allegedly violates the federal Constitution.3 Pet. ¶ 17. The Court finds that Plaintiff's allegations, as pled, do not support an allegation of impropriety or a conclusion that sufficient illegal votes were cast to change or place in doubt the result of the election. These arguments have been offered and rejected in other courts. *See Wood*, 2020 WL 6817513, at *10. Furthermore, the statutory changes put in place by the General Assembly permitting voters to cure signature issues on their ballot as a result of 2019 legislation, as well as regulatory changes adopted by the State Election Board contemporaneous with execution of the Settlement Agreement, would be expected to result in fewer signature rejections. This would not be because illegal votes are somehow evading review, but because subjecting signatures to more thorough verification and permitting voters to cure suspected errors should reduce the number of lawful ballots that are improperly thrown out."

Likewise, in the *Della Polla* case, a Georgia State Court Judge concluded as follows:

"[Georgia law] provides that a petition for an election contest must set forth the grounds for the election context. [Georgia law] further provides that it must set forth such facts as are necessary to 'provide a full particular and explicit statement of the cause of contest.' Georgia's Supreme Court has interpreted this to require a contestant to allege and prove a factual basis showing grounds for an election contest and to prohibit a contestant from basing a contest on a mere speculative belief that an error has occurred. *See Ellis v. Johnson*, 263 Ga. 514 (1993). Plaintiffs' Complaint does not meet this requirement as it does not recite facts or evidence but relies on speculation as to this belief that an error in the election has occurred. Therefore, his complaint is dismissed for failure to state a claim."

In one remaining state court case, *Trump et al. v. Raffensperger et al.*, No. 2020-CV-343255, counsel for President Trump initially sought an emergency hearing to address his claims of fraud and

illegality, but then withdrew that emergency motion on December 8, 2020, canceling the imminent hearing and delaying the case. This has slowed the ultimate resolution of that action.

## B.  Principal Cases litigated in Federal Court in Georgia

*Lin Wood v. Raffensperger*, Federal District Court for the Northern District of Georgia, Atlanta Division, Judge Stephen Grimburg (appointed by President Trump.)

The plaintiff in this Federal District Court case argued that Georgia officials took unauthorized actions and treated absentee ballots in a manner that favored candidate Biden.  Plaintiff also asked the Court to order a "second recount" of Georgia ballots.  The absentee ballot allegations related in part to a settlement in March 2020 by Georgia of a prior lawsuit.  Plaintiff also argued that designated Republican monitors did not have proper access to an audit conducted by Georgia state officials in the days after the election.

Judge Grimberg, a Trump appointee, conducted a hearing with live witness testimony before issuing his ruling.  His opinion begins by describing the foundational Constitutional problems with Plaintiff Wood's federal suit, including that Wood lacked standing and noting that Wood was relying upon a 1993 11th Circuit precedent that is "no longer good law."  Judge Grimberg also explained why courts require the type of challenge Plaintiff brought to be made pre-election, before millions of voters cast their ballots.[2]  After addressing those issues, the Court turned to the substance of Wood's legal and factual arguments, explaining as follows:

> "Even assuming Wood possessed standing, and assuming Counts I and II are not barred by laches, the Court nonetheless finds Wood would not be entitled to the relief he seeks."

> *Allegations about Absentee Ballots*: "Wood's argument is that the procedures in the Settlement Agreement regarding information and signature match so overwhelmed ballot clerks that the rate of rejection plummeted and, ergo, invalid ballots were passed over and counted. This argument is belied by the record; the percentage of absentee ballots rejected for missing or mismatched information and signature is the exact same for the 2018 election and the General Election (.15%). This is despite a substantial increase in the total number of absentee ballots submitted by voters during the General Election as compared to the 2018 election."

> *Elections and Electors Clauses*: "In relevant part, the Constitution states: 'The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. This provision—colloquially known as the Elections Clause—vests authority in the states to regulate the mechanics of federal elections. *Foster v. Love*, 522 U.S. 67, 69 (1997). The 'Electors Clause' of the Constitution similarly states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of [Presidential] Electors." U.S. Const. art. II, § 1, cl. 2. Wood argues Defendants violated the Elections and Electors Clauses because the 'procedures set forth in the [Settlement Agreement] for the handling of defective absentee ballots is not consistent with the laws of the State of Georgia, and thus, Defendants' actions . . . exceed their authority.' Put another way, Wood argues Defendants usurped

---

[2]  Judge Grimberg cited Justice Kavanaugh's concurrence in a recent election suit filed by the Democratic National Committee.  *See Democratic Nat'l Comm. v. Wisc. State Legislature*, No. 20A66,2020 WL 6275871, at *4 (U.S. Oct. 26, 2020) (Kavanaugh, J., concurring in denial of application to vacate stay) ("The principle [of judicial restraint] also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process.")

the role of the Georgia General Assembly—and thereby violated the United States Constitution—by enacting additional safeguards regarding absentee ballots not found in the Georgia Election Code.... State legislatures—such as the Georgia General Assembly—possess the authority to delegate their authority over elections to state officials in conformity with the Elections and Electors Clauses. [*Citing* U.S. Supreme Court precedent.] *Ariz. State Legislature*, 576 U.S. at 816 ("The Elections Clause [ ] is not reasonably read to disarm States from adopting modes of legislation that place the lead rein in the people's hands . . . it is characteristic of our federal system that States retain autonomy to establish their own governmental processes."). *See also Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) ("The Elections Clause, therefore, affirmatively grants rights to state legislatures, and under Supreme Court precedent, to other entities to which a state may, consistent with the Constitution, delegate lawmaking authority.")... Recognizing that Secretary Raffensperger is "the state's chief election official," the General Assembly enacted legislation permitting him (in his official capacity) to "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). *The Settlement Agreement is a manifestation of Secretary Raffensperger's statutorily granted authority. It does not override or rewrite state law.* It simply adds an additional safeguard to ensure election security by having more than one individual review an absentee ballot's information and signature for accuracy before the ballot is rejected. Wood does not articulate how the Settlement Agreement is not "consistent with law" other than it not being a verbatim recitation of the statutory code. Taking Wood's argument at face value renders O.C.G.A. § 21-2-31(2) superfluous. A state official—such as Secretary Raffensperger—could never wield his or her authority to make rules for conducting elections that had not otherwise already been adopted by the Georgia General Assembly. The record in this case demonstrates that, if anything, Defendants' actions in entering into the Settlement Agreement sought to achieve consistency among the county election officials in Georgia, which furthers Wood's stated goals of conducting "[f]ree, fair, and transparent public elections."

*Judge Grimberg's Conclusion*: "Granting injunctive relief here would breed confusion, undermine the public's trust in the election, and potentially disenfranchise over one    million Georgia voters. Viewed in comparison to the lack of any demonstrable harm to    Wood, this Court finds no basis in fact or in law to grant him the relief he seeks."

On appeal, a three judge panel of the Federal Circuit Court of Appeals for the 11th Circuit affirmed Judge Grimberg's ruling unanimously. The panel included Judge Lagoa (a Trump appointee who was considered by the President for the recent Supreme Court vacancy, and Judge William Pryor, a Bush appointee.)

Finally, in the *Pearson* litigation filed by Sidney Powell in Federal District Court in Atlanta, Judge Batten (a Bush appointee) reviewed all the pleadings and held an argument on a motion for an injunction. Judge Batten concluded as follows:

"Finally, in their complaint, the Plaintiffs essentially ask the Court for perhaps the most extraordinary relief ever sought in any Federal Court in connection with an election. They want this Court to substitute its judgment for that of two-and-a-half million Georgia voters who voted for Joe Biden, and this I am unwilling to do."

## III. Michigan

11

A number of cases were launched in Federal and State Courts in Michigan challenging different elements of the Michigan election. Certain of the cases were summarily dismissed by the courts for a range of pleading or procedural errors – including suing the wrong state official. Certain other cases were voluntarily dismissed by those litigants who brought them after the election was certified under Michigan law. The evidence supporting various arguments was assessed in certain of the cases. For example, Judge Stephens of the Court of Claims for Michigan described one set of evidentiary issues this way:

> "This 'supplemental evidence' is inadmissible as hearsay. The assertion that Connarn was informed by an unknown individual what "other hired poll workers at her table" had been told is inadmissible hearsay within hearsay, and plaintiffs have provided no hearsay exception for either level of hearsay that would warrant consideration of the evidence. See MRE 801(c). The note—which is vague and equivocal—is likewise hearsay. And again, plaintiffs have not presented an argument as to why the Court could consider the same, given the general prohibitions against hearsay evidence. *See Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 105; 776 NW2d 114 (2009). Moreover, even overlooking the evidentiary issues, the Court notes that there are still no allegations implicating the Secretary of State's general supervisory control over the conduct of elections. . . . Not only can the relief requested not issue against the Secretary of State, who is the only named defendant in this action, but the factual record does not support the relief requested."

Another Federal District Court case brought by attorney Sidney Powell in the Eastern District of Michigan alleged many of the same irregularities publicized in the press, such as voting machines allegedly corrupted or hijacked in the same manner used in Venezuela by former President Hugo Chavez. Federal District Court Judge Parker systematically reviewed the evidence Powell submitted explained why the relief sought by Powell could not be granted. For example, Judge Parker wrote:

> "With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs'equal protection claim fails."

> "[T]o be perfectly clear, Plaintiffs' equal protection claim is not supported by any allegation that Defendants' alleged schemes caused votes for President Trump to be changed to votes for Vice President Biden. For example, the closest Plaintiffs get to alleging that physical ballots were altered in such a way is the following statement in an election challenger's sworn affidavit: "I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates." (ECF No. 6 at Pg ID 902 ¶ 91 (citing Aff. Articia Bomer, ECF No. 6-3 at Pg ID 1008-1010).) But of course, "[a] belief is not evidence" and falls far short of what is required to obtain any relief, much less the extraordinary relief Plaintiffs request."

> "The closest Plaintiffs get to alleging that election machines and software changed votes for President Trump to Vice President Biden in Wayne County is an amalgamation of theories, conjecture, and speculation that such alterations were *possible*."

> "As Defendants aptly describe, Plaintiffs' requested injunction would "upend the statutory process for election certification and the selection of Presidential Electors. Moreover, it w[ould] disenfranchise millions of Michigan voters in favor [of] the preferences of a handful of people who [are] disappointed with the official results." (ECF No. 31 at Pg ID 2227.) In short, none of the remaining factors weigh in favor of granting Plaintiffs' request for an injunction."

In the wake of Judge Parker's ruling, defense counsel has filed a motion seeking sanctions against Powell and others on her legal team: "Plaintiffs' egregious conduct and frivolous and fraudulent filings clearly warrant sanctions under 28 U.S.C. §1927."

## IV. Nevada

In Nevada, as in other states, several election challenges were filed pursuant to state law. The principal case was filed before .... The Court allowed multiple depositions to be taken, considered all the affidavits presented, and issued a lengthy evidentiary ruling following a hearing. This is the case that President Trump's legal team called, "the most important case" [Kayleigh McEnany Dec 2 Hannity] that would finally fully vet the factual basis for their election fraud claims. The Court did indeed conduct a full hearing vetting the factual basis for each legal claim. He ruled against the plaintiffs, and was affirmed unanimously by the Nevada Supreme Court.

Nevada District Judge Russell allowed each party to conduct 15 depositions, considered all the evidence from those depositions and all submitted affidavits in detail. His 34 page opinion is highly detailed and addresses all the principal allegations. He explained as follows:

*Dominion Voting Machines*: "Clark County, along with 15 other counties in Nevada uses Dominion Voting Systems to conduct in person voting.... These voting systems are subject to extensive testing and certification before each election and are audited after each election. For example, the electronic voting systems used by Clark County were certified by the federal government when they were first brought on the market, as well as any time a hardware or software component is upgraded. This certification is done by a voting system test laboratory. The electronic voting machines are also tested and certified by the Secretary. ... These voting machines are also audited against a paper trail that is generated ... when voters make their selections. A Clark County voting machine will not operate unless it is connected to a printer ... which creates a paper record that voters can review. ... After each election, Clark County, like Nevada's other counties, conducts a random audit of its voting machines. Specifically, it compares the paper trail created by the printer against the results recorded by the voting machine to ensure they match. ... Clark County conducted this audit following the November election and there were no discrepancies between the paper audit trail created by the printer and the data from the voting machine."

"Contestants' evidence does not establish by clear and convincing proof, or under any standard of evidence, that 'there was a malfunction of any voting device or electronic tabulator, counting device or computer in a manner sufficient to raise reasonable doubt as to the outcome of the election.'"

*Affidavits/Declarations from Non-Testifying Witnesses*: "Much of Contestants' evidence consists of non-deposition evidence in the form of witness declarations. These declarations fall outside the scope of the contest statute, which provides that election contests 'shall be tried and submitted so far as may be possible upon depositions and written or oral argument as the court may order. ... The reason for this is to allow for the cross-examination of the deponent under oath. ... These declarations also constitute hearsay, as they are out-of-court statements offered in evidence to prove the truth of the matters asserted. Most of these declarations were self serving statements of little or no evidentiary value. The Court nonetheless considers the totality of evidence provided by Contestants in reaching and ruling upon the merits of their claims."

*Plaintiffs' Expert Evidence*: The Court heard expert testimony from three individuals who sought to use telephone surveys and statistical information to infer that the vote tallies must be incorrect, and to opine upon the administration of mail in voting. He found each proffered expert unreliable.

13

"The Court questions Mr. Baselice's methodology because he was unable to identify the source of the data for his survey and conducted no quality control of the data he received."

"The Court questions Mr. Kamzol's methodology because he had little to no information about or supervision over the origins of his data, the manner in which it had been matched and what the rate of false positives would be. Additionally, there was little to no verification of his numbers."

"Mr. Gessler's report lacked citations to facts and evidence that he used to come to his conclusions and did not include a single exhibit to support any of his conclusions. The Court finds that Mr. Gessler's methodology is unsound because he based nearly all of his opinions on a handful of affidavits that he took no steps to corroborate through independent investigation."

"As reflected herein, the Court finds that the expert testimony provided by Contestants was of little or no value. The Court did not exclude consideration of this evidence, which it could have, but gave it very little weight."

*Illegal or Improper Votes*: "Contestants allege that fraud occurred at multiple points in the voting process in Nevada that exceed the margin of victory in the presidential race. ... The Court finds there is no evidence that voter fraud rates associated with mail in voting are systematically higher than voter fraud rates associated with other forms of voting. .... [T]he illegal vote rate totaled at most only 0.00054 percent."

*Provisional Ballots, Mismatched Signatures, Illegal Votes from In-Person Voting Technology, Ineligible Voters and Double Voting, Deceased Voters, Voter Impersonation, Untimely Ballots*: The court made detailed findings rebutting each of plaintiffs' claims about illegality on each of these topics.

Judge Russell concluded: "The Contestants failed to meet their burden to prove credible and relevant evidence to substantiate any of the grounds set forth in NRS 293.410 to contest the November 3, 2020 General Election." President Trump's legal team appealed each of the issues up through the Nevada Supreme Court. That Court unanimously affirmed the ruling of the trial court judge, explaining:

"Despite our earlier order asking appellants to identify specific findings with which they take issue, appellants have not pointed to any unsupported factual findings, and we have identified none."

## V. Pennsylvania

### A. Cases Filed in State Court

In *Kelly et al. v. Commonwealth of Pennsylvania et al.*, a group of plaintiffs challenged the mail-in ballot measures enacted by the Pennsylvania legislature in Act 77 (Act of October 31, 2019, P.L. 552, No. 77; *see also* 25 Pa. Stat. xx 3146.6(c)). The case began in Pennsylvania state court, reached the Pennsylvania Supreme Court, and then was the subject of a petition for emergency injunctive relief to the U.S. Supreme Court.

The principal allegation in the case was that Pennsylvania's "mail-in ballot" law violated the Pennsylvania state Constitution's provision on absentee voting. The plaintiffs claimed that the state constitution's provision is a restriction on all forms of remote voting, *i.e.* other than in-person voting. But Pennsylvania does not interpret its own Constitution that way. Instead, the Pennsylvania legislature understood the absentee voting provision to require that the Legislature *provide an avenue for absentee*

14

*voting* for anyone who will not vote in person because they will be out of town on business, are prevented from voting in person by illness, are physically disabled, are observing a religious holiday or are serving as poll workers that day.  As Pennsylvania explains in its brief to the U.S. Supreme Court, the absentee voting provision ensures that people in those categories will be able to vote absentee, but does not prevent the legislature from going further and providing a broader provision for mail-in ballots:

> "Petitioners contend that by requiring the General Assembly to allow certain voters to cast absentee ballots, Article VII, § 14 somehow forbids the General Assembly from allowing others to vote by mail. But the inclusion of a particular legislative duty in the Pennsylvania Constitution does not prevent the General Assembly from crafting other legislation on that topic. In fact, the Pennsylvania Constitution originally said "may" and now says "shall" in Article VII, § 14—a change meant to further clarify that this provision provides a floor, not a ceiling, for absentee voting in Pennsylvania. *See, e.g., Mathews v. Paynter,* 752 F. App'x 740, 744 (11th Cir. 2018) (distinguishing "shall" from "may" and noting that former term does not impliedly limit government authority). Thus, the Pennsylvania Constitution provides that the General Assembly must allow voters in the enumerated four categories to cast absentee ballots, but may also go further—by exercising its broad power to "prescribe[]" the permissible "method[s]" of voting, PA. CONST. art. VII, § 4—and allow other categories of voters to vote by mail, including by allowing any voter to opt to cast a mail-in ballot."

When this issue reached the Pennsylvania Supreme Court, the court ruled against plaintiffs based on the state law doctrine of "laches" – explaining that the plaintiffs waited too long to bring their claims, and could have brought their claims before the November election.  Pennsylvania also explained that multiple state elections have already been conducted under the "mail-in" ballot law.  Pennsylvania's brief in the U.S. Supreme Court and characterized the argument this way:

> "Petitioners maintain that the doctrine of laches must yield because they "are not lawyers," and could not have "been reasonably expected to know[] that they had viable legal claims well-before the election occurred." App. at 37. This assertion of ignorance is implausible, given that several Petitioners are current legislators or candidates for legislative office. *See* Compl. ¶¶ 3-4. In any event, '[l]aches is not excused by simply saying, 'I did not know.' If by diligence a fact can be ascertained, the want of knowledge so caused is no excuse for a stale claim. The test is not what the plaintiff knows, 'but what he might have known by the use of the means of information within his reach with the vigilance the law requires of him.'"

As noted, after the Pennsylvania Supreme Court ruled, the plaintiffs in the case filed a request with the U.S. Supreme Court for an emergency injunction.  The Supreme Court denied that request on December 8, 2020.  No U.S. Supreme Court Justice dissented from that denial.

In addition to the *Kelly* case, several other state court cases have been unsuccessfully pursued. One such case, *Metcalf,* was brought 11 days after the state law deadline, and was dismissed on that basis.  In another matter, *IN RE: CANVASS OF ABSENTEE AND MAIL-IN BALLOTS OF NOVEMBER 3, 2020 GENERAL ELECTION,* 8,329 votes were challenged because the voters failed to properly print their names, addresses and the date in full on the ballot envelope.  The Pennsylvania Supreme Court applied state law and ruled as follows:

> "Here we conclude that while failures to include a handwritten name, address or date in the voter declaration on the back of the outer envelope, while constituting technical violations of the Election Code, do not warrant the wholesale disenfranchisement of thousands of Pennsylvania voters."

## B. Cases Filed in Federal Court

In *Donald J. Trump for President, Inc., et al v. Boockvar*, the Federal District Court for the Middle District of Pennsylvania addressed plaintiffs' concerns with what is known as a "notice and cure" policy. Under that policy Pennsylvania State election officials allowed Pennsylvania county officials to provide notice to voters who had not properly filled out mail in or absentee ballots, so that the voters could correct them.  Some of the counties in the state exercised this authority and others did not.  Plaintiffs argued that the unequal application of this policy across the state required the Court to throw out the election result state-wide.  The Court responded as follows:

"One might expect that when seeking such a startling outcome, a plaintiff would come formidably armed with compelling legal arguments and factual proof of rampant corruption, such that this Court would have no option but to regrettably grant the proposed injunctive relief despite the impact it would have on such a large group of citizens. That has not happened. Instead, this Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence. In the United States of America, this cannot justify the disenfranchisement of a single voter, let alone all the voters of its sixth most populated state."

"Plaintiffs' claims fail because it is perfectly rational for a state to provide counties discretion to notify voters that they may cure procedurally defective mail-in ballots. Though states may not discriminatorily sanction procedures that are likely to burden some persons' right to vote more than others, they need not expand the right to vote in perfect uniformity. All Plaintiffs have alleged is that Secretary Boockvar allowed counties to choose whether or not they wished to use the notice-and-cure procedure. No county was forced to adopt notice-and-cure; each county made a choice to do so, or not. Because it is not irrational or arbitrary for a state to allow counties to expand the right to vote if they so choose, Individual Plaintiffs fail to state an equal-protection claim."

"Crucially, Plaintiffs fail to understand the relationship between right and remedy. Though every injury must have its proper redress, a court may not prescribe a remedy unhinged from the underlying right being asserted. By seeking injunctive relief preventing certification of the Pennsylvania election results, Plaintiffs ask this Court to do exactly that. Even assuming that they can establish that their right to vote has been denied, which they cannot, Plaintiffs seek to remedy the denial of their votes by invalidating the votes of millions of others. Rather than requesting that their votes be counted, they seek to discredit scores of other votes, but only for one race. This is simply not how the Constitution works."

The Federal Court of Appeals for the Third Circuit affirmed the District Court ruling.  Judge Bibas, *another nominee of President Trump*, wrote the extensive opinion:

"Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here.  The Trump Presidential Campaign asserts that Pennsylvania's 2020 election was unfair. But as lawyer Rudolph Giuliani stressed, the Campaign "doesn't plead fraud. . . . [T]his is not a fraud case." Mot. to Dismiss Hr'g Tr. 118:19–20, 137:18. Instead, it objects that Pennsylvania's Secretary of State and some counties restricted poll watchers and let voters fix technical defects in their mail-in ballots. It offers nothing more."

"So is the claim that, "[u]pon information and belief, a substantial portion of the approximately 1.5 million absentee and mail votes in Defendant Counties should not have

been counted." Id. ¶¶ 168, 194, 223, 253. 'Upon information and belief' is a lawyerly way of saying that the Campaign does not know that something is a fact but just suspects it or has heard it. 'While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.' *Iqbal*, 556 U.S. at 679. Yet the Campaign offers no specific facts to back up these claims."

"The Campaign's claims have no merit. The number of ballots it specifically challenges is far smaller than the roughly 81,000-vote margin of victory. And it never claims fraud or that any votes were cast by illegal voters. Plus, tossing out millions of mail-in ballots would be drastic and unprecedented, disenfranchising a huge swath of the electorate *and upsetting all down-ballot races too*."

Another case filed in Federal District Court addressed the State law deadline for *receipt of mailed ballots*. This case has now been the subject of multiple filings at the U.S. Supreme Court but addresses only a relatively small number of ballots – approximately 9400 votes, far short of the Biden margin of victory in Pennsylvania. The matter relates to a Pennsylvania State Court ruling extending the Pennsylvania statue's deadline for receipt of mailed ballots by a number of days because COVID-19 apparently threatened delays in mail delivery. On November 6, 2020, Justice Alito entered a brief order, requiring that:

"All [Pennsylvania] county boards of election are hereby ordered, pending further order of the Court, to comply with the following guidance provided by the Secretary of the Commonwealth on October 28 and November 1, namely, (1) that all ballots received by mail after 8:00 p.m. on November 3 be segregated and kept "in a secure, safe and sealed container separate from other voted ballots," and (2) that all such ballots, if counted, be counted separately. Pa. Dep't of State, Pennsylvania Guidance for Mail-in and Absentee Ballots Received From the United States Postal Service After 8:00 p.m. on Tuesday, November 3, 2020 (Oct. 28, 2020); Pa. Dep't of State, Canvassing Segregated Mail-in and Civilian Absentee Ballots Received by Mail After 8:00 p.m. on Tuesday, November 3, 2020 and Before 5:00 p.m. on Friday, November 6, 2020 (Nov. 1, 2020)."

The procedural history in this matter is complicated, and multiple courts have ruled in various contexts. But the principal remaining issue pending before the Supreme Court is this: "Do State courts and executive officials have authority to alter legislatively established election rules, despite the U.S. Constitution's vesting of authority to set the rules for federal elections in State legislatures?" Briefing on a petition for certiorari seeking Supreme Court review is complete now, and the Court could issue its decision on the petition at any time. But to be clear, *the parties involved in this case know that the matter being addressed will not impact the outcome of the Presidential Election in Pennsylvania or any other state*. Indeed, the Petitioner, who supports President Trump's position in this case has argued in a recent brief: "In reality, however, this case is an ideal vehicle [for Supreme Court review], in part precisely *because it will not affect the outcome of this election*."

## VI. Wisconsin

### A. Cases litigated in Federal Court

*Donald J. Trump v. Wisconsin Elections Commission, et al.*

In Federal District Court for the Eastern District of Wisconsin, and then on appeal in the Seventh Circuit, *two Trump appointees*, Judges Ludwig and Scudder, ruled against the President. The case addressed a series of issues relating to Wisconsin Election Commission procedures for addressing absentee ballots during the pandemic. The President's counsel argued that those procedures were at

odds with Wisconsin Legislative enactments and thus unconstitutional under the Electors Clause of Article II of our federal Constitution.

At the District Court, Judge Ludwig concluded that the President had standing and presented federal claims. He conducted an expedited hearing on the merits of the President's claims before ruling. Judge Ludwig summarized his conclusion as follows:

"And, on the merits of plaintiff's claims, the Court now further concludes that plaintiff has not proved that defendants violated his rights under the Electors Clause. To the contrary, the record shows Wisconsin's Presidential Electors are being determined in the very manner directed by the Legislature, as required by Article II, Section 1 of the Constitution."

Judge Ludwig also explained how the Wisconsin Legislature specifically created the Wisconsin Election Commission (WEC) to carry out the election, and delegated to the Commission specific authority to create procedures for addressing election related issues (including absentee balloting) and created a right to seek relief in state court to remedy any "alleged irregularity, defect or mistake" related to the election:

"The Wisconsin Legislature has also established laws detailing the particulars of election administration; these details are set forth in Chapters 5 to 12 of the Wisconsin Statutes. For the last five years, responsibility for the administration of Wisconsin elections has rested with the WEC. The Wisconsin Legislature created the WEC in 2015 specifically to "have the responsibility for the administration of ... laws relating to elections and election campaigns." 2015 Wis. Act 118 §4; Wis. Stat. §5.05. The Wisconsin Legislature has also assigned powers and duties under the state election laws to municipal and county clerks, municipal and county boards of canvassers, and in Milwaukee, the municipal and county boards of election commissioners. Wis. Stat. §§7.10, 7.15,7.21. The Wisconsin Legislature has directed that these officials, along with the WEC, administer elections in Wisconsin. See Wis. Stat. chs. 5 to 10 and 12. To carry out these duties, the legislature has delegated significant authority to the WEC. ... For the determination of Presidential Electors, the Wisconsin Legislature has directed the WEC to "prepare a certificate showing the determination of the results of the canvass and the names of the persons elected." Wis. Stat. §7.70(5)(b). The legislature has further directed that "the governor shall sign [the certificate], affix the great seal of the state, and transmit the certificate by registered mail to the U.S. administrator of general services." Id. ... In addition to logistically administering the election, the Wisconsin Legislature has directed the WEC to issue advisory opinions. Wis. Stat. §5.05(6a), and "[p]romulgate rules ...applicable to all jurisdictions for the purpose of interpreting or implementing the laws regulating the conduct of elections or election campaigns. Wis. Stat. §5.05(1)(f). The WEC is to"conduct or prescribe requirements for educational programs to inform electors about voting procedures, voting rights, and voting technology." Wis. Stat. §5.05(12). Finally, the Wisconsin Legislature has provided detailed recount procedures. Wis. Stat. §9.01. After requesting a recount, "any candidate ... may appeal to circuit court." Wis. Stat. §9.01(6). The legislature has also directed that "[Wis. Stat. §9.01] constitutes the exclusive judicial remedy for testing the right to hold an elective office as the result of an alleged irregularity, defect or mistake committed during the voting or canvassing process." Wis. Stat. §9.01(11)."

Judge Ludwig then concluded that the WEC did not act inconsistently with the manner provided by the Wisconsin Legislature for conducting the election and selecting a slate for the Electoral College:

"The approach, form, method, or mode the Wisconsin Legislature has set for appointing Presidential electors is by "general ballot at the general election. Wis. Stat. §8.25(1). There

18

is no dispute that this is precisely how Wisconsin election officials, including all the defendants, determined the appointment of Wisconsin's Presidential Electors in the latest election. They used "general ballot[s] at the general election for choosing the president and vice president of the United States" and treated a "vote for the president and vice president nominations of any party is a vote for the electors of the nominees." Absent proof that defendants failed to follow this "Manner" of determining the state's Presidential Electors, plaintiff has not and cannot show a violation of the Electors Clause."

And Judge Ludwig also explained explicitly why the WEC actions regarding absentee ballots were consistent with the enactments of the Wisconsin Legislature:

"These issues are ones the Wisconsin Legislature has expressly entrusted to the WEC. Wis. Stat. §5.05(2w) ("The elections commission has the responsibility for the administration of chs. 5 to 10 and 12."). When the legislature created the WEC, it authorized the commission to issue guidance to help election officials statewide interpret the Wisconsin election statutes and new binding court decisions. Wis. Stat. §5.05(5t). The WEC is also expressly authorized to issue advisory opinions, Wis. Stat. §5.05(6a), and to "[p]romulgate rules ... applicable to all jurisdictions for the purpose of interpreting or implementing the laws regulating the conduct of elections or election campaigns." Wis. Stat. §5.05(1)(f). The Wisconsin Legislature also directed that the WEC would have "responsibility for the administration of ... laws relating to elections and election campaigns." Wis. Stat. §5.05(1). In sum, far from defying the will of the Wisconsin Legislature in issuing the challenged guidance, the WEC was in fact acting pursuant to the legislature's express directives. ... Thus, the guidance that plaintiff claims constitutes an unconstitutional deviation from the Wisconsin Legislature's direction, is, to the contrary, the direct consequence of legislature's express *command*. And, defendants have acted consistent with the "Manner" of election administration prescribed by the legislature."

"Because plaintiff has failed to show a clear departure from the Wisconsin Legislature's directives, his complaint must be dismissed. As Chief Justice Rehnquist stated, "in a Presidential election the clearly expressed intent of the legislature must prevail." Bush v. Gore, 531 U.S. 98, 120 (2000) (Rehnquist, C.J., concurring). That is what occurred here. There has been no violation of the Constitution."

As noted, the United States Court of Appeals for the Seventh Circuit affirmed Judge Ludwig's ruling, and addressed the issues in additional detail.  Judge Scudder, *also a Trump appointee*, wrote for the unanimous three judge panel, explaining:

"We agree that Wisconsin lawfully appointed its electors in the manner directed by its Legislature and add that the President's claim also fails because of the unreasonable delay that accompanied the challenges the President now wishes to advance against Wisconsin's election procedures."

"On the merits, the district court was right to enter judgment for the defendants. We reach this conclusion in no small part because of the President's delay in bringing the challenges to Wisconsin law that provide the foundation for the alleged constitutional violation. Even apart from the delay, the claims fail under the Electors Clause."

"In his concurring opinion in Bush v. Gore, Chief Justice Rehnquist suggested that the proper inquiry under the Electors Clause is to ask whether a state conducted the election in a manner substantially consistent with the "legislative scheme" for appointing electors. 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring). . . . Whatever actions the

Commission took here, it took under color of authority expressly granted to it by the Legislature."

## B. Principal Case in State Court

After a recount conducted in Wisconsin increased candidate Biden's lead, President Trump's campaign filed suit in State Court in Wisconsin arguing that the absentee voting procedures in two specific heavily democratic Wisconsin counties violated Wisconsin law. A Wisconsin state court trial judge conducted a hearing and then on December 11, 2020 entered findings against the President. The matter then reached the Wisconsin Supreme Court on appeal. That court again ruled against the President 4-3, which multiple concurrences and dissents.

The issues litigated related to absentee ballot procedures during the pandemic in the two specific heavily democratic counties selected by the President's counsel. The case did not address similar issues state-wide, or in other counties with vote totals predominantly favoring the President. One issue related to a county determination that, pursuant to the Governor's "Safer at Home" pandemic order, voters could qualify as "indefinitely confined" due to illness, and thus vote by mail or drop box without showing identification in person. The President's counsel sought to disqualify every absentee ballot in the two counties of an "indefinitely confined" person regardless of whether that "confinement" related to the pandemic or not. Another issue related to ballots collected by volunteers at various events in Madison, Wisconsin named "Democracy in the Park."

Judge Hagedorn, appointed by former Republican Governor Scott Walker, wrote the majority opinion. The majority first ruled against the Plaintiff as to the application of the definition of "indefinitely confined" – "The challenge to the indefinitely confined voter ballots is meritless on its face." As a concurrence explained:

"Although the number of individuals claiming indefinitely confined status has increased throughout the state, the Campaign asks us to apply this blanket invalidation of indefinitely confined voters only to ballots cast in Dane and Milwaukee Counties . . . . The Campaign's request to strike indefinitely confined voters in Dane and Milwaukee Counties as a class without regard to whether any individual voter was in fact indefinitely confined has no basis in reason or law; it is wholly without merit."

Next, the Court declined to address the merits of other claims, explaining that the doctrine of "laches" applied:

"Such doctrine is applied because the efficient use of public resources demands that a court not allow persons to gamble on the outcome of an election contest and then challenge it when dissatisfied with the results, especially when the same challenge could have been made before the public is put through the time and expense of the entire election process. Thus if a party seeking extraordinary relief in an election-related matter fails to exercise the requisite diligence, laches will bar the action. ... Although it disagrees the elements were satisfied here,the Campaign does not dispute the proposition that laches may bar an untimely election challenge. This principle appears to be recognized and applied universally. ... The relevant election officials, as well as Vice President Biden and Senator Harris, had no knowledge a claim to these broad categories of challenges would occur. The Campaign's delay in raising these issues was unreasonable in the extreme, and the resulting prejudice to the election officials, other candidates, voters of the affected counties, and to voters statewide, is obvious and immense."

Addressing the "Democracy in the Park" events specifically, the majority explained:

"When the events were announced, an attorney for the Wisconsin Legislature sent a warning letter to the City of Madison suggesting the events were illegal. The City of Madison responded that the events were legally compliant, offering reasons why. Although these events and the legislature's concerns were widely publicized, the Campaign never challenged these events, nor did any other tribunal determine they were unlawful.  The Campaign now asks us to determine that all 17,271 absentee ballots collected during the "Democracy in the Park"events were illegally cast. Once again, when the events were announced, the Campaign could have challenged its legality. It did not."

The Majority concluded:

"Our laws allow the challenge flag to be thrown regarding various aspects of election administration. The challenges raised by the Campaign in this case, however, come long after the last play or even the last game; the Campaign is challenging the rulebook adopted before the season began. Election claims of this type must be brought expeditiously. The Campaign waited until after the election to raise selective challenges that could have been raised long before the election. We conclude the challenge to indefinitely confined voter ballots is without merit, and that laches bars relief on the remaining three categories of challenged ballots."

And the concurring justices added:

"As acknowledged by the President's counsel at oral argument, the President would have the people of this country believe that fraud took place in Wisconsin during the November 3, 2020 election. Nothing could be further from the truth. The President failed to point to even one vote cast in this election by an ineligible voter; yet he asks this court to disenfranchise over 220,000 voters.  The circuit court, whose decision we affirm, found no evidence of any fraud."

The three dissenting members of the Wisconsin Supreme Court each opposed application of the doctrine of laches, explaining that the people of Wisconsin deserved clarity on the law applicable for each of the circumstances identified:

"Our constitutional responsibility is to analyze the law and determine if it was followed regardless of whether any remedy might be available. In this way future elections benefit from our analysis."

"Petitioners assert troubling allegations of noncompliance with Wisconsin's election laws by public officials on whom the voters rely to ensure free and fair elections. It is our solemn judicial duty to say what the law is. The majority's failure to discharge its duty perpetuates violations of the law by those entrusted to administer it.  I dissent."

Finally, one dissenter declined to reach a conclusion as to the "indefinite confinement" issue with absentee ballots, noting that the court lacked "sufficient information ... to determine whether they lawfully asserted that they were indefinitely confined prior to receiving an absentee ballot."  And multiple dissenters questioned the legality of the "Democracy in the Park" events.  None of the dissenters explained whether or how a contrary ruling on the subject issues could change the outcome of the election.

# Exhibit 4

# REPORT

## OF THE ELECTION LAW
## STUDY SUBCOMMITTEE
## OF THE STANDING SENATE
## JUDICIARY COMMITTEE

### SUMMARY OF TESTIMONY FROM DECEMBER 3, 2020 HEARING

Honorable William T. Ligon, Chairman
Senator, District 3

_____

Honorable John Kennedy, Member
Senator, District 18

_____

Honorable Bill Heath, Member
Senator, District 31

_____

Honorable Blake Tillery, Member
Senator, District 19

_____

Honorable Michael Rhett, Member
Senator, District 33

_____

Honorable Elena Parent, Member
Senator, District 42

_____

I. INTRODUCTION

II. EXECUTIVE SUMMARY

III. ORAL TESTIMONY

IV. FINDINGS

V. RECOMMENDATIONS

## I.     INTRODUCTION

The charge assigned to the Election Law Study Subcommittee of the Standing Senate Judiciary Committee was to examine the recent election cycle, the recount process, the audit process, the current investigations taking place, the litigation that is moving forward, as well as address issues relating to the upcoming runoffs. In the matter of the law itself, we were to also consider Georgia's election laws as they have impacted and are impacting the current election cycle. This Report may be further amended prior to the 2021 Georgia Legislative Session.

This Subcommittee met once at the Georgia State Capitol on Thursday, December 3, 2020. The hearing was open to the public, and there was an open invitation for citizens to speak before the committee. Subcommittee members also expressed stories they had heard from their constituents. Other committee meetings have also been hearing testimony which should be considered to present an even broader understanding. At this time, the additional committees which have met and received testimony are the Senate Governmental Affairs Committee and the House Governmental Oversight Committee. Many who could not testify due to lack of time have recorded their own testimonies online and shared their written speeches with this committee; the Subcommittee received many affidavits under oath.

## II.    EXECUTIVE SUMMARY

The November 3, 2020 General Election (the "Election") was chaotic and any reported results must be viewed as untrustworthy.  The Subcommittee took evidence from witnesses and received affidavits sworn under oath.  The Subcommittee heard evidence that proper protocols were not used to ensure chain of custody of the ballots throughout the Election, after the opening of ballots prior to the Election, and during the recounts. The Subcommittee heard testimony that it was possible or even likely that large numbers of fraudulent ballots were introduced into the pool of ballots that were counted as voted; there is no way of tracing the ballots after they have been separated from the point of origin. The Subcommittee heard testimony of pristine ballots whose origin looked suspicious or which could not be verified and the inability of poll workers to distinguish between test ballots and absentee ballots. Signatures were not consistently verified according to law in the absentee balloting process.

Poll watchers on Election Night testified that they had noted that ballots were not secured, that seals and security tags were not used, and the chain of custody was often lax or non-existent. During the recount process, the monitors observed similar patterns of unsecured ballots that had broken seals and open cases of ballots laying around for hours or overnight in unsecured locations. There was a lack of enforcement of the law, sloppy handling of the ballots by those counting, deliberate covering-up of voting numbers by workers, lack of following the process during the recount, unsafe handling of military ballots, and insecure data such as on laptops and flash drives. According to submitted testimony, there were also many equipment failures when ballots would not go through the machines and other times when ballots were counted more than once.

A great deal of testimony supported evidence of a coordinated effort to prevent a transparent process of observing the counting of ballots during the absentee ballot opening period and on Election Night. Witnesses testified to hostility to Republican poll workers during the recount – directional signage was unavailable, doors were locked, and Republican poll watchers were sent home early or given menial assignments.

Monitors throughout the state were often kept at an unreasonably long distance – some social distancing was understandable, but monitors were blocked from having the visual ability to see what was written on the ballots or to have any meaningful way to check the counting or to double-check that what was counted was actually assigned to the right candidate. They also could not observe what was entered into the ARLO system, nor could they be told the count that was being entered into ARLO. Instead, they were told that those numbers would be totaled and come back from the Secretary of State's Office. They were also told not to take pictures, film, or have other means of acquiring proof of the process that they were experiencing based on a rule from the State Elections Board.  That rule contravenes the spirit and purpose of the election law.

The Secretary of State's Office was unresponsive to its hotline. It has been unresponsive to many who wonder if their vote ever really counted. The office has turned a blind eye to fraud to the point that it ought to be considered gross negligence.

The Subcommittee did not have time to investigate the numerous publicly reported issues with the Dominion voting machines. The Subcommittee takes notice of the various publicly reported functions of the machines and heard evidence that the machines can duplicate fraudulent ballots to the point that not even trained personnel can tell the difference between a test ballot and a real ballot. Testimony also suggested that the system responds wirelessly to being reset from an unknown location as happened with the poll books. The Subcommittee also heard that Dominion machines can be programmed with algorithms that reallocate votes between candidates. In addition, the Dominion machines are programmed to count votes using percentages of whole numbers rather than actual votes, which is a feature incompatible with the actual voting process.  The Subcommittee learned that the history and control of the

company that owns the Dominion voting system is unclear and provides serious implications of
foreign interference in the U.S. election.

## III.  ORAL TESTIMONY

**Violation of Ballot/Computer Security Procedures During Early Voting and on Election Day**

- ■ Bridget Thorne, who has nine years' experience as a poll worker/precinct manager in
  Fulton County, worked for five and a half days during early voting as a technician in the
  temporary warehouse in the Georgia World Congress Center. Because of positive COVID
  tests among Fulton County elections employees, Dominion Software was selected to run
  the warehouse. Thorne was disturbed at the lack of ballot security. Test ballots were
  printed on the same type of paper (official Rolland Voting paper) as real ballots, but test
  ballots were not routinely marked as such or destroyed. Thorne testified she saw a stack
  of these ballots almost eight inches tall.

  On October 30, when early voting finished at State Farm Arena in Fulton County (the
  "State Farm Arena"), Thorne observed 40-50 scanners being brought into the arena and
  tens of thousands of ballots being scanned in by random people pulling ballots from
  random places – no formal procedure, no oaths, no chain of custody. When Thorne
  objected to this haphazard process, a Dominion employee replied, "It's fine, we have
  been doing this all week." When Thorne left that night, she observed unsecured
  suitcases of ballots next to the scanners.

  Upon arriving at the State Farm Arena the following morning, Thorne saw that suitcases
  of ballots had been piled in a corner and sealed. But there was no restricted access, so
  anyone could have removed one or more suitcases. In addition, anyone could have
  opened them and resealed them" because "seals were easily accessible." During the
  day, employees brought Thorne other ballots that were found in the warehouse, asking
  if they were real or test. She had no way of knowing.

  The following night, when Thorne was again working at the warehouse, she observed a
  Dominion employee and an Election Group Consultant printing "test ballots" but doing
  so incorrectly. She realized then that "_anyone_ in the warehouse had access to printing
  real ballots."

  Before Election Day, Thorne attempted to report her concerns about these insecure
  ballot operations to the Secretary of State (SOS) office and to the State Board of
  Elections; she received no response.

  Since giving her testimony to the Senate Subcommittee, Bridget Thorne has been fired
  by a consultant working for Fulton County.

**Recount: Counting Votes Without Monitoring, or Without Meaningful Monitoring**

- Election Day – Video from State Farm Arena in Fulton County showed a Fulton County Election worker approaching the media and poll monitors. After a brief exchange, the media and monitors packed up and left. This coincided with media reports that everyone was told to leave State Farm Arena around 10 p.m. on Election Night; workers testified they were told that tabulation was stopping for the night and would resume the next morning. Instead, video from State Farm Arena revealed that about six workers stayed behind. What happened next revealed a coordinated effort by election workers to deliberately conceal their continued counting of ballots out of public view, in direct violation of the law. This incident was premeditated. Those workers pulled out four concealed cases of ballots from under a table and continued counting for another two hours. During those two hours there were multiple machines running, each of which could process up to 3000 ballots per hour.  A "representative" of The Secretary of State's office claimed that it had a representative present during that period, and the media reported that statement widely; it was not true.  The representative admitted he was not present during that time period and is not evident on the video.

- David Cross, though unable to speak at the hearing due to time constraints, submitted written testimony with graphs, one of which appears to enhance the significance of what took place with the change in vote totals just after the late-night activities took place at State Farm Arena. Due to its significance to the State Farm Arena video seen by the committee, his graph is included with this Report. It shows that 136,155 votes suddenly appeared in Biden's vote column at 1:59 a.m., November 4, 2020.

- Scott Hall of Fulton County is an experienced poll watcher who testified that there was a secured "lunch area" but when he bought lunch for workers, they were not permitted to use that area.  There were no cameras in that area, yet tables were set up for counting, and poll watchers were excluded.  He has photographs of the area.  He also testified that there were stacks and stacks of unsecured blank ballots ("checks," as he called them) that were in the open.

- Mr. Hall noted a limitation of one monitor per 10 recounting tables as being an inadequate ratio to be truly effective.  He was constantly engaged in the recount, even being called to go to the World Congress Center at ridiculous hours, such as 10 p.m., for more counting.  He was adamant that something was seriously wrong with how Fulton County was handling the ballots.

- Mark Amick reported that in DeKalb County, only one monitor was allowed per 10 tables of 16 recounters.  He testified that monitors were kept six feet away and could not see the totals entered on the computer screens.

- At State Farm Arena at the end of the recount day on November 14, Susan Voyles of Sandy Springs observed pallets of ballots remaining to be counted beginning the following day. When she arrived the next morning, November 15, those pallets were gone.

- On November 15, Voyles and her partner with whom she had traveled to State Farm Arena (also identified as a Republican), were given only 60 ballots to review, even though other tables had thousands. Voyles and her partner, as well as other Republican monitors, were told at 10 a.m. there was nothing else for them to do, so they should leave. Since giving her testimony to the Senate Subcommittee, Susan Voyles has been fired by a consultant working for Fulton County.

- Tony Burrison of Savannah and a military veteran served as one of very few recount observers during the recount in Chatham County. He described the process as "disgusting" – stacks of ballots were being counted with no oversight or accountability. Based on what he observed, he believed there is a major problem with voting integrity due to tampering with the vote.

- Nancy Kain of DeKalb reported that she was kept too far from the counting to verify any votes.

- Hal Soucie of Smyrna, a poll watcher at State Farm Arena, testified that he was told that he was not supposed to be close enough to see batch numbers.

**No Chain of Custody**

- Annette Davis Jackson, a Gwinnett monitor, saw broken locks on the bins containing paper backup ballots.

- Scott Hall of Fulton County was told to leave the World Congress Center after he tried to document and photograph nine unsecured bags of ballots.  He testified he "cried" over the incidents he saw.

- Dana Smith, a Republican poll watcher in Hart County, testified that she observed the paper backup ballots being placed in unlocked canvas bags for transport to the county office of the Elections Supervisor. The precinct manager finally (at Smith's insistence) obtained locks before transporting the bags in her car, but she refused to complete chain-of-custody forms.  Smith also testified that there was open access to the special paper used to print the paper backup ballots.

■ Hal Soucie observed the recount process in two counties, Cobb and Fulton. At State Farm Arena in Fulton County, he reported "suitcases" full of ballots "all over the place," with no chain-of-custody procedures, no time and no date information. He observed people taking ballots out of the cases, counting, and putting them right back into the cases. No one checked him in as a credentialed observer, and one man handed him a stack of ballots without knowing who he was or where the ballots came from.

**Suspicious "Pristine" Absentee Ballots**

■ At the State Farm Arena recount on November 14, Susan Voyles – who has 20 years' experience managing election precincts in Fulton County – reviewed a stack of 110 absentee ballots [ballots are normally placed in stacks of 100] and noticed they were "pristine." They had not been folded, and they did not appear worn as though voters and election workers had handled them. Each ballot was "bubbled in" with exactly the same marking, which showed a small crescent of white in the bubble. It appeared as though one ballot had been marked and then reproduced over 100 times. In addition, one of these ballots bore the distinctive ink markings of having been pulled from a printer too soon. Almost all of these ballots were votes for Vice President Biden; only two were for President Trump. In her 20 years of election experience, Voyles had never seen any ballots like these. As noted above, Ms. Voyles has been fired from her position as a poll manager with Fulton County, presumably for her honest testimony.

■ Hal Soucie, who was also at the State Farm Arena, verified that he saw the pristine ballots mentioned by Ms. Voyles.

■ During the recount, Scott Hall of Fulton County saw large quantities of ballots at the World Congress Center that appeared to have been machine-produced. He stated that he saw this "over and over." The Subcommittee received evidence that other poll workers throughout the State reported similar instances of "pristine" ballots with no explicable origin.

**Duplication of Ballots Without Oversight**

■ Nancy Kain, a naturalized citizen in DeKalb County, volunteered as a poll watcher for Advance Voting at lower Roswell Road, served as a poll monitor during processing of absentee ballots and as a poll watcher on Election Day. At 10 a.m. on November 5, at the State Farm Arena, she was not asked for credentials and noticed that many people did not even have credentials. She observed a young man with paper ballots putting in selections on a ballot on a voting machine and wondered why it was not going through the scanner. The supervisor explained that the military ballots are transcribed in proper format and ballots come in that they were trying to salvage because of damage, thus they were just transferring them to a new ballot, and that was the process. Yet, no one was there to verify what the young man was doing. He was the brother of the

supervisor. Technically, he was voting for someone else on a voting machine. She took video and photographs and recorded her conversation with the supervisor.

■ Mark Amick observed the processing of Provisional, Military and UOCAVA ballots in Fulton County on November 6 from early morning until 10:15 p.m. The only "oversight" provided was from a Secretary of State (SOS) employee who was not seen in the area before mid-morning, and who spent much of day not observing the duplication and tabulation process but rather sitting in the back of the room and leaving the room while on his phone. The first time Amick saw the SOS employee on the counting/sorting floor was 5:53 p.m. By 6:02 p.m. he had returned to his chair at the back of the room, and he did not go back onto the counting/sorting floor by the time Amick left at 10:15 p.m.

**Denial of Entry to Election Day Poll Watchers and During Recount**

■ Mark Amick, a credentialed Statewide Poll Watcher in Milton (Fulton County), was denied entry into the Birmingham Falls Elementary School precinct despite his statewide credentials. The Subcommittee has also received evidence from monitors that some of them were denied entrance during the recount.

**Hostility**

■ Hale Soucie of Symrna testified that Cobb County was using an electronic counting machine on the first day to count ballots, which was not the approved way to do the recount. The next day, it was the hand count process. He stated that on his second day he immediately observed that the first auditor made three mistakes in two minutes calling three ballots marked for Trump as Biden votes, but the second auditor caught those mistakes. He noticed another table that was not even doing a double-check at all. When he sought to observe, he was met with great hostility and vulgar name calling directed at him. The Subcommittee received other evidence of hostility against the monitors.

**Wildly Disparate Vote Totals from the Recount**

■ While observing the recount at the DeKalb County Board of Elections on November 15, Mark Amick saw that a box of ballots was recorded as 10,707 votes for Biden and 13 votes for President Trump. He flagged this obvious disparity to the election workers, who discussed among themselves how it came to be. Two election officials with whom he engaged about this issue became agitated with Amick for his continued monitoring of the situation. They finally agreed to recount the box, resulting in a revised total of 1,081 votes for Vice President Biden and 13 for President Trump – still statistically disparate, but 9,626 votes less so.  Amick was not certain if the corrected count was actually entered into the final recount totals.

- At State Farm Arena during the recount, Susan Voyles also noted a stack of absentee ballots with only two votes for President Trump.

- Hal Soucie of Smyrna, while monitoring in State Farm Arena, noticed stacks of ballots quite high, such as eight inches high for Biden, yet not a single Trump vote. He stated that he works with data and marketing, and anytime figures start reaching the 90th percentile, that type of consumer data is suspect, and when it gets to 100 percent that is passing the level of improbable to impossible.

**Ballots Counted from Ineligible Voters**

- Mark Davis analyzed data from U.S. Postal Service change-of-address (COA) forms and compared it to voters who voted in their former precincts. For example, he discovered that 14,980 out-of-state movers still voted in the Georgia General Election. Another 40,279 moved across county lines more than 30 days prior to the election, yet still voted in their former county precincts, a violation of Georgia law. He also noted that about 1,000 voters had voted twice in the Primary, inferring that the same pattern could have existed in the General Election.

**Constitutional Violations of Duly Passed Law**

- Dr. John C. Eastman, former Professor of Law and former Dean of the Chapman University Fowler School of Law and current Fellow at the Claremont Institute, testified regarding the plenary authority of the legislative body of the States to set the "Times, Places and Manner" of elections involving Federal officials, including with respect to the selection of Electors for the Electoral College in the presidential election, citing Article I, Section 4 and Article II, Section 1 of the U.S. Constitution. He noted that when States have vested that authority in the people of their States that they are bound to follow the people's choice in a free and fair election, but where fraud and failure to follow the law as passed by the legislative body is evident, that authority can be withdrawn. The legislature then can exercise its plenary authority to choose the electors in a presidential contest. He referenced both *Bush v. Gore* and *McPherson v. Blacker* as authoritative.

  Professor Eastman further explained that the failure of State election officials to follow the manner of conducting the election according to the statutes duly passed by the legislative body can annul an election. The U.S. Constitution clearly gives State legislatures under Article I, Section 4 the duty to determine the "manner" of federal elections, and that power rests solely with the State legislatures unless Congress passes its own laws that preempt State election laws. There is no provision which allows any Executive branch member to modify, set aside, enhance, or otherwise create policies or procedures which undermine or contravene those laws.

He noted various ways State election officials had failed to follow the statutes in conducting the election. He reiterated failures such as counting the votes of approximately 66,000 underage individuals, the 2,500 felons whose votes were unlawfully counted, the votes of those who had no verifiable residences within the State, and the "biggest" of all he believed was the March 2020 settlement agreement that was entered into with Georgia's Secretary of State and "certain democrat committee challengers that effectively altered the signature verification process" with regard to Absentee Ballots, an agreement that was contrary to State law.  He further noted that the "intermingling of legal and illegal ballots" also meant that the election cannot legally be certified. "The State has failed to make a choice on Election Day in accordance with the manner" the legislature prescribed. In light of the failures, the fraud, and the unconstitutional agreement, Dr. Eastman opined that it was the duty of the legislative body to choose the State's Electors for the presidential election.

**Data Analysis in General and Dominion Issues**

- Russell J. Ramsland, Jr., a cybersecurity expert from Texas, testified that his team had compared data from Dominion voting machines in those places where they were used around the nation. They discovered that with Dominion machines, Vice President Biden outperformed what he was statistically expected to receive by an "amazing" 5%. He also outperformed statistical expectations when the analysis was run by county, with Vice President Biden picking up 78% of Dominion counties but only 46% of counties using machines from other manufacturers. Depending on the type of analysis performed, Ramsland estimated that these anomalies translated to between 123,000 and 136,000 extra votes for Vice President Biden in Georgia.

  Ramsland also found that the rejection rate for absentee ballots in Georgia was much lower in 2020 (0.2%) than in 2016 (6.4%). He also identified over 96,000 phantom votes, meaning that they had been counted, but there was no record of the counties recording those ballots as "received."

- Phil Waldron, a former U.S. Army information officer with expertise in electronic warfare, identified a "pretty significant information warfare campaign" conducted across the country during the Election. He described the history of the Dominion and other voting machines, with the operating software sharing the same "DNA" going back to Smartmatic, which was created to help steal elections in Venezuela.

  Waldron analyzed these machines in Michigan and found them extremely insecure. He said a good hacker could get into them within two minutes, while an elementary-school student could probably do it in twelve. There are 12 avenues of attack. Dominion also sends voter data outside the United States.

Waldron discussed fractional voting. Waldron testified that the Dominion software used in the Georgia machines assigns a fractional value to each vote; there is no legitimate purpose in assigning an elector's vote as a fractional vote.  That feature can allow the manipulation of election results.

Waldron said federal law (USC Title 46) requires that the ballot images within the machine are required to be preserved for 22 months, but only a forensic analysis would show if this was done. Each machine can record 2,000-3,000 ballots per hour.  His Michigan analysis showed "huge breaches in chain of custody" with respect to the machines and to absentee ballots. In Georgia, there was an unexplained upload of ballots at 3:36 a.m. on November 4.

Waldron urged a full forensic audit of the machines and of absentee ballots (for example, ink analysis would show if ballots were mass-produced).

- Scott Hall of Fulton County stated that when he worked at the English Street facility that he had concerns about the contractors hired there. He noted that every vote in Fulton County ends up on thumb drives that eventually find their way to the English Street location. He said, "I have photographs of pallet loads of basically signed checks." "So you've got every single vote, you've got currency, and now you just need someone to do it." He said he hired one of his own guys to determine if a fraudulent vote could be recorded on the Dominion machines at that point in the process.  "Now, I've got all these votes that have not been uploaded anywhere. And he actually wrote me a paper, and he said that it was the 'stupidest, simplest thing I've ever seen.' He said, 'Dominion's own documentation shows how you take an entire batch, swipe it off, and then swipe on a new batch, before you put it into the real-time reader that uploads." He summed up the voter fraud by using the analogy that the referee got paid off to call the game and something is very wrong.

**Outside Influence Over Governmental Election Functions**

- Scott Walter from the Capitol Research Group testified about Mark Zuckerberg's Center for Technology and Civic Life (CTCL), a progressive advocacy group that seeks to influence elections via voter "education" and get-out-the-vote efforts. In the 2020 election, CTCL made grants to individual counties, in Georgia and elsewhere, ostensibly to help run safe elections during COVID. But county boards could use the money for whatever they wanted, and the bulk of the grants (95% of total funding) went to counties that voted for Clinton in 2016 and for Biden in 2020. In fact, nine of the 10 Georgia counties that experienced the largest shifts toward Democrats in 2020 received CTCL grants -- $4.38-$10.47 spent per each man, woman, and child in those counties. Georgia should not allow "privatized" elections via the organization that the Washington Post has called the "Democratic Party's Hogwarts for digital wizardry."

**Voters Unable to Verify Votes Counted**

- ■ Grace Lennon, a student at Georgia Tech, hoped to early vote on October 23. When she arrived, she was told that she had been sent an absentee ballot.  She never received an absentee ballot. She had to sign an affidavit saying that she had not requested nor had she received an absentee ballot. She was then given a voter card to vote on the machine. However, the next day, she learned that someone had voted absentee in her name on October 7th.  She was not able to verify that her vote actually counted for the one she chose to select in the election or whether the absentee ballot counted instead. Senator Greg Dolezal confirmed that most all the Senators had heard many similar stories.

## V.    FINDINGS

1- The November 3, 2020 election was chaotic and the results cannot be trusted.
2- The Secretary of State and the State Elections Board failed to enforce the law as written in the Georgia Code, and furthermore, created policies that contravened State law. As Senator Matt Brass concluded at the December 3 hearing, "We have heard evidence that State law was not followed, time after time after time."
3- The Secretary of State failed to have a transparent process for the verification of signatures for absentee ballots, for the counting of votes during the subsequent recount and audit, and for providing the type of guidance and enforcement necessary to ensure that monitors and other observers had meaningful access to the process.
4- The Secretary of State instituted an unconstitutional gag order so that monitors were told not to use photography or video recording devices during the recount.
5- Election officials at all levels failed to secure test ballots and actual ballots. Many reports indicate that proper procedures were not followed, and there was systematic failure to maintain appropriate records of the chain of custody for these ballots, both prior to and after voting and throughout the recount.
6- The Secretary of State and Election Supervisors failed to stop hostile behavior of workers toward citizen volunteer monitors during the recount process.
7- The events at the State Farm Arena are particularly disturbing because they demonstrated intent on the part of election workers to exclude the public from viewing the counting of ballots, an intentional disregard for the law. The number of votes that could have been counted in that length of time was sufficient to change the results of the presidential election and the senatorial contests. Furthermore, there appears to be coordinated illegal activities by election workers themselves who purposely placed fraudulent ballots into the final election totals.
8- Grants from private sources provided financial incentives to county officials and exerted influence over the election process.
9- The oral testimonies of witnesses on December 3, 2020, and subsequently, the written testimonies submitted by many others, provide ample evidence that the 2020 Georgia General Election was so compromised by systemic irregularities and voter fraud that it should not be certified.

## VI.    RECOMMENDATIONS

### A.  Absentee Ballots

In addition to following the law as already written by the legislature, such as not opening absentee ballots until Election Day, additional steps should be taken to ensure that only legal absentee votes are counted.

At a minimum, these recommendations include requiring photo identification, following signature match procedures faithfully, allowing absentee ballots to be used only upon demonstration of need, mailing absentee ballots out only upon the request of the registered voter, and although already illegal, expressly prohibiting drop boxes.

### B.  Secure Chain of Custody and Additional Security Measures

Procedures should be established to ensure proper chain of custody for all ballots, whether they are test ballots, new unused ballots, spoiled ballots, cast BMD-generated ballots, absentee ballots, and even the specialty paper that is used to print the ballots.

Penalties should be clearly known and enforced for any violations.

There should be complete security when workers go on the job, with sign-in of their names and a time stamp, when they go in and when they go out.

Cameras should also be on-site to monitor the process at all times, as well as all the entrances to the buildings where ballots and the ballot paper are stored.

### C.  Meaningful Access for Poll Watchers and Monitors

Citizens who are seeking to ensure the integrity of the vote need to be able to truly see the process. They should be able to ensure that people are reading their ballots before they are cast. They should be able to inspect the signature match process when ballots are opened. They should be able to write down seal information so they can ensure proper custody is in place. They should be close enough to see the names on the ballots during any recounts, the counts written on recount report sheets, the counts going into the ARLO system, the counts written on ballot containers, the process of the seals being broken as the ballots are entering the process, and so forth.

More poll watchers and monitors should be allowed to participate since the ratio needs to be improved. Objections by monitors should be addressed immediately on-site to ensure access and transparency.

Hostile actions by election workers toward volunteers should be immediately addressed and should be cause for dismissal.

**D. No Unconstitutional Gag Orders**

There is no reason to ban cameras when tabulation is taking place or when recounts and audits are taking place.

Furthermore, there is no reason to ban cameras at the polling booth as long as voters have privacy while voting.

The State Board of Elections should not ban cameras and recording equipment. They must fulfill their duty to ensure a transparent election process. Furthermore, citizens have a right to share those photos, recordings, and thoughts about what they observe.

**E. Unqualified Voters Should Be Purged from the System**

No underage voters should be in the system to allow their votes. No felons should be in the system to allow their votes.

Other categories of voters, such as the deceased and those who have moved out of state, should also be examined as to their continued presence on the voter rolls.

**F. Violations of State Election Laws Must Be Prosecuted**

The Georgia Bureau of Investigation ("GBI") and the Attorney General should aggressively investigate and prosecute those who violate election laws, including those conspiring to place fraudulent ballots into the system and the 1,000 persons identified by the Secretary of State who voted twice in the 2020 primaries. If prosecutions do not happen, violations will recur.

The GBI should establish an independent office for the investigation of all claims of voter fraud. That office should report regularly to the Judiciary Committee and, except in the case of investigations involving the Secretary of State or its personnel, the office of the Secretary of State.

The GBI should investigate the cases where many affidavits already exist regarding election fraud in the 2020 General Election.

### G.  Forensic Audits of Ballots and Machines

The Legislature must determine if ballot marking devices (BMDs) have been manipulated to provide a fraudulent result and without regard to whether the forensic audits can actually identify the manipulation of votes and the authenticity of the ballots that are in the ballot boxes, either generated by the BMDs or those that are absentee ballots.

Independent third-party auditors should review the fiducials on all ballots types (absentee, military, machine generated), audit the absentee ballot results from the last election, confirm the number of external envelopes in each county, and the number of ballots for each county.

Such audits should help ensure that phantom ballots and other fraudulent ballots are not counted in election results, and that legal votes are the only votes counted.

### H.  For Rectifying the 2020 General Election Results

The Legislature should carefully consider its obligations under the U.S. Constitution.  If a majority of the General Assembly concurs with the findings of this report, the certification of the Election should be rescinded and the General Assembly should act to determine the proper Electors to be certified to the Electoral College in the 2020 presidential race.  Since time is of the essence, the Chairman and Senators who concur with this report recommend that the leadership of the General Assembly and the Governor immediately convene to allow further consideration by the entire General Assembly.

Respectfully submitted this the 30th day of December 2020.

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**DECLARATION OF
J. ALEX HALDERMAN**

**Civil Action No. 1:17-CV-2989-AT**

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1.      I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

2.      My July 1, 2021, expert report describes numerous security vulnerabilities in Georgia's Dominion ICX BMDs. These include flaws that would allow attackers to install malicious software on the ICX, either with temporary physical access (such as that of voters in the polling place) or remotely from election management systems. They are not general weaknesses or theoretical problems, but

rather specific flaws in the ICX software, and I am prepared to demonstrate proof-of-concept malware that can exploit them to steal votes cast on ICX devices.

3.      Some of these critical vulnerabilities could be at least partially mitigated through changes to the ICX software if Dominion implemented such changes and jurisdictions deployed them. However, it would likely take months for Dominion to assess the problems, develop responsive software updates, test them, obtain any necessary approvals from the EAC and state-level certification authorities, and distribute the new software to states, as well as additional time for localities to install the changes. But Dominion cannot begin this process, because (to my knowledge) they have yet to learn what is in my report.

4.      My analysis also concludes that the ICX is very likely to contain other, equally critical flaws that are yet to be discovered. Jurisdictions can mitigate this serious risk through procedural changes, such as reserving BMDs for voters who need or request them. Election officials cannot make an informed decision about such urgent policy changes or any other mitigations until they have assessed the technical findings in my report. However, to my knowledge, the Georgia Secretary of State's Office has yet to even request access to it, despite Plaintiffs' repeated offers to make it available to appropriate individuals at the Secretary's Office.

5. Nor do these problems affect Georgia alone. In 2022, the ICX will be used in parts of 16 states.[1] Nevada will use it as the primary method of in-person voting in certain areas of the state. Louisiana is slated to use it for early voting in a DRE configuration where there is not even a paper trail. It will be used for accessible voting in Alaska and large parts of Arizona, California, Colorado, and Michigan. It will also see some use in parts of Illinois, Kansas, Ohio, Missouri, New Jersey, Pennsylvania, Tennessee, and Washington State. Officials in these jurisdictions too must act to update the software and their procedures, but they cannot do so without information about the problems. Continuing to conceal those problems from those who can—and are authorized to—address them, to the extent possible, serves no one and only hurts voters (and heightens the risk of compromise in future elections).

6. The most effective way to ensure that the necessary information gets to the parties responsible (without also falling into the wrong hands) would be to share my report with the Cybersecurity and Infrastructure Security Agency (CISA), which operates a Coordinated Vulnerability Disclosure (CVD) program for just this purpose. CISA is a federal agency that collaborates with state and local governments, election officials, federal partners, and vendors to manage risks to U.S. election

---

[1] See Verified Voting, "Verifier Search – November 2022," https://verifiedvoting. org/verifier/#mode/search/year/2022/model/ImageCast%20X.

infrastructure.[2] Under CISA's CVD process, agency staff would independently validate the vulnerabilities, work with Dominion to develop software updates as necessary, and facilitate sufficient time for affected states and localities to apply mitigation strategies.[3] CISA strives to disclose "accurate, neutral, objective information focused on technical remediation and mitigation" and to "correct misinformation where necessary,"[4] making it well qualified to coordinate the disclosure of such sensitive vulnerabilities.

7.     Geoff Hale, Director of CISA's Election Security Initiative, has confirmed to me that, if the Court permits it, the agency would be willing to receive my expert report and carry out coordinated vulnerability disclosure activities as appropriate (see Exhibit 1). Mr. Hale requests that I and my assistant Drew Springall be available for consultation with CISA during the CVD process, which we would be willing to do subject to the Court's permission.

8.     Informing responsible parties about the ICX's vulnerabilities is becoming more urgent by the day. Foreign or domestic adversaries who are intent on

---

[2] Cybersecurity and Infrastructure Security Agency, "Election Infrastructure Initiative," https://www.cisa.gov/election-security.

[3] Cybersecurity and Infrastructure Security Agency, "Coordinated Vulnerability Disclosure Process," https://www.cisa.gov/coordinated-vulnerability-disclosure-process.

[4] *Id.*

attacking elections certainly could have already discovered the same problems I did, yet Georgia's 2022 primaries are less than nine months away, and other states that use the ICX will conduct high-profile elections even sooner. It is important to recognize the possibility that nefarious actors already have discovered the same problems I detail in my report and are preparing to exploit them in future elections. Providing my report to CISA through its CVD program will ensure that Dominion and affected jurisdictions are able to begin appropriate mitigations as soon as possible. Continuing to withhold my report from CISA puts voters and election outcomes in numerous states at unnecessary, and avoidable, risk.

9.    I understand that State Defendants object to disclosure to CISA on the argument that my report should be used only for this lawsuit. But this ignores the implications of my report and my role in this matter. I am not a party to this lawsuit. I am an independent expert who was engaged to conduct an impartial assessment of the security and reliability of the Dominion BMD system, using (in part) election equipment that the Court ordered I be provided. I have done that, as reflected in my lengthy, detailed report and other submissions in this matter. As an independent expert and member of the election integrity community, I have a professional obligation to take appropriate steps to ensure that the severe vulnerabilities my report describes are properly remediated, to the extent possible, and that those tasked with

election security and administration across the country have the information they need to make responsible, informed decisions about election procedures, including the equipment used, the manner and purposes for which it is used (including whether it is used at all), the steps needed to secure that equipment and other aspects of the election systems in which it is used, and more. In short, my professional obligations do not end at the boundaries of this lawsuit, nor do the serious risks to voters and elections that my report discusses in depth. Additionally, I can imagine no prejudice to anyone in this lawsuit (or beyond) from disclosure of my report to CISA, nor am I aware of any claim of prejudice from any of the parties.

10.    I of course have complied, and will continue to comply, with all directives from the Court regarding disclosure of my work in this matter. I submit this declaration to explain why I believe disclosure of my report to CISA is critically important (and not just for Georgia) and to respectfully ask that the Court allow that disclosure, rather than accept State Defendants' position that my findings must not be shared beyond the confines of this lawsuit, including with those who are authorized to address the vulnerabilities with the ICX and stand ready to do so. If my findings regarding the ICX actually present no meaningful risks to voters and election outcomes and therefore require no remediation, as I gather State Defendants would have the Court believe, CISA is well positioned to determine that. If, on the other

hand, my findings do warrant remediation, as I believe they do, then CISA is well positioned to work with Dominion and the appropriate authorities around the country to implement remedial measures. I can see no reason to prevent (or further delay) that important work for future elections. And I note that none of State Defendants' experts have disputed my findings regarding the ICX machines. Only Dr. Juan Gilbert has responded to my sealed report, and he has not examined the machines (or used them) to my knowledge.

I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 21st day of September, 2021 in Ann Arbor, Michigan.

J. ALEX HALDERMAN

# EXHIBIT 1



**J. Alex Halderman <halderman@gmail.com>**

## Vulnerability Disclosure

**Hale, Geoffrey** < ▮▮▮▮ >
To: "J. Alex Halderman" < ▮▮▮▮ >
Cc: Andrew Springall < ▮▮▮▮ >

Thu, Aug 19, 2021 at 12:15 PM

Prof. Halderman,

Thank you for your email. Yes, CISA would be willing to receive the report regarding possible vulnerabilities in election infrastructure for inclusion in CISA's Coordinated Vulnerability Disclosure (CVD) process and would carry out any further coordinated disclosures activities as appropriate. As we share on our public website (https://www.cisa.gov/coordinated-vulnerability-disclosure-process), CISA's CVD program coordinates the remediation and public disclosure of newly identified cybersecurity vulnerabilities in products and services with the affected vendor(s). Note that part of our process may also involve validating any alleged vulnerabilities, planned mitigations, remediations, or patches with the security researcher who discovered the alleged vulnerability, so we would appreciate if you could continue to be available for consultation during the CVD process as well.

As shared on our website, please submit any vulnerability reports for CVD coordination using the form here: https://www.kb.cert.org/vuls/report/

Best,

Geoff

**From:** J. Alex Halderman < ▮▮▮▮ u>
**Sent:** Wednesday, August 18, 2021 4:37 PM
**To:** Hale, Geoffrey < ▮▮▮▮ >
**Cc:** Andrew Springall < ▮▮▮▮ >
**Subject:** Vulnerability Disclosure

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Dear Mr. Hale,

We are writing to you in your capacity as Director of the Election Security Initiative at the federal Cybersecurity and Infrastructure Security Agency (CISA).

We understand that the Election Security Initiative at CISA works to ensure the physical security and cybersecurity of the systems and assets that support the Nation's elections, including through detection and prevention, information sharing and awareness, and incident response.

As you may be aware from recent press reports, one of us (Halderman) is presently serving as an expert witness for the plaintiffs in Curling v. Raffensperger (Civil action no. 1:17-CV-2989-AT, N.D. Ga.), a case that concerns the security of Georgia's election system. A year ago, the court granted plaintiffs access to an ICP ballot scanner and ICX ballot marking device as used in Georgia in order to test their security. Following months of analysis, on July 1, Dr. Halderman submitted an expert report that describes several very serious vulnerabilities we found in the equipment, which, to our knowledge, have not been previously documented or disclosed.

Given the nature of the vulnerabilities and the time that would be necessary to mitigate them before the 2022 midterm elections, we believe it is critical for Dominion and affected jurisdictions (which include Georgia and parts of many other states) to begin taking responsive action soon. It is also vitally important to prevent information sufficient to exploit the vulnerabilities from falling into the wrong hands, and to avoid fueling election-related misinformation if possible.

Currently, disclosure of the expert report to anyone other than outside litigation counsel for the parties is strictly prohibited by the Court's protective order and by recent directives from the judge. However, if permitted by the Court, we would like to share the report with CISA and ask your agency to carry out appropriate further disclosure of the information it contains to Dominion and affected jurisdictions as you see fit, under CISA's coordinated vulnerability disclosure (CVD) program (https://www.cisa.gov/coordinated-vulnerability-disclosure-process).

We understand that under this process, CISA will work with the vendor (Dominion) for mitigation development and the issuance of patches or updates and to facilitate sufficient time for affected end users to obtain, test, and apply mitigation strategies. We further understand that CISA strives to disclose "accurate, neutral, objective information focused on technical remediation and mitigation" and to "correct misinformation where necessary".

Please confirm that CISA would be an appropriate agency to handle coordinated vulnerability disclosure for election infrastructure under these circumstances, and that you would be willing to receive the report (subject to the Court's permission) and carry out further disclosures as you deem appropriate.

Sincerely,

J. Alex Halderman

Drew Springall

Exhibit 6

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

---

DONNA CURLING, ET AL.,

        *Plaintiffs*,

v.

BRAD RAFFENSPERGER, ET AL.,

        *Defendants*.

No. 1:17-CV-2989-AT

STATUS REPORT

---

As this Court directed on February 11, 2022, *see* Doc. 1315, the U.S. Cybersecurity and Infrastructure Security Agency (CISA), respectfully submits this status report to update the Court and the parties on CISA's ongoing Coordinated Vulnerability Disclosure (CVD) process.

CISA commenced its CVD process once it was able to share Dr. Halderman's report among its own staff and also with Dominion. *See* Doc. 1314. CISA continues to work with Dr. Halderman's team and Dominion to analyze the potential software vulnerabilities identified in the report.[1] After the analysis phase, CISA will continue to coordinate with Dr. Halderman and Dominion to develop and share measures to mitigate the risk of any confirmed vulnerabilities, as needed. The goal of this process is to provide sufficient time for any affected end users to obtain, test, and apply any mitigation measures before public disclosure of software

---

[1] CISA's CVD process addresses software vulnerabilities and does not cover other types of weaknesses, such as the physical security of the systems themselves or general machine design that are not tied to the software vulnerabilities under review. To address other sources of risk, CISA has published Best Practices for Securing Election Systems and encourages election officials to engage in information-security best practices, such as updating and patching software, enabling multi-factor authentication, chain-of-custody measures, software independence, and robust audits.

vulnerabilities.   Moreover, through this process, CISA will strive to ensure accurate and objective disclosures by the vendor.

As CISA previously indicated, *see* Doc. 1314, the timeline for completion of the CVD process, which is already operating in a greatly expedited fashion, depends on a range of factors outside CISA's control, including the cooperation of third parties. CISA is aware of the urgency of this matter and is devoting extensive resources to this effort, is working closely with Dr. Halderman and Dominion to guide them through the CVD process, and will endeavor to garner their continued cooperation through the entire process to the greatest extent it is able. CISA is not yet in a position to provide a definitive timeline for completion, however, given that significant aspects of the process are outside of CISA's control and CISA cannot predict how expeditiously other parties will complete necessary parts of the process.

CISA anticipates that, ideally in coordination with Dominion and Dr. Halderman's team, it soon may be in a position to conduct limited pre-disclosure releases of certain information to relevant states that use the specific version of the election software analyzed in Dr. Halderman's report. In addition, limited pre-disclosures to other stakeholders, such as states that use other versions of the election software or entities that certify election systems, may be contemplated in the future. Such pre-disclosures are a typical part of CISA's CVD process.

Accordingly, CISA respectfully requests that the Court order that another status report shall be due in 30 days.

Respectfully submitted,


BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

BRIGHAM BOWEN
*Assistant Branch Director*

 */s/ Kate Talmor*
KATE TALMOR
*Trial Attorney*
*Civil Division*
*Federal Programs Branch*
*US Department of Justice*
*1100 L St., NW*
*Washington, DC 2005*
*202-305-5267*
*kate.talmor@usdoj.gov*

Exhibit 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>v.<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **DECLARATION OF**<br>**J. ALEX HALDERMAN**<br><br><br>Civil Action No. 1:17-CV-2989-AT |

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1.     I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

2.     I have reviewed the expert disclosures prepared by Dr. Juan Gilbert and Dr. Benjamin Adida for State Defendants. Neither Dr. Gilbert not Dr. Adida offers any rebuttal to the numerous, critical vulnerabilities in Georgia's BMDs that I described in my July 1, 2021 expert report. Dr. Adida did not respond to my report at all; State Defendants reissued prior declarations from him previously provided in this litigation. Neither of them disputes the presence of any of the serious

vulnerabilities I detail in my report or the steps I describe for exploiting those vulnerabilities to alter individual votes and election outcomes in Georgia. Nor does either of them claim to have examined any of the voting equipment used in Georgia to evaluate whether the vulnerabilities I identified—or others—have been exploited in any past election. Although each of them presumably could do this with the permission of State Defendants, who I understand engaged them as experts in this case, there is no indication either has undertaken any such inquiry or asked to do so. As a result, neither Dr. Gilbert nor Dr. Adida has anything to say about the reliability of the voting equipment used in Georgia elections. This is surprising, given that they have had at least the last year to examine Georgia's voting equipment.

3.    State Defendants urgently need to engage with the findings in my report and address the vulnerabilities it describes before attackers exploit them. Nothing in Dr. Gilbert's or Dr. Adida's responses indicates that State Defendants understand the seriousness of these problems or have taken any measures to address them and their implications for the Plaintiffs' individual votes in future elections. Established practice in the security field would require State Defendants to promptly subject Georgia's voting system to rigorous testing in response to my report, to assess the extent and significance of each of the vulnerabilities I described, and to identify and *promptly implement* specific measures (where possible) to eliminate or mitigate each

2

of those vulnerabilities. Neither Dr. Gilbert nor Dr. Adida indicates any such efforts on their own part or on the part of State Defendants or anyone else. Again, Dr. Adida did not respond to my report.

4.    In my report—a 25,000-word document that is the product of twelve weeks of intensive testing of the Dominion equipment provided by Fulton County—I find that Georgia's BMDs contains multiple severe security flaws. Attackers could exploit these flaws to install malicious software, either with temporary physical access (such as that of voters in the polling place) or remotely from election management systems. I explain in detail how such malware, once installed, could alter voters' votes while subverting all the procedural protections practiced by the State, including acceptance testing, hash validation, logic and accuracy testing, external firmware validation, and risk-limiting audits (RLAs). Finally, I describe working proof-of-concept malware that I am prepared to demonstrate in court.

5.    My report concludes, *inter alia*, that Georgia's BMDs are not sufficiently secured against technical compromise to withstand vote-altering attacks by bad actors who are likely to target future elections in the state; that the BMDs' vulnerabilities compromise the auditability of Georgia's paper ballots; that the BMDs can be compromised to the same extent as or more easily than the DREs they replaced; and that using these vulnerable BMDs for all in-person voters, as Georgia

3

does, greatly magnifies the level of security risk compared to using hand-marked paper ballots and providing BMDs to voters who need or request them.

### Reply to Declaration of Dr. Juan Gilbert

6.  Rather than engage with the facts in my report, Dr. Gilbert responds largely with vague generalities. He gives no indication that he has ever used an ICX BMD, let alone tested its security. He begins by conceding that "any computer can be hacked," but he contends that "this general statement is largely irrelevant," because hand-marked paper ballot systems use computers too (to scan the ballots) (¶ 6). His position is inconsistent with accepted standards for election security and with the facts of the particular voting system used in Georgia.

7.  My testing has shown that the BMDs used in Georgia suffer from specific, highly exploitable vulnerabilities that allow attackers to change votes despite the State's purported defenses. There is no evidence that Georgia's ballot scanners suffer from the same extraordinary degree of exploitability, nor does Dr. Gilbert contend they do. He ignores the relative ease with which Georgia's BMDs can be hacked, including by a voter in a voting booth in mere minutes. That extreme difference in security as compared to other voting technologies, particularly hand-marked paper ballots, is far from "irrelevant" as Dr. Gilbert implies.

8.    Furthermore, even if the scanners were just as insecure as the BMDs, Georgia's practice of requiring essentially all in-person voters to use highly vulnerable BMDs would needlessly give attackers *double* the opportunity to change the personal votes of individual Georgia voters, since malware could strike either the BMDs or the scanners. Accepted standards in election security compel reducing points of attack for bad actors, not unnecessarily expanding them—a point Dr. Gilbert ignores.

9.    Lastly, Dr. Gilbert also ignores that accepted election security protocols include an effective measure to protect against hacks of ballot scanners when the ballots are hand-marked rather than generated by BMDs—namely, reliable risk-limiting audits (RLAs), which would have a high probability of detecting any outcome-changing attack on the scanners. Not only do Georgia's BMDs defeat the efficacy of RLAs, but Dr. Gilbert continues to ignore the fact that Georgia requires an RLA of just one statewide contest every two years (and, to my knowledge, has not adopted specific, adequate procedures to ensure a reliable RLA for that one audit every other year).

10.    Dr. Gilbert goes on to discuss issues related to voter verification of BMD ballots (which I respond to below). Yet he fails to address the potential for attackers to cheat by changing only the QR codes printed by Georgia's BMDs.

5

Voters cannot read the QR codes, but they are the only part of the ballots that the scanners count. My report details several routes by which malicious hardware or software can manipulate the QR codes and cause the recorded votes to differ from voters' selections. In principle, a rigorous risk-limiting audit would be likely to detect such an attack if the attacker changed enough votes to alter the outcome of the contest being audited, but again Georgia rules require such an audit in only a single statewide contest once every two years. As my report explains, this leaves the vast majority of elections and contests in Georgia vulnerable to QR code (and others) attacks, yet Dr. Gilbert says nothing about this threat.

11.     Instead, Dr. Gilbert focuses exclusively on a different threat: attacks that change *both* the QR codes and the ballot text. In addition to the barcode-only attacks I just discussed, my report demonstrates that Georgia's BMDs can be manipulated so that both the barcodes and the printed text indicate the same fraudulent selections. No audit or recount can catch such fraud, because all records of the voter's intent would be wrong. The only reliable way to detect it would be if enough voters carefully reviewed their ballots, noticed that one or more selections differed from their intent, and reported the problems to election officials, *and* if Georgia officials then discerned from the pattern of voter reports that the BMDs were systematically misbehaving. Thus, Dr. Gilbert is mistaken when he contends that the distinction

between "voter-verifiable" and "voter-verified" paper ballots "only matters in principle" (¶ 7). All BMD ballots are potentially voter-verifiable, but unless enough BMD ballots are actually voter-*verified*, BMD-based attacks could alter election outcomes even in the rare instances where the State conducts a risk-limiting audit. And unless *every* BMD ballot is actually voter-*verified*, BMD-based attacks could alter individual voters' selections without detection..

12.   A large body of recent scientific evidence has established that few voters are likely to catch errors caused by malicious BMDs. I have reviewed this evidence in previous declarations.[1] It comes from both field observations (which report how long real voters review their ballots during real elections) and laboratory tests (which report the fraction of errors that subjects detect when voting on hacked BMDs in simulated elections). These methodologies are complementary, and results to-date from all studies of both kinds point to a low rate of voter-verification.

13.   Dr. Gilbert criticizes field observations because "[t]ime spent reviewing a ballot has little to do with whether it was actually verified" (¶ 9). This claim is inconsistent with accepted election security principles. Of course, they are not exactly the same question, but obviously the time spent reviewing a ballot can

---

[1] *Halderman decl.* (Dec. 16, 2019), Dkt. 682 at 23-33; *Halderman decl.* (Sept. 1, 2020) Dkt. 855-1 at 6-8, 55.

provide important insight into whether it was likely verified. For example, we can conclude that a voter who spends only a second or two reviewing a lengthy, complicated ballot is unlikely to have reliably verified each of their selections on the ballot. And of course, the same is true for a voter who spends no time at all reviewing their ballot. Review time is both practical to measure and clearly correlated with the error detection success, making it a valuable and relevant metric, as multiple studies confirm.

14.   Dr. Gilbert seems to contend, without evidence, that a casual glance is sufficient to review Georgia-style ballots because selections are printed together with party affiliations (¶ 9). He cites no research (and I am unaware of any) that supports this conclusion, particularly when, as in Georgia, the party affiliations are printed in small type and in a different horizontal position for each contest. A real BMD ballot is reproduced on page 15 of my expert report. This is just one example of such a ballot; they can be longer and more confusing. Dr. Gilbert provides no basis for believing that voters would likely catch deliberate errors caused by compromised BMDs when voting such a ballot.

15.   Dr. Gilbert references my award-winning peer-reviewed study about voter verification behavior, which found very poor rates of error detection and

reporting in a mock election using BMDs that my team hacked (¶ 10).[2] He contends that my study "ignores the reaction to such manipulation in an actual election, particularly one as heated in the public domain as the 2020 Election." (¶ 11). He does not explain how or why such circumstances would be expected to materially increase voter verification of their respective BMD ballots, nor does he cite any support for his claim to believe they would. And, just last week, the Atlanta Journal-Constitution obtained a study (under the Georgia Open Records Act) commissioned by the Secretary of State's Office in which researchers from the University of Georgia observed Georgia voters during the November 2020 election and reported how long they spent reviewing their BMD ballots.[3] Although it appears the Secretary of State had this study at the time of Dr. Gilbert's response to my report, he does not address or acknowledge it. The new study suggests that voters in the real world review their ballots *even less carefully* than voters in recent laboratory studies—despite the reminders election workers are supposed to give them to carefully review

---

[2] Matthew Bernhard, Allison McDonald, Henry Meng, Jensen Hwa, Nakul Bajaj, Kevin Chang, and J. Alex Halderman, "Can Voters Detect Malicious Manipulation of Ballot Marking Devices?" In *41st IEEE Symposium on Security and Privacy* (May 2020). Available at https://ieeexplore.ieee.org/document/9152705.

[3] Mark Niesse, "Under half of Georgia voters checked their paper ballots, study shows," *Atlanta Journal-Constitution* (July 27, 2021). Available at https://www.ajc.com/politics/under-half-of-georgia-voters-checked-their-paper-ballots-study-shows/6HSVHHFOBRBDPODRZXLIBTUS64/.

9

their ballots at the polling sites, which Dr. Gilbert emphasizes as a remedy for poor voter verification of BMD ballots.[4]

16.  The University of Georgia researchers report that 20% of voters they observed did not check their ballots at all.[5] Only about 49% examined their ballots for at least one second, and only 19% did so for more than five seconds. This is significantly worse performance than observed in my study, which found that when voters were verbally prompted to review their ballots before casting them, as should occur in Georgia, 63% of voters reviewed their ballots for only *two* seconds or more, compared to 19-49% in the new study.

17.  This suggests that laboratory studies like mine tend to *overestimate* the rate at which real Georgia voters would detect errors on their BMD ballots. Since real Georgia voters were observed to review their ballots even less carefully than the

---

[4] Secretary Raffensperger appears to disagree with Dr. Gilbert about the value of measuring voter review time for assessing voter verification performance. He told the Atlanta Journal-Constitution that the new study "shows voters do indeed review their ballots for accuracy before casting them" and offers "proof the votes that were counted were for the candidates the voters intended." (*Id.*). I agree that the new study provides valuable insights about voter behavior, but, contrary to the Secretary's pronouncements, the results indicate that real Georgia voters are even less likely to detect errors caused by compromised BMDs than previous studies have suggested.

[5] Audrey A. Haynes and M.V. Hood III, "Georgia Voter Verification Study" (January 22, 2021). Available at https://s3.documentcloud.org/documents/ 21017815/gvvs-report-11.pdf.

participants in my study, it is reasonable to infer that real voters would catch an even smaller fraction of errors. The participants in my study who were similarly prompted to review their ballots caught 14% of errors. Therefore, real voters in Georgia are likely to catch substantially less than 14% of errors.

18.    How often would voters have to detect errors on their BMD ballots to effectively safeguard against attacks? The answer depends on the margin of victory, since an outcome-changing attack would need to change fewer votes in a close contest. The model from my study shows that, given the margin of victory from the 2020 Presidential contest in Georgia, voters would need to have detected 46% of errors for there to be even one error report per 1000 voters, under a hypothetical scenario where the election outcome had been changed by hacked BMDs.[6] The University of Georgia observations show that barely 49% of voters looked at their ballots for even a second, let alone studied them carefully enough to reliably spot errors.

---

[6] To reiterate, the November presidential race was the only state-wide contest subjected to a risk-limiting audit. In other contests, attackers could change the outcome by tampering with only the ballot QR codes, and voters would have no practical way to detect this manipulation regardless of how diligently they reviewed their ballots.

11

19.   Dr. Gilbert performs a similar calculation using the baseline error detection rate measured in my study. He finds that an outcome changing attack on Georgia's Presidential contest would have resulted in only 832 voters noticing that their BMD ballots showed the wrong selection. Dr. Gilbert suggests that there have not been such complaints from any voters, and says he finds it implausible that so many voters would have "simply not said anything or otherwise simply corrected their ballot and thought nothing of it then or since" (¶ 12).

20.   This is an oddly constructed hypothetical, since Curling Plaintiffs do not claim here that the Presidential outcome was altered by hacking the BMDs. And Dr. Gilbert does not indicate any effort to determine the total number of spoiled ballots in Georgia's Presidential contest, which he presumably could have explored with State Defendants. Neither does he provide any basis to believe there were only 832 or fewer spoiled ballots. But suppose for the sake of argument that the Presidential election outcome in Georgia had been altered by hacking the BMDs, and there *were* complaints from the 832 voters that Dr. Gilbert has calculated. What then? It seems all but certain that these complaints would have been dismissed or drowned out in the cacophonous aftermath of the election or simply disregarded by election workers at the polling sites as voter errors. Yet the official count, the risk-limiting audit, and the recount would all have found the wrong winner, and there would be no

12

way to recover any altered vote or correct the election outcome short of rerunning the election. With a mere 832 complaints among 5 million participating voters (amidst a sea of other complaints, real and imagined), it is unlikely that poll workers or election officials, including State Defendants, would realize or even suspected there was a systemic problem with the BMDs, and it is completely implausible that they would take the drastic but necessary step of asking Georgians to vote again. Georgia's election system is susceptible to this extraordinary risk as long as it remains vulnerable to the attacks I described in my report (and potentially others).

21.   To get to the point of making a decision to rerun an election, State Defendants (among others, perhaps) would first need to know how many voters discovered a problem when verifying their ballots. As Dr. Gilbert points out, the number of spoiled BMD ballots provides an upper bound on the number of voters who discovered and corrected an error (¶ 12). He does not say how many spoiled ballots there actually were in November 2020. If State Defendants knew the number was less than 832, they likely would have shared this fact with Dr. Gilbert, and he would have stated it in his report. It is reasonable to infer that either there were more than 832 spoiled ballots (and the attack is plausible) or State Defendants *do not know* how many BMD ballots were spoiled during the election, eight months later, despite

13

what Dr. Gilbert acknowledges those ballots would suggest about the reliability of the election.

22.    That State Defendants may not know this information is consistent with gaps in other important election data that Georgia counties report to the Secretary of State. State Defendants recently produced electronic data (election projects) that I understand were required to be returned to them by counties after the November 2020 and January 2021 elections. In both elections, a large fraction of counties failed to return any data, returned the wrong data, or omitted data necessary for assessing the security and integrity of the result, such as election databases or ballot images. More than six months after these elections, the Secretary of State has not been able to assemble these electronic records and has not indicated any effort or willingness to do so. Yet the only way that State Defendants could use the number of spoiled ballots as a defense against BMD-based cheating would be if the poll workers accurately tracked it, counties accurately aggregated it, and the Secretary's Office received such data from across the state before the election result was determined. Even then, it is unlikely that the Secretary would be prepared to react by *rerunning the election* if the number of spoiled ballots exceeded the number predicted in an outcome-changing attack.

23.   Given the ineffectiveness of such defenses and the critical security problems in Georgia's BMDs, I (like Dr. Appel) recommend that BMDs be reserved for voters who need or request them, as is the case in most states. Dr. Gilbert responds by claiming, without evidence, that "[d]isabled voters are even less likely to identify an error on their printed ballot" (¶ 14). I am unaware of any study that supports this sweeping indictment of voters with disabilities, which encompasses a vast array of disabilities that would not impact the ability of the voter to identify an error on their printed ballot in any way. He also contends that blind voters cannot detect errors on their ballot at all, but this is not true. Many blind voters use assistive technology to read printed text and likely could do so to verify their ballots. Moreover, only some voters who need BMDs are blind. For instance, those with motor impairments that prevent them from marking a ballot by hand would not necessarily have any greater difficulty verifying the printed text than any other voter. In any case, if BMDs are used primarily by voters with disabilities (as in most jurisdictions that use BMDs), they will represent a *much* smaller target,[7] and an

---

[7] Although Dr. Gilbert cites a figure that would imply that 10% of Georgians who voted in 2020 were disabled, data from Maryland, where BMDs are available upon request, suggests that only about 1.8% of voters would request to use BMDs if they were offered a hand-marked ballot first. (*Halderman decl.*, Aug. 19, 2020, Dkt. 785-2 at 49.) Dr. Gilbert's citation to the number of all Georgia voters with disabilities is highly misleading since, again, very few of those voters would be

15

outcome-changing attack on any given election will be detectable with a much lower rate of voter error detection than when all in-person voters use BMDs as they do in Georgia today. This in turn creates a strong disincentive for bad actors to attempt hacking an election (the risk likely is not worth the reward when the outcome is highly unlikely to be changed), which means individual votes would be less likely to be altered by hacking.

24. In his only direct response to my expert report, Dr. Gilbert states that he is not aware that I have "provided equipment marred by 'undetectable' hacks to any other independent researcher" (¶ 15).[8] This is a curious and ironic criticism coming from Dr. Gilbert, since he evidently chose not to evaluate my findings through an examination of the voting equipment himself, which he does not explain. Moreover, Dr. Gilbert misreads my report. It does not claim that malicious software infecting a BMD would be undiscoverable by any possible means. If an individual BMD is

---

unable to vote on a hand-marked paper ballot, consistent with the number reported in Maryland.

[8] Dr. Gilbert ignores that, as I understand it, State Defendants have objected to my report and the underlying work being shared with third parties (except Dominion), including other independent researchers, with whom I am eager to share my work for review. I am confident in my findings and believe they should be shared promptly with appropriate election security researchers and officials in an effort to mitigate the critical vulnerabilities in Georgia's voting equipment that I describe. I invite Dr. Gilbert to join me in seeking State Defendants' consent to do that.

16

*known* to contain malware, there will likely be some level of detailed forensic scrutiny that can detect where the malware is, perhaps requiring months of expert analysis per machine at extraordinary expense. It would be completely infeasible to perform this level of analysis on every machine before every election, much less between an election and the deadline for certification of its results. (And after manipulating ballots, malware could remove all traces of its presence from a machine, defeating any possible post-election examination of the device.) What my report shows is that vote-stealing malware of the type I have constructed would not be detected by any of the defenses that State Defendants purport to practice. I describe in detail how such malware would defeat QR code authentication, logic and accuracy testing, on-screen hash validation, and external APK validation (as was used by Pro V&V after the November election). Dr. Gilbert offers no rebuttal to these findings. He does not dispute them or even address them.

25.    Moreover, there is already an example of an "undetectable" attack entered into testimony: exploitation of the Drupal vulnerability discovered by Logan Lamb in the Center for Election Systems server. As Lamb attested, the developers of the primary tool for detecting this vulnerability stated that "[n]either [the defensive tool] nor an expert can guarantee a website has *not* been compromised. They can only

confirm with certainty a website *has* been compromised."[9] Furthermore, the Drupal developers state that any server running the vulnerable software after the initial disclosure of the vulnerability should be assumed to have been compromised unless it was patched within *hours* of disclosure. According to the timeline presented in Lamb's declaration, he found the KSU server to be in a vulnerable state on August 28, 2016, nearly two years after the initial announcement of the critical vulnerability (October 15, 2014).[10] The KSU server image also contains evidence that a second vulnerability, the so-called Shellshock flaw, was exploited on December 2, 2014.[11] This vulnerability was publicly disclosed more than two months earlier and widely publicized in the media as a critical vulnerability, yet the KSU server remained unpatched.

26.    An attacker who compromised the KSU server could therefore have maintained undetected access to the compromised server. Since the server remained in a vulnerable state undetected for almost two years, it is highly likely that it was successfully attacked at some point in time. An attacker who did so would have been able to move laterally to other systems within the CES network and to other

---

[9] *Lamb decl.*, Dkt. 258-1 at 19.

[10] See "Drupal Core - Highly Critical - Public Service announcement" (Oct. 29, 2014), available at https://www.drupal.org/PSA-2014-003.

[11] *Halderman decl.* (Sept. 1, 2020) Dkt. 855-1 at 23.

18

components of Georgia's voting system. As I have previously pointed out, many election system components that could have been compromised in this way are still in use in Georgia today, where they provide a means by which attackers could spread vote-stealing malware to the BMDs.

27. Rather than address the many threats to Georgia's voting system, Dr. Gilbert persists in drawing illogical comparisons between BMDs and hand-marked paper ballots. For instance, he questions why Plaintiffs have presented no research "regarding voters' proclivity to review [hand-marked paper ballots] to ensure their ballots are marked and will count as intended" (¶ 8). Much like Dr. Gilbert's earlier testimony that "[i]n essence, a BMD is nothing more than an ink pen,"[12] one does not need expertise in election security to find fault with this reasoning. Preventing voters from making accidental mistakes is a completely different problem from preventing their selections from being deliberately and systematically changed by an attacker who has compromised the BMDs. There is abundant evidence that voters do sometimes make errors whether filling out a ballot by hand or by machine. Bad ballot design exacerbates this problem with both voting modalities, but following ballot design best practices can greatly reduce it. Both

---

[12] *Gilbert decl.*, Dkt. No. 658-3 at 60.

BMDs and scanners that count hand-marked ballots can also be configured to reject overvotes and to warn voters about undervotes, the most common kinds of voter errors. Moreover, unlike older technologies for counting hand-marked ballots, the scanners used in Georgia (when properly configured) can detect improperly or incompletely marked bubbles and present them to human operators to adjudicate whether the marks should count as votes. Election officials can use all of these options to help protect voters from their own mistakes, but none of them offers protection against a BMD that deliberately changes the selections printed on a voter's ballot (or those encoded in the ballot barcode). The central problem with Georgia's highly vulnerable BMD system—that attackers can change all records of the voter's intent without being detected by election officials—has no parallel in a hand-marked paper ballot system.

28.   Dr. Gilbert concludes as he started, with vague and sweeping generalities. "Simply put, BMD elections systems are no more insecure than [hand-marked] systems" (¶ 16). It is unclear whether he is claiming that *all* BMD systems are at least as secure as all hand-marked systems or merely that some specific BMD system (such as the one he recently developed himself to address some of the reliability problems that exist with Georgia's BMDs) is at least as secure as some hand-marked system, but this is of little consequence. The only BMD system that is

20

relevant here is the Dominion ICX as used in Georgia. As my expert report details, Georgia's BMD system suffers from numerous, severe vulnerabilities. These vulnerabilities would have little potential to change election outcomes if use of BMDs were limited to voters who need or request them, as Curling Plaintiffs desire, and they would be far less likely to affect the personal votes of individual Georgia voters.

### Reply to Declarations of Dr. Benjamin Adida

29. The declarations by Dr. Adida that State Defendants have submitted predate my expert report, so Dr. Adida's opinions are not informed by the critical vulnerabilities in Georgia's BMD equipment that my analysis has revealed or by anything else in my lengthy, detailed report. Nor are they informed by any events that occurred in the year since he first provided these declarations, such as any aspect of the November 2020 election in Georgia or the Secretary of State's study indicating that few voters verified their respective ballots in that election.

30. Nevertheless, Dr. Adida's first declaration is correct that "Running a risk-limiting audit is one of the most important advances states can take in improving election integrity—without an RLA, we are effectively trusting computerized scanners to count our paper ballots" (Dkt. 834-2 at ¶ 5). This is true, but, as my expert report shows, without a risk-limiting audit Georgia is also trusting its critically

21

vulnerable BMDs to generate ballots with QR codes that correctly reflect voters' selections. Obviously compromised BMDs and compromised scanners could change individual votes and election outcomes. But again, nothing suggests that Georgia's scanners suffer from such easily exploitable critical vulnerabilities as the BMDs do.

31. Dr. Adida and I also agree that RLAs are important for discovering whether compromised BMDs have manipulated enough ballot QR codes to change the outcome of an election (¶ 12). Although RLAs are, as Dr. Adida says, "of the utmost importance" (¶ 6), Georgia does not require an RLA in the vast majority of elections and the vast majority of contests, leaving both election outcomes and individual voters' votes susceptible to manipulation via BMD malware. Additionally, it is insufficient for states to merely (in Dr. Adida's words) "take meaningful steps to implement RLAs"; rather, states have to *actually conduct* reliable RLAs, which Georgia does not intend to do for the vast majority of its elections (or perhaps any of its elections, depending on the reliability of the audit procedures it implements).

32. In his second declaration, Dr. Adida refers to a "dispute amongst academics regarding whether voters verify their ballots using ballot-marking devices" (Dkt. 912-1 at ¶ 11). This statement reflects a misunderstanding of the state of research today. I am not aware of any scientific research that supports the proposition that Georgia voters would likely detect more than a small fraction of

errors caused by BMD malware. In contrast, the past two years have seen a wave of laboratory studies and multiple field observation studies addressing this question, all of which strongly indicate the opposite, that few voters carefully review their ballots and so the vast majority of errors caused by BMD malware would likely to go undiscovered and uncorrected. Although there once was uncertainty about whether most voters carefully verify their BMD ballots, there is no longer any serious scientific dispute that they do not. It is the hallmark of good science (and of good public policy) that it evolves based on new evidence, such as the University of Georgia study commissioned by the Secretary of State that I discussed above— which Dr. Adida has not addressed.

33.    Georgia's election system needs to evolve as well. Due to the critical vulnerabilities in Georgia's BMDs that are described in my expert report, Georgia voters face an extreme risk that BMD-based attacks could manipulate their individual votes and alter election outcomes. Even in the rare contests for which the State requires a risk-limiting audit, the scientific evidence about voter verification shows that attackers who compromise the BMDs could likely change individual votes and even the winner of a close race without detection. Georgia can eliminate or greatly mitigate these risks by adopting the same approach to voting that is practiced in most of the country: using hand-marked paper ballots and reserving

BMDs for voters who need or request them. Absent security improvements such as this, it is my opinion that Georgia's voting system does not satisfy accepted security standards. Neither Dr. Gilbert nor Dr. Adida offers a contrary opinion in their respective declarations, instead ignoring the critical issue of whether the *voting system used in Georgia*—which neither claims to have examined—reliably protects the right to vote for individual Georgia voters.

I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 2nd day of August, 2021 in Rushland, Pennsylvania.

J. ALEX HALDERMAN

# Exhibit 8

UNCLASSIFIED

## DIRECTOR OF NATIONAL INTELLIGENCE
WASHINGTON, DC

SUBJECT:         Views on Intelligence Community Election Security Analysis

REFERENCE:     Intelligence Community Assessment: Foreign Threats to the 2020 U.S. Elections

From my unique vantage point as the individual who consumes all of the U.S. government's most sensitive intelligence on the People's Republic of China, I do not believe the majority view expressed by Intelligence Community (IC) analysts fully and accurately reflects the scope of the Chinese government's efforts to influence the 2020 U.S. federal elections.

The IC's Analytic Ombudsman issued a report, which I will reference several times below, that includes concerning revelations about the politicization of China election influence reporting and of undue pressure being brought to bear on analysts who offered an alternative view based on the intelligence. The Ombudsman's report, which is being transmitted to Congress concurrently with this Intelligence Community Assessment (ICA), also delves into a wider range of election security intelligence issues that I will not focus on here. However, the specific issues outlined below with regard to China reporting are illustrative of broader concerns. It is important for all IC leaders to foster a culture within the Community that encourages dissenting views that are supported by the intelligence. Therefore, I believe it is incumbent upon me in my role as the Director of National Intelligence to lead by example and offer my analytic assessment, alongside the majority and minority views. This letter was prepared in consultation with the Ombudsman to ensure that I am accurately articulating his findings and presenting them in their proper context.

The majority view expressed in this ICA with regard to China's actions to influence the election fall short of the mark for several specific reasons.

Analytic Standard B requires the IC to maintain "independence of political considerations." This is particularly important during times when the country is, as the Ombudsman wrote, "in a hyper partisan state." However, the Ombudsman found that:

> "China analysts were hesitant to assess Chinese actions as undue influence or interference. These analysts appeared reluctant to have their analysis on China brought forward because they tend to disagree with the administration's policies, saying in effect, I don't want our intelligence used to support those policies. This behavior would constitute a violation of Analytic Standard B: Independence of Political Considerations (IRTPA Section 1019)."

Furthermore, alternative viewpoints on China's election influence efforts have not been appropriately tolerated, much less encouraged. In fact, the Ombudsman found that:

UNCLASSIFIED

UNCLASSIFIED

SUBJECT:    Views on Intelligence Community Election Security Analysis

"There were strong efforts to suppress analysis of alternatives (AOA) in the August [National Intelligence Council Assessment on foreign election influence], and associated IC products, which is a violation of Tradecraft Standard 4 and IRTPA Section 1017. National Intelligence Council (NIC) officials reported that Central Intelligence Agency (CIA) officials rejected NIC coordination comments and tried to downplay alternative analyses in their own production during the drafting of the NICA."

Additionally, the Ombudsman found that CIA Management took actions "pressuring [analysts] to withdraw their support" from the alternative viewpoint on China "in an attempt to suppress it. This was seen by National Intelligence Officers (NIO) as politicization," and I agree. For example, this ICA gives the false impression that the NIO Cyber is the only analyst who holds the minority view on China. He is not, a fact that the Ombudsman found during his research and interviews with stakeholders. Placing the NIO Cyber on a metaphorical island by attaching his name alone to the minority view is a testament to both his courage and to the effectiveness of the institutional pressures that have been brought to bear on others who agree with him.

Intelligence Reform and Terrorism Prevention Act (IRTPA) Analytic Standard D requires that coordinated analytic products be "based on all available sources of intelligence." However, because of the highly compartmented nature of some of the relevant intelligence, some analysts' judgements reflected in the majority view are not based on the full body of reporting. Therefore the majority view falls short of IRTPA Analytic Standard D.

Tradecraft Standard 1 requires the analytic community to be consistent in the definitions applied to certain terminology, and to ensure that the definitions are properly explained. Having consumed election influence intelligence across various analytic communities, it is clear to me that different groups of analysts who focus on election threats from different countries are using different terminology to communicate the same malign actions. Specifically, definitional use of the terms "influence" and "interference" are different between the China and Russia analytic communities. The Analytic Ombudsman found that:

"Terms were applied inconsistently across the analytic community… Given analytic differences in the way Russia and China analysts examined their targets, China analysts appeared hesitant to assess Chinese actions as undue influence or interference."

As a result, similar actions by Russia and China are assessed and communicated to policymakers differently, potentially leading to the false impression that Russia sought to influence the election but China did not. This is inconsistent with Tradecraft Standard 1.

In the Ombudsman's report, he accurately acknowledged my commitment "to provide an independent avenue for analysts to pursue unbiased analysis." My approach here is not without precedent. In 1962, a National Intelligence Estimate stated that the Soviet Union was unlikely to place missiles in Cuba. Then-CIA Director John McCone forcefully disagreed with the analysts,

2

UNCLASSIFIED

UNCLASSIFIED

SUBJECT:    Views on Intelligence Community Election Security Analysis

and later ordered the U-2 reconnaissance flights that discovered that missiles had in fact been deployed.

     In that same spirit, I am adding my voice in support of the stated minority view -- based on all available sources of intelligence, with definitions consistently applied, and reached independent of political considerations or undue pressure -- that the People's Republic of China sought to influence the 2020 U.S. federal elections, and raising the need for the Intelligence Community to address the underlying issues with China reporting outlined above.

_____                    _January 7, 2021_____
John Ratcliffe                             Date                  .

UNCLASSIFIED