# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KURT B. OLSEN,                                  **)**
                                     **)**
            Plaintiff,                        **)**
                                       **)**
v.                                              **)**         Case No. **1:22-cv-00807-CJN**
                                       **)**
NANCY PELOSI, in her official                   **)**
capacity as Speaker of the United               **)**
States House of Representatives, et al.          **)**
                                       **)**
                                       **)**
            Defendants.                       **)**

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

Patrick M. McSweeney
**MCSWEENEY, CYNKAR & KACHOUROFF, PLLC**
Patrick M. McSweeney*
Christopher I. Kachouroff*
13649 Office Place, suite 101
Woodbridge, VA 22192
Telephone: (804) 937-0895
patrick@mck-lawyers.com
chris@mck-lawyers.com

*Pro hac vice motion pending*

Charles Burnham, Esq.
DC Bar # 1003464
**BURNHAM & GOROKHOV, PLLC**
1424 K St. NW Suite 500
Washington, D.C. 20005
202.386.6920
202.390.7587 F
charles@burnhamgorokhov.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iii.

BACKGROUND ........................................................................................ 7

ARGUMENT ............................................................................................. 9

I.      APPLICABLE LEGAL STANDARD ........................................... 9

II.     PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS....................................... 10

     A.    Sovereign Immunity Is Not a Bar. ....................................................... 14

     B.    The Speech or Debate Clause Is Not a Bar............................................ 16

III.    PLAINTIFF WOULD SUFFER IRREPARABLE INJURY IF A PRELIINARY INJUNCTION IS NOT GRANTED.............................................................. 21

IV.    THE BALANCE OF EQUITIES TIPS IN FAVOR OF MOVANT ............................. 22

V.     THE PUBLIC INTEREST FAVORS A GRANT OF THE PRELIMINARY INJUNCTION............................................................................................. 24

CONCLUSION.......................................................................................... 24

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Aamer v. Obama,*
    742 F.3d 1023, 1038 (D.C. Cir. 2014) ................................................................. 10

*ACLU of Illinois v. Alvarez,*
    679 F.3d 588, 589-90 (2018) ............................................................................... 22

*American for Prosperity Found. v. Bonta,*
    141 S. Ct. 2373, 2388 (2021) ........................................................................... 11, 22

*AT&T Co. v. Winbach and Conserve, Inc.,*
    42 F.3d 1421 (3d Cir. 1994) ................................................................................. 23

*Bailey v. Drexel Furn. Co. Child Labor Tax Case,*
    259 U.S. 20, 37 (1922) .......................................................................................... 14

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018) .......................................................................................... 20

*Bivens v. Six Unknown Unnamed Agents of Federal Bur. Of Narcotics,*
    403 U.S. 388 (1971) ......................................................................................... 14, 22

*Booth v. Bowser,*
    2022 WL 823068, * 16 (D.D.C. 3/18/2022) ......................................................... 10

*Budowich v. Pelosi,*
    No. 1:21-cv-03366-JEB (D.D.C.) .............................................................. 13, 17, 22

*Camara v. Mun. Ct.,*
    387 U.S. 523, 532 (1967) ...................................................................................... 11

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290, 297 (D.C. Cir. 2006) ..................................................................... 21

*Citizens United v. Federal Election Comm'n,*
    558 U.S. 310. 336 (2010) ...................................................................................... 14

*Davis v. Passman,*
    442 U.S. 228 (1979)..................................................................................... 15

*Davis v. Pension Benefit Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009) ................................................................. 10

*Dep't of Transportation v. Ass'n of Am. RRs,*
    575 U.S. 43, 57 (2015)............................................................................... 18

*Doe v. McMillan,*
    412 U.S. 306 (1973)............................................................................. 19, 20

*Eastland v. United States Servicemen's Fund,*
    421 U.S. 491 (1975)............................................................................. 17, 19

*Eastman v. Thompson,*
    No. 8:22-cv-00099 (C.D.Cal.1/20/2022) ................................................... 13

*Elrod v. Burns,*
    427 U.S. 347, 373 (1976)............................................................................ 21

*Gibson v. Fla. Legislative Com.,*
    372 U.S. 539, 545 (1963)............................................................................ 18

*Giovani Carandola, Ltd. V. Bason,*
    303 F.3d 507, 521 (4th Cir. 2002) ..................................................... 21, 23

*Gojack v. United States,*
    384 U.S. 702, 708-09 (1966) ............................................................ 12, 14, 17

*Gravel v. United States,*
    408 U.S. 606 (1972)............................................................................. 19, 20

*Guedes v. Bur. Of Alcohol, Tobacco, Firearms & Explosives,*
    920 F.3d 1, 10 (D.C. Cir. 2019)................................................................. 21

*Hutchinson v. Proxmire,*
    443 U.S. 111 (1079)................................................................................... 18

*Kilbourn v. Thompson,*
    103 U.S.168, 199-200 (1880) .................................................................... *passim*

*League of Women Voters of the U.S. v. Newby,*
    838 F.3d 1, 12 (D.C. Cir. 2016)................................................................. 23, 24

*Louisiana v. Becerra,*
    2022 WL 16571, * 15 (W.D. LA. 1/1/2022) ................................................. 22, 24

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1809)........................................................................ 17

*McCulloch v. Maryland,*
    4 Wheat. 316, 423 (1819) ........................................................................ 14, 17

*NAACP v. Alabama ex rel. Patterson,*
    357 U.S. 449, 460 (1958)................................................................................ 11

*Nat'l Treasury Emps. Union v. United States,*
    101 F.3d 1423, 1430 (D.C. Cir. 1996) ............................................................ 22

*Nken v. Holder,*
    556 U.S. 416, 434 (2009)............................................................................... 21

*Population Inst. v. McPherson,*
    797 F.2d 1062, 1078 (D.C. Cir. 1986) ........................................................... 10

*Pursuing America's Greatness v. FEC,*
    831 F.3d 500. 505 (D.C. Cir. 2016). .............................................................. 10

*Quinn v. United States,*
    349 U.S. 155 (1955)....................................................................................... 17

*Republican National Committee v. Pelosi,*
    No. 1:22-cv-00659-TJK ........................................................................ *passim*

*Riley v. California,*
    573 U.S. 373, 382 (2014).............................................................................. 11

*Roman Catholic Diocese v. Cuomo,*
22  141 S. Ct. 63, 67 (2020) ................................................................ 20, 21

*S.S. Body Armor I, Inc. v. Carter, Ledyard & Milburn LLP,*
   927 F.3d 763, 772 (3d Cir. 2019) ................................................................ 10

*Scheuer v. Rhodes,*
   416 U.S. 232, 237 (1974) ................................................................ 14

*Shadwick v. City of Tampa,*
   407 U.S. 345 U.S. 350 (1972) ................................................................ 11

*Shereley v. Sebelius,*
   644 F.3d 388 (D.C. Cir. 2011). ................................................................ 10

*Tate v. Pompeo,*
   513 F.Supp.3d 132 (D.D.C. 2021) ................................................................ 24

*Tiktok Inc. v. Trump,*
   507 F.Supp.3d 92 (D.D.C. 2021) ................................................................ 21

*Trump v. Mazars USA, LLP,*
   *140 S. Ct. 2019 (2020)* ................................................................ 12, 13, 17

*Tully v. Okeson,*
   977 F.3d 608, 613 (7th Cir. 2020) ................................................................ 10

*United States v. Rumely,*
   345 U.S. 41 (1953) ................................................................ 12, 14, 17

*Watkins v. United States,*
   354 U.S. 178, 188 (1957) ................................................................ *passim*

*Winter v. Natural Resources Defense Council,*
   555 U.S. 7 (2008) ................................................................ 9, 10, 21

*Wynn v. Vilsack,*
   545 F.Supp.3d 1271 (M.D.Fla. 2021) ................................................................ 21

*Yellin v. United States,*
    374 U.S. 109 (1963) .......................................................................................... 14

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579, 582, 585-86 (1942) ...................................................................... 24

## **Constitutional Provisions**

U.S. CONST. amend. I ............................................................................................... 13

U.S. CONST. amend. IV ............................................................................................. 13

U.S. CONST. art. I, § 6, cl. 1 (Speech or Debate Clause) ................................... 11, 12, 15

U. S. CONST. art. VI, cl. 3 ......................................................................................... 12

## **Legislative Materials**

*Establishing the Select Committee to Investigate the January 6th Attack*
    *on the United States Capitol*, H.Res.503, 117th Cong. (2021)………………………….... 9

## **Rules of the House of Representatives, 117th Congress**

Rules of the U.S. House of Representatives, Rule X.5(a)(1) (2021)…………………………….. 9

## **Other Authorities**

C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2948.3 (2013) .......... 10

FARRAND, THE FRAMING OF THE CONSTITUTION OF THE UNITED STATES 157 (1913) ................. 17

Plaintiff ("Movant"), by counsel, submits the following memorandum in support of his Motion for Preliminary Injunction.

## BACKGROUND

On March 1, 2022, Defendant Bennie G. Thompson, as Chairman of the Select Committee to Investigate the January 6th Attack on the United States Capitol ("the Select Committee"), issued a subpoena to Movant ("the Subpoena") (Amended Complaint, Exhibit 2). Movant filed a Complaint challenging the Subpoena on March 23, 2022, and an Amended Complaint on April 4, 2022.

Movant is a resident of Maryland and an attorney who has represented, among others, President Donald J. Trump, Michael J. Lindell, and proposed class representatives in a putative class action against Dominion Voting Systems, Inc. The Subpoena compels the production of 29 broad categories of documents, most of which relate to a matter, namely, the occurrence of election fraud in the 2020 Presidential election—a matter that the Select Committee has otherwise declined to investigate, having declared there to be no evidence of election fraud in that election which could have changed the outcome.

The Subpoena would require the disclosure and production of documents protected by the attorney-client privilege and the attorney work product doctrine. Movant is also required by the Subpoena to appear for a deposition to be taken by the Select Committee.

Movant's activities that prompted the issuance of the Subpoena have been reported by media outlets for more than a year. His communications with then-Acting U.S. Attorney General Jeffrey Rosen in December 2020 and his role in the development of evidence of election fraud in the 2020 election have long been matters of public record or knowledge. Yet, Defendant

Thompson waited until March 1, 2022, to issue the Subpoena, which required Movant to produce massive volumes of documents within 15 days.

By the terms of H. Res. 503, which established the Select Committee, its investigatory authority is limited to the causes of, and influencing factors that contributed to, the January 6, 2021, events. The Subpoena, however, requires the production of documents in existence as early as September 1, 2020, as well as those created through March 1, 2022, which is almost 14 months after the January 6, 2021, events.

The Amended Complaint asserts that the Subpoena: (1) violates Movant's Fourth Amendment rights; (2) violates his First Amendment rights of freedom of speech, association, political expression, press, association, and to petition the government for redress of grievances; (3) violates the separation-of-powers provisions of the Constitution because the Select Committee is conducting an impermissible law enforcement investigation; (4) violates the provisions of H. Res. 503 because the Select Committee is exercising authority not granted by the resolution and declining the requirement to investigate whether election fraud was a factor contributing to the events of January 6, 2021; (5) violates Rule X.5(a)(1) of the Rules of the U.S. House of Representatives that mandates a bipartisan composition of House committees; (6) serves no legitimate legislative function; and (7) is unenforceable to the extent it requires production of documents protected by the attorney-client privilege and the attorney work product doctrine.

## ARGUMENT

### I.     APPLICABLE LEGAL STANDARD

A preliminary injunction requires a balancing of competing interests under the four-factor standard established by *Winter v. Natural Resources Defense Council,* 555 U.S. 7 (2008).

Movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20; *Pursuing America's Greatness v. FEC,* 831 F.3d 500. 505 (D.C. Cir. 2016). Each factor is discussed below.

## II.     PLAINTIFF IS LIKLEY TO SUCCEED ON THE MERITS

The likelihood-of-success-on-the-merits factor is an "independent, free-standing requirement" for a preliminary injunction. *Shereley v. Sebelius,* 644 F.3d 388, 393 (D.C. Cir. 2011). However, Movant need not establish absolute certainty of success on the merits. *Booth v. Bowser,* 2022 WL 823068, * 16 (D.D.C. 3/18/2022) (citing *Population Inst. v. McPherson,* 797 F.2d 1062, 1078 (D.C. Cir. 1986)). "[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." It is not necessary for Movant to show a 51% likelihood of success. *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1292 (D.C. Cir. 2009); *Tully v. Okeson,* 977 F.3d 608, 613 (7th Cir. 2020); *S. S. Body Armor I, Inc. v. Carter, Ledyard & Milburn LLP,* 927 F.3d 763, 772 (3d Cir. 2019). It is sufficient for Movant to present a *prima facie* case on the merits. C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2948.3 (2013). This first factor is considered the most important factor. *Aamer v. Obama,* 742 F.3d 1023, 1038 (D.C. Cir. 2014).

The Amended Complaint asserts, among other claims, that the Subpoena violates Movant's freedom of association, freedom of speech, and freedom of the press guaranteed by the First Amendment and his right under the Fourth Amendment to have a "neutral and detached' party issue the Subpoena.

The law is well-settled that the First Amendment protects against the compelled disclosure of information concerning the identities and communications of individuals who associate for the advancement of shared beliefs and who choose to do so anonymously. *E.g., NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460 (1958) (citing previous holdings). In a recent decision, those holdings were reinforced. *American for Prosperity Found. v. Bonta,* 141 S. Ct. 2373, 2388 (2021) ("Our cases have said that disclosure requirements can chill association…."). Congressional attempts to compel such disclosures are subject to judicial review and invalidation. *Watkins v. United States,* 354 U.S. 178, 188 (1957):

> The Bill of Rights is applicable to investigations as to all forms of governmental action. Witnesses cannot be compelled to give evidence against themselves. They cannot be subjected to unreasonable search and seizure. Nor can the First Amendment freedoms of speech, press, religion, or political belief and association be abridged.

Movant, therefore, has established a substantial likelihood that he would prevail on his freedom of association claim. He has also shown a substantial likelihood of prevailing on his claims of violation of his freedom of speech and political expression, his freedom of the press, and his right to petition the government for redress of grievances.

In addition, Movant has also asserted that the Subpoena violates the warrant provision of the Fourth Amendment because it was issued by Defendant Thompson as Chairman of the Committee. (Amended Complaint, Ex. 2.) The Supreme Court has held repeatedly that the warrant provision requires that a "neutral and detached" party issue a subpoena or warrant. *E.g., Riley v. California,* 573 U.S. 373, 382 (2014); *Shadwick v. City of Tampa,* 407 U.S. 345 U.S. 350-51 (1972); *Camara v. Mun. Ct.,* 387 U.S. 523, 532 (1967). Defendant Thompson filed an action in this Court in February 2021 seeking to "punish" Movant's client, former President Donald J. Trump, for his allegedly unlawful actions.  As the issuer of the Subpoena, Defendant Thompson was not a "disinterested party" for purposes of the warrant provision. Movant has,

therefore, established a substantial likelihood that he can prevail on his Fourth Amendment claim.

Although Movant relies principally on his First and Fourth Amendment claims to establish the likelihood of success on the merits, he contends that he will likely prevail on his other claims as well. For example, Count IV asserts that the Select Committee acted beyond its authority, which is confined by H. Res. 503 to an investigation of the causes of the January 6, 2021, breach of the Capitol, because the Subpoena compels documents created well after that date. In *United States v. Rumely,* 345 U.S. 41 (1953), the Court invalidated a conviction for refusing to testify before a congressional committee on the ground that the resolution of the House of Representatives establishing the committee did not authorize the particular inquiry to which the defendant refused to respond. The inquiry authorized an investigation of lobbying, but the committee went beyond that to investigate efforts to influence public opinion. *Id.,* at 47. The Court reversed another conviction for refusal to respond to a congressional committee's inquiry because the subject of the inquiry was never specified or authorized in the resolution establishing the committee. *Gojack v. United States,* 384 U.S. 702, 708-09 (1966).

The Amended Complaint also asserts in Count VI that the Subpoena seeks private information that the Select Committee will use merely for the sake of exposing that information. It has repeatedly leaked private communications that it has secured through numerous subpoenas for private communications for the purpose of exposing the information to the public to aggrandize the Select Committee and to punish the individuals involved in those communications.[1] This is an improper purpose that warrants quashing the Subpoena. *See Trump v. Mazars USA, LLP,* 140 S. Ct. 2019, 2032 (2020).

---

[1] https://www.axios.com/2022/04/27/jan-6-leaks-undermine-committees-made-for-tv-plans;

In Count VII, Movant claims that the Select Committee cannot compel the production of documents protected by the attorney-client privilege. Recipients of legislative subpoenas "retain common law and constitutional privileges with respect to certain materials, such as attorney-client communications…." *Mazars,* 140 S. Ct. at 2032. In *Eastman v. Thompson,* No. 8:22-cv-00099 (C.D.Cal.1/20/2022), ECF No. 12, the court granted a temporary restraining order to the plaintiff based upon his likelihood of prevailing on his attorney-client privilege claim, but it denied a subsequent motion for a preliminary injunction that was based on a blanket assertion of the attorney-client privilege and granted leave for the plaintiff "to reassert those claims in the context of specific documents." *Id.,* ECF No. 43 (1/25/2022). Movant has detailed the kinds of legal advice that he has provided to his clients. At the appropriate juncture, he is prepared to submit a privilege log.

In other, related litigation before this Court, the Select Committee has argued that a moving party seeking a temporary restraining order or a preliminary injunction cannot demonstrate a substantial likelihood of success on the merits of his claim because the claim is barred by sovereign immunity and the Speech or Debate Clause. Defendants' Memorandum in Opposition to Plaintiffs' Amended Emergency Motion for a Temporary Restraining Order (1/11/22), *Budowich v. Pelosi,* No. 1:21-cv-03366-JEB (D.D.C.), ECF No. 23 at 1-2, 9-14. Neither basis defeats Movant's claims. In the related case of *Republican National Committee v. Pelosi,* No. 1:22-cv-00659-TJK, the Court held that it lacked jurisdiction to review a challenge to

---

https://nbcnews.com/politics/congress/avalanche-leaks-risks-jan-6-committee-delivering-blockbuster-hearings; https://www.columbian.com/news/2022/apr/30/mark-meadows-says-jan-6-committee-leaked-all-his   texts;https://www.thegateaypundit.com/2022/04/january-6-committee-leaks-san-hannity-text-messages-cnn;https://www.tampabay.com/news/nation-world/2022/04/30/mark-meadows-says-jan-6-panel-is-leaking-his-texts-to-vilify-him/

a subpoena issued by the Select Committee because the Speech or Debate Clause provides the Select Committee with absolute immunity. Movant will now address each of those arguments.

### A. Sovereign Immunity Is Not a Bar.

The doctrine of sovereign immunity does not preclude judicial review of actions of government officials and agents that violate the Constitution and the enjoining of those individuals ultimately responsible in their individual capacity. *See Scheuer v. Rhodes,* 416 U.S. 232, 237 (1974) (State officials are stripped of their immunity when they violate the U.S. Constitution.); *Ex parte Young,* 209 U.S. 123, 154 (1908) (Officials of a State can be enjoined from violating the Constitution in their individual capacity.). Federal officials and agents may be sued by those individuals whose constitutional rights have been violated by those officials and agents. *Bivens v. Six Unknown Unnamed Agents of Federal Bur. Of Narcotics,* 403 U.S. 388, 397 (1971). A federal court may also invalidate legislative actions, even legislative enactments, that violate constitutional rights. *E.g., Citizens United v. Federal Election Comm'n,* 558 U.S. 310. 336 (2010) ("The ongoing chill upon speech that is beyond all doubt protected makes it necessary in this case to invoke the earlier precedents that a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated").

If the Court has jurisdiction and authority to strike down a statute, it certainly may strike down the action of a congressional committee or its chairman. *See, e.g., Gojack,* 384 U.S. at 708-09; *Yellin v. United States,* 374 U.S. 109, 123-24 (1963); *Watkins,* 354 U.S. at 198; *Quinn v. United States,* 349 U.S. 155, 164 (1955); *Rumely,* 345 U.S. at 47; *Kilbourn v. Thompson,* 103 U.S.168, 199-200 (1880). In *McCulloch v. Maryland,* 4 Wheat. 316, 423 (1819), Chief Justice Marshall announced the principle that the courts can invalidate unconstitutional legislative actions; *see Bailey v. Drexel Furn. Co. Child Labor Tax Case,* 259 U.S. 20, 37 (1922) ("We

cannot avoid the duty, even though it require us to refuse to give effect to legislation designed to promote the highest good."). Sovereign immunity, therefore, cannot be asserted as a defense to a claim of a violation of a self-executing provision of the Bill of Rights, including the First and Fourth Amendments to the U.S. Constitution.

No person, including a congressional committee, is above the Constitution. U. S. Constitution, art. VI, cl. 3:

> The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and the several States, shall be bound by Oath or Affirmation, to support the Constitution; . . .

There is no exemption for Members of Congress in the Bill of Rights. Indeed, the Supreme Court has held that an action for damages could be brought against a former Member of Congress for his violation of the Constitution while serving in Congress. *Davis v. Passman,* 442 U.S. 228 (1979) (cause of action by staff member under the Due Process Clause for termination based on gender).

The issue of the applicability of sovereign immunity to congressional violations of the Constitution was addressed in *Kilbourn*:

> The house of representatives is not the final judge of its powers and privileges in cases in which the rights and liberties of the subject are concerned, but the legality of its action may be examined and determined by this court…. Especially is it competent and proper for this court to consider whether its proceedings are in conformity with the Constitution and laws, because, living under a written constitution, no branch or department of the government is supreme; and it is the province and duty of the judicial department to determine in cases regularly brought before them, whether the powers of any branch of the government, and those of the legislature in the enactment of laws, have been exercised in conformity with the Constitution; and if they have not, to treat their acts as null and void.

103 U.S. at 199. The *Kilbourn* Court held that the resolution of the House of Representatives and the warrant issued by the Speaker were unauthorized. *Id.* at 199-200.

For the foregoing reasons, entry of a declaratory judgment that the Subpoena violates Plaintiff's First Amendment right of freedom of association and his right to have the subpoena issued by a disinterested individual as guaranteed by the Fourth Amendment and an order enjoining such violations are not barred by the doctrine of sovereign immunity.

## B. The Speech or Debate Clause Is Not a Bar.

The second clause of Article I, § 6 of the Constitution provides:

> [The Senators and Representatives] shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

In the first case in which the Supreme Court construed that provision, *Kilbourn v. Thompson,* 103 U.S. 168 (1880), the Court held that warrants and subpoenas issued pursuant to a resolution authorizing a congressional investigation and the resolution itself were invalid. *Id.,* at 199. It also held that the Speaker of the House and several Members named as defendants were themselves immune from suit under the Speech or Debate Clause for all speech or actions in the exercise of the functions of their offices. This distinction between formal actions of Congress and its committees, on the one hand, and the speech or actions of individual Members, on the other hand, protects Members from intimidation by potentially hostile Executive Branch officials and review by potentially hostile judges without giving the Legislative Branch immunity when it violates the Constitution or acts without authority.

The plaintiff in *RNC v. Pelosi* did not rely on this distinction; furthermore, the Court did not address the distinction in concluding that the Speech or Debate Clause provides absolute immunity to the Select Committee to the challenge to the issuance of its subpoena. No. 1:22-cv-00659-TJK, ECF No. 33 (5/01/2022). Movant respectfully contends that the decision in that case is erroneous and would have unacceptable consequences.

Page 16

If the distinction established by *Kilbourn* is ignored, there would necessarily be a wholesale nullification of  the precedents established in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1809) and *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316 (1819) that federal courts may invalidate congressional enactments[2]; in *Trump v. Mazars USA, LLP,* 140 S. Ct. 2019 (2020) that a congressional subpoena is valid only if it is related to, and in furtherance of, a legitimate task of the Congress; in *Quinn v. United States,* 349 U.S. 155 (1955) that a congressional investigation may be held to violate specific provisions of the Bill of Rights; and in *Gojack v. United States,* 384 U.S. 702 (1966) and *United States v. Rumely,* 345 U.S. 41 (1953) that a congressional investigation may be invalidated to the extent it is not authorized by the chamber. The *Kilbourn* distinction is essential to a construction of the Speech or Debate Clause that respects the role assigned to each branch under the Constitution. To immunize "all legislative acts," as the Court in *RNC v. Pelosi* concluded it must,[3] would frustrate the constitutional design of the Framers.

The Court in *RNC v. Pelosi* relied on a statement in *Eastland v. United States Servicemen's Fund,* 421 U.S. 491 (1975) that "once it is determined that Members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to interference." *Id.,* at 503. The memorandum opinion ignored the recognition by the majority in *Eastland* that "[a]lthough the power to investigate is necessarily broad it is not unlimited." *Id.,* at 504, n. 15 (citing *Watkins*). Justice Marshall noted in his concurring opinion in *Eastland*: "I do not read the court to suggest, however, nor would I agree, that the constitutionality of a

---

[2] The Framers embraced this position: "[I]t was asserted over and over again, and by such men as Wilson, Madison, Gouverour Morris, King, Gerry, Mason, and Luther Martin, that the federal judiciary would declare null and void laws that were inconsistent with the constitution." M. FARRAND, THE FRAMING OF THE CONSTITUTION OF THE UNITED STATES  157 (1913).
[3] *Republican National Committee v. Pelosi,* No. 1:22-cv-00659-TJK, ECF. No. 33 at 13 (5/1/22).

congressional subpoena is always shielded from judicial inquiry." *Id.,* at 513. In *Hutchinson v. Proxmire,* 443 U.S. 111 (1079), the Court said: "In no case has this Court ever treated the [Speech or Debate] Clause as protecting all conduct *relating* to the legislative process." *Id.,* at 131. That opinion distinguished between "what is only 'related to the due functioning of the legislative process,' and what constitutes the legislative process entitled to immunity under the Clause." *Id.*

The Supreme Court has not departed from the position it adopted in *Gibson v. Fla. Legislative Com.,* 372 U.S. 539, 545 (1963) and *Watkins* that the legislative power to investigate is limited. "Validation of the broad subject matter under investigation does not necessarily carry with it automatic and wholesale validation of all individual questions, subpoenas, and documentary demands."  *Gibson,* 372 U.S. at 545; *see Watkins,* 354 U.S. at 197-98; *Kilbourn*, 103 U.S. at 199-200.

The construction of the Speech or Debate Clause in *RNC v. Pelosi* is at odds with the principle of political accountability that applies to the exercise of authority by the Executive and Legislative Branches. *See, e.g., Dep't of Transportation v. Ass'n of Am. RRs,* 575 U.S. 43, 57 (2015) (Alito, J., concurring) ("Liberty requires accountability."). The reasoning of the memorandum opinion in the *RNC* case denies courts the ability to hold Congress, its committees, and its Members accountable for violating the Constitution or for acting beyond their authority. The Supreme Court has never suggested that legislation that contravenes the Constitution may not be invalidated or that congressional actions that are beyond the authority granted may not be declared null and void.[4]

---

[4] A construction of the Speech or Debate Clause that effectively cancels the protections guaranteed by the First and Fourth Amendments in absolute and unequivocal terms is

Accepting the construction adopted by the *RNC* Court and urged by the Select Committee would mean that every challenge to a congressional enactment would be subject to dismissal on grounds of lack of jurisdiction whenever the Speech or Debate Clause is invoked. Enacting legislation is plainly within the "legitimate legislative sphere." *Eastland,* 421 U.S at 503. The expansive scope of activity contemplated by the *RNC* memorandum opinion and the Select Committee, which encompasses every act of Congress, either chamber, its committees, subcommittees, and members, is at odds with the construction of the Clause by the *Kilbourn* Court which distinguished speech and acts of Members from acts of Congress as a whole, its separate chambers, and their committees and subcommittees.

If federal courts have jurisdiction to invalidate legislation enacted by Congress, as has been clearly established*,* courts surely have jurisdiction, notwithstanding the Speech or Debate Clause, to invalidate actions of congressional committees that violate the Constitution. A contrary conclusion would stand the Constitution on its head and leave Congress free to ignore its provisions. The absolute immunization of all congressional actions, as opposed to the speech and acts of individual Members, would be inconsistent with the separation-of-powers provisions that empower the judiciary to invalidate actions that violate the Constitution or are taken without authority.

*Doe v. McMillan,* 412 U.S. 306 (1973) and *Gravel v. United States,* 408 U.S. 606 (1972) do not support the conclusion that all actions undertaken "within the 'legitimate legislative sphere'" are immunized under the Speech or Debate Clause. *RNC v. Pelosi,* No. 1:22-cv-00659-TJK, ECF No. 33 at 13-14, 19 (quoting *Eastland,* 421 U.S. at 503). The facts in *McMillan* and

---

unreasonable in light of the fact that ratification of the Bill of Rights occurred after the ratification of the Speech or Debate Clause.

*Gravel* distinguish those cases from the instant case. *McMillan* was an action for damages and declaratory and injunctive relief for alleged violations of privacy by the chairman and members of a House committee; its clerk, staff director, counsel, consultant, and investigator; the Superintendent of Documents and Public Printer; the President and members of the D.C. Board of Education; the D.C. Superintendent of Public Schools; a high school principal; a teacher at the high school; and the United States. The Court in *McMillan* stated that the activities of members of a congressional committee are protected, "**although subject to judicial review in various circumstances, as is legislation itself**." *McMillan*, 412 U.S. at 311-125 (quoting *Gravel v United States*, 408 U.S. at 624 (emphasis added)). Both *McMillan* and *Gravel* involved actions taken by individual Members of Congress on which the decision in each case turned. Even so, the *Gravel* Court recognized that the privilege granted to Members is not unlimited:

> [N]o prior case has held that Members of Congress would be immune if they executed an invalid resolution by themselves carrying out an illegal arrest, or if, an order to secure information for a hearing, themselves seized the property or invaded the privacy of a citizen.

*Id.* at 621; *see Kilbourn,* 103 U.S at 204 ("It is not necessary to decide here that there may be things done…of an extraordinary character, for which the members who take part in that act may be held legally responsible.").

   *McMillan* and *Gravel,* which recognized that not all legislative acts are immunized, support Movant's position, not that of the Select Committee.  Because the Court in *Kilbourn* invalidated the congressional resolution and the warrant in that case, notwithstanding the Speech or Debate Clause, *Kilbourn* provides Movant with especially strong support for his position that the Clause does not give the Select Committee itself absolute immunity when it violates Movant's rights under the First and Fourth Amendments or acts outside its authority.

### III.   PLAINTIFF WOULD SUFFER IRREPARABLE INJURY IF A PRELIINARY INJUNCTION IS NOT GRANTED

Movant must show that he will suffer irreparable harm if his motion for preliminary injunction is not granted. *Benisek v. Lamone.* 138 S. Ct. 1942, 1944 (2018). The injury to Movant in the absence of the requested relief would be immediate and irreparable. *See Roman Catholic Diocese v. Cuomo,* 141 S. Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("[T]he temporary violation of a constitutional right itself is enough to establish irreparable harm.").

The injury need only be "likely." *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006). Movant is not required to "wait for the Damocles' sword to actually fall." *Tiktok Inc. v. Trump,* 507 F.Supp.3d 92, 114 (D.D.C. 2021). He has shown in his verified amended complaint and is declaration, which is attached to this memorandum as Exhibit A, that there is more than a "subjective chill" of his First Amendment rights. The violation of his constitutional rights, including his First and Fourth Amendment rights, constitute an immediate and irreparable injury if a preliminary injunction is not granted. *Roman Catholic Diocese of Brooklyn v. Cuomo,* 141 S. Ct. 63, 67 (2020) (nothing more needed than such violation).

The first two *Winter* factors are the most critical. *Nken v. Holder,* 556 U.S. 416, 434 (2009). The strength of Movant's claims is derived from the unambiguous decisions of the Supreme Court and their application to Movant's claims. That the injuries to the Movant caused by the violation of his constitutional rights are irreparable is likewise established by the decisions cited in the first paragraph of this section.

### IV.     THE BALANCE OF EQUITIES TIPS IN FAVOR OF MOVANT

The third *Winter* factor, whether the balance of the equities tips in favor of the moving party, is often considered together with the fourth factor, whether an award of a motion for preliminary injunction would serve the public interest, when government is the opposing party. *Nken,* 556 U.S. at 435; *Guedes v. Bur. Of Alcohol, Tobacco, Firearms & Explosives,* 920 F.3d 1, 10 (D.C. Cir. 2019). The protection of individual constitutional rights serves the public interest. *See Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002); *Wynn v. Vilsack,* 545 F.Supp.3d 1271, 1293-94 (M.D.Fla. 2021) (interest of movant in preserving his constitutional rights superior to the interests of the Government regardless of how well-intended its program and how many beneficiaries of that program would be adversely affected).

The Committee argued in the *Budowich* case that prompt compliance with a congressional committee subpoena is an interest "of the highest order." *Budowich,* No. 1:21-cv-03366 (C.D. Fla.) ECF No. 23 at 38. To the contrary, the interest in adhering to the Constitution is of a higher order than the efficient operation of a congressional committee. *Cf. Bivens,* 403 U.S. at 407 (Harlan, J., concurring in the judgment):

> But it must also be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will expressed in legislative majorities;….

Indeed, the Seventh Circuit has noted: "In First Amendment cases, the likelihood-of-success factor is usually determinative." *ACLU of Illinois v. Alvarez,* 679 F.3d 588, 589-90 (2018).

The Select Committee's interest in obtaining the information that it seeks through the Subpoena before the issues raised by the amended complaint are resolved by the Court is outweighed by Movant's interest in protecting his rights guaranteed by the Constitution. *See Louisiana v. Becerra,* 2022 WL 16571, * 15 (W.D. LA. 1/1/2022). The chilling effect on

Movant's exercise of his First Amendment rights, namely, the freedom of speech and political expression, the freedom of association, the freedom of the press, and the right to petition the government for the redress of grievances, would be immediate and severe. *See Bonta,* 141 S. Ct. at 2382-83 ("Broad and sweeping inquiries into these protected areas discourage citizens from exercising rights protected by the Constitution."). These likely consequences are described in Exhibit A, ¶¶ 7-12, 18-20. Enforcement of the Subpoena would inhibit Movant and his associates in continuing to bring to the public's attention the extent of election fraud in the 2020 election. *See Nat'l Treasury Emps. Union v. United States,* 101 F.3d 1423, 1430 (D.C. Cir. 1996).

In this case, there is no justification for an argument that a preliminary injunction would frustrate the Select Committee's interest in obtaining prompt compliance with the Subpoena. The Select Committee had known for months before the Subpoena was issued on March 1, 2022, that Movant had urged the Acting Attorney General at the time to file a complaint on behalf of the United States in the U.S. Supreme Court. Exhibit A, ¶¶ 13-14. The long delay in issuing the Subpoena belies any suggestion that the Select Committee is in urgent need of the documents it has requested in the Subpoena or of Movant's deposition. The Select Committee's argument in *Budowich* that the public interest would be served by requiring immediate compliance with the Subpoena so that its investigation can proceed "expeditiously and without impediment" carries no weight in the circumstances here. No. 1:21-cv-3366 (D.D.C.), ECF No. 23 at 39. The Court should not allow the Select Committee, having failed to act in a timely manner to issue the Subpoena, to deny Movant an opportunity to litigate his claims without having to suffer irreparable injury resulting from the temporary loss of his constitutional rights.

## V.      THE PUBLIC INTEREST FAVORS A GRANT OF THE PRELIMINARY INJUNCTION

"If, as a practical matter, a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *AT&T Co. v. Winbach and Conserve, Inc.,* 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994). The public interest is always served by assuring that the requirements and prohibitions of the Constitution are faithfully enforced. *See League of Women Voters of the U.S. v. Newby,* 838 F.3d 1, 12 (D.C. Cir. 2016) (" There is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations."); *Giovani Carandola,* 303 F.3d at 521: "[A} state is 'in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction."); *Louisiana v. Becerra,* 2022 WL 16571, * 15 (The public interest is served by maintaining the constitutional structure and the liberty of individuals.); *Tate v. Pompeo,* 513 F.Supp.3d 132, 153 (D.D.C. 2021). That interest in protecting the constitutional rights of citizens in this case overrides the public's interest in "the speedy and efficient conduct of the Select Committee's investigation," especially where the Select Committee's conduct of its investigation has been neither speedy nor efficient. The government may not act "unlawfully even in pursuit of desirable ends." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 582, 585-86 (1942). In any event, there is no public interest in enforcement of an unlawful action. *League of Women Voters,* 838 F.3d at 21.

### CONCLUSION

The Court should grant the Motion for a Preliminary Injunction.

Respectfully submitted,

**KURT B. OLSEN**

By_____/S/_____

Patrick M. McSweeney                    Charles Burnham, Esq.
**MCSWEENEY, CYNKAR & KACHOUROFF, PLLC**    DC Bar # 1003464
Patrick M. McSweeney*                   **BURNHAM & GOROKHOV, PLLC**
Christopher I. Kachouroff*              1424 K St. NW Suite 500
13649 Office Place, suite 101          Washington, D.C. 20005
Woodbridge, VA 22192                   202.386.6920
Telephone: (804) 937-0895              202.390.7587 F
patrick@mck-lawyers.com                charles@burnhamgorokhov.com
chris@mck-lawyers.com

*Pro hac vice motion pending*           *Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KURT B. OLSEN, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 1:22-cv-00807_____ |
| | ) |
| NANCY PELOSI, *et al.* | ) |
| | ) |
| Defendants. | ) |
| ——————————————————— | ) |

### <u>DECLARATION OF KURT B. OLSEN</u>

I, Kurt Olsen, state the following as my declaration pursuant to 28 U.S.C. §1746:

    1.      The facts in this affidavit are based on my personal knowledge and experiences in my personal and business relationships.

    2.      I am 59 years old, a citizen of the United States of America and a resident of the State of Maryland.

    3.      In 1992, I received my J.D. from George Washington University and have been licensed to practice law since 1992.

    4.      I am an attorney admitted to practice law in the State of Maryland and the District of Columbia.

    5.      I am privileged to represent several high-profile individuals and am actively involved with litigation, or anticipated litigation, relating to election fraud and illegal voting. I am also involved in cases and claims relating to retaliatory acts against those who have spoken out on such issues in both state and federal courts. In the course of my representation of clients, I have provided legal advice at their request and have undertaken investigations at their direction,



which involved assembling teams of lawyers and experts regarding anticipated and pending litigation.

6.     Since November 2020, I have, or had, an attorney-client relationship with multiple clients on matters related to illegal voting and election fraud including, *inter alia*: the Attorney General of the State of Texas; former President Donald J. Trump; Mike Lindell (who is currently engaged in litigation with Dominion Voting Systems, Inc. ("Dominion"), and Smartmatic USA Corp.); Arizona gubernatorial candidate Kari Lake, and current candidate for Arizona Secretary of State, Arizona State Representative Mark Finchem;  and proposed class representatives in a putative class action pending against Dominion and other related defendants.[1] Notably, that class action alleges Dominion engaged in an illegal campaign of intimidation and harassment against volunteer poll watchers and other Americans in violation of their constitutional rights by threatening to wage Lawsuit Warfare ("Lawfare") against anyone who exposes or even speaks about fraud and illegal voting activity in the 2020 Presidential election.

7.     Since November 20, 2020, various clients, potential clients, and individuals with whom I share a common interest in litigation (or anticipated litigation), asked me to analyze, investigate, and review whether evidence existed and was available to show fraudulent or illegal election activity in the 2020 Presidential election and subsequent elections. Those investigations also included requesting and receiving information from anonymous and non-public sources.

---

[1] Specific filed cases include, but are not limited to: *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020) (No. 22O155); *U.S. Dominion et al. v. Mike Lindell*, Case No. 1:21-cv-00445-CJN (D.D.C.); *Cooper et al. v. U.S. Dominion, Inc. et al.*, No. 1:21-cv-02672-PAB-STV, (D. Co.); Kari Lake and Mark Finchem vs. Kathleen Hobbs, as Arizona Secretary of State, et al., No. 2:22-cv-00677-DMF (D. Az.).

8.      I obtained, reviewed and analyzed evidence relating to illegal voting and election fraud from numerous sources to determine the credibility of the evidence and whether such evidence warranted or supported legal action.

9.      Before and after January 6, 2021, I associated and communicated with a number of United States citizens who shared my concerns concerning the November 2020 election and possible legal remedies.

10.     Many of these individuals with whom I communicated about the 2020 elections expressed a concern about maintaining their anonymity out of fear that those who deny there is evidence of fraud or illegal voting in the 2020 Presidential election, including politicians, media outlets, and even law enforcement, would retaliate against them for their beliefs.

11.     These communications occurred both verbally and in writing with the understanding that they remain private, and away from public scrutiny. These communications and in person interactions were first and foremost based on privacy because these people, including myself, believed we had a right to associate together and engage in political speech anonymously. We were also concerned about a negative effect on businesses and personal relationships.

12.     After January 6, 2021, and as a result of the establishment of the House Select Committee to Investigate the Attack on the U.S. Capitol (the "Select Committee"), individuals who had voiced concerns about the November 2020 election and potential litigation have told me that they were increasingly concerned about communicating over email and on a cell phone. They told me that they believed, as I do, that the ability to engage in communications by email or cell phone involved a risk that such communications would be obtained by the January 6th Committee and made public, possibly through leaks to mainstream media.  Such concerns have

proven valid as private communications produced to the Select Committee have in fact been leaked to the press.[2]

13.    The effect of the enforcement of the Subpoena would make it substantially more difficult for me to accomplish the common objectives I have with other individuals which requires me to investigate illegal voting and election fraud generally (*i.e.*, not just in the 2020 Presidential election) including investigations concerning potential litigation conducted in the course of representing my clients.

14.    Indeed, after January 6, 2021, many articles appeared in the press describing my legal work in connection with the November 2020 election—and included client communications which were obtained and disclosed by the House Oversight Committee on Oversight and Reform (the "House Oversight Committee").  In fact, on June 15, 2021, the House Committee issued a press release entitled "New Documents Show Trump Repeatedly Pressed DOJ to Overturn Election Results Before Inciting Capitol Attack."[3]  This press release included discussion of email exchanges in late December 2020 that I had with then-acting Attorney General Jeffery Rosen (with whom I previously worked in the 1990s while we were both at Kirkland & Ellis, P.C.).  Those communications discussed the possibility of the United States acting as a plaintiff, with standing under the doctrine of *parens patriae*, in a potential action against certain States regarding, *inter alia*, those States' constitutional violations in connection

---

[2] *See. e.g.,* First on CNN: January 6 committee has text messages between Ginni Thomas and Mark Meadows, https://www.cnn.com/2022/03/24/politics/ginni-thomas-mark-meadows-text-messages/index.html

[3] *See* https://oversight.house.gov/news/press-releases/new-documents-show-trump-repeatedly-pressed-doj-to-overturn-election-results.

with the November 2020 general election similar to those pled in *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020).

15.     That same day, the Chairwoman of the House Oversight Committee, posted a lengthy thread on Twitter including screen captures set in bold stating "President Trump Sent Bogus Election Fraud Claims to Top DOJ Officials Minutes Before Announcing Their Promotions to the Top Two Spots in the Department" and "President Trump Used Official Whitehouse Channels and a Private Attorney to Pressure DOJ to Urgently File a Supreme Court Lawsuit to Nullify the Election".[4] Chairwoman Maloney also identified me (and others) by name and cited my email communications with then-acting Attorney General Jeff Rosen and his assistant in her Twitter thread.

16.     Similar articles have been uniformly negative, and foster an environment commonly referred to as Cancel Culture[5]—i.e., an attempt to intimidate into silence anyone who would provide evidence of, or speak out on, election fraud.[6]

17.     The Select Committee publicly issued me a broad subpoena along with an attached cover letter implying I had committed a crime in connection with my legal work.  The subpoena demanded, among other things, that I produce "all communications" with anyone regarding fraud in the November 2020 election and other purportedly related matters through the present date.  The subpoena and cover letter generated wide-spread publicity on the internet, cable news, and print publications.  I believe this subpoena was intended to send a message of

---

[4] https://twitter.com/repmaloney/status/1404830208423874568
[5] https://en.wikipedia.org/wiki/Cancel_culture
[6]*See also*, Yahoo News, This Pro-Trump Lawyer Was a Rising 'Stop the Steal' Star. His Firm Erased Him, August 15, 2021 available at https://news.yahoo.com/pro-trump-lawyer-rising-stop-090303115.html.

intimidation to anyone who has spoken, or might want to speak, to me about any issue—and not just election fraud, but any topic that might contradict the Select Committee's narrative.

18.     I also note that the U.S. Department of Homeland Security has taken similar action to intimidate anyone who would expose illegal and fraudulent voting in the 2020 Presidential election by issuing thinly veiled threatening "guidance" on so-called "domestic extremism," which includes "sociopolitical developments such as narratives of fraud in the recent general election" as a marker.[7]

19.     The concern of many of my associates and me about the Select Committee's threats to our privacy and associational interests has been further heightened by the publication of reports that the Select Committee has obtained massive amounts of cell phone data from carriers such as AT&T and Verizon without a valid warrant and without apparent respect for the constitutional rights of American citizens.

20.     The prospect of having private and confidential communications obtained by compulsion or by arguably unconstitutional tactics and likely made public by a committee that is obviously partisan and has prejudged the outcome of its investigation has impaired not only my communications with friends, family, clients, and other acquaintances, but also the ability to freely associate with them about matters of shared political and social concern.

21.     As a result of the Select Committee investigation, I have been forced to minimize the use of my cell phone and email as a means of communication because I am concerned that the Select Committee will attempt to obtain those records and thereby obtain confidential information relating to my political and social associations. This concern became a reality with

---

[7] Report *available at* https://www.dhs.gov/sites/default/files/2022-03/Report%20to%20the%20Secretary%20of%20Homeland%20Security%20Domestic%20Violent%20Extremism%20Internal%20Review%20Observations%2C%20Findings%2C%20and%20Recommendations.pdf.

the subpoena now being challenged by this action. I am already concerned about my friends, my clients, and others knowing that, despite my having nothing to do with any violence at the Capitol on January 6, 2021, being fearful of communicating with me.

22.     Before the Select Committee was established, my clients and I relied more freely upon the attorney-client privilege to discuss potential and pending lawsuits concerning things such as the November 2020 election, election integrity, and issues involving electronic voting machine companies like Dominion.

23.     After the Select Committee was formed and because its members expressly stated that President Trump had committed some type of crime, it became clear to me that some of these privileged conversations I had with clients, and others with whom I or my clients share a common interest, were in jeopardy of being unfairly treated by that Committee as unprotected by the attorney-client privilege or work product doctrine under a contrived crime/fraud exception.

24.     I have represented Mike Lindell for more than a year on matters related to his efforts to inform the American public about the nature and extent of election fraud in U.S. elections.

25.     I have had extensive communications with Mr. Lindell about pending and anticipated litigation, especially the litigation or potential litigation involving Dominion and other electronic voting machine companies. He has frequently requested and received my legal advice regarding litigation matters that affect him personally.

26.     Other clients, or individuals with whom I or my clients share a common interest, have sought my legal advice, which I have provided regarding anticipated or pending litigation.

27.     The Subpoena requires that I produce information related to matters that occurred after January 6, 2021, which is not legitimately within the scope of the investigation authorized

by H. Res. 503.   The Select Committee's efforts to obtain my private communications, work product, and attorney-client communications have no reasonable relationship to the causes of, or any influencing factors contributing to, the attack on the Capitol on January 6, 2021.  This is especially obvious because there is a wealth of information in the public domain regarding the illegal and fraudulent voting that took place in the 2020 Presidential election—which the Select Committee continues to ignore as demonstrated in its members' public statements and in the Select Committee's court filings.

I declare under penalty of perjury of the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge.

Dated:  May 16, 2022                    _____

                                                                    Kurt B. Olsen