**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KURT B. OLSEN,

*Plaintiff*,

v.

NANCY PELOSI, et al.,

*Defendants*.

Case No. 1:22-CV-00807-CJN

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION TO DISMISS

Defendants the Honorable Nancy Pelosi, the Honorable Bennie G. Thompson, the Honorable Elizabeth L. Cheney, the Honorable Adam B. Schiff, the Honorable Jamin B. Raskin, the Honorable Susan E. Lofgren, the Honorable Elaine G. Luria, the Honorable Peter R. Aguilar, the Honorable Stephanie Murphy, the Honorable Adam D. Kinzinger, and the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol respectfully submit this opposition to Plaintiff Kurt Olsen's Motion for a Preliminary Injunction and move for an order dismissing Plaintiff's Amended Complaint (Apr. 4, 2022) (ECF 7). For the reasons set forth in the accompanying Memorandum of Law, Mr. Olsen's Motion should be denied and the Amended Complaint should be dismissed with prejudice (pursuant to Federal Rule of Civil Procedure 65(a)(2), this Court can and should combine denial of the preliminary injunction with final judgment for Defendants).

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter
    *General Counsel*
Todd B. Tatelman
    *Principal Deputy General Counsel*
Eric R. Columbus
    *Special Litigation Counsel*
Michelle S. Kallen
    *Special Litigation Counsel*
Stacie M. Fahsel
    *Associate General Counsel*

Office of General Counsel[*]
U.S. House of Representatives
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

*Counsel for Defendants*

June 28, 2022

---

[*] Attorneys for the Office of General Counsel for the U.S. House of Representatives are "entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States or of any State or political subdivision thereof without compliance with any requirements for admission to practice before such court."  2 U.S.C. § 5571.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KURT B. OLSEN, | |
| *Plaintiff*, | |
| v. | Case No. 1:22-CV-00807-CJN |
| NANCY PELOSI, et al., | |
| *Defendants*. | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION .................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................2

A.    Mr. Olsen Publicly Promoted Claims That The 2020 Presidential Election
      Was Fraudulent And Attempted To Disrupt Or Delay Certification Of
      Election Results .........................................................................................................2

B.    The January 6th Attack ..............................................................................................3

C.    The Formation Of The Select Committee..................................................................4

D.    The Select Committee's Subpoena To Mr. Olsen .....................................................5

E.    Procedural History .....................................................................................................6

ARGUMENT ........................................................................................................................6

I.     LEGAL STANDARD.................................................................................................7

II.    MR. OLSEN CANNOT DEMONSTRATE A LIKELIHOOD OF
       SUCCESS ON THE MERITS....................................................................................8

       A.    The Speech Or Debate Clause Bars Mr. Olsen's Suit
             And Requested Relief ........................................................................................8

       B.    The Subpoena Serves A Valid Legislative Purpose And Does Not
             Violate The Separation Of Powers ..................................................................13

       C.    The Select Committee Is Properly Composed..................................................14

       D.    Mr. Olsen's Constitutional Claims Fail ...........................................................22

             1.   Mr. Olsen Fails To State A First Amendment Claim ..................................22

             2.   Mr. Olsen Fails To State A Valid Fourth Amendment Claim .....................24

       E.    Mr. Olsen's Compliance With The Subpoena Will Not Violate
             Attorney-Client Privilege Nor Work Product Protections..................................26

III.   MR. OLSEN HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF
       IRREPARABLE HARM ..........................................................................................27

i

IV.      THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH
DISPOSTIVIELY IN FAVOR OF THE SELECT COMMITTEE ............................29

CONCLUSION ........................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ark. Dairy Co-op Ass'n, Inc. v. USDA,*
573 F.3d 815 (D.C. Cir. 2009) ............................................................................7

*Barenblatt v. United States,*
360 U.S. 109 (1959) ...................................................................................24, 29

*Barker v. Conroy,*
921 F.3d 1118 (D.C. Cir. 2019)...................................................................16, 21

*Barry v. U.S. ex rel. Cunningham,*
279 U.S. 597 (1929) ...........................................................................................16

*Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO,*
860 F.2d 346 (9th Cir. 1988) .............................................................................23

*Brown & Williamson Tobacco Corp. v. Williams,*
62 F.3d 408 (1995) ......................................................................................12, 13

*Buckley v. Valeo,*
424 U.S. 1 (1976) .......................................................................................23, 24

*\*Budowich v. Pelosi,*
2022 WL 2274359 (D.D.C.)..........................................................10, 14, 20, 21

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006)......................................................................7, 27

*Comm. on the Judiciary of U.S. House of Representatives. v. McGahn,*
968 F.3d 755 (D.C. Cir. 2020)...........................................................................29

*Doe v. McMillan,*
412 U.S. 306 (1973) ...........................................................................................11

*\*Eastland v. U.S. Servicemen's Fund,*
421 U.S. 491 (1975) .............................................................8, 9, 12, 23, 25

*\*Eastman v. Thompson,*
2022 WL 894256 (C.D. Cal.) ...............................................4, 14, 20, 21, 24, 25

*Exxon Corp. v. FTC,*
589 F.2d 582 (D.C. Cir. 1978).....................................................................29

*FTC v. Boehringer Ingelheim Pharms., Inc.,*
180 F. Supp. 3d 1 (D.D.C. 2016)......................................................................26

*Ghandi v. Police Dep't of Detroit*,
    747 F.2d 338 (6th Cir. 1984) ..................................................................................28

*Gravel v. United States*,
    408 U.S. 606 (1972) ..............................................................................................8

*Hearst v. Black*,
    87 F.2d 68 (D.C. Cir. 1936) ......................................................................11, 12, 13

*In re Lindsey*,
    158 F.3d 1263 (D.C. Cir. 1998) ............................................................................26

*In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*,
    439 F.3d 740 (D.C. Cir. 2006) ..............................................................................26

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) ............................................................................................23

*Jud. Watch, Inc. v. Schiff*,
    998 F.3d 989 (D.C. Cir. 2021) ................................................................................9

*Kilbourn v. Thompson*,
    103 U.S. 168 (1880) ............................................................................................11

*Laird v. Tatum*,
    408 U.S. 1 (1972) ................................................................................................28

*Lo-Ji Sales, Inc. v. New York*,
    442 U.S. 319 (1979) ............................................................................................24

*Mancusi v. DeForte*,
    392 U.S. 364 (1968) ............................................................................................25

*McCarthy v. Pelosi*,
    5 F.4th 34 (D.C. Cir. 2021) .................................................................................8, 9

*McGrain v. Daugherty*,
    273 U.S. 135 (1927) ............................................................................................29

*McPhaul v. United States*,
    364 U.S. 372 (1960) ............................................................................................25

*McSurely v. McClellan*,
    521 F.2d 1024 (D.C. Cir. 1975) ..............................................................................8
    553 F.2d 1277 (D.C. Cir. 1976) ..............................................................................9

*McTernan v. City of York*,
    577 F.3d 521 (3d Cir. 2009) ................................................................................28

*Meadows v. Pelosi*,
   No. 21-3217 (D.D.C.) ..................................................................................................19

*MINPECO, S.A. v. Conticommodity Servs., Inc.*,
   844 F.2d 856 (D.C. Cir. 1988) ......................................................................................8

*Pursuing Am.'s Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ....................................................................................29

*Rangel v. Boehner*,
   20 F. Supp. 3d 148 (D.D.C. 2013) ..............................................................................16
   785 F.3d 19 (D.C. Cir. 2015) ..................................................................................8, 11

*\*Republican Nat'l Comm. v. Pelosi ("RNC")*,
   2022 WL 1294509 (D.D.C.) ..................................................................10, 14, 18, 19

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020) ....................................................................................................28

*Sanders v. McClellan*,
   463 F.2d 894 (D.C. Cir. 1972) ....................................................................................13

*Senate Permanent Subcomm. v. Ferrer*,
   199 F. Supp. 3d 125 (D.D.C. 2016) ........................................................................23, 24

*Senate Permanent Subcomm. on Investigation v. Ferrer*,
   856 F.3d 1080 (D.C. Cir. 2017) ..................................................................................13

*\*Trump v. Thompson*,
   20 F.4th 10 (D.C. Cir. 2021) ............................................................1, 3, 10, 13, 14, 25, 30

*Texas v. Pennsylvania*,
   141 S. Ct. 1230 (2020) ..................................................................................................2

*United States v. Bannon*,
   No. 21-670 (D.D.C.) ..............................................................................................14, 20

*United States v. Brewster*,
   408 U.S. 501 (1972) ......................................................................................................8

*United States v. Chem. Found., Inc.*,
   272 U.S. 1 (1926) ........................................................................................................16

*United States v. Durenberger*,
   48 F.3d 1239 (D.C. Cir. 1995) ....................................................................................20

*United States v. Fitzsimons*,
   No. 21-158 (D.D.C.) ......................................................................................................4

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC,*
 933 F.3d 728 (D.C. Cir. 2019) ............................................................17

*United States v. Neefe,*
 No. 21-567 (D.D.C.) ...........................................................................4

*\*United States v. Rostenkowski,*
 59 F.3d 1291 (D.C. Cir. 1995) ............................................16, 18, 19

*United States v. Sandlin,*
 No. 21-88 (D.D.C. Jan. 20, 2021) ......................................................4

*Vander Jagt v. O'Neill,*
 699 F.2d 1166 (D.C. Cir. 1982) ...................................................16, 21

*Winter v. Nat. Res. Def. Council, Inc.,*
 555 U.S. 7 (2008) .........................................................................7, 27

*Wis. Gas Co. v. FERC,*
 758 F.2d 669 (D.C. Cir. 1985) ..........................................................27

**Statutes**

26 U.S.C. §§ 8001-05 ...........................................................................16

**Rules**

Fed. R. Civ. P. 65 ...................................................................................2

**Legislative & Constitutional Authorities**

165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) ...................................16

167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) .........................................17

167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021) ...................................19

167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) ..............................20

167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ..................................19

167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) .............................20

168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) ....................................19

168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) ...............................20

H. Res. 6, 116th Cong. (2019) ...................................................................18

H. Res. 24, 110th Cong. (2007) .................................................................18

*H. Res. 503, 117th Cong. (2021) .................................3, 4, 5, 14, 15, 16, 17, 18, 19, 21, 22, 25

H. Res. 730, 117th Cong. (2021) ...............................................................20

H. Res. 851, 117th Cong. (2021) ...............................................................20

H. Res. 1037, 117th Cong. (2022) .............................................................20

Rules of the U.S. House of Representatives, 117th Cong. (2021)

     Rule I ...................................................................................................17

     Rule X .........................................................................................14, 15, 16

U.S. Const. Art. I, § 5, cl. 2 .......................................................................15

U.S. Const. Art. I, § 6, cl. 1 .........................................................................8

**Other Sources**

*8 Cannon's Precedents of the U.S. House of Representatives*, § 2172 ......................17

Betsy Woodruff Swan & Nicholas Wu, *Trump asked his AG about legal strategy
to overturn election, Rosen tells senators*, POLITICO (Aug. 10, 2021),
https://perma.cc/Y8VS-SEUC .................................................................3

Black's Law Dictionary (11th ed. 2019) ........................................................17

*Hearing on Jan. 6th Investigation before the Select Comm. to Investigate the
Jan. 6th Attack on the U.S. Capitol*, 117th Cong. (June 9, 2022),
https://perma.cc/7CCL-X9QN .................................................................3

*Hearing on Jan. 6th Investigation before the Select Comm. to Investigate the
Jan. 6th Attack on the U.S. Capitol*, 117th Cong. (July 27, 2021),
https://perma.cc/8HZK-VUWH .................................................................3

Press Release, Kevin McCarthy, U.S. House of Representatives, McCarthy
Statement about Pelosi's Abuse of Power on Jan. 6th Select Comm. (July 21, 2021),
https://perma.cc/4JNC-73R2 ....................................................................5

Press Release, Nancy Pelosi, Speaker, U.S. House of Representatives, Pelosi Statement
on Republican Recommendations to Serve on the Select Comm. to Investigate
the Jan. 6th Attack on the U.S. Capitol (July 21, 2021),
https://perma.cc/B86B-SJ ............................................................................................5

## INTRODUCTION

Plaintiff Kurt Olsen asks this Court to preliminarily enjoin the enforcement of a subpoena for documents and testimony that the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol issued to him.  Mr. Olsen provides no valid basis for this Court to thwart the Select Committee's investigation into "the single most deadly attack on the Capitol by domestic forces" and evaluation of the need for corrective measures to "ensur[e] the safe and uninterrupted conduct of [Congress's] constitutionally assigned business." *Trump v. Thompson*, 20 F.4th 10, 35 (D.C. Cir. 2021), *inj. denied*, 142 S. Ct. 680 (2022), *cert. denied*, 142 S. Ct. 1350 (2022) (No. 21-932).

The Select Committee's investigation has revealed that Mr. Olsen promoted claims that the 2020 Presidential election was fraudulent and participated in attempts to disrupt or delay the certification of the election results.  Indeed, Mr. Olsen continues to peddle debunked claims of election fraud in this very lawsuit, and his Amended Complaint goes so far as to ask this Court to declare that there is "credible evidence" of election fraud that altered the results of the 2020 Presidential election in key swing States.  Am. Compl. Prayer for Relief ¶ e-f.  Mr. Olsen's documents and testimony are plainly important to the Select Committee's investigation into the factors that fomented the attack on the Capitol and the disruption of the peaceful transfer of power.

Mr. Olsen has not shown that he is likely to succeed on the merits of his claims. Critically, the injunctive relief Mr. Olsen seeks against Members of Congress and a Congressional committee is squarely foreclosed by the Constitution's Speech or Debate Clause. Alternatively and independently, all the claims in Mr. Olsen's Amended Complaint fail as a matter of law.  On top of that, Mr. Olsen has not shown that he would suffer irreparable injury

absent an injunction, and the public interest heavily favors the Select Committee's weighty investigation.  The Court should thus deny Mr. Olsen's request for injunctive relief and dismiss the Amended Complaint (pursuant to Federal Rule of Civil Procedure 65(a)(2), this Court can and should combine the denial of the preliminary injunction with final judgment for Defendants).

## **FACTUAL BACKGROUND**

The Select Committee is investigating the facts, circumstances, and causes regarding the January 6th attack on the United States Capitol.  This includes an examination of the influencing factors that fomented the attack on the United States Capitol, as well as how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.

**A.**     **Mr. Olsen Publicly Promoted Claims That The 2020 Presidential Election Was Fraudulent And Attempted To Disrupt Or Delay Certification Of Election Results**

Mr. Olsen, the recipient of the subpoena at issue, is an attorney licensed to practice in Maryland and Washington, D.C.  *See* Am. Compl. ¶ 1.  According to his Amended Complaint, he was "appointed Special Counsel to the Office of the Attorney General for the State of Texas ('OAG') to assist the OAG" in a lawsuit challenging the 2020 Presidential election results.  *Id.* The Texas suit sought to file a bill of complaint in the U.S. Supreme Court to prevent Georgia, Michigan, Wisconsin, and Pennsylvania from certifying electoral votes.  *See* Mot. for Leave to File Bill of Compl. at 2, *Texas v. Pennsylvania*, No. 22O155 (2020); Reply in Supp. of Mot. at 12, *Texas v. Pennsylvania*, No. 22O155.

After the Supreme Court denied the motion for lack of standing, *see Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020), Mr. Olsen pitched his failed theory of a stolen election to senior officials in the federal government, including by circulating a 54-page draft complaint urging the Supreme Court to declare that the Electoral College votes from key swing States

could not be counted.[1]  At the President's request, and just days before the January 6th attack on the Capitol, Mr. Olsen "contacted various high-level officials at the Department of Justice . . . to discuss filing a last-minute challenge to the election."  Am. Compl. Ex. 2.  When the Department of Justice declined to file the proposed complaint and the Office of Legal Counsel reportedly provided legal reasons why it was a "non-starter,"[2] Mr. Olsen "prepared a draft executive order for former President Trump that would have directed the U.S. Department of Justice 'to take voter action.'"  Am. Compl. Ex. 2.

**B.**     **The January 6th Attack**

The tragedy that occurred on January 6, 2021, is now well-known.  Violent rioters seeking to stop the peaceful transfer of power following the 2020 Presidential election launched a vicious assault on the United States Capitol.  *See* H. Res. 503, 117th Cong. Preamble (2021).  Rioters attacked police, breached the Capitol, and obstructed and impeded the electoral vote.[3]  As the D.C. Circuit explained, "[t]he rampage left multiple dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol."  *Trump v. Thompson*, 20 F.4th at 15.

---

[1] *See* Betsy Woodruff Swan & Nicholas Wu, *Trump asked his AG about legal strategy to overturn election, Rosen tells senators*, POLITICO (Aug. 10, 2021), https://perma.cc/Y8VS-SEUC.

[2] Swan & Wu, *supra* note 1.

[3] *Hearing on Jan. 6th Investigation before the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol*, 117th Cong., at 51:00-1:00:45 (June 9, 2022), https://perma.cc/7CCL-X9QN; *Hearing on Jan. 6th Investigation before the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol*, 117th Cong., at 02:31-02:38 (July 27, 2021) (statement of Rep. Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan 6th Attack on the U.S. Capitol), https://perma.cc/8HZK-VUWH.

Notably, individuals charged with committing violence at the Capitol on January 6th have indicated that the "stolen election" narrative motivated their violent attack.[4]  As noted by Judge Carter, baseless allegations of election fraud (such as those proffered by Mr. Olsen in this matter) "spurred violent attacks on the seat of our nation's government, led to the deaths of several law enforcement officers, and deepened public distrust in our political process." *Eastman v. Thompson*, No. 22-99, 2022 WL 894256, at \*27 (C.D. Cal. Mar. 28, 2022).

## C.   The Formation Of The Select Committee

In response to this unprecedented attack, the House of Representatives adopted House Resolution 503, "establish[ing] the Select Committee to Investigate the January 6th Attack on the United States Capitol."  H. Res. 503 § 1.  That resolution authorizes the Select Committee to: (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures . . . as it may deem necessary." *Id.* at § 4(a)(1)-(3).  The Resolution further describes categories of potential corrective measures: "changes in law, policy, procedure, rules, or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent

---

[4] *See, e.g.*, Compl. at 5, *United States v. Sandlin*, No. 21-88 (D.D.C. Jan. 20, 2021), ECF 1-1 ("I'm going to be there to show support for our president and to do my part to stop the steal and stand behind Trump when he decides to cross the rubicon."); Indictment ¶ 22, *United States v. Neefe*, No. 21-567 (D.D.C. Sep. 8, 2021), ECF 1 ("Trump is literally calling people to DC in a show of force.  Militias will be there and if there's enough people they may fucking storm the buildings and take out the trash right there."); Mot. to Revoke Det. Order & for Pretrial Release at 3-4, *United States v. Fitzsimons*, No. 21-158 (D.D.C. Aug. 27, 2021), ECF 34 (noting defendant "believed voter fraud [had] occurred" and that he was "[c]onvinced that the election results had been fraudulently reported, he was moved by the words of then-President Trump to travel to the District of Columbia for the 'Save America Rally'").

extremism, including acts targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism." *Id.* at § 4(c)(1)-(3).

To carry out those functions, House Resolution 503 authorizes the Speaker of the House to appoint up to thirteen Members to the Select Committee, five of whom "shall be appointed after consultation with the minority leader." *Id.* at § 2(a). Consistent with the Resolution, the Speaker initially consulted with the House Minority Leader, who recommended five Republicans for appointment. When the Speaker voiced concerns about two of those Members "and the impact their appointments may have on the integrity of the [Select Committee's] investigation," the Minority Leader declined to recommend additional Republicans for appointment and, instead, withdrew all five recommendations.[5] The Speaker then named an additional Republican to the Select Committee. Since then, the Select Committee has functioned with seven Democrats and two Republicans.

**D.    The Select Committee's Subpoena To Mr. Olsen**

In the furtherance of its duty to investigate the facts, circumstances, and causes of the attack on January 6th, the Select Committee has issued subpoenas to various government agencies, private companies, and certain individuals. On March 1, 2022, the Select Committee issued a subpoena to Mr. Olsen seeking testimony and documents regarding Mr. Olsen's election

---

[5] Press Release, Nancy Pelosi, Speaker, U.S. House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA; *see* Press Release, Kevin McCarthy, U.S. House of Representatives, McCarthy Statement about Pelosi's Abuse of Power on Jan. 6th Select Comm. (July 21, 2021), https://perma.cc/4JNC-73R2.

fraud claims and efforts to "certif[y] . . . President Trump as the victor of the 2020 presidential election;" Mr. Olsen's meetings with state election and Department of Justice officials; Mr. Olsen's communications with former President Trump and other White House staff on January 6, 2021;[6] and any fee arrangements under which Mr. Olsen provided legal services related to election fraud claims.  Am. Compl. Ex. 2.

## E.   Procedural History

On March 24, 2022, a few weeks after the issuance of the subpoena, Mr. Olsen filed his Complaint in this case.  *See* ECF 1.  On April 4, 2022, Mr. Olsen filed an Amended Complaint, which includes seven claims and seeks twelve categories of relief, including declaratory judgments that the Select Committee subpoena to him is unlawful, an order quashing the subpoena, and an award of attorney's fees and costs associated with this proceeding.  *See* Am. Compl. Prayer for Relief ¶¶ a-l.  Mr. Olsen also filed a Motion for a Preliminary Injunction, asking this Court to enjoin the Select Committee from enforcing its subpoena against him.  *See* Pl.'s Mot. for Prelim. Inj. at 1, ECF 13 ("Mot."); Pl.'s Mem. in Supp. of Mot. for Prelim. Inj., ECF 14 ("Mem.").

## ARGUMENT

Mr. Olsen has failed to show that he is entitled to the extraordinary remedy of a preliminary injunction, and his Amended Complaint does not state a claim on which relief can be granted.  As a threshold matter, the Speech or Debate Clause absolutely bars Mr. Olsen's suit against Defendants and the injunctive relief he seeks.  Regardless, Mr. Olsen's various theories are all flawed on their merits.  *First*, the D.C. Circuit has already held that the Select Committee

---

[6] As part of his effort to press his false claims of election fraud, Mr. Olsen "had multiple telephone calls with former President Trump on January 6, 2021."  Am. Compl Ex. 2; *see* Am. Compl. ¶ 32.

has a valid legislative purpose, and that purpose undoubtedly permits subpoenaing Mr. Olsen's

documents and testimony regarding election fraud and attempts to disrupt or delay the

certification of the election results.  *Second*, as other federal courts have held, the Select

Committee is validly constituted.  *Third*, Plaintiff's First and Fourth Amendment claims fail.

*Fourth*, attorney-client privilege does not shield Mr. Olsen from complying with the subpoena.

Further, Mr. Olsen has not shown that he will suffer irreparable harm in the absence of an

injunction, and the equities and public interest undoubtedly weigh against interference with the

Select Committee's critical investigation.  The Motion for a Preliminary Injunction should

therefore be denied and this suit should be dismissed.

## I.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22 (2008).  To obtain this extraordinary remedy, a plaintiff must show: (1) it is likely

to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary

relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.

*See id.* at 20.  A failure to show likelihood of success on the merits is enough to defeat a motion

for a preliminary injunction.  *See Ark. Dairy Co-op Ass'n, Inc. v. USDA*, 573 F.3d 815, 832

(D.C. Cir. 2009).  Likewise, a failure to show irreparable harm is a sufficient ground to deny the

preliminary injunction "even if the other three factors entering the calculus" weigh in favor.

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

## II.  MR. OLSEN CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  The Speech Or Debate Clause Bars Mr. Olsen's Suit And Requested Relief

Mr. Olsen cannot demonstrate a likelihood of success because the Speech or Debate Clause bars this lawsuit and Mr. Olsen's request for injunctive relief.  The Clause provides that Senators and Representatives "shall not be questioned in any other Place" for "any Speech or Debate in either House."  U.S. Const. Art. I, § 6, cl. 1.  By "freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct," *Gravel v. United States*, 408 U.S. 606, 618 (1972), the Clause both "preserve[s] the independence and . . . integrity of the legislative process," *United States v. Brewster*, 408 U.S. 501, 524 (1972), and "reinforc[es] the separation of powers," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975) (citation omitted).

"[I]t is long settled that the Clause's protections range beyond just the acts of speaking and debating."  *McCarthy v. Pelosi*, 5 F.4th 34, 38 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 897 (2022).  Indeed, the "Supreme Court has consistently read the Speech or Debate Clause 'broadly' to achieve its purposes."  *Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015) (quoting *Eastland*, 421 U.S. at 501).  The protections of the Clause extend not only to Congress, but to its committees as well.  *See, e.g.*, *Eastland*, 421 U.S. at 501; *McSurely v. McClellan*, 521 F.2d 1024, 1036-37 (D.C. Cir. 1975); *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859-61 (D.C. Cir. 1988).  So long as Congress or its committees are engaged in activities "within the 'legitimate legislative sphere,'" including "participat[ion] in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation," Courts have held that the Speech or Debate Clause is an absolute bar to interference.  *Eastland*, 421 U.S. at 503-04.

In *Eastland*, the Supreme Court applied the Speech or Debate Clause to reject a challenge to a subpoena issued by a Senate subcommittee.  There, the United States Servicemen's Fund, Inc. ("USSF") asked the Court to enjoin enforcement of a subpoena relating to the USSF's opposition to the United States' involvement in Southeast Asia.  *Id.* at 494-95.  USSF, much like Mr. Olsen, filed a lawsuit alleging that the subpoena served to "harass, chill, punish and deter (USSF and its members) in their exercise of their rights and duties under the First Amendment." *Id.* at 495.

The Supreme Court held that because the subcommittee was acting "within the legitimate legislative sphere," the Speech or Debate Clause operated as an "absolute bar" to USSF's action. *Id.* at 503.  The Supreme Court reasoned that a holding to the contrary would allow private litigation to "delay and disrupt the legislative function" and subject Congress to "judicial power" in such a way that would "imperil" Congress's "legislative independence."  *Id.*  The Court further held that the "absolute nature of the speech or debate protection" prohibited the Judiciary from intervening even though USSF alleged that its First Amendment rights had been infringed. *Id.* at 509-10.  While the Court acknowledged the "potential for abuse" created by the Clause, it noted that this was the "conscious choice of the Framers."  *Id.* at 510-11.

Indeed, since *Eastland*, the D.C. Circuit has applied the Speech or Debate Clause in numerous cases to bar challenges to various actions by Congress.  *See, e.g.*, *Jud. Watch, Inc. v. Schiff*, 998 F.3d 989, 993 (D.C. Cir. 2021) (holding that House committee's issuance of subpoenas was "a legislative act protected by the Speech or Debate Clause" and dismissing action brought by nonprofit to obtain copies of the subpoenas and responses thereto); *McCarthy*, 5 F.4th at 39 (dismissing challenge to House resolution that enabled Members to vote by proxy); *McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1976) (en banc) ("[I]nformation

gathering, whether by issuance of subpoenas or field work by a Senator or his staff, is essential to informed deliberation over proposed legislation.").

As in *Eastland*, here the Speech or Debate Clause serves as an "absolute bar" to Mr. Olsen's suit and motion for injunctive relief.  As the D.C. Circuit has already held, the Select Committee's investigation of the January 6th attack, and requests for information to advance that investigation, constitute "a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had.'"  *Trump v. Thompson*, 20 F.4th at 41 (affirming denial of preliminary injunction to prevent national archivist from producing records in response to Select Committee's request (internal citations omitted)).  Because the Select Committee's subpoena to Mr. Olsen is within this legitimate legislative sphere, the Court may not interfere with Congress's independence by entertaining Mr. Olsen's Motion.

The consistent decisions of the Supreme Court and D.C. Circuit mandate denial of the injunction and dismissal of the Amended Complaint.  Indeed, other courts in this district have recently concluded that the Speech or Debate Clause bars similar claims against Members of the House and the Select Committee challenging subpoenas issued by the Select Committee.  *See Budowich v. Pelosi*, No. 21-3366, 2022 WL 2274359, at *7-8 (D.D.C. June 23, 2022) ("[T]he Speech or Debate Clause plainly immunizes the Congressional Defendants from all six of the claims against them, given that each challenge arises from a legislative act."); *Republican Nat'l Comm. ("RNC") v. Pelosi*, No. 22-659, 2022 WL 1294509, at *7-10 (D.D.C. May 1, 2022) ("[T]he Court has little trouble concluding that the Speech or Debate Clause immunizes House Defendants from this suit and that they must be dismissed for that reason."), *appeal pending*, No. 22-5123 (D.C. Cir.).

Mr. Olsen's arguments that the subpoena "violates the Constitution" and that the Select Committee "acts without authority" (Mem. 16) do not change the analysis. As explained by the D.C. Circuit, similar arguments are "made in almost every Speech or Debate Clause case" and have "been rejected time and again." *Rangel*, 785 F.3d at 24. The Clause prevents a court from exercising jurisdiction when a "plaintiff alleges that [the act] violated the House Rules . . . or even the Constitution." *Id.* at 24 (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 203 (1880), and *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973)). "Such is the nature of absolute immunity, which is—in a word—absolute." *Id.*

The D.C. Circuit has repeatedly confirmed that the Constitutional separation of powers principle precludes the entry of injunctive relief to impede a Congressional investigation. In *Hearst v. Black*, the plaintiff sought to enjoin a Senate Special Committee from enforcement of a subpoena much broader than the subpoena here. 87 F.2d 68, 68 (D.C. Cir. 1936). There, the Committee sought thousands of telegrams to and from the target of its investigation, including messages that "had no connection with the subject matter of the investigation" and which, the plaintiff argued, would "result in the disclosure of . . . privileged and private information relating to his private business affairs." *Id.* at 69. As here, the plaintiff argued that the investigation thereby violated his Constitutional rights. *See id.* at 68-69. While the D.C. Circuit accepted all the uncontested allegations of the plaintiff as true, and further assumed that the seizure of the messages had been unlawful, a unanimous panel held that no court could interfere with a Congressional investigation by suing the members of the committee. *See id.* at 69. The Court held that the "universal rule, so far as we know it, is that the legislative discretion in discharge of its [C]onstitutional functions, whether rightfully or wrongfully exercised, is not a subject for judicial interference." *Id.* at 71.

*Hearst* based its holding on the separation of powers principles that animate the Speech or Debate Clause.  As the court made clear, "[n]othing is better settled than that each of the three great departments of government shall be independent and not subject to be controlled directly or indirectly by either of the others."  *Id.* at 72; *see also Eastland*, 421 U.S. at 502 ("[The Clause] reinforc[es] the separation of powers.").  And the court relied on the same Constitutional principles in rejecting the plaintiff's contention that such judicial deference to Congress and its committees in the way they conducted their investigations would lead to unaddressed Constitutional violations.  As it concluded, "[i]f it be insisted that this is the acknowledgement of a power whose plenitude may become a cataclysm, the answer is that the Congress is as much the guardian of the liberties and welfare of the people as the courts."  *Hearst*, 87 F.2d at 72 (internal quotation marks omitted).

The D.C. Circuit further instructed that the judiciary may not interfere with Congressional investigations, even where it was alleged that Members of Congress were proceeding improperly.  *See Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 411-12 (1995) (holding that the Speech or Debate Clause barred subpoenas issued against two Members of Congress when they obtained privileged, internal documents of a tobacco manufacturer from a paralegal who allegedly stole documents from a law firm representing the tobacco manufacturer).  The D.C. Circuit explained that the protection of the Clause precluded even inquiries that would "provide clues as to what Congress is doing, or might be about to do."  *Id.* at 420.  The court held that the Clause "serves to insulate Members of Congress from distractions that divert their time, energy, and attention from their legislative tasks," and that "the touchstone is interference with legislative activities."  *Id.* at 421 (internal quotations omitted).

Most recently, in *Senate Permanent Subcommittee on Investigation v. Ferrer*, 856 F.3d 1080, 1086 (D.C. Cir. 2017), the D.C. Circuit confirmed its rulings in *Hearst* and *Brown & Williamson*, and once again held that the courts lack jurisdiction to interfere with Congressional investigations.  In *Ferrer*, the plaintiff had partially cooperated with Congressional investigators and, upon conclusion of the investigation, sought an order directing the subcommittee "to return, destroy, or refrain from publishing the produced documents."  *Id*. at 1083.  The court held, however, that such relief was "barred by the separation of powers, including the Speech or Debate Clause."  *Id.*  The court expressly reaffirmed that "*Brown & Williamson* and *Hearst* [] make clear that" under the separation of powers, "[t]he judiciary has the duty of not lightly interfering with Congress' exercise of its legitimate powers."  *Id.* at 1086 (quoting *Sanders v. McClellan*, 463 F.2d 894, 902 (D.C. Cir. 1972)).

Accordingly, the Speech or Debate Clause requires this Court to deny the motion and dismiss this action.

## B.   The Subpoena Serves A Valid Legislative Purpose And Does Not Violate The Separation Of Powers

Even if this Court had subject matter jurisdiction, all of Mr. Olsen's claims are meritless. The D.C. Circuit recently held that "the January 6th Committee plainly has a valid legislative purpose and its inquiry concern[s] a subject on which legislation could be had."  *Trump v. Thompson*, 20 F.4th at 41 (internal quotation marks and citation omitted).  In reaching this holding, the Court described "Congress's uniquely vital interest in studying the January 6th attack on itself to formulate remedial legislation and to safeguard its constitutional and legislative operations."  *Id.* at 17.  Applying the D.C Circuit's decision in *Trump v. Thompson*, four other courts (including this Court) have rejected arguments—much like Mr. Olsen's arguments here—that the Select Committee lacks a legitimate legislative purpose.  *See* Oral Arg.

Tr. at 119:19-121:4, *United States v. Bannon*, No. 21-670 (June 15, 2022); *RNC*, 2022 WL

1294509, at *16-19; Oral Arg. Tr. at 34, *Budowich*, ECF 27; Order Den. Pl.'s Mot. for Prelim.

Inj. at 10, *Eastman*, ECF 43.

Nonetheless, the Amended Complaint repeatedly insists that the Select Committee's

investigation is "not in furtherance of a valid legislative purpose."  Am. Compl. ¶ 33; *see also id.*

¶¶ 102-109.  The Complaint alleges that the Select Committee's investigation is in fact an

"unauthorized criminal investigation by a handful of Members of Congress in violation of the

separation-of-powers provisions of the Constitution."  *Id.* ¶ 11; *see also id.* ¶¶ 80-91, Prayer for

Relief ¶ c.  But the Select Committee is not criminally investigating Mr. Olsen or anyone else—

nor is the Select Committee, by investigating the January 6th attack, trying to "expose

information for the mere sake of exposure."  *Id.* ¶ 118.  Indeed, the D.C. Circuit rejected this

very argument:

> The Committee's announced purpose is to "issue a final report to the
> House containing such findings, conclusions, and
> recommendations" for such "changes in law, policy, procedures,
> rules, or regulations" as the Committee "may deem necessary[.]"
> H.R. Res. 503 § 4(a)(3), (c). . . . The mere prospect that misconduct
> might be exposed does not make the Committee's request
> prosecutorial.  Missteps and misbehavior are common fodder for
> legislation.

*Trump v. Thompson*, 20 F.4th at 42.  That holding governs here.

### C.    The Select Committee Is Properly Composed

Mr. Olsen's Amended Complaint contends that the subpoena was "issued in violation" of

House Rules, "particularly Rule X.5(a)(1), which requires bipartisanship in the appointment of

House committees."  Am. Compl. ¶ 97; *see also id.* ¶ 94.  The Amended Complaint further

alleges that the Select Committee "is in substantial violations of the requirements of" its

authorizing resolution, House Resolution 503, apparently because, in Mr. Olsen's view, the

Select Committee has failed to "conduct any serious investigation of whether the claims of election fraud were accurate." *Id.* ¶ 99. Those arguments are fatally flawed for multiple reasons.

*First*, the House Rule cited in the Amended Complaint—Rule X.5(a)(1), Rules of the U.S. House of Representatives, 117th Cong. (2021) ("House Rules")—applies only to standing committees. The Select Committee, as its very title suggests, is not a standing committee, but a separate and distinct type of committee under the House Rules. *See infra* at 16. Mr. Olsen's argument fails for that simple reason.

*Second*, other subpoena recipients have (unsuccessfully) argued in other litigation that the Select Committee's composition violates its authorizing resolution because, the argument goes, Speaker Nancy Pelosi failed to "consult[]" with the Minority Leader as required by House Resolution 503. Mr. Olsen's Amended Complaint does not contain such an allegation. The complaint alleges only that "[n]one of the members of the Select Committee was nominated by the Minority Leader," Am. Compl. ¶ 99, and that "Defendant Pelosi made the unprecedented decision of refusing to appoint two members of the House nominated by the Minority Leader to serve on the Select Committee to represent the Minority," *id.* ¶ 96. But the Amended Complaint fails to allege how the Speaker's appointment decisions were inconsistent with the Select Committee's authorizing resolution. Setting aside the deficiency in the allegations, any suggestion that the Select Committee's composition violates House Resolution 503 has correctly been rejected by each court to have addressed it.

As an initial matter, any demand that this Court override the actions of the House and its Speaker for assertedly not following the Select Committee's authorizing resolution violates Constitutional separation of powers principles. The Constitution's Rulemaking Clause states that "[e]ach House may determine the Rules of its Proceedings." U.S. Const., Art. I, § 5, cl. 2. It is

settled law in this circuit that the Clause "'clearly reserves to each House of the Congress the authority to make its own rules,' and . . . interpreting a congressional rule 'differently than would the Congress itself' is tantamount to '*making* the Rules—a power that the Rulemaking Clause reserves to each House alone.'" *Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995)); *see also Rangel v. Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013).  As the D.C. Circuit has explained, it is a "startlingly unattractive idea, given [courts'] respect for a coequal branch of government, for [a federal court] to tell the Speaker" whom to appoint to committees.  *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1175-77 (D.C. Cir. 1982) (internal quotation marks omitted).

In addition, Mr. Olsen's arguments ignore the presumption of regularity due Congress. *See Barry v. U.S. ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("The presumption in favor of regularity . . . cannot be denied to the proceedings of the houses of Congress, when acting upon matters within their constitutional authority.").  None of the allegations in the Amended Complaint comes close to demonstrating the "clear evidence to the contrary," *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926), required to overcome that presumption.

Regardless, any challenge to the Select Committee's composition is deeply flawed.  By way of background, the House has four different kinds of committees: standing, joint, select, and conference committees, each of which is established and governed by various House Rules, statutes, and House resolutions, or on an *ad hoc* basis.  *See, e.g.*, House Rule X (rules governing "standing" Committees); 26 U.S.C. §§ 8001-05 (establishing the Joint Committee on Taxation); H. Res. 503 § 1 (establishing the Select Committee); 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) (appointment of conferees for H.J. Res. 31).  The House rules and procedures governing appointments to these four distinct types of committees vary.

Significantly, under House rules, the Speaker appoints Members for all select committees, including the one at issue here.  *See* House Rule I.11, ("[t]he Speaker shall appoint all select, joint, and conference committees ordered by the House.").  And, by unanimous consent, on January 4, 2021, the House expressly authorized the Speaker to "make appointments authorized by law or by the House."  167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (authorizing Speaker to "accept resignations and to make appointments authorized by law or by the House"); *see also* 8 *Cannon's Precedents of the U.S. House of Representatives*, § 2172 (citing "[i]nstances in which the majority declined to recognize minority recommendations for committee assignments").

House Resolution 503 is consistent with that practice.  When creating the Select Committee, the House required that five Members be chosen "after *consultation* with the Minority Leader."  H. Res. 503 § 2(a) (emphasis added).  This language provides the Speaker greater authority regarding the appointment of minority party Members than, for example, either language authorizing the Minority Leader to directly appoint a certain number of Members, or language requiring that appointments be made "upon the recommendation of the Minority Leader."  *See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) ("Consultation" means to "seek[] advice or information of" (internal quotation marks omitted)); *Consultation*, Black's Law Dictionary (11th ed. 2019) (defining "consultation" as "[t]he act of asking the advice or opinion of someone").  The Minority Leader's refusal to consult further after the Speaker declined to appoint two of his recommendations does not alter the authority under House Resolution 503.  Neither the Speaker nor the full House has interpreted House Resolution 503 to allow the Minority Leader to unilaterally frustrate the

operation of the Select Committee.  Indeed, no reasonable interpretation of House Resolution 503 would so allow.

Had the House intended a binding role for the Minority Leader, it could have provided for such a requirement, as it has in the past.  *See* H. Res. 6, 116th Cong. § 104(f)(1)(B) (2019) (Select Committee on the Climate Crisis requirement that a portion of the Members be appointed by the Speaker "on the recommendation of the Minority Leader"); *id.* at § 201(b)(3) (same requirement for Select Committee on the Modernization of Congress).  Similarly, had the House wished to delegate appointment power directly to the Minority Leader, it could have done so. *See*, *e.g.*, H. Res. 24, 110th Cong. § 2(a) (2007) (creating the House Democracy Assistance Commission and allowing nine Members to "be appointed by the Minority Leader of the House of Representatives").

Here, House Resolution 503 was followed: the Minority Leader *was* consulted.  The fact that the Speaker—using the authority provided to her by the House Rules; the January 4, 2021, Order of the House; and House Resolution 503—made different selections as to two Members, and that the Minority Leader subsequently withdrew his recommendations, does not make the Select Committee improperly constituted, nor does it invalidate any of its actions.

It is thus no surprise that every court to have considered similar challenges to the Select Committee's composition—this Court and three other district courts—has rejected them.  As Judge Kelly of this district recently explained, if he accepted the plaintiff's arguments about the Select Committee's composition, he "would be 'interpret[ing] the Rule differently than . . . the [House] itself' and 'would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone.' "  *RNC*, 2022 WL 1294509, at *15 (quoting *Rostenkowski*,

59 F.3d at 1306-07).[7]  Judge Kelly emphasized that "the House views the Select Committee to be duly constituted and empowered to act under its authorizing resolution."  *Id.*  Indeed, "[t]his understanding is reflected by the House's adoption of the Select Committee's recommendations to find witnesses in contempt of Congress for their refusals to comply with Select Committee subpoenas."  *Id.*

For example, when the full House debated the resolutions recommending referral of Steve Bannon, Mark Meadows, Peter Navarro, and Daniel Scavino, Jr. for contempt of Congress for failure to comply with Select Committee subpoenas, several Members of Congress raised arguments about the composition and authority of the Select Committee.[8]  The full House

---

[7] In *RNC v. Pelosi*, the court described the Speaker's consultations with Minority Leader McCarthy: "House Minority Leader Kevin McCarthy recommended five more members to Speaker Pelosi: Representative Jim Banks (to serve as Ranking Member) along with Representatives Rodney Davis, Jim Jordan, Kelly Armstrong, and Troy Nehls.  Speaker Pelosi agreed to appoint Representatives Davis, Armstrong, and Nehls but declined to appoint Representatives Banks and Jordan, and she asked Minority Leader McCarthy to recommend two other members.  That same day, Minority Leader McCarthy decided to withdraw all five of his recommended appointees in protest."  2022 WL 1294509, at *2 (citations omitted).  Following the Minority Leader's failure to continue the consultation process, the Speaker interpreted and applied Resolution 503 and House Rules consistent with House precedents, as outlined herein.  As indicated, the Constitution's Rulemaking Clause leaves no doubt that judicial deference to this application of Resolution 503 is required.  *See also* Defs.' Mot. for Summ. J. at 7-8, 17-25, *Meadows v. Pelosi*, No. 21-3217 (D.D.C. Apr. 22, 2022), ECF 15.

[8] *See, e.g.*, 167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ("This committee is illegitimate.  It has violated its own rules of creation.  It has violated its own rules of creation and it says they want to find out this massive truth here about what happened on January 6.  You can't have a committee to find out what happened because you are interested.  You can't do that.  And that is what they are doing today.") (statement of Rep. Biggs); *id.* at H7786 (contending that the Select Committee does not comply with H. Res. 503 because "the committee has zero members appointed in consultation with Leader McCarthy" and "it doesn't have 13 members") (statement of Rep. Banks); *see also* 168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) (specifically raising challenges to the Select Committee's means of operation before the full House during its debate over whether the House should adopt a contempt resolution relating to Peter Navarro and Daniel Scavino, Jr.); 167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021) (arguing, in debate on the contempt resolution for Steve Bannon, that "the subpoenas that have so far been issued do not ask for information that would meet any legitimate legislative purpose") (statement of Rep. Banks).

nonetheless approved the Select Committee's referrals of those four individuals for contempt of Congress.[9]  The full House's ratification of the referrals reinforces that any objection by Mr. Olsen to the Select Committee's composition cannot be accepted.

Beyond the decision in *RNC*, three other district courts—including this Court—have rejected substantially similar challenges to the composition of the Select Committee.  In *Budowich v. Pelosi,* Judge Boasberg held that courts must "defer to Congress in the manner of interpreting its rules," and that it would be "usurping Congressional authority" to hold that the Select Committee was not validly composed.  Oral Arg. Tr. at 34, *Budowich*, ECF 27.  Shortly thereafter, Judge Carter of the Central District of California agreed with Judge Boasberg, likewise recognizing the deference owed to the Speaker, the full House, and the Select Committee in interpreting a House resolution.  As Judge Carter explained, "[a] court may interpret internal congressional rules only when such interpretation 'requires no resolution of ambiguities.'"  Order at 9 & n.12, *Eastman*, ECF 43 (quoting *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995)).  Most recently, in denying Steve Bannon's motion to dismiss his indictment for contempt of Congress, this Court rejected Mr. Bannon's challenge to the composition of the Select Committee.  This Court recognized that it "must give great weight to the interpretation of those House members charged with implementing the [authorizing] resolution and to the House itself," and "there would be potential separation of powers issues, should this or any court reject a congressional interpretation of its own rule."  Oral Arg. Tr. at 115:7-24, *Bannon*, No. 21-670.

---

[9] *See* H. Res. 730, 117th Cong. (2021) (Bannon); H. Res. 851, 117th Cong. (2021) (Meadows); H. Res. 1037, 117th Cong. (2022) (Navarro and Scavino).  These resolutions were reported by the Select Committee, approved for floor consideration by the House Rules Committee, and approved by the full House.  *See* 167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) (vote on Bannon); 167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) (vote on Meadows); 168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) (vote on Navarro and Scavino).

In short, there is no basis for this Court to substitute an alternative interpretation of the Select Committee's authorizing resolution for the House's view; indeed, such a determination would be impermissible and "tantamount to 'making the [House] Rules.'" *Barker*, 921 F.3d at 1130; *see also* Oral Arg. Tr. at 33-34, *Budowich*, ECF 27; Order at 9 & n.12, *Eastman*, ECF 43; *Vander Jagt*, 699 F.2d at 1175.

*Third*, Mr. Olsen alleges, remarkably, that the Select Committee has "ignore[d] mounting evidence that the 2020 election in fact was affected by widespread fraud" and has failed "to conduct any serious investigation of whether the claims of election fraud were accurate." Am. Compl. ¶¶ 98, 99. Setting aside that those allegations are wildly inaccurate (as has been shown in the past twenty days during the Select Committee's public hearings, which have included numerous statements to the contrary by officials from the Trump Campaign, Trump Administration Department of Justice, and Trump Administration White House), Mr. Olsen fails to explain how such allegations could constitute a violation of House Resolution 503 or invalidate the Select Committee's subpoena to Mr. Olsen. The Select Committee is tasked with investigating the "facts, circumstances, and causes relating to" the attack on the Capitol "and relating to the interference with the peaceful transfer of power," including "the influencing factors that fomented such an attack on American representative democracy while engaged in a constitutional process." H. Res. 503 § 3. Mr. Olsen was involved in challenges to the election results and had multiple calls with President Trump on January 6th. *See* Am. Compl. Ex. 2. And although Mr. Olsen complains that the subpoena "compels documents created" after January 6 (Mem. 12), the document requests on their face relate to claims of election fraud surrounding the 2020 Presidential election and attempts to delay election certification (*see* Am. Compl. Ex. 2)—

key potential influencing factors for the Capitol attack.  The subpoena for Mr. Olsen's testimony and documents is thus well within the scope of the Select Committee's authority.

Mr. Olsen nonetheless asks this Court to tell the Select Committee how it should conduct its investigation.  He seeks "[a] declaratory judgment that the failure of the Select Committee to investigate whether the occurrence of illegal voting or election fraud in the 2020 Presidential election was an influencing factor that contributed to the January 6, 2021 breach of the Capitol violates the requirement of House Resolution 503," and, even more incredibly, a "declaratory judgment that credible evidence has been produced to the legislatures in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin that election fraud and other illegal activities altered the result of the 2020 Presidential elections in those States."  Am. Compl. Prayer for Relief ¶¶ d, f. Such judicial interference with the Select Committee's investigation would plainly violate the separation of powers principle that is at the heart of our Constitution.  *See supra* at 11-13.

In sum, the Select Committee's investigation and its subpoena to Mr. Olsen are undoubtedly authorized by House Resolution 503, and Mr. Olsen provides no valid basis for this Court to conclude otherwise.

### D.     Mr. Olsen's Constitutional Claims Fail

#### 1.     Mr. Olsen Fails To State A First Amendment Claim

Mr. Olsen alleges that the subpoena violates his "rights of freedom to associate with others to advance their shared beliefs, freedom of speech, and freedom of political expression, which are guaranteed by the First Amendment."  Am. Compl. ¶ 17; *see also id.* ¶¶ 16, 74-78; Mem. 11.  Mr. Olsen contends that many of the individuals with whom he "associated to advance their shared political beliefs as they relate to the conduct of the 2020 presidential election . . . wish to remain anonymous" and "[t]he forced disclosure of their identity and participation in the association would chill and potentially end their willingness to continue their

association with [Mr. Olsen] for the advancement of their shared political beliefs."  Am. Compl. ¶ 77.

Mr. Olsen's First Amendment claim is squarely foreclosed by *Eastland v. United States Servicemen's Fund*.  There, the Supreme Court rejected an organization's argument that a Congressional subpoena's purpose was to "'harass, chill, punish, and deter' [it] in the exercise of [] First Amendment rights," explaining that the typical First Amendment balancing test "plays no part" when a Congressional subpoena is involved.  421 U.S. at 509 & n.16.  Mr. Olsen's First Amendment arguments against enforcement of the Select Committee's subpoena accordingly must be dismissed.

Even if Mr. Olsen's First Amendment claim were subject to a balancing test, such balancing would favor the Select Committee's investigation.  As a threshold matter, Mr. Olsen's conclusory assertion that disclosure of the identities of his associates would "chill and potentially end their willingness to continue their association with [Mr. Olsen]," Am. Compl. ¶ 77, is far too amorphous to be actionable.  Courts require considerably more specificity than Mr. Olsen alleges.  *See Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125, 143 (D.D.C. 2016) ("Mr. Ferrer has failed to explain the nature and scope of the subpoena's alleged intrusion into his First Amendment rights."), *aff'd*, 856 F.3d 1080 (D.C. Cir. 2017).[10]

Even if Mr. Olsen were able to substantiate a legitimate interest implicated by the subpoena, it would be greatly outweighed by the Select Committee's overwhelming interest here.

---

[10] *See also Buckley*, 424 U.S. at 74 (stating that showing an associational injury requires demonstrating "a reasonable probability that the compelled disclosure" "will subject them to threats, harassment, or reprisals from either Government officials or private parties"); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010); *Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 n.1 (9th Cir. 1988) (courts have "emphasized in each of those decisions . . . the need for objective and articulable facts, which go beyond broad allegations or subjective fears. . . . [A] merely subjective fear of future reprisals is an insufficient showing of infringement of associational rights").

The Select Committee's subpoena seeks records relevant to determining the root causes of the January 6th insurrection against Congress, a "violent attack[] on the seat of our nation's government" that resulted in the "deaths of several law enforcement officers" and "deepened public distrust in our political process." *Eastman*, 2022 WL 894256, at *27.  This is a paradigmatic example of the governmental interest in the "free functioning of our national institutions."  *Buckley*, 424 U.S. at 66 (citation omitted).  The balancing of "the competing private and public interests at stake" thus plainly favors the Select Committee.  *Barenblatt v. United States*, 360 U.S. 109, 126 (1959); *see* Order at 12-13, *Eastman*, ECF 43 (rejecting plaintiff's First Amendment claim); *Ferrer*, 199 F. Supp. 3d at 138-142 (same).

Accordingly, Mr. Olsen's First Amendment claim cannot succeed on the merits, and his complaint fails to state a First Amendment claim on which relief may be granted.

**2.      Mr. Olsen Fails To State A Valid Fourth Amendment Claim**

Mr. Olsen alleges that the subpoena violates the Fourth Amendment because Chairman Thompson is not a "'neutral and detached' party for purposes of the warrant provision of the Fourth Amendment" and because the subpoena is "overbroad and intrusive."  Am. Compl. ¶¶ 65, 68; *see also* Mem. 11.  Both arguments are incorrect.

1. Mr. Olsen's "neutral and detached party" argument rests on the mistaken premise that the Fourth Amendment's "warrant provision[] requires that the decision to issue a warrant *or subpoena* be made by 'a neutral and detached' party."  Am. Compl. ¶ 63 (emphasis added); *see also id.* at ¶ 58.  To the contrary, the Supreme Court has held only that a "warrant" must be "authorized by a neutral and detached judicial officer" as a "safeguard against improper searches" under the Fourth Amendment.  *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326 (1979).  But a subpoena is not a search warrant.  Mr. Olsen cites no case law suggesting that the

Fourth Amendment's search warrant requirement applies to a subpoena—where no search has been authorized or conducted—let alone a Congressional subpoena.  It does not.  *Cf. Mancusi v. DeForte*, 392 U.S. 364, 371 (1968) (holding warrantless search violated the Fourth Amendment and explaining that district attorney's subpoena did not confer authority to seize documents and "could not in any event quali[f]y as a valid search warrant under the Fourth Amendment, for it was issued by the District Attorney himself").

2.  Mr. Olsen's argument that the subpoena here is overbroad likewise fails.  Supreme Court precedent establishes that a subpoena is not impermissibly overbroad if its call for documents or testimony is within the scope of the Congressional inquiry at issue.  *See McPhaul v. United States*, 364 U.S. 372, 382 (1960).  The D.C. Circuit recently held in *Trump v. Thompson* that the Select Committee has a valid legislative purpose in investigating the January 6th attack, emphasizing that "Congress's power to obtain information is broad and indispensable . . . and encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them."  20 F.4th at 24 (internal quotation marks and citations omitted).  That holding forecloses Mr. Olsen's arguments that the subpoena violates the Fourth Amendment because it is "overbroad and intrusive."  Am. Compl. ¶ 68.

The Select Committee's authorizing resolution charges it to "investigate and report upon the facts, circumstances, and causes . . . relating to the interference with the peaceful transfer of power . . . as well as the influencing factors that fomented such an attack."  H. Res. 503 § 3(1).  Given that vast scope, the subpoena at issue is appropriately tailored to meet the Select Committee's mandate and is not impermissibly broad.  *See Eastland*, 421 U.S. at 509; *McPhaul*, 364 U.S. at 382; Order at 13-14, *Eastman*, ECF 43 (rejecting plaintiff's Fourth Amendment

claim).  Mr. Olsen was directly involved in pushing baseless claims of election fraud and in State officials' challenges to the election results; reportedly drafted an executive order for President Trump directing the Department of Justice to "take voter action"; and had multiple calls with President Trump on January 6, 2021.  Am. Compl. Ex. 2.  Mr. Olsen's records are plainly within the ambit of the Select Committee's inquiry.  Thus, the subpoena is not overbroad and does not violate Mr. Olsen's Fourth Amendment rights.

### E.      Mr. Olsen's Compliance With The Subpoena Will Not Violate Attorney-Client Privilege Nor Work Product Protections

The Amended Complaint alternatively alleges that, even if the subpoena is valid, it "impermissibly requires the production of records of private communications protected by the attorney-client privilege and the attorney work product doctrine."  Am. Compl. ¶¶ 70-72.  But, even if such protections are applicable, Mr. Olsen's blanket invocation in his Amended Complaint is inadequate.  "It is settled law that the party claiming the privilege bears the burden of proving that the communications are protected."  *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998).  Accordingly, "[t]he basis of [a] privilege must be adequately established in the record, through evidence sufficient . . . to establish the privilege . . . with reasonable certainty."  *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740, 750 (D.C. Cir. 2006) (internal quotation marks and citation omitted).  "This requires the party asserting privilege to adduce competent evidence in support of its claims, something beyond conclusory statements, generalized assertions, and unsworn averments of its counsel."  *FTC v. Boehringer Ingelheim Pharms., Inc.*, 180 F. Supp. 3d 1, 15-16 (D.D.C. 2016), *aff'd*, 892 F.3d 1264 (D.C. Cir. 2018) (internal quotation marks omitted).

Mr. Olsen has failed to meet his burden.  The Amended Complaint alleges only that Mr. Olsen had an attorney-client relationship with former President Trump, Mike Lindell, and

proposed class representatives in a putative class action pending against Dominion and related defendants.  *See* Am. Compl. ¶ 2.  That is woefully insufficient to meet the necessary specificity. Indeed, the instructions accompanying the subpoena provide an avenue for Mr. Olsen to raise his privilege claims:  they require that Mr. Olsen provide a log containing specified information regarding any withheld documents.  *See* Am. Compl. Ex. 2.  To date, he has not done so.  Mr. Olsen's privilege claim fails.

### III.   MR. OLSEN HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF IRREPARABLE HARM

The Court should deny Mr. Olsen's Motion for a Preliminary Injunction for the additional, independent reason that he has not established a likelihood of irreparable injury.  A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22 (emphasis omitted).  Because a preliminary injunction is an "extraordinary remedy," a mere "possibility" of irreparable injury is not sufficient.  *Id.*  The D.C. Circuit applies a "high standard for irreparable injury."  *England*, 454 F.3d at 297.  The alleged injury "must be both certain and great; it must be actual and not theoretical."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  And it must be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  *Id.* (internal quotation marks omitted).  To meet this standard, a movant "must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future."  *Id.*  The movant must also show "that the alleged harm will directly result from the action which the movant seeks to enjoin."  *Id.*

Mr. Olsen cannot meet his burden.  He broadly asserts that the violation of his First and Fourth Amendment rights will constitute "immediate and irreparable injury," and that "there is more than a 'subjective chill'" of his First Amendment rights.  Mem. 21.  Allegations of this

type, however, are not legally adequate.  *See McTernan v. City of York*, 577 F.3d 521, 532 (3d Cir. 2009) (denying preliminary injunction where plaintiffs made "conclusory allegations" that "Defendants' actions target[ed] and . . . intended to chill, restrict, and inhibit" plaintiffs' First Amendment rights); *Ghandi v. Police Dep't of Detroit*, 747 F.2d 338, 347 (6th Cir. 1984) (noting that injunctive relief is not available based merely on conclusory assertions that "the exercise of first amendment rights is being 'chilled' by the mere existence, without more, of a governmental investigative and data-gathering activity" (quoting *Laird v. Tatum*, 408 U.S. 1, 10 (1972)).

Mr. Olsen's supporting declaration is of no help.  Mr. Olsen asserts that he has "been forced to minimize the use of [his] cell phone and email as a means of communication" with his clients; that he has "concern[s]" that his friends and clients might be fearful of communicating with him; and that he previously relied more "freely" on the attorney-client privilege.  Olsen Decl. ¶ 21, 22.  But none of that is sufficient to show that Mr. Olsen's speech has in any way been "chilled."

Mr. Olsen relies on the Supreme Court's grant of injunctive relief in *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67-68 (2020) (per curiam), but that reliance is misplaced.  Contrary to Mr. Olsen's suggestion, the Supreme Court's action in that case did not suggest that "nothing more" than an alleged violation of First Amendment rights is needed for a preliminary injunction.  Mem. 21.  Rather, the Court concluded that there was "no question" that the challenged occupancy restrictions on houses of worship during the COVID-19 pandemic would, if enforced, "cause irreparable harm" because "the great majority of those who wish to attend Mass on Sunday or services in a synagogue on Shabbat will be barred."  141 S. Ct. at 67-68.  Mr. Olsen has not pointed to any comparable harm, let alone harm that is imminent and irreparable, in the absence of a preliminary injunction.

IV.     **THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH DISPOSITIVELY IN FAVOR OF THE SELECT COMMITTEE**

The balance of the equities and the public interest strongly support denial of the requested injunction.  When weighing equities, "the government's interest is the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis omitted).  The D.C. Circuit has recognized a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress." *Exxon Corp. v. FTC*, 589 F.2d 582, 594 (D.C. Cir. 1978).  And the information is sought here pursuant to "Congress's discharge of its primary constitutional responsibilities." *Comm. on the Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 764 (D.C. Cir. 2020) (en banc).

As explained above, Mr. Olsen has not shown that he would suffer any meaningful harm in the absence of a preliminary injunction.  By contrast, the Select Committee's interests in prompt compliance with the subpoena are of the highest order, as has been amply demonstrated during the Select Committee's public hearings over the past three weeks.  *See Barenblatt*, 360 U.S. at 111; *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927) ("[W]here the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it.").

The Select Committee is investigating matters of immense national importance, including any role that Mr. Olsen played in the disinformation campaign that led up to the January 6th attack.  Mr. Olsen complains that, in his view, the Select Committee did not issue the subpoena to him in a "timely" manner (Mem. 23).  But it is not for Mr. Olsen to dictate how the Select Committee's investigation proceeds, and the Committee issued the subpoena to Mr. Olsen after its investigation revealed credible evidence of his role in spreading claims of election fraud and attempting to delay electoral certification.  *See* Am. Compl. Ex. 2.  The Select Committee's

interest in promptly proceeding with its investigation is self-evident, and injunctive relief would hinder and frustrate that ongoing investigation.

The Select Committee's investigation into the attack on January 6th is "a matter of unsurpassed public importance." *Trump v. Thompson*, 20 F.4th at 23, 41.  The public interest in permitting the Select Committee to proceed with its investigation thus compels rejection of Mr. Olsen's Motion.

## CONCLUSION

For the reasons set forth above, Mr. Olsen's Motion for a Preliminary Injunction should be denied and the Amended Complaint should be dismissed in its entirety with prejudice.

Respectfully submitted,

/s/ *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

Dated:  June 28, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on June 28, 2022, I caused the foregoing document to be filed via

the CM/ECF system for the U.S. District Court for the District of Columbia, which I understand

caused a copy to be served on all registered parties.


*/s/ Douglas N. Letter*
Douglas N. Letter